## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

| | |
|---|---|
| WILLIAM S. MONTGOMERY, JR., ) | |
| INDIVIDUALLY AND ON BEHALF OF ) | |
| ALL OTHERS SIMILARLY SITUATED; ) | |
| ) | |
| Plaintiff. ) | |
| ) | |
| v. ) | Civil Action No: 00-14284 |
| ) | Roettger/Lynch |
| THE NEW PIPER AIRCRAFT, INC., AND ) | |
| TEXTRON, INC. d/b/a ) | |
| TEXTRON LYCOMING; ) | |
| ) | |
| Defendants. ) | |

### NEW PIPER'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant. The New Piper Aircraft, Inc., ("New Piper"), under Rule 56 of the Federal Rules of Civil Procedure, and respectfully requests that the Court grant its summary judgment motion.

As discussed in the accompanying Memorandum of Law, this "square peg" of a case fails as a matter of law because **(1)** Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") does not apply to non-Floridians undertaking foreign, non-Florida transactions; **(2)** Plaintiff patently fails to satisfy FDUTPA's "reasonable consumer" standard, due to the fact that before Montgomery purchased the Mirage, he believed the Mirage fleet suffered endemic engine problems due to "either systemic improper manufacturing procedures or a fundamentally flawed design"; and **(3)** he has not suffered any damages.

Therefore, New Piper's summary judgment motion should be granted.



**WHEREFORE**, New Piper respectfully requests that the Court grant its Summary

Motion, in its entirety.

Dated: May 24, 2001                    Respectfully submitted,

DOMBROFF & GILMORE, P.C.
Elizabeth Lim, Esq.
Florida Bar No. 129755
1700 Miami Center
201 S. Biscayne Blvd.
Miami, Florida 331313
(305) 670-4843
Fax no. (305) 670-4846
email: elim@dglitigators.com

DOMBROFF & GILMORE, P.C.
Mark A. Dombroff, Esq.
Courtney R. Bateman, Esq.
1025 Thomas Jefferson St., N.W.
Suite 300-West Lobby
Washington, D.C. 20007
(202) 965-6100
Fax No. (202) 625-3150
email: cbateman@dglitigators.com

**COUNSEL FOR DEFENDANT NEW PIPER
AIRCRAFT, INC.**

781720

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

| | |
|---|---|
| WILLIAM S. MONTGOMERY, JR., ) | |
| INDIVIDUALLY AND ON BEHALF OF ) | |
| ALL OTHERS SIMILARLY SITUATED; ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No: 00-14284 |
| ) | Roettger/Lynch |
| THE NEW PIPER AIRCRAFT, INC., AND ) | |
| TEXTRON, INC. d/b/a ) | |
| TEXTRON LYCOMING; ) | |
| ) | |
|     Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF NEW PIPER'S MOTION
FOR SUMMARY JUDGMENT**

DOMBROFF & GILMORE, P.C.
Elizabeth Lim, Esq.
Florida Bar No.: 129755
1700 Miami Center
201 S. Biscayne Blvd.
Miami, Florida 331313
(305) 341-3145
Fax no. (305) 670-4846
email: elim@dglitigators.com

DOMBROFF & GILMORE, P.C.
Mark A. Dombroff, Esq.
Courtney R. Bateman, Esq.
1025 Thomas Jefferson St., N.W.
Suite 300-West Lobby
Washington, D.C. 20007
(202) 965-6100
Fax No. (202) 625-3150
email: cbateman@dglitigators.com

## TABLE OF CONTENTS

I     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II    **STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    **New Piper's Malibu Mirage** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    **William Montgomery's Extensive Mirage History** . . . . . . . . . . . . . . . . . . . . . 2

III    **ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    **Summary Judgment Standard** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    **Plaintiff Cannot Recover Because FDUTPA Does Not Apply to Non-Florida Consumers Undertaking Out-of-State Transactions** . . . . . . . . . 5

    C.    **Montgomery Cannot Recover Because He Fails FDUTPA's Reasonable Consumer Test** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    **Montgomery Cannot Recover Under FDUTPA Because He Has Not Been Damaged** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF AUTHORITIES

**Cases**

Coastal Physician Svcs. V. Ortiz, 764 So. 2d 7 (Fla. Ct. App., 4th Dist. 1999) . . . . . . . . . . . . . . 5

Davich v. Norman Bros. Nissan, Inc., 739 So. 2d 138 (Fla. Ct. App., 5th Dist. 1999)
     reh'g denied, 760 So. 2d 947 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Delgado v. J.W. Courtesy Pontiac, 693 So. 2d 602 (Fla. Ct. App., 2d Dist. 1997) . . . . . . . . . . 5, 6

Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.,
     No. 96-8532-CIV, 1999 U.S. Dist. LEXIS 22434  (S.D. Fla. January 20, 1999) . . . . . . . . . 4, 5, 9

Himes v. Brown & Company Securities Corporation, 518 So. 2d 937
     (Fla. Ct. App., 3d Dist. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re: Crown Auto Dealerships, Inc., 187 B.R. 1009 (M.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . 9

Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General,
     761 So. 2d 1256 (Fla. Ct. App., 3rd Dist. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6, 7

Oce Printing Systems USA, Inc. v. Mailer Data Servs., Inc.,
     760 So. 2d 1037, 1042 (Fla. Ct. App., 2d Dist. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Southwest Sunsites, Inc. v. Federal Trade Commission,
     785 F. 2d 1431 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Statutes and Rules**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Exhibits**

Exhibit 1, February 24, 2000 Letter from William S. Montgomery
     to John S. Mastern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 7, 8

Exhibit 2, Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7, 9

Exhibit 3, Undisputed Material Facts in Support of
     Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 4, Molly Martin Pearce Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 5, Deposition of William S. Montgomery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 6, Montgomery Deposition Transcript 4:19 - 5:23; 8:15 - 8:17 . . . . . . . . . . . . . . . . . 2, 6

Exhibit 7, Montgomery Deposition Transcript 60:24 - 61:1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 8, Montgomery Deposition Transcript 76:3 - 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 7

Exhibit 9, Montgomery Deposition Transcript 227 - 229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 10, Montgomery Deposition Transcript 71:18 - 73:1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 11, Security Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

Exhibit 12, Montgomery Deposition Transcript 106:3 - 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 13, Security Agreement at WSM 01342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 14, Montgomery Deposition Transcript 106:10 - 13; 176:14 - 19 . . . . . . . . . . . . . . 4, 8, 9

Exhibit 15, Montgomery Deposition Transcript 122:7 - 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

Exhibit 16, Montgomery Deposition Transcript 120:15 - 24; 149:17 - 25; 150:1 - 4 . . . . . . . . 4, 8

Exhibit 17, Montgomery Deposition Transcript 242:23 - 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

Exhibit 18, Montgomery Deposition Transcript 178:3 - 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

Exhibit 19, Montgomery Deposition Transcript 133:2 - 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhibit 20, Montgomery Deposition Transcript 132:25 - 134:7 . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Defendant, The New Piper Aircraft, Inc. ("New Piper"), by and through its attorneys,

under Rule 56 of the Federal Rules of Civil Procedure, respectfully requests that the Court grant

its summary judgment motion.

## I. INTRODUCTION

In this misguided cause of action, Plaintiff, a Texas citizen, who purchased stock in a

Texas corporation, in Texas, in order to obtain an ownership interest in a Malibu Mirage

hangared in Texas, is attempting to recover under Florida's Deceptive and Unfair Trade Practices

Act ("FDUTPA") when (1) FDUTPA does not apply to non-Floridians undertaking foreign, non-

Florida transactions; (2) he patently fails to satisfy FDUTPA's "reasonable consumer" standard;

and (3) he has not suffered any damages.

Underpinning Plaintiff's FDUTPA "claim" is the assertion that New Piper misrepresented

the longevity and reliability of the Mirage's Textron Lycoming-designed TIO-540-AE2A engine,

including statements that the Mirage offered a 2000 hour "TBO." [1] Am. Complaint at ¶ 8; 19.

However, Montgomery's "claims" are belied by his own words. Indeed, before he bought the

Mirage, Montgomery believed that: (1) the Mirage fleet suffered endemic engine problems due

to "either systemic improper manufacturing procedures or a fundamentally flawed design" and

(2) that there was an "extraordinary (Mirage engine) failure rate since it appears to have affected

approximately 25% of the aircraft utilizing this (Textron Lycoming AE2A) engine." February

24, 2000 Letter from William S. Montgomery to John S. Mastern, Textron Lycoming, exhibit 1.

---

[1]     "TBO" stands for "Time Between Engine Overhaul." A plane's TBO is similar
to an automobile's suggested mileage before major service, e.g., 100,000 miles before dealer
engine service.

As discussed below, this "square peg" of a case fails as a matter of law. Therefore, New

Piper's summary judgment motion should be granted.[2]

## II. STATEMENT OF FACTS

### A.   New Piper's Malibu Mirage[3]

New Piper manufactures Malibu Mirage aircraft, with Textron Lycoming TIO-540-AE2A

engines, in Vero Beach Florida. See Molly Martin Pearce Affidavit ( "Pearce Aff.") at ¶ 6,

exhibit 4. New Piper distributes Malibu Mirages to independent, regional distributors on an as-

ordered basis. Pearce Affidavit at ¶ 7, exhibit 4.

### B.   William Montgomery's Extensive Malibu Mirage History

Plaintiff is a lifelong Texas citizen. March 1, 2001 Deposition of William S.

Montgomery ("Montgomery Dep. Tr.") 4:19-5:23; 8:15-8:17, exhibit 6.[4]

In May 1998, Plaintiff purchased an ownership interest in his first Piper Malibu Mirage,

registration number 9285W (referred to as the "WOWAM" aircraft or "85 Whiskey").

Montgomery Dep. Tr. at 60:24-61:1, exhibit 7. In January 2000, WOWAM was involved in a

serious accident, a "gear-up landing," due to engine problems. Montgomery Dep. Tr. at 76:3-4,

---

[2]     Plaintiff is attempting to certify a nationwide class under this cause of action. Amended Complaint ("Am. Comp.") at ¶ 17, attached as Exhibit 2.  As demonstrated in New Piper's Opposition to Class Certification papers, Plaintiff's class motion, like his FDUTPA claim, fails as a matter of law.

[3]     Pursuant to Local Rule 7.5, New Piper has included a statement of undisputed material facts in support of its motion for summary judgment, appended as exhibit 3.

[4]     The entire Montgomery Deposition is appended as Exhibit 5.  Cited deposition excerpts are attached as individual exhibits.

2

exhibit 8. Plaintiff believes that the WOWAM crash was caused by a connecting rod failure, which, in turn, led to a catastrophic engine failure. Montgomery Dep. Tr. at 227-229, exhibit 9.

Several months before purchasing his second Mirage, Plaintiff sent a letter to Textron Lycoming asserting that the Mirage fleet suffered endemic engine problems due to "either systemic improper manufacturing procedures or a fundamentally flawed design." See February 24, 2000 Letter from William S. Montgomery to John S. Mastern, Textron Lycoming, exhibit 11 to the March 1, 2001 Deposition of William S. Montgomery, appended here as exhibit 1 (emphasis added). In Montgomery's letter, Plaintiff contended that the Mirage Fleet suffered an "extraordinary failure rate since it appears to have affected approximately 25% of the aircraft utilizing [the Textron Lycoming AE2A] engine." Id., exhibit 1.

Nonetheless, in April 2000, Montgomery purchased a 25% ownership in a second Mirage, registration number N960MA (hereinafter "N960MA" or "0MA"). Montgomery Dep. Tr. at 71:18- 73:1 (delineating Montgomery's purchase of a half-interest of SKB Aviation, Inc. which owns half of 0MA), exhibit 10. The 0MA purchase transaction occurred entirely in Texas; no portion of this transaction occurred in Florida. See Security Agreement between William Montgomery and SKB (the "Security Agreement") (indicating that both parties are Texas entities agreeing to a Texas choice of law provision), exhibit 11.

At the time of purchase, 0MA was valued at $600,000. Montgomery Dep. Tr. 106:3-5, exhibit 12. See also Security Agreement at WSM 01342 (referencing the $600,000 price baseline), exhibit 13. Plaintiff considered 0MA's price tag an "exceptionally good deal" because, at the time of purchase, "there were enough failures and they were widespread enough that

people were beginning to figure out that this airplane had a systemic engine problem."
Montgomery Dep. Tr. 106:10-13; 176:14-19, exhibit 14.

In fact, Plaintiff bought into 0MA because its owners had a history of operating 0MA
under revised engine parameters, due to the engine's shortcomings. See Montgomery Dep. Tr.
122:7-12, exhibit 15. Indeed, Plaintiff was cognizant that 0MA's current owners operated the
plane using procedures and engine temperatures significantly different from those referenced in
the Pilot's Operating Handbook. Montgomery Dep. Tr. 120:15-24; 149:17-25; 150:1-4, exhibit
16. Additionally, at the time of purchase, Montgomery knew that 0MA was experiencing an
increase in fuel burn. Montgomery Dep. Tr. 242:23-25, exhibit 17. Moreover, Montgomery
knew that the 0MA had not realized the 2,000 TBO. Montgomery Dep. Tr. 178:3-178:19 ("**Q.**
And you knew that (0MA) had not made it to the 2,000 TBO when you bought it? **A**. Yes. **Q.**
And you knew all that before you bought the plane? **A.** Yes. **Q.** And you bought it anyway? **A.**
Yes."), exhibit 18.

Interestingly, 0MA is presently for sale at a price of $635,000, or $35,000 above its value
when Montgomery purchased his interest. Montgomery Dep. Tr. 133:2-4, attached as exhibit
19.

## III. ARGUMENT

### A. Summary Judgment Standard

Summary judgment is proper when there are no issues of material fact and the moving
party is entitled to judgment as a matter of law. Eclipse Medical, Inc. v. American Hydro-
Surgical Instruments, Inc., No. 96-8532-CIV, 1999 U.S. Dist. LEXIS 22434, *7 (S.D. Fla.
January 20, 1999) (granting summary judgment to a FDUTPA claim) citing Fed.R.Civ.P. 56(c).

4

In order to defeat a summary judgment motion, the non-moving party may not rely on mere allegations, but instead must raise significant probative evidence sufficient for a jury to find in his favor.   Eclipse Medical, Inc., 1999 U.S. Dist. LEXIS 22434, at * 7.

## B.   Plaintiff Cannot Recover Because FDUTPA Does Not Apply to Non-Florida Consumers Undertaking Out-of-State Transactions

As an initial matter, Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") applies solely to in-state consumers.   See Oce Printing Systems USA, Inc. v. Mailer Data Servs., Inc., 760 So. 2d 1037, 1042 (Fla. Ct. App., 2d Dist. 2000) (holding that only Florida consumers can pursue a valid FDUTPA claim because "[o]ther states can protect their own residents") (citations omitted); Coastal Physician Svcs. v. Ortiz, 764 So. 2d 7, 8 (Fla. Ct. App., 4th Dist. 1999) (FDUTPA's application limited to "in-state consumers").   See also Delgado v. J.W. Courtesy Pontiac, 693 So. 2d 602, 606 (Fla. Ct. App., 2d Dist. 1997) (FDUTPA bestows substantive remedies on Florida citizens); Davich v. Norman Bros. Nissan, Inc., 739 So. 2d 138, 141 (Fla. Ct. App., 5th Dist. 1999) (accord), reh'g denied, 760 So. 2d 947 (Fla. 2000).

A few Florida courts, predominantly in the Third District Court of Appeals, have carved-out a limited exception to FDUTPA's scope by extending FDUTPA to non-Floridians undertaking wholly domestic, i.e., in-state, Florida transactions.   See Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General, 761 So. 2d 1256 (Fla. Ct. App., 3rd Dist. 1999).   However, even if the folly of extending FDUTPA to every United States citizen is accepted, these cases flatly do not stand for the proposition that FDUTPA covers (1) non-Florida transactions (2) undertaken by out-of-state consumers.   See Millennium Communication, 761 So. 2d at 1262 (holding "[a]s we read FDUTPA, it seeks to prohibit unfair,

5

deceptive and/or unconscionable practices which have transpired within the territorial boundaries of (Florida) . . . .") (emphasis added).

Further, extending FDUTPA to out-of-state residents, conducting non-Florida transactions, would result in absurd consequences. For example, under Plaintiff's read of FDUTPA, a Maine resident, buying a Malibu Mirage in California, from a Nebraska dealer, after receiving marketing materials in Hawaii, would have a cause of action under Florida's consumer protection laws- simply because the manufacturer of the plane, New Piper, conducts business in Florida. In other words, under the analysis Plaintiff must advocate, and has the burden to prove, FDUTPA applies to all United States residents undertaking non-Florida transactions, as long as the defendant conducts business in Florida- an ill-founded conclusion, and certainly not what the Florida Legislature intended when enacting FDUTPA. See Delgado, 693 So. 2d at 606 (FDUTPA bestows substantive remedies on citizens of the state of Florida).

Plaintiff is a lifelong Texas citizen. Montgomery Dep. Tr. 4:19-5:23; 8:15-8:17, exhibit 6. Plaintiff's purchase of 0MA was entirely transacted outside of Florida. See Security Agreement between William Montgomery and SKB (the "Security Agreement") (indicating that the 0MA Security Agreement was executed by two Texas entities who agreed to a Texas choice of law provision), exhibit 11.

Therefore, Plaintiff cannot recover under FDUTPA.

## C.   Montgomery Cannot Recover Because He Fails FDUTPA's Reasonable Consumer Test

Even if FDUTPA applies to foreign residents undertaking foreign transactions. Plaintiff still cannot recover, because he fails FDUTPA's reasonable consumer test.

6

In order to recover under FDUTPA, a plaintiff must prove that the alleged misstatements are "likely to mislead the <u>consumer acting reasonably under the circumstances</u>, to the consumer's detriment." <u>Millennium Communications</u>, 761 So. 2d at 1263 (emphasis added), <u>citing</u> <u>Southwest Sunsites, Inc. v. Federal Trade Commission</u>, 785 F. 2d 1431 (9th Cir. 1986).

The gravamen of Plaintiff's complaint is that New Piper misrepresented the longevity and reliability of the Mirage's TIO-540-AE2A engine, including misrepresenting that the Mirage had a 2000 hour TBO. Am. Complaint at ¶¶ 8; 19. Even assuming the veracity of Plaintiff's allegations, which New Piper vigorously denies, Plaintiff still cannot recover under FDUTPA because he cannot prove that New Piper's advertising/marketing materials were likely to mislead him acting reasonably under the circumstances. <u>See Millennium Communications</u>, 761 So. 2d at 1263. That is, Montgomery's vast personal history with the Mirage precludes his assertion that he acted reasonably, vis-a-vis New Piper's advertising and marketing materials, when he purchased his second Mirage- especially considering that the alleged misrepresentations contradicted his extensive personal experience with, and wide-ranging personal knowledge of, the Mirage's alleged engine troubles. <u>See Millennium Communications</u>, 761 So. 2d at 1263.

In this regard, there is a veritable mountain of evidence demonstrating that Montgomery was aware of the AE2A engine's troubles, before he purchased 0MA. For example:

- Montgomery's first plane was involved in a life-threatening accident, due to engine trouble, fewer than four months before buying 0MA. Montgomery Dep. Tr. at 76:3-4, exhibit 8.

- On February 24, 2000, several months <u>before</u> purchasing his second Mirage, Plaintiff wrote a letter to Textron Lycoming asserting that the Mirage fleet suffered endemic engine problems due to "either **systemic** improper manufacturing procedures or a fundamentally flawed design." February 24, 2000 Letter from William S. Montgomery to John S. Mastern, Textron Lycoming, exhibit 1 (emphasis added).

- In the Textron-Lycoming Letter, Plaintiff suggested that there was an "extraordinary (Mirage engine) failure rate since it appears to have affected approximately 25% of the aircraft utilizing this [Textron Lycoming AE2A] engine." Id.

- Plaintiff considered 0MA's price tag an "exceptionally good deal" because, at the time of purchase, "there were enough failures and they were widespread enough that people were beginning to figure out that this airplane had a systemic engine problem." Montgomery Dep. Tr. 106:10-13; 176:14-19, exhibit 14.

- Plaintiff bought into 0MA because its owners had a history of operating 0MA under revised engine parameters, due to the AE2A engine. See Montgomery Dep. Tr. 122:7-12, exhibit 15.

- Plaintiff was cognizant that 0MA's current owners operated the plane using procedures and engine temperatures significantly different from those referenced in the Pilot's Operating Handbook. due to the engine. See Montgomery Dep. Tr. 120:15-24; 149:17-25; 150:1-4, exhibit 16.

- Before purchase, Plaintiff knew that 0MA was experiencing an increase in fuel burn. Montgomery Dep. Tr. 242:23-25 exhibit 17.

- At the time of purchase, Plaintiff knew that the 0MA had not realized the 2,000 TBO. Montgomery Dep. Tr. 178:3-178:19 exhibit 18 ("**Q.** And you knew that (0MA) had not made it to the 2,000 TBO when you bought it? **A.** Yes. **Q.** And you knew all that before you bought the plane? **A.** Yes. **Q.** And you bought it anyway? **A.** Yes.")

In short, Plaintiff believed that the Mirage's engine had potentially catastrophic

shortcomings, but decided to purchase the plane anyway. It is simply not credible that

Montgomery acted as a "reasonable consumer under the circumstances," when his personal

knowledge. experience, and beliefs flatly contradicted the misstatements allegedly contained in

New Piper's advertising/marketing materials.

Therefore, Plaintiff fails the reasonable consumer test, and therefore cannot recover under

FDUTPA.

**D.     Montgomery Cannot Recover Under FDUTPA Because He Has Not Been Damaged**

Proof of damages is required for recovery under FDUTPA. Eclipse Medical, Inc. v.

American Hydro-Surgical Instruments, Inc., No. 96-8532-CIV, 1999 U.S. Dist. LEXIS 22434,

* 58 (S.D. Fla. January 20, 1999) (rejecting FDUTPA claim due to a lack of damages); In re:

Crown Auto Dealerships, Inc., 187 B.R. 1009, 1018 (M.D. Fla. 1995) (holding that damages are

necessary to establish a FDUTPA claim): Himes v. Brown & Company Securities Corporation,

518 So. 2d 937, 938 (Fla. Ct. App., 3d Dist. 1987) (no recovery under FDUTPA where plaintiff

sustained no out-of-pocket losses).  Under FDUTPA, recoverable damages are limited to the

market value diminution caused by the deceptive trade practice. Eclipse Medical, 1999 U.S.

Dist. LEXIS at * 58.

Under FDUTPA, Plaintiff has not been damaged for several reasons. First, Montgomery

has offered no evidence that the market value of 0MA has been negatively impacted. See Am.

Comp. Quite the contrary: less than a year after purchasing 0MA, the plane has been listed to

sell at $635,000; $35,000 dollars more than the value of the plane at the time of purchase- a gain

of almost six percent! Montgomery Dep. Tr. 132: 25- 134:7, exhibit 20. Second, Montgomery

bought the plane with the full knowledge that the plane was selling for below market value due

to engine difficulty. Montgomery Dep. Tr. 106:10-13; 176:14-19, exhibit 14. Therefore, even if

0MA sells at below market value due to New Piper's advertising, Montgomery cannot be

damaged because he purchased the plane at an already discounted cost. In other words, the

"diminished" value of the plane, if any, was absorbed in the 0MA's below-market price at the

time of Montgomery's purchase. By definition, Montgomery cannot "double dip" and recover

9

damages for the plane's diminished sales price, after already capitalizing on 0MA's lowered

value at the time of purchase.

Therefore, Montgomery cannot recover under FDUTPA, because he has not been

damaged under the statute.

## IV. **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment should be

granted.

Dated: May 24, 2001

Respectfully submitted,

DOMBROFF & GILMORE, P.C.
Elizabeth Lim, Esq.
Florida Bar No.: 129755
1700 Miami Center
201 S. Biscayne Blvd.
Miami, Florida 331313
(305) 341-3145
Fax no. (305) 670-4846
email: elim@dglitigators.com

DOMBROFF & GILMORE, P.C.
Mark A. Dombroff, Esq.
Courtney R. Bateman, Esq.
1025 Thomas Jefferson St., N.W.
Suite 300-West Lobby
Washington, D.C. 20007
(202) 965-6100
Fax No. (202) 625-3150
email: cbateman@dglitigators.com

**COUNSEL FOR DEFENDANT NEW PIPER
AIRCRAFT, INC.**

781828

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

| | |
|---|---|
| WILLIAM S. MONTGOMERY, JR., ) | |
| INDIVIDUALLY AND ON BEHALF OF ) | |
| ALL OTHERS SIMILARLY SITUATED; ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No: 00-14284 |
| ) | Roettger/Lynch |
| THE NEW PIPER AIRCRAFT, INC., AND ) | |
| TEXTRON, INC. d/b/a ) | |
| TEXTRON LYCOMING; ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING NEW PIPER'S MOTION FOR SUMMARY JUDGMENT**

THIS CAUSE, having come before the Court upon the Motion filed herein, and after

having duly reviewed the pleadings, it is hereby

ORDERED AND ADJUDGED as follows:

New Piper's Motion is GRANTED. The Court hereby enters summary judgment in favor

of defendant New Piper.

DONE AND ORDERED this ___ day of _____, 2001.

                                                       NORMAN C. ROETTGER
                                                       District Court Judge

781725

## CERTIFICATE OF SERVICE

I hereby certify that a copy of New Piper's Motion for Summary Judgment, along with

the proposed order and memorandum, was sent via first class mail on this the 24th day of May,

2001, as indicated on the attached Service List.

By:

Elizabeth Lim, Esq.
Florida Bar No.: 129755

## MONTGOMERY SERVICE LIST

Michael J. Pucillo, Esq.
R. Scott Palmer, Esq.
Manuel J. Dominguez, Esq.
**BURT & PUCILLO, LLP**
Northbridge Centre, Suite 1701
515 North Flagler Drive
West Palm Beach, Florida 33401
Telephone: (561) 835-9400
Facsimile: (561) 835-0322
**COUNSEL FOR PLAINTIFF**

Fred Misko, Jr., Esq.
Charles A. Ames, Esq.
**FRED MISKO, JR., P.C.**
3811 Turtle Creek Blvd., 19th Floor
Dallas, Texas 75219
Telephone: (214) 443-8000
Facsimile: (214) 443-8010
**COUNSEL FOR PLAINTIFF**

William Whitehurst, Jr., Esq.
Tom Harkness, Esq.
**WHITEHURST, HARKNESS, OZMUN & ARCHULETA**
24th Floor, Westgate Building
12th and Lavaca Street
Austin, Texas 78701
Telephone:    (512)476-4346
Facsimile:    (512)476-4400
**COUNSEL FOR PLAINTIFF**

R. Michael McCauley, Esq.
**McCAULEY, MacDONALD, DEVIN & HUDDLESTON**
1201 Elm Street, 3800 Renaissance Tower
Dallas, Texas 75270
Telephone:    (214)651-3301
Facsimile:    (214)747-0942
**COUNSEL FOR PLAINTIFF**

James L. Branton, Esq.
**BRANTON & HALL**
1 Riverside Place
700 North St. Mary's Street
San Antonio, Texas 78205
Telephone:    (210)224-4474
Facsimile:    (210)224-1928
**COUNSEL FOR PLAINTIFF**

Benjamine Reid, Esq.
Joseph Ianno, Jr., Esq.
**CARLTON, FIELDS,WARD, EMMANUEL
SMITH & CUTLER, P.A.**
4000 International Place
100 S.E. Second Street
Miami, Florida 33131
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
**COUNSEL FOR AVCO CORP.
(incorrectly named in the Amended Complaint
as Textron, Inc., d/b/a Textron Lycoming)**

WILLIAM S. MONTGOMERY JR.
3500 MAPLE AVENUE, SUITE 1470
DALLAS, TEXAS 75219

Mr. John S. Masten
Textron-Lycoming
625 Oliver Street
Williamsport, PA  17701

February 24, 2000

RE: 1997 Malibu Mirage N9285W
OWNER: Wowam LLC

Dear Mr. Masten,

As you are aware this aircraft suffered a catastrophic engine failure on January 2,
2000 at approximately 1:30 AM MDT at an altitude of 14,000' in IFR conditions. The pilot,
Mr. John Vann is a member and 50% owner of Wowam LLC, the owner of the aircraft. He
declared an emergency to ATC and was able to complete an emergency landing just short of
the Bullhead City airport. The FAA and the NTSB were called in sometime during the next
24 hours. The FAA "tagged" the engine. The aircraft was then moved from the side of the
runway to a hanger to await further inspection by Textron-Lycoming, The New Piper
Aircraft (hereinafter "Piper"), AIG, the insurance company for the aircraft and myself

At the time of the accident the aircraft was 2 ½ years old and had 857 hours total
time on both the airframe and engine. Recommended Factory TBO on this model of the
Lycoming 540 engine is 2000 hours.

The engine was inspected on February 10th, 2000 at the facilities of Lynn's Aircraft
Engines, Inc., an engine overhauler located in Mohave Valley, Arizona. Among those
present were representatives from the FAA, NTSB, AIG Insurance, Textron-Lycoming, and
Piper. The examination revealed that the # 5 connecting rod was in five pieces. The
crankcase was also cracked in two places. The metallurgical analysis of these parts is
scheduled to be performed at Seal Labs in El Segundo, California on March 7th, 2000. Your
representative at the teardown, Mr. Charles Ward, agreed that the connecting rod failed due
to fatigue. There were no prior indications of metal in the engine oil. We followed the
factory recommended oil change and analysis by an authorized Piper maintenance facility.

We believe that the evidence clearly indicates that this was a premature
catastrophic engine failure due to either systemic improper manufacturing procedures or a
fundamentally flawed design. It is our understanding that at a recent Piper Distributor
meeting Mr. Mike Wolf of Textron-Lycoming informed those present that there have been
more than 40 failures of this engine in the Malibu Mirage since 1996, and that these failures
occurred between 300 and 800 hours of engine time. He also stated that Textron-Lycoming

214.521.5881                    MM9285W@SWBELL.COM              FACSIMILE 214.521.5889

was working on a "fix" for this problem. This is an extraordinary failure rate since it appears to have affected approximately 25% of the aircraft utilizing this engine. We have reason to believe that Piper and Textron-Lycoming were made aware of this problem prior to 1997 in writing and continued to manufacture and sell these aircraft with these engines regardless.

The aircraft was heavily damaged. Initial repair estimates range between $165,730 and $212,385, not including the engine or propeller. Some of the parts necessary to rebuild the aircraft are made to order by Piper and could take many months to obtain. We are very concerned that the integrity of the pressure vessel of this aircraft can be successfully repaired or maintained. Our insurance carrier insists that the insurance coverage does not cover the loss of the engine or the substantial diminution in value of our aircraft. Before purchasing the Mirage, we considered options of pre-owned aircraft, and rejected not only aircraft with Damage History, but also all pre-owned aircraft, because we wanted the added integrity that supposedly comes with a new plane. We wanted the "state of the art" full IFR certified single piston engine aircraft. We do not want to own a damaged aircraft under any circumstances. For this luxury we paid a premium and you and Piper were beneficiaries of this "Premium". It is our opinion that not only Textron-Lycoming but also Piper have responsibility for the losses that we have incurred.

We therefore are placing you on notice that we expect a speedy resolution of this matter. We will settle our claim in exchange for a new (1999 or 2000 model) Malibu Mirage. We understand that Piper can make a new aircraft available within the next thirty days. We will "trade titles" and you may dispose of the remains of our old aircraft as you see fit.

We have been most patient and cooperative up to this point. You have had almost two months to wait for teardown and inspections. Now that the cause is known, there is no reason not to expedite the conclusion of this matter, and get us in the air again. Should you not resolve this situation quickly, we intend to prosecute this matter to the fullest extent of the law, including loss of use expenses, replacement transportation costs, and any applicable punitive damages.

Sincerely,

W.S. Montgomery
Manager, Wowam LLC

TRANSMISSION VERIFICATION REPORT

```
TIME  : 03/01/2000 16:33
NAME  : AIR SAFETY & RECORDS
FAX   : 5617700344
TEL   : 5615674361
```

```
DATE.TIME              03/01 16:31
FAX NO./NAME           19733790923
DURATION               00:02:16
PAGE(S)                06
RESULT                 OK
MODE                   STANDARD
                       ECM
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-14284-CIV-ROETTGER/LYNCH

| | |
|---|---|
| WILLIAM S. MONTGOMERY, JR., | § |
| INDIVIDUALLY AND ON BEHALF OF | § |
| ALL OTHERS SIMILARLY SITUATED | § |
| | § |
| **Plaintiff,** | § |
| | § |
| v. | § |
| | § |
| THE NEW PIPER AIRCRAFT, INC. AND | § |
| TEXTRON, INC. d/b/a | § |
| TEXTRON LYCOMING | § |
| | § |
| **Defendants.** | § |

**JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff William S. Montgomery Jr., through his undersigned attorneys, alleges the following:

## PARTIES

1.      Plaintiff William S. Montgomery, Jr. ("Plaintiff" or "Montgomery") is a resident of Dallas County, Texas.

2.      Defendant The New Piper Aircraft, Inc. (*New Piper*) is a Delaware corporation with its principal place of business in Vero Beach, Florida, in Indian River County.

3.      Defendant Textron, Inc. d/b/a Textron Lycoming (*Textron Lycoming*) is a Delaware corporation with its principal place of business in Williamsport, Pennsylvania.

## JURISDICTION AND VENUE

4.      This court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the Plaintiff and the defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.   Venue is proper in this court under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTS

5.      In approximately 1987, Piper Aircraft Corporation (*Old Piper*) together with Textron Lycoming designed the Malibu Mirage aircraft equipped with the TIO-540-AE2A engine (*AE2A*). Textron Lycoming has produced, remanufactured and overhauled AE2A engines and parts continuously since 1987. On July 1, 1991, Old Piper filed for bankruptcy, and on July 11, 1995, The New Piper Aircraft, Inc., emerged as the new manufacturer of the Malibu Mirage airplane equipped with the original design Textron Lycoming AE2A engine.   No claims are made in this lawsuit against Old Piper.  Claims are made against New Piper for its tortious acts committed since July 11, 1995 to present.

6.      Plaintiff's claims and class claims made in this lawsuit arise out of New Piper and Textron Lycoming's design, manufacture, marketing and/or aftermarket support of the Malibu Mirage aircraft equipped with the AE2A engine.  Plaintiff alleges that Textron Lycoming sold, remanufactured and overhauled AE2A engines for more than 465 Malibu Mirage aircraft from 1987 to the present.  New Piper has manufactured, sold and supported approximately 270 Malibu Mirage airplanes equipped with the AE2A engine since July 11, 1995.  New Piper has provided airframe parts and product support to the airplanes manufactured by Old Piper including engines remanufactured and overhauled since July 11, 1995.

7.     Williams S. Montgomery, Jr. became an owner in a Malibu Mirage aircraft in April, 2000, Registration No. N960MA.

8.     Plaintiff Montgomery became an owner of a Malibu Mirage aircraft with the AE2A engine based on New Piper and Textron Lycoming's representations about the safety, reliability and performance characteristics of the aircraft. The engine manufacturer Textron Lycoming, in fact, touted the AE2A engine used in the Malibu Mirage as the "strongest, most reliable six cylinder engine in General Aviation." New Piper and Textron Lycoming specifically represented to all owners that the Malibu Mirage with the AE2A engine had a 2000 hour TBO ("Time Between Overhaul"). To the plaintiff and members of the class, this meant that they could reasonably expect that their aircraft would be able to fly 2000 hours before an overhaul would be necessary.

9.     The actual experience of Malibu Mirage owners has been quite different. A survey polling all former and current registered owners of the Malibu Mirage, totaling nearly 750, has been conducted along with further research of Malibu Mirage accident records as well as FAA accident records. The combined result of 111 aircraft showed that there were 60 in-flight engine failures, 66 premature engine overhauls, 46 instances of metal in the oil, and 32 replaced engines. In summary, Malibu Mirage owners have consistently experienced premature failures that require engine overhaul or replacement at one-third service life or less. This has resulted in excessive aircraft maintenance and operating costs of 3 to 4 times that represented by the defendants.

10.    For example, a purchaser of a Mirage aircraft with an AE2A engine discovered bearing metal in the engine oil in its aircraft after only 324.5 accumulated hours. The airplane was down for seven weeks for engine change. Even though the engine had failed at approximately 15%

FIRST AMENDED CLASS ACTION COMPLAINT - PAGE 3

of its published life, Textron Lycoming adamantly refused to install a new engine in the aircraft. The owner was forced by Textron Lycoming to settle for a remanufactured engine with used parts.

11.     Clearly, New Piper and Textron Lycoming have known for several years of excessive major component failure in the Malibu Mirage AE2A engine due to defects in the engine's main bearings and rod bearings. The AE2A engine in the Mirage uses connecting rods that attach to the crankshaft of the engine; these rods are separated by a rod bearing. The rod bearing includes a leaded alloy. Due to the excessive heat and vibration generated by the engine, the leaded alloy delaminates, allowing the unprotected connecting rod to pound against the crankshaft until either the rod breaks or causes permanent internal damage to the engine. New Piper and Textron Lycoming, in fact, has been warned by component suppliers of the excessive failure rate and resulting safety of fight conditions created by this defect. Despite repeated warnings by suppliers, distributors, and repair service centers, as well as numerous consumer complaints, New Piper and Textron Lycoming continued to put the Malibu into the stream of commerce.

12.     In May 2000, in a half-hearted attempt to address the increasing number of Malibu Mirage engine failures, New Piper issued Vendor Service Publication 124. In the publication, New Piper notified owners that Textron Lycoming had identified abnormal crankshaft wear in the AE2A engine as shown by the presence of metal particles in the suction screen. While New Piper and Textron Lycoming offered to replace bearings on a limited basis, the publication failed to warn owners of the danger of in-flight failure; it did not propose to pay for all expenses related to the engine problem; and it did not address the lessened market value for the planes that would inevitably result from the issuance of such a publication.

13.      As further evidence of defendants' knowledge of the defective engine, Textron
Lycoming published SSP-400 during the spring of this year which included revised "Operating
Recommendations" for the Malibu Mirage's AE2A engine.   Even with the reduced power settings
in defendant's recommendations, owners still cannot expect to achieve the 2000 hour TBO
represented by New Piper and Textron Lycoming as the engine's average service life.

14.      On August 31, 2000, in what amounts to a clear admission that its AE2A engines are
unsafe and prone to failure because of manufacturing defects, Textron Lycoming issued Special
Advisory No. 59-800 in which the company advised Malibu Mirage owners of the danger of engine
failure on the AE2A engine due to delamination of the connecting rod bearings, even on low time
AE2A engines.   Textron Lycoming notified owners that it would be instituting "a mandatory
replacement program to equip the subject engines with connecting rod bearings with increased
durability." Until the engines have been "upgraded," Textron Lycoming requires that owners change
their oil and filter every 10 hours, rather than the 50 hours originally required, and that owners
perform a mandatory filter and suction screen inspection by removing the paper filter and examining
its folds for metal particles produced by the delaminating rod bearings. As a result of this mandatory
replacement and oil change program, many owners have effectively lost the use of their aircraft.

15.      Therefore, Malibu Mirage owners have suffered economic damage resulting from
engine failure, premature overhaul and inability to meet published performance specifications.
Specifically, as a result of the high engine component failure rate, owners of the Malibu Mirage have
suffered:

- excessive maintenance costs;
- increased operating costs;

- ● premature engine overhaul or replacement costs;

- ● excessive loss of use and downtime from the extended time periods required for

aircraft maintenance;

- ● the costs of alternative travel;

- ● loss of use of hangar time and cost of insurance for the aircraft;

- ● loss of use of a substantial investment; and

- ● loss of resale value in their aircraft.

In total, the damages suffered by the class are in excess of $75 million.

## CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action as a class action on behalf of itself individually and all

other persons similarly situated, subject to the entry of an order certifying this case as a class action

under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

### Proposed Class:

17.    Specifically, plaintiff seeks certification of the following class:

> **All current and former owners of Malibu Mirage Airplanes
> equipped with Lycoming TIO-540-AE2A engines during the
> period from 1987 through the present; excluding, however, any
> claims against The New Piper Aircraft, Inc., for any product
> manufactured or sold by Piper Aircraft Corporation prior to
> July 11, 1995. Also excluded from the class are the defendants,
> each of their parents, subsidiaries, authorized distributors and
> affiliates, any person controlled by any excluded person, and the
> legal representatives, heirs, successors and assigns of any
> excluded person.**

18.    The proposed class specifically excludes claims for wrongful death, personal injury,

and any damage to the aircraft airframe resulting from engine failure.

**Class Claims:**

# FIRST CAUSE OF ACTION

## Violations of the Florida Deceptive and Unfair Trade Practices Act

19.     Plaintiff, on behalf of the class, brings claims for violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201 *et seq* (West 2000). As explained above, New Piper and Textron Lycoming represented through advertising and marketing materials that the Mirage was a safe and reliable aircraft that, among other things, would achieve a 2000 hour TBO. Further, New Piper and Textron Lycoming made representations about the plane's performance capabilities as well as the expected maintenance, fuel and other ownership costs for the plane. New Piper and Textron Lycoming made these representations with the intention that the consuming public rely on them in purchasing the aircraft. These representations were false and constitute an unconscionable or unfair or deceptive act or practice in the conduct of any trade or commerce, in violation of Fla. Stat. § 501.204. As a result of these representations, Plaintiff and class members have suffered damages.

20.     Application of the Florida Deceptive and Unfair Trade Practices Act to New Piper and to Textron Lycoming is appropriate and fair under the Due Process Clause of the United States Constitution and under applicable choice-of-law standards because there are multiple significant contacts between Florida and the claims alleged in this lawsuit, including:

> a.     Defendant New Piper has its principal place of business in Vero Beach, Florida.
>
> b.     Defendant Textron Lycoming participated in the design of the Malibu Mirage aircraft with the Textron Lycoming AE2A engine in the State of Florida.
>
> c.     Defendant New Piper manufactured the Malibu Mirage aircraft with the Textron Lycoming AE2A engine in the State of Florida.

d.    Defendant Textron Lycoming provided New Piper its AE2A engine to be installed in the New Piper Malibu Mirage airframe in the State of Florida.

e.    Defendant Textron Lycoming and Defendant New Piper represented to consumers who purchased the Malibu Mirage in the State of Florida that the AE2A engine was a safe and reliable engine.

f.    Defendant Textron Lycoming and Defendant New Piper represented to consumers who purchased the Malibu Mirage aircraft in the State of Florida that the AE2A engine had a 2000 hour TBO.

g.    Defendant New Piper disseminated marketing materials for the Malibu Mirage aircraft from its headquarters in Vero Beach, Florida. New Piper made at least the following representations to consumers about its Malibu Mirage aircraft:

-    That the Malibu Mirage equipped with the AE2A engine was a safe aircraft;

-    That the Malibu Mirage equipped with the AE2A engine was a reliable aircraft;

-    That the Malibu Mirage's AE2A engine had a 2000 hour TBO ("Time Between Overhaul").

h.    Defendant Textron Lycoming prepared and printed its AE2A operating instructions manual for New Piper to include with the operating instructions for the Mirage aircraft and for use in training pilots in the State of Florida.

i.    Defendant New Piper delivered the Malibu Mirage aircraft to consumers at its headquarters and conducted flight checkouts in Vero Beach, Florida.

j.    Defendant New Piper flight-trained consumers on operation of the Malibu Mirage aircraft through its approved flight schools in the State of Florida.

k.    Defendant New Piper and Defendant Textron Lycoming conspired together in the State of Florida to conceal and deny the defects and safety of flight issues with the Malibu Mirage.

For these reasons, application of the Florida Deceptive and Unfair Trade Practices Act to the conduct

of New Piper and Textron Lycoming on behalf of a nationwide class is warranted.

## The Proposed Class Meets the Requirements for Class Certification:

21.    **Numerosity**:        The proposed class, which consists of approximately 1200 present and previous owners, is so numerous that joinder of all members is impracticable.

22.    **Commonality**:        There are questions of law and fact which are common to the class, specifically including (1) whether defendants committed deceptive and unfair trade practices under the Florida Deceptive and Unfair Trade Practices Act by making false representations about the Malibu Mirage aircraft and by concealing the defects in the aircraft, as alleged above.

23.    **Typicality**:    Plaintiff's claims are typical of those of the class.    The Plaintiff alleges the same injuries due to defendants' conduct: increased operation costs and decreased market value for the aircraft. The Plaintiff has the same interest in recovering damages, included diminution in market value of their aircraft, from the responsible parties.

24.    **Adequacy**:    Plaintiff will fairly and adequately represent and protect the interests of the class members, and plaintiff has no interest antagonistic to those of the class.  Furthermore, Plaintiff has retained counsel who are competent, experienced and committed.

25.    **Class Action under Rule 23(b)(3) -- Predominance and Superiority:** The common issues outlined above predominate over any individual issues in the case and will be the focus of this litigation. Furthermore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons: (i) it is economically impracticable for class members to prosecute individual actions; (ii) Plaintiff is aware of no other litigation concerning this controversy already commenced by class members; (iii) it is desirable to concentrate these claims in a single forum because no member of the class has sustained damages sufficient to warrant

litigation of the claims separately; (iv) there are no difficulties likely to be encountered in the management of a class action.

**Prayer for Relief**:

26.     Plaintiff, on behalf of himself and on behalf of the class, prays for judgment and for relief on all causes of action as is appropriate, including:

A.     An order certifying that the action may be maintained as a class action, that the Plaintiffs are appropriate class representatives, and that their attorneys are class counsel;

B.     Damages in an amount to be proven at trial;

C.     Pre-judgment and post-judgment interest;

D.     Attorneys' fees and costs of this action; and

E.     Such other and further relief as this Court may deem necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

Dated:  October 5, 2000

Respectfully submitted,

**BURT & PUCILLO, LLP**

By:     _____

Michael J. Pucillo
Fla. Bar No. 261033
R. Scott Palmer
Fla. Bar No. 220353
Northbridge Centre, Suite 1701
515 North Flagler Drive
West Palm Beach, Florida 33401
(561) 835-9400 Telephone
(561) 835-0322 Facsimile
Email:  law@burt-pucillo.com

and

**FRED MISKO, JR. P.C.**
Fred Misko, Jr.
State Bar No. 14204000
Charles E. Ames
State Bar No. 00795221
John Volney
State Bar No. 24003118
3811 Turtle Creek Blvd., 19th Floor
Dallas, Texas 75219
(214) 443-8000 Telephone
(214) 443-8010 Facsimile
E-mail:  ames@misko.com

**WHITEHURST, HARKNESS & WATSON**
William Whitehurst, Jr.
Tom Harkness
24th Floor, Westgate Building
12th and Lavaca Street
Austin, TX  78701
(512) 476-4346 Telephone
(512) 476-4400 Facsimile
E-mail:  gaplacek@onr.com

**BRANTON & HALL**
James L. Branton
711 Navarro Street
737 Travis Park Plaza Bldg.
San Antonio, TX  78205-1787
(210) 224-4474 Telephone
(210) 224-1928 Facsimile
E-mail:  jimbranton@branton-hall.com

**McCAULEY, MacDONALD, DEVIN**
 **& HUDDLESTON**
R. Michael McCauley
1201 Elm Street, 3800 Renaissance Tower
Dallas, TX  75270
(214) 651-3301 Telephone
(214) 747-0942 Facsimile
E-mail:  rmm@mmdh.com

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing has been furnished via

Facsimile and Fed Ex to Dumbroff & Gilmore, Counsel for Defendant The New Piper Aircraft, Inc.,

and by Fed Ex to CT Corporation Systems for Defendant Textron, Inc., as indicated on the attached

Service List this 5th day of October, 2000.

R. Scott Palmer

H:\Judy\55142\Complaint-amd

**FIRST AMENDED CLASS ACTION COMPLAINT - PAGE 12**

**Montgomery v. The New Piper Aircraft, Inc., et al.**
**Service List**

Michael J. Pucillo
R. Scott Palmer
Burt & Pucillo, LLP
Northbridge Centre, Suite 1701
515 North Flagler Drive
West Palm Beach, Florida 33401
Tel:   561/835-9400
Fax:   561/835-0322
Email:  law@burt-pucillo.com

[Plaintiff's Counsel]

William Whitehurst, Jr.
Tom Harkness
Whitehurst, Harkness & Watson
24th Floor, Westgate Building
12th and Lavaca Street
Austin, TX  78701
Tel:   512/476-4346
Fax:   512/476-4400
E-mail:  gaplacek@onr.com

[Plaintiff's Counsel]

R. Michael McCauley
McCauley, MacDonald, Devin
& Huddleston
1201 Elm Street, 3800 Renaissance Tower
Dallas, TX  75270
Tel:   214/651-3301
Fax:   214/747-0942
E-mail:  rmm@mmdh.com

[Plaintiff's Counsel]

Textron, Inc.
Registered Agent:
CT Corporation System
1200 S. Pine Island Road
Plantation, FL  33324

Fred Misko, Jr.
Charles E. Ames
John Volney
Fred Misko, Jr. P.C.
3811 Turtle Creek Blvd., 19th Floor
Dallas, Texas 75219
Tel:   214/443-8000
Fax:   214/443-8010
E-mail:  ames@misko.com

[Plaintiff's Counsel]

James L. Branton
Branton & Hall
711 Navarro Street
737 Travis Park Plaza Bldg.
San Antonio, TX  78205-1787
Tel:   210/224-4474
Fax:   210/224-1928
E-mail:  jimbranton@branton-hall.com

[Plaintiff's Counsel]

Mark A. Dombroff, Esq.
Courtney Bateman, Esq.
Dombroff & Gilmore
1025 Thomas Jefferson Street, N.W.
West Lobby, Suite 300
Washington, DC  20007-5201
Tel:   202/965-6100
Fax:   202/625-3150

[Counsel for Def. The New Piper Aircraft. Inc.]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

WILLIAM S. MONTGOMERY, JR.,                )
INDIVIDUALLY AND ON BEHALF OF              )
ALL OTHERS SIMILARLY SITUATED;             )
                                           )
      Plaintiff,                     )
                                           )
v.                                         )   Civil Action No: 00-14284
                                           )   Roettger/Lynch
THE NEW PIPER AIRCRAFT, INC., AND          )
TEXTRON, INC. d/b/a                        )
TEXTRON LYCOMING;                          )
                                           )
      Defendants.                    )
_____)

## NEW PIPER'S STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, The New Piper Aircraft, Inc. ("New Piper"), by and through its attorneys,

under Local Rule 7.5, respectfully submits its statement of undisputed material facts

in support of its motion for summary judgment.

1.  New Piper manufactures Malibu Mirage aircraft, with Textron Lycoming TIO-540-AE2A engines, in Vero Beach Florida. See Molly Martin Pearce Affidavit ("Pearce Aff.") at ¶ 6, exhibit 4.

2.  New Piper distributes Malibu Mirages to independent, regional distributors on an as-ordered basis. Pearce Affidavit at ¶ 7, exhibit 4.

3.  Plaintiff is a lifelong Texas citizen. March 1, 2001 Deposition of William S. Montgomery ("Montgomery Dep. Tr.") 4:19-5:23; 8:15-8:17, exhibit 6.

4.  In May 1998, Plaintiff purchased an ownership interest in a Piper Malibu Mirage, registration number 9285W (referred to as the "WOWAM" aircraft or "85 Whiskey"). Montgomery Dep. Tr. at 60:24-61:1, exhibit 7.

1

5.  In January 2000, WOWAM was involved in a "gear-up landing," due to engine problems. Montgomery Dep. Tr. at 76:3-4, exhibit 8.

6.  Plaintiff believes that the WOWAM crash was caused by a connecting rod failure, which, in turn, led to a catastrophic engine failure. Montgomery Dep. Tr. at 227-229, exhibit 9.

7.  Before purchasing his second Mirage, Plaintiff sent a letter to Textron Lycoming asserting that the Mirage fleet suffered endemic engine problems due to "either systemic improper manufacturing procedures or a fundamentally flawed design." See February 24, 2000 Letter from William S. Montgomery to John S. Mastern, Textron Lycoming, exhibit 11 to the March 1, 2001 Deposition of William S. Montgomery, appended here as exhibit 1.

8.  In Montgomery's letter, Plaintiff contended that the Mirage Fleet suffered an "extraordinary failure rate since it appears to have affected approximately 25% of the aircraft utilizing [the Textron Lycoming AE2A] engine." Id., exhibit 1.

9.  In April 2000, Montgomery purchased a 25% ownership in a second Mirage, registration number N960MA (hereinafter "N960MA" or "0MA"). Montgomery Dep. Tr. at 71:18- 73:1, exhibit 10.

10. The 0MA purchase transaction occurred entirely in Texas; no portion of this transaction occurred in Florida.   See Security Agreement between William Montgomery and SKB (the "Security Agreement") (indicating that both parties are Texas entities agreeing to a Texas choice of law provision), exhibit 11.

11. At the time of purchase, 0MA was valued at $600,000. Montgomery Dep. Tr. 106:3-5, exhibit 12. See also Security Agreement at WSM 01342 (referencing the $600,000 price baseline), exhibit 13.

12. Plaintiff considered 0MA's price tag an "exceptionally good deal" because, at the time of purchase, "there were enough failures and they were widespread enough that people were beginning to figure out that this airplane had a systemic engine problem." Montgomery Dep. Tr. 106:10-13; 176:14-19, exhibit 14.

13. Plaintiff bought into 0MA because its owners had a history of operating 0MA under revised engine parameters. See Montgomery Dep. Tr. 122:7-12, exhibit 15.

14. Plaintiff was cognizant that 0MA's current owners operated the plane using procedures and engine temperatures significantly different from those referenced in the Pilot's Operating Handbook. Montgomery Dep. Tr. 120:15-24; 149:17-25; 150:1-4, exhibit 16.

2

15.     Additionally, at the time of purchase, Montgomery knew that 0MA was experiencing an increase in fuel burn. Montgomery Dep. Tr. 242:23-25, exhibit 17.

16.     Montgomery knew that the 0MA had not realized the 2,000 TBO. Montgomery Dep. Tr. 178:3-178:19 ("**Q.** And you knew that (0MA) had not made it to the 2,000 TBO when you bought it? **A.** Yes. **Q.** And you knew all that before you bought the plane? **A.** Yes. **Q.** And you bought it anyway? **A.** Yes."), exhibit 18.

17.     0MA is presently for sale at a price of $635,000, or $35,000 above its value when Montgomery purchased his interest.   Montgomery Dep. Tr. 133:2-4, attached as exhibit 19.


Dated: May 24, 2001                          Respectfully submitted,

                                             DOMBROFF & GILMORE, P.C.
                                             Elizabeth Lim. Esq.
                                             Florida Bar No.: 129755
                                             1700 Miami Center
                                             201 S. Biscayne Blvd.
                                             Miami, Florida 331313
                                             (305) 341-3145
                                             Fax no. (305) 670-4846
                                             email: elim@dglitigators.com

                                             DOMBROFF & GILMORE, P.C.
                                             Mark A. Dombroff, Esq.
                                             Courtney R. Bateman. Esq.
                                             1025 Thomas Jefferson St., N.W.
                                             Suite 300-West Lobby
                                             Washington, D.C. 20007
                                             (202) 965-6100
                                             Fax No. (202) 625-3150
                                             email: cbateman@dglitigators.com

                                             **COUNSEL FOR DEFENDANT NEW PIPER
                                             AIRCRAFT, INC.**

781733

3

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

WILLIAM S. MONTGOMERY, JR, )
INDIVIDUALLY AND ON BEHALF OF )
ALL OTHERS SIMILARLY SITUATED )
                         )
        Plaintiff,             )    Case No. 00-14284-Civ-Roettger
                         )    Magistrate Judge Lynch
v.                          )
                         )
THE NEW PIPER AIRCRAFT, INC. AND )
TEXTRON, INC. d/b/a/ )
TEXTRON LYCOMING )
                         )
        Defendants.       )

## AFFIDAVIT OF MOLLY MARTIN PEARCE

Molly Martin Pearce being first duly sworn, upon oath deposes and says:

1. My name is Molly Martin Pearce. I am of sound mind, competent to make this affidavit, and hereby testify upon personal knowledge to the following:

2. I am Manager of Dealer Development at The New Piper Aircraft, Inc. ("New Piper"), located at 2926 Piper Drive, Vero Beach, Florida.

3. Prior to becoming Manager of Dealer Development in January of 2001, I was Manager of Marketing Programs at New Piper.

4. I became Manager of Marketing Programs in April 1997.

5. In my capacity as Manager of Marketing Programs and now as Manager of Dealer Development, I have knowledge of New Piper's marketing and advertising materials, New Piper's business relationship with its independent distributors, and ownership records concerning the Malibu Mirage aircraft.

6. New Piper, Vero Beach, manufactures aircraft in Florida.

7. New Piper distributes its aircraft to independent, regional distributors on an as-ordered

basis.

8.   New Piper does not provide training or instruction to its independent, regional distributors regarding Malibu Mirage aircraft sales.

9.   To the best of my knowledge, there has never been a uniform training or "sales pitch" established for the sale of the Malibu Mirage during the proposed class period of 1987 through present.  There is no common authorized "sales pitch" endorsed for use by New Piper.

10.  New Piper does not require that its independent distributors use any standard script or presentation in selling the Malibu Mirage aircraft.

11.  New Piper does not require that its independent distributors use New Piper's marketing and advertising material in selling the Malibu Mirage aircraft.

12.  To the best of my knowledge, New Piper's brochures and marketing materials do not contain the phrase "strongest, most reliable six cylinder engine in General Aviation."

13.  New Piper's Malibu Mirage aircraft are sold in all fifty states and the District of Columbia.

14.  New Piper's Malibu Mirage aircraft are owned by residents of forty-four states and the District of Columbia.

15.  A majority of Malibu Mirage owners are not Florida citizens.

16.  A majority of Malibu Mirage owners purchased their planes outside of Florida.

17.  FURTHER AFFIANT SAYETH NOT.

_____
MOLLY MARTIN PEARCE

SUBSCRIBED AND SWORN to before me, the undersigned Notary Public, this _26_ day of _March_____, 2001.

_____
Notary Public in and for the District of Florida

My Commission Expires: _July 1, 2002_

779371

Patricia G Hervin
My Commission CC851194
Expires July 1. 2003

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                        FORT PIERCE DIVISION
                      CASE NO. 00-14284 Civ-Roettger
 3

 4    WILLIAM S. MONTGOMERY, JR.,
      INDIVIDUALLY AND ON BEHALF OF
 5    ALL OTHERS SIMILARLY SITUATED,

 6                         Plaintiff,

 7    vs.

 8    THE NEW PIPER AIRCRAFT, INC. AND
      TEXTRON, INC. d/b/a TEXTRON LYCOMING,
 9
                      Defendants.
10    _____/

11

12

13

14
                              VOLUME I
15         DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
            TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                            West Palm Beach, Florida
20                          March 1, 2001
                            9:02 a.m. - 12:05 p.m.
21

22

23

24

25
```

Page 2

1   APPEARANCES:
2
    LAW OFFICE OF FRED MISKO, JR.
3   3811 Turtle Creek Boulevard, 19th Floor
    Dallas, Texas  75219
4   Counsel for the Plaintiff
    BY:  CHARLES E. AMES, ESQUIRE
5        FRED MISKO, JR., ESQUIRE
6
    BURT & PUCILLO, LLP
7   515 North Flagler Drive, Suite 1701
    West Palm Beach, Florida  33401
8   Counsel for the Plaintiff
    BY:  MANUEL J. DOMINGUEZ, ESQUIRE
9
10  BRANTON & HALL
    700 N. St. Mary's Street, Suite 1700
11  San Antonio, Texas  78205
    Counsel for the Plaintiff
12  BY:  JIM BRANTON, ESQUIRE
13
    DOMBROFF & GILMORE, P.C.
14  1025 Thomas Jefferson Street, N.W.
    Suite 300, West Lobby
15  Washington, D.C.  20007
    Counsel for New Piper Aircraft, Inc.
16  BY:  COURTNEY R. BATEMAN, ESQUIRE
17
    CARLTON, FIELDS, WARD, EMMANUEL,
18  SMITH & CUTLER, P.A.
    100 S.E. Second Street, Suite 4000
19  Miami, Florida  33131
    Counsel for Avco Corp.
20  BY:  BENJAMINE REID, ESQUIRE
21
    COWLES & THOMPSON
22  901 Main Street, Suite 4000
    Dallas, Texas  75202
23  Co-counsel for Avco Corp.
    BY:  JOHN M. PEASE, ESQUIRE
24       GREG CARBOY, ESQUIRE
25

Page 3

1          INDEX
    WITNESS                        PAGE
2   (VOLUME I)
    WILLIAM S. MONTGOMERY, JR.
3   Direct Examination by Mr. Reid          4
    (VOLUME II)
4   Cross Examination by Mr. Bateman    210
    Redirect Examination by Mr. Reid     244
5   Recross Examination by Mr. Bateman   256
6
7   EXHIBITS FOR IDENTIFICATION         PAGE
    (VOLUME I)
8   Defendant's Exhibit No. 1           40
    Notice of Deposition
9
    Defendant's Exhibit No. 2           70
10  First Amended Class Action Complaint
11  Defendant's Exhibit No. 3           73
    FAA documentation relating to
12
    Defendant's Exhibit No. 4           87
13  Registration for 9285 Whiskey
14
    (VOLUME II)
15
    Defendant's Exhibit No. 5           155
16  Affidavit of W. Montgomery, Jr. 10/30/00
17  Defendant's Exhibit No. 6           158
    Service Instruction 11/5/99
18
    Defendant's Exhibit No. 7           158
19  Service Instruction 1-10/97
20  Defendant's Exhibit No. 8           160
    Service Instruction 5/16/00
21
    Defendant's Exhibit No. 9           162
22  Special Advisory Number 59-800
23  Defendant's Exhibit No. 10          162
    Special Advisory Number 56-500
24
    Defendant's Exhibit No. 11          228
25  Letter to J. Masten from W. Montgomery 2/24/00

Page 4

1          The deposition of WILLIAM S. MONTGOMERY, JR.
2   was taken before me, LISA D. DANFORTH, Registered
3   Professional Reporter, Notary Public, State of Florida
4   at Large, at Burt & Pucillo, LLP, 515 North Flagler
5   Drive, Suite 1701, in the City of West Palm Beach,
6   County of Palm Beach, State of Florida, beginning at
7   the hour of 9:02 a.m., on March 1, 2001, pursuant to
8   Notice filed herein, at the instance of the Defendant
9   in the above-entitled cause pending before the
10  above-named Court.
11          - - - -
12  THEREUPON,
13          WILLIAM S. MONTGOMERY, JR.,
14  being by me first duly sworn to testify the whole
15  truth, as hereinunder certified, testified as follows:
16          THE WITNESS:  I do.
17          DIRECT EXAMINATION
18  BY MR. REID:
19      Q.  Would you tell me your complete name and your
20  address?
21      A.  William S. Montgomery, Jr., 4210 Lorraine
22  Avenue, Dallas, Texas, 75205.
23      Q.  And how long have you lived at that address?
24      A.  Thirteen years.
25      Q.  And who lives there with you?

Page 5

1       A.  My wife and my two children.
2       Q.  Tell me where you lived before you lived
3   there.
4       A.  42 -- Sorry.
5           4520 Southern Avenue, Dallas, Texas, 75205.
6       Q.  For how long?
7       A.  Ten years.
8       Q.  That's 23 years.  Where did you live before
9   that?
10      A.  I've got to think.
11      Q.  Okay.
12      A.  4650 Meadowood, Dallas, Texas.  I think it's
13  75220.
14      Q.  And for how long?
15      A.  Ten years.
16      Q.  We're getting close, I guess.
17          How old are you, by the way?
18      A.  Fifty.
19      Q.  Okay.  So where did you live the prior seven
20  years of your life, if I've counted correctly?
21      A.  11819 Hampsted, Dallas, Texas, 75230.
22      Q.  I take it you were born in Dallas?
23      A.  No.
24          I'm sorry.  Yes, I was.
25      Q.  And tell me what education you have.

2 (Pages 2 to 5)

Page 6

1      A.  I have a Bachelor's Degree.
2      Q.  From where?
3      A.  SMU.
4      Q.  Any advanced degrees?
5      A.  No.
6      Q.  Any other educational study that you've
7   done --
8      A.  Yeah.
9      Q.  -- maybe that didn't result in a degree?
10      A.  Yes.
11      Q.  Tell me what that is.
12      A.  Went to the Graduate School of Business at
13   SMU.
14      Q.  I take it you did not get a degree?
15      A.  No.  I was three hours short.
16      Q.  Any other education?
17      A.  Yes.
18      Q.  Tell me about it.
19      A.  I went to the SMU School of Law for two
20   years.
21      Q.  Anything else?
22      A.  I'm trying to think if a securities license
23   qualifies as school.  I suppose it does.
24      Q.  Okay.  You've had some training to be able to
25   sell securities?

Page 7

1      A.  Yes.
2      Q.  Any other educational programs that you've
3   had that didn't necessarily lead to a degree?
4      A.  No.
5      Q.  Now, the addresses that you gave me I take it
6   were your homes, your permanent addresses?
7      A.  Yeah.
8      Q.  Have you ever had any temporary addresses
9   because of a work assignment or for any other reason?
10   Your college dorm would obviously be an example.
11      A.  Well, I've had lots of those.
12      Q.  Okay.  Sure.  But once you became an adult
13   and finished college and you're working and so forth,
14   have you ever had a second home or residence or
15   address?
16      A.  Yes.
17      Q.  I want to know all of those.  You don't have
18   to be precise about the address, but just tell me where
19   they are, and I'll ask you about them if I want to.
20      A.  We have a house in Fredericksburg, Texas.
21      Q.  That's a vacation home?
22      A.  Yeah.
23      Q.  Any others?
24      A.  We just got a house on a lake.
25      Q.  In Texas?

Page 8

1      A.  Yes.
2      Q.  Okay.  Any others?
3      A.  No.
4      Q.  Have you ever lived anywhere because of
5   business where you were assigned to go and be somewhere
6   for an extended period of time, other than the
7   addresses and places you've told me about?
8      A.  No.  I did -- I forgot about Washington, D.C.
9   I lived there for three years.
10      Q.  And when was that?
11      A.  1973 to 1975, two years, two-and-a-half
12   years.
13      Q.  What did you do while you were there?
14      A.  I owned a photographic business.
15      Q.  It sounds to me like you'd be a citizen of
16   Texas then?
17      A.  Yes.
18      Q.  And is there anything, any paperwork or
19   documents or registrations, that are of any other state
20   besides Texas that you possess?
21      A.  No.
22      Q.  Have you had your deposition taken before?
23      A.  Yes.
24      Q.  How many times?
25      A.  Three, I think.

Page 9

1      Q.  Can you just quickly tell me what those
2   related to?
3      A.  We were involved in an action on a blown up
4   engine on a Cessna 421.
5      Q.  Who's "we"?
6      A.  I had a partner in that airplane.
7      Q.  And when was that?  What was the date of that
8   deposition?
9      A.  1986.
10      Q.  Was there a lawsuit associated with that
11   incident?
12      A.  Yes.
13      Q.  And who was the plaintiff?
14      A.  We were.
15      Q.  Tell me the name of the -- By "we," do you
16   mean the owners of the airplane?
17      A.  Yes.
18      Q.  Tell me the name of the owners.
19      A.  Robert Thompson and myself.
20      Q.  In what form did you hold that ownership?
21      A.  Individually, as partners, as I recall.
22      Q.  And who did you sue?
23      A.  Kitty Hawk Airways and two FBO's.  I don't
24   remember the names of the FBO's.
25      Q.  Where was the suit pending?

3 (Pages 6 to 9)

Page 10

1    A. Dallas.
2    Q. In state court or federal court?
3    A. I don't remember. I think it was state.
4    Q. Was it brought in your name as the plaintiff,
5    one of the plaintiffs?
6    A. Yes.
7    Q. And who was your lawyer?
8    A. Alan Busch.
9    Q. Does he still practice in Dallas?
10   A. Yes.
11   Q. Do you know his firm?
12   A. Alan Busch.
13   Q. Sole practitioner?
14   A. Uh-huh.
15   Q. All right. And was that a claim about some
16   problem with that particular airplane?
17   A. Yes.
18   Q. And just how was it resolved; tried, settled?
19   A. We lost.
20   Q. You tried the case?
21   A. Yes, tried it and lost.
22   Q. You mentioned you were deposed two other
23   times. Tell me about each of those.
24   A. I was deposed for that case three different
25   times.

Page 11

1    Q. Oh, oh, I see. Okay. And --
2    A. I was deposed one other time in -- I've
3    forgotten about this one -- 1989, I believe.
4    Q. And what was that about?
5    A. Patent infringement.
6    Q. What was your role in that case?
7    A. My old firm was being sued by someone for
8    patent interference, so we were the defendants.
9    Q. And what was the name of your firm?
10   A. At that time, it was Bismuth, B-I-S-M-U-T-H,
11   Cartridge Company.
12   Q. And who sued you, or who sued the company?
13   A. A firm called Miniature Die Casting.
14   Q. And where was that pending?
15   A. Dallas.
16   Q. Do you recall who your lawyer was in the case
17   or your company's lawyers?
18   A. David Tannenbaum.
19   Q. Is he in a firm or --
20   A. Yes.
21   Q. What's his firm?
22   A. Vinson & Elkins.
23   Q. In their Dallas office?
24   A. Yeah.
25   Q. Any other depositions that you've given?

Page 12

1    A. Not that I recall.
2    Q. Have you ever been called on to file an
3    affidavit in any proceeding before this case that we're
4    here today for?
5    A. I may have I think in the Trickle -- I mean,
6    the Miniature Die Cast case.
7    Q. Anything else that you can recall?
8    A. No.
9    Q. Aside from the case you've already mentioned,
10   have you ever been the plaintiff in any litigation
11   before, either you or a business that you're associated
12   with?
13   A. No.
14   Q. Have you ever been a defendant in any lawsuit
15   other than -- Well, strike that.
16   Well, I guess your company was a defendant in
17   one of those cases.
18   Have you or any company you've been
19   associated with ever been a defendant in a case?
20   A. Yes.
21   Q. Tell me what case that would have been.
22   A. It was against the securities firm I worked
23   for.
24   Q. And what was the name of that firm?
25   A. Southwest Securities.

Page 13

1    Q. When was that case?
2    A. 1982 or 3.
3    Q. And were you named personally as a defendant?
4    A. No. I believe it was the firm, but I was --
5    It was my client.
6    Q. Your client.
7    This had something to do with trades or
8    something that you had done for that client?
9    A. Yes.
10   Q. Who was your lawyer in that case or your
11   company's lawyer?
12   A. Oh, I don't remember. That's --
13   Q. You don't remember.
14   Where was the case pending?
15   A. Dallas.
16   Q. Do you remember the name of the plaintiff, of
17   your customer, or client?
18   A. Richard Ellis, I believe.
19   Q. A Dallas attorney -- I mean, a Dallas
20   resident?
21   A. Yes.
22   Q. Okay. And was that case ultimately resolved?
23   A. Yes.
24   Q. How was it resolved?
25   A. They settled.

4 (Pages 10 to 13)

Page 14

1    Q. Settled, okay.
2        I have to ask everybody this. Have you ever
3    been charged with a crime?
4    A. No.
5    Q. I'm interested in talking a little bit about
6    what you did to get ready for this deposition.
7        First, tell me with whom you met to prepare
8    for the deposition.
9    A. My attorneys.
10   Q. And which attorney specifically did you meet
11   with?
12   A. Charles Ames.
13   Q. Charles Ames. Anybody else?
14   A. Well, I met with Mr. Misko and Jim on the way
15   in, but...
16   Q. Okay. How much time did you spend then with
17   Mr. Ames preparing for your deposition?
18   A. A couple of days.
19   Q. Full days or --
20   A. Oh, half days.
21   Q. Okay. And where was that meeting, or where
22   were those meetings?
23   A. His office.
24   Q. And when was that, approximately?
25   A. This week.

Page 15

1    Q. Did you look at documents?
2    A. Yes.
3    Q. Give me an idea of the volume of documents
4    that you personally looked at in preparation for the
5    deposition.
6    A. It would take up 100 pages.
7    Q. Now, we've been given about six boxes over
8    here this morning that we'll talk about later. Were
9    those documents that you looked at contained within the
10   six boxes, or do you know?
11   A. I don't know, but I assume they are.
12   Q. Can you give me an idea of the kinds of
13   documents that you looked at?
14   A. Service bulletins, correspondence, surveys,
15   interviews, warranty files.
16   Q. Anything else?
17   A. I think we looked at the POH, the Amended
18   Complaint, logbooks. I think that's it.
19   Q. Do you remember which service bulletins you
20   looked at specifically or what the subject matter of
21   the service bulletins was?
22   A. There were two. I think one of them is 588,
23   and then the one that follows after 588.
24   Q. Issued by whom?
25   A. Textron.

Page 16

1    Q. Okay.
2    A. And Piper.
3    Q. Now, you mention correspondence. What
4    correspondence did you look at?
5    A. Correspondence between Textron and Piper
6    management.
7    Q. Regarding what subject?
8    A. Engines.
9    Q. And you mention surveys. What do you mean by
10   surveys?
11   A. Well, there's the Fisk survey.
12   Q. Tell me what that is.
13   A. A fellow name John Fisk sent out a survey to
14   a number of Mirage and Malibu owners about any engine
15   problems they might have.
16   Q. And do you know who John Fisk -- Is it
17   F-I-S-K?
18   A. I believe so.
19       MR. MISKO: Sisk, S-I-S-K.
20       THE WITNESS: Oh, is it Sisk? Thank you,
21   Fred.
22       I apologize.
23   BY MR. REID:
24   Q. Who is he, if you know?
25   A. As far as I know, he's an aircraft owner that

Page 17

1    has some technical background and was trying to
2    determine if other pilots had had the same problems he
3    had. And he had some theories about how to fix those
4    problems that were -- There was another survey that was
5    done by my law firm.
6    Q. Okay. We'll get to that in a second.
7        Have you ever met Mr. Sisk?
8    A. No.
9    Q. Did you know anything about this survey
10   before you saw it this week in preparation for your
11   deposition?
12   A. Yes.
13   Q. When did you first learn about it?
14   A. Somewhere between six and nine months ago.
15   Q. And how did you come to learn about it?
16   A. Well, I got surveyed.
17   Q. So that was your first -- you just got a
18   survey in the mail?
19   A. I don't know if I got it in the mail or if it
20   was on the MMOPA --
21       M-M-O-P-A is MMOPA.
22       MR. REID: All caps, no periods.
23       THE WITNESS: -- website, and one of my
24   attorneys may have told me about it.
25   BY MR. REID:

Page 18

1    Q. And you filled it out?
2    A. I believe I did.
3    Q. Did you fill out with regard to a particular
4    aircraft?
5    A. Yes.
6    Q. Which aircraft?
7    A. 9285 Whiskey.
8    Q. And is that the aircraft that's the subject
9    of this lawsuit or a different lawsuit?
10   A. Different lawsuit.
11   Q. Okay. Is it fair to call that the WOWAM
12   airplane?
13   A. That would be fair.
14   Q. And you did not fill it out with regard to
15   the subject aircraft at that time?
16   A. No, because I didn't own the subject aircraft
17   at that time.
18   Q. Okay. Let's see. In Florida we don't have
19   seasons, so I can't remember when anything happened.
20   Six to nine months ago. Where are we now?
21   We're in February. So you're talking about spring of
22   last year, approximately, spring of 2000?
23   A. I'd say March.
24   Q. March, okay.
25   A. April, somewhere in there.

Page 19

1    Q. The survey that you looked at, do you know
2    whether or not it's in these boxes?
3    A. I don't know, but I believe it is.
4    Q. Now, you mentioned a second survey, a second
5    survey that you looked at this week in preparation.
6    What survey was that?
7    A. I'm going to call it the Misko survey.
8    Q. Okay. Tell me about when that survey was
9    done.
10   A. I'm going to -- And this is a guess. I'm
11   going to guess June or July of last year.
12   Q. When did you first learn about the Misko
13   survey?
14   A. When they told me about it.
15   Q. And when would that have been?
16   A. I think that was June or July, but I --
17   Q. Had you already retained the firm at that
18   point for this case or for any reason?
19   A. Yes.
20   Q. And when they told you about the survey, had
21   the survey already gone out, or was it discussed with
22   you before it went out?
23   A. I believe all they said was we're going to do
24   our own survey. I don't know that they discussed it
25   with me.

Page 20

1    Q. Had you suggested this idea of a survey
2    yourself?
3    A. No. No.
4    Q. So did you see the survey before it went out
5    or any materials that went out with the survey?
6    A. Well, I don't know exactly when it went out,
7    but all I saw was here is the survey, we're sending it
8    out, so...
9    Q. So you didn't have any input into it?
10   A. No.
11   Q. Did you read it?
12   A. Yes.
13   Q. Now, in addition to questions, did it have
14   any other material that was sent out with this survey?
15   A. I'm not sure if the recommended placard went
16   out at that time, but I think it did.
17   Q. When did you first see the recommended
18   placard?
19   A. At the same time I saw the survey.
20   Q. Who drafted or wrote the information
21   contained on the recommended placard?
22   A. I don't know specifically, but I assume it
23   was the Misko law firm.
24   Q. It was lawyers?
25   A. I believe so.

Page 21

1    Q. Did you have any input at all into the
2    substance of the recommended placard?
3    A. I don't know the answer to that question.
4    Q. Why not?
5    A. Because I don't know if they -- I can't
6    remember if they asked me or not, but there was a great
7    deal of discussion about operating procedures at that
8    time. And I had -- I had my ideas, and I think they
9    were listened to, but...
10   Q. You had these conversations before the survey
11   was sent out and the placard was prepared?
12   A. Yes.
13   Q. And what ideas did you have about recommended
14   operating procedures that differed from those called
15   for by anybody else?
16   A. Well -- And I had gotten this from talking to
17   a number of other owners. The gist of it is that you
18   don't want to operate this engine for more than five
19   minutes at max continuous power. You don't want to let
20   the TIT temperature get above about 1650. And you
21   don't want to let the cylinder head temperatures get
22   above 400.
23   Q. Any other procedures?
24   A. I don't believe so.
25   Q. Were those different from those procedures

6 (Pages 18 to 21)

Page 22

1  recommended by any of the other manufactures involved
2  here?
3     A. Yes.
4     Q. Tell me how each one differed. Five minutes
5  at maximum power.
6     A. The POH and the training that I received in
7  Vero Beach at the factory training facility both
8  recommend -- authorize I think would be the better
9  word -- 42 inches of boost to 18,000 feet. The red
10 line on the TIT, I believe, are 1750, and the red line
11 on the cylinder head temperature is 500.
12    Q. You gave me two different measurements.
13 Can you correlate them; five minutes at maximum power
14 and 42 inches boost at 18,000 feet?
15    A. That would be max continuous power, 42 inches
16 of boost.
17    Q. And how does that compare to five minutes
18 that you're set to start with your new recommendation?
19    A. Well, if you adopt best rate of climb, it
20 would take you 18 minutes to get to 18,000 feet, normal
21 load configuration.
22    Q. Okay.
23    A. So they're saying that you can operate the
24 engine at max continuous power for 18 minutes.
25    Q. Eighteen minutes, okay.

Page 23

1        And how did you arrive at these alternative
2  operating procedures?
3     A. Conversations with a number of mechanics,
4  distributor or two, other operators, instructors.
5     Q. Conversations with instructors?
6     A. Yes.
7     Q. Okay.
8     A. For example, the same engine slightly
9  differently equipped in the Navaho, the POH says
10 maximum continuous power for five minutes.
11    Q. The same Textron Lycoming engine?
12    A. It's the same size in configuration. Just,
13 as I understand it, it has one turbo on it instead of
14 two.
15    Q. Now, the placard that was recommended, did it
16 contain this new criteria that you had developed?
17    A. Well, I wouldn't want to say that I developed
18 it.
19    Q. Recommended?
20    A. Yes.
21    Q. Was there anything else on the placard that
22 you had any input into from these conversations that
23 you had?
24    A. I don't recall. I haven't seen it in a
25 while.

Page 24

1     Q. Okay. Do you have it in any airplanes that
2  you operate? Did you post it?
3     A. No.
4     Q. You didn't? Why not?
5     A. Because I know what it says.
6     Q. That's the only reason you didn't put it --
7     A. That's the only reason.
8     Q. Were there any legal reason that you know of,
9  based on your training as a pilot, why you shouldn't
10 have put it in your airplane?
11    A. No.
12    Q. You read the surveys before they actually
13 went out, you believe?
14    A. What do you mean by that?
15    Q. Did you read --
16    A. Did I read the survey? Did I read the
17 questions of the survey?
18    Q. Yes.
19    A. Yes.
20    Q. Okay. Did you make any suggestions or any
21 changes?
22    A. Not that I recall, no.
23    Q. And to whom did you understand these surveys
24 were going to be sent?
25    A. The fleet.

Page 25

1     Q. And results came back, I assume?
2     A. Yes, I believe so.
3     Q. Do you know how many responses there were?
4     A. I believe over 100.
5     Q. How about on the Sisk survey, do you know how
6  many responses there were to that one?
7     A. I believe there were over 100 in that one,
8  too.
9     Q. Any other surveys that you know of or looked
10 at?
11    A. There was a third survey, and I don't know
12 the name of it or where it came from.
13    Q. You saw it yesterday you mean, or this week
14 when you were preparing?
15    A. Yes.
16    Q. And what was -- Tell me -- Describe it.
17    A. It had no -- It just had columns of
18 information in numbers, engine failures, premature
19 overhauls.
20    Q. And that's all you know about it? Nobody
21 told you where those numbers came from?
22    A. No, I don't know where it came from.
23       MR. CARBOY: Charles, are those documents in
24 those boxes?
25       MR. AMES: Everything's right in there. And

7 (Pages 22 to 25)

Page 26

1   what he just mentioned is a summary of what he's
2   already discussed.
3       MR. REID: Oh, okay. Okay. A summary of the
4   two previous surveys; it's not a third survey?
5       MR. AMES: Right.
6       MR. REID: Okay. Thanks for clearing that
7   up.
8   BY MR. REID:
9       Q. You said that in your preparation you looked
10  at interviews. What were those?
11      A. With some Textron former employees and
12  employees.
13      Q. How many of those were there?
14      A. Four, I think.
15      Q. And can you give me the names of the people?
16      A. Not without looking at them.
17      Q. Are they in the box?
18      A. I believe so.
19      Q. Okay. And do you remember what the gist of
20  those four were? Were they the same subject matters?
21      A. Pretty much.
22      Q. Give me the gist of them.
23      A. The decline in the number of quality control
24  inspectors at the Williamsport plant once Textron took
25  the plant over. The greatly reduced number of

Page 27

1   inspections of various parts prior to assembly of an
2   engine. The removal of a number of measuring devices
3   from that plan. The greatly relaxed QC standards in
4   terms of engine assembly.
5       Q. Anything else?
6       A. No.
7       Q. Okay. You looked at warranty files?
8       A. Yes.
9       Q. What warranty file did you review?
10      A. Oh, there were a bunch of them; I mean, 40
11  or 50.
12      Q. What are these? Describe them to me.
13      A. Warranty claims.
14      Q. Warranty claims made by...
15      A. Either a dealer or an owner.
16      Q. Back to who?
17      A. Back to Piper.
18      Q. To Piper, okay.
19      A. And I say "back to Piper," maybe Lycoming or
20  Textron.
21      Q. Okay. You mentioned you looked at the POH.
22  What was the purpose of looking at the POH?
23      A. Just to review it.
24      Q. You looked at the Amended Complaint, and you
25  looked at logbooks. Whose logbooks?

Page 28

1       A. Mine.
2       Q. Now, are your logbooks kept per individual or
3   per aircraft? Do you know what I mean?
4       A. Yes, I do.
5       Q. Yeah.
6       A. Per FAR's, each of our -- the two airplanes
7   I have an ownership interest in has its own logbooks,
8   and then I have my personal flying logbook.
9       Q. Now, which ones did you look at yesterday?
10      A. I looked at the logbooks for 960 Mike Alpha
11  and my flight log.
12      Q. 960 Mike Alpha would be the subject airplane?
13      A. That's correct.
14      Q. And you didn't look at the WOWAM logbook?
15      A. No.
16      Q. WOWAM aircraft logbook?
17      A. No.
18      Q. Did you meet with anybody besides Mr. Ames in
19  preparing for your deposition?
20      A. No.
21      Q. Did you speak to anyone else about your
22  deposition?
23      A. My wife.
24      Q. Okay. Aside from family?
25      A. No.

Page 29

1       Q. And by that, I'm thinking of other pilots or
2   people, mechanics, or any people that you talk to
3   generally about aircraft matters.
4       A. I'm trying to remember if I told the guy that
5   works on our airplane, Mike Alpha. I may have.
6       Q. Mike Alpha, any time you say that, or "our
7   airplane," you're talking about the subject airplane?
8       A. I'm talking about the subject airplane.
9       Q. Because you also own a piece of the WOWAM
10  airplane; isn't that correct?
11      A. Yes.
12      Q. Are you employed at the present time?
13      A. I'm trying to think of how to answer that. I
14  have my own company.
15      Q. Okay. That's fair.
16      And what's the name of your company?
17      A. Pinon Holdings, P-I-N-O-N.
18      Q. And what does that company do?
19      A. It rents an office. It has no -- Other than
20  office equipment, it has no assets.
21      Q. What do you do on a daily basis?
22      A. I'm an investor in oil and gas properties.
23      Q. And that's what you do through this
24  structure?
25      A. No, I don't do it through that structure. It

8 (Pages 26 to 29)

**Page 30**

1  literally owns an office lease.
2  Q. And how long have you had that company?
3  A. Nine years.
4  Q. Your investment activity, do you do that
5  through some corporate or partnership form?
6  A. No.
7  Q. How do you do that?
8  A. I write checks.
9  Q. Just your personal investments?
10  A. Yes.
11  Q. And how long have you been doing that as a
12  type of business?
13  A. Off and on for 25 or 30 years.
14  Q. When was the last time you had what I'll
15  maybe call a regular job? Is that offensive to you?
16  A. There's no offense to me, but thank you for
17  asking.
18  February of '99.
19  Q. And what was that job?
20  A. I was the chief executive of a business
21  cartridge company.
22  Q. And how long did you hold that job?
23  A. Eight years.
24  Q. And did you have another job before that?
25  A. I was a partner in a firm called Alton,

**Page 31**

1  Talmadge & Stone, private investment bank.
2  Q. And how long did you do that?
3  A. Six years.
4  Q. Going back, have you always been in the
5  investment type business in one form or another?
6  A. Well, the cartridge company was a
7  manufacturing company.
8  Q. Okay. That's fair. Sure.
9  A. The oil and gas business is financial
10  investment.
11  Q. Sure.
12  A. Yes.
13  Q. Have you ever had any business relating in
14  any way to aviation?
15  A. The closest I would say I had any business
16  relationship is we did offer our 421 out on a charter
17  basis, but I wouldn't call that a -- That was to defer
18  expenses, not to --
19  Q. That was your Cessna?
20  A. Yes.
21  Q. When you say "we" regarding the charter, the
22  Cessna, you say you own that as a -- I think you told
23  me previously it was a partnership?
24  A. It was a partnership; not a formal
25  established partnership.

**Page 32**

1  Q. Right.
2  A. Just myself and one other gentleman.
3  Q. And who was that person?
4  A. You've already asked me that.
5  Q. Did I? Robert Thompson?
6  A. Yes.
7  Q. Okay. I can't read my own writing. But I'm
8  trainable, so...
9  The Cessna plane, you said you had a blown
10  engine. That related to a blown engine?
11  A. Yes.
12  Q. Tell me how that happened. Was it in flight?
13  A. Yes. It was about somewhere between 200 and
14  300 feet, maybe 500 feet after takeoff. I wasn't in
15  the airplane.
16  Q. Oh, okay.
17  A. I was not flying the airplane.
18  And the pilot experienced a malfunction. I
19  don't know if he shut the engine down or not, but he
20  turned around and landed successfully.
21  Q. Was there any personal injury claim grown out
22  of that?
23  A. No.
24  Q. Just the --
25  A. Just the aircraft.

**Page 33**

1  Q. -- airplane.
2  Okay. I was trying to get the dates worked
3  out a minute ago about the surveys and all. When did
4  you actually retain counsel for this case, Mr. Misko's
5  office?
6  A. I believe it was April of last year.
7  Q. And do you recall what specifically you
8  retained counsel to do at that time?
9  A. Yes.
10  Q. What was that?
11  A. To attempt to recover damages on the WOWAM
12  airplane.
13  Q. And did you personally retain the firm?
14  A. I believe so. Well, I signed an engagement
15  letter, so I'm -- I don't remember if it was on behalf
16  of WOWAM or it was --
17  Q. Okay. But you were the person dealing with
18  the lawyers as opposed to any of your other partners?
19  A. No.
20  Q. Okay.
21  A. I actually didn't know Mr. Misko.
22  Q. Okay. How did you come to the Misko firm?
23  A. My partner, John Vann, in WOWAM, apparently
24  knew Mr. Misko. And we had actually talked to another
25  law firm prior to Mr. Misko and ended up meeting with

9 (Pages 30 to 33)

FLORIDA COURT REPORTING
561-689-0999

Page 34

1  Mr. Misko, and he said he thought we had a case here,
2  and on down the road we go.
3      Q.  And that would have been in April, you think?
4      A.  I believe so.
5      Q.  And who met with Mr. Misko?
6      A.  Mr. Vann, myself, Mr. Vann's fiance at the
7  time, Toni Chapman, and various associates of the Misko
8  firm.
9      Q.  And were you also talking about personal
10  injury litigation or just -- just --
11      A.  I wasn't.  I was not in the WOWAM aircraft
12  when it had its incident.
13      Q.  So the group that met together, was that the
14  subject?
15      A.  That was part of the discussion.
16      Q.  Did you bring any papers to that meeting, or
17  was it pretty much just conversation?
18      A.  I believe it was -- I believe it was just
19  conversation at that point.
20      Q.  And what reason did you have to believe that
21  there might be a claim for the WOWAM airplane at that
22  time?
23      A.  Well, you had an engine that was about a
24  third of the way into its supposed useful life that --
25  I'm going to use the word "blew up" somewhat loosely,

Page 35

1  if I may -- failed in flight at night IMC for no
2  visible reason on a relatively new airplane, not even
3  three years old.
4      Q.  You said its supposed useful life.  What are
5  you calling the supposed?
6      A.  TBO, time between overhauls.
7      Q.  And you interpret or you define TBO to be the
8  useful life of an aircraft?
9      A.  Well, I think it's the industry standard.
10      Q.  Okay.
11      A.  In fact, legally, if you're operating at
12  I think it's a 135 operation, I get the 135 and 91's
13  mixed up, but I believe if you're operating a charter
14  operation or a for-hire operation, you have to overhaul
15  the engine at TBO, whether it meets specs or not.
16      Q.  At the time of this meeting with counsel
17  about the WOWAM aircraft, had the aircraft been
18  inspected by anybody?
19      A.  Yes.
20      Q.  And had you been present at the inspections?
21      A.  Yes.  Not all of them.
22      Q.  Sure.
23          And did you have an understanding in your own
24  mind what the problem may have been with the WOWAM
25  engine?

Page 36

1      A.  I would say that there were several theories.
2      Q.  Okay.  And what theories did you have at that
3  time?
4      A.  I'd say the sort of number one candidate was
5  the what I'm going to call the strike engine
6  hypothesis.
7      Q.  What's that?
8      A.  Well, in conversations with various
9  owner/operators, it turned out that there was a period
10  of time, and I'm not clear about exactly that period of
11  time, but sometime for about two and-a-half years in
12  the mid to late '90s, the assembly technicians, the
13  plant workers at Textron had gone on strike, and that
14  there were roughly 100 of these engines that had
15  actually been assembled by management, and that this
16  was one of those engines.
17      Q.  Okay.  What were your other theories?
18      A.  I believe there had been some discussion
19  about the max continuous power time limit at that point
20  in time, but that was just -- That was more of a
21  possibility.
22      Q.  Okay.  You said there were three.
23      A.  Well, then there was the potential of a
24  bearing issue.
25      Q.  Why do you say potential?

Page 37

1      A.  Well, when an engine blows up like this, it
2  sometimes gets difficult to figure out exactly what
3  made it blow up, but in this instance, the number 5
4  con rod had parted at the main bearing joint or main
5  bearing area, and that certainly is cause to believe
6  that the bearing might have had something to do with
7  it, a condition called a spun bearing, where the
8  bearing literally rotates around the crank shaft
9  instead of the other way around.
10      Q.  So those were the theories that you had in
11  mind when you were meeting with Mr. Misko in April
12  of 2000?
13      A.  I think so.
14      Q.  And you had developed them by attending these
15  inspections and so forth?
16      A.  Well, that, and conversations with various
17  and sundry people.
18      Q.  I want to talk about the inspections of the
19  WOWAM plane where you attended.  Can you tell me the
20  first one you attended?
21      A.  That was the Air Salvage inspection.
22      Q.  And where was that?
23      A.  Lancaster Airport.  Well, it's just off of
24  Lancaster Airport in Dallas County.
25      Q.  Who was present?

10 (Pages 34 to 37)

Page 38

1    A. Oh, there were a whole bunch of people there.
2 My attorneys, various people from their office.
3    Q. Who were your attorneys at that point?
4 Because I thought this was before you --
5    A. That's why I'm trying to get the sequence.
6    Q. Sure.
7    A. Actually, this was probably in June or July
8 by that time.
9    Q. That was the later one, okay.
10    A. Yeah.
11    Q. Was that the first one you attended?
12    A. Yes. Now, I had inspected the airplane in
13 California, but I wasn't present for any formalized
14 inspection, and the engine was not even there.
15    Q. Okay. So the one where a bunch of people
16 attended off the Lancaster airport was after you had
17 counsel?
18    A. Right.
19    Q. But before you retained counsel, did you have
20 negotiations or discussions with any insurance carriers
21 about the plane?
22    A. Yes.
23    Q. And do you remember with whom you spoke or
24 corresponded?
25    A. Tracy Reasoner.

Page 39

1    Q. And who does Tracy Reasoner represent?
2    A. The insurance company.
3    Q. Whose insurance company?
4    A. Ours.
5    Q. Yours?
6    A. Well, WOWAM's.
7    Q. Did you have any discussions with insurers of
8 anybody else, people that, you know, assume you might
9 be thinking about making a claim?
10    A. I know that there was someone from Textron
11 involved, but not as an insurance carrier, but as the
12 company itself.
13    Q. Okay. Do you remember discussing or having
14 any correspondence with anybody from an aviation
15 underwriters organization?
16    A. Not that I recall. I don't remember the name
17 of the insurance company that wrote the insurance, the
18 agency.
19    Q. Do you remember the name Tony Cassese?
20    A. That sounds familiar, but I couldn't tell you
21 in what context.
22    Q. All right. What ultimately led you to go to
23 attorneys in April, approximately, as opposed to
24 resolving the case with some of these people you had
25 been talking to?

Page 40

1    A. Well, there was no -- There was no offer of
2 any content from Textron or Piper for what was
3 essentially a totaled airplane. And to make matters
4 worse, our insurance carrier refused to total the
5 airplane.
6    Q. Your carrier?
7    A. My carrier.
8    Q. Why is that?
9    A. They said it was repairable
10    (Defendant's Exhibit No. 1 marked.)
11 BY MR. REID:
12    Q. I'll show you Exhibit 1.
13    MR. AMES: Let me take a look at it.
14    MR. REID: Yeah, I've got one for you.
15 BY MR. REID:
16    Q. Did you see this or its predecessor? It was
17 set once in a different office, and then it was
18 modified to be here.
19    A. Yes.
20    Q. You've seen Exhibit 1 before?
21    A. Yes.
22    Q. Would you look at the attachment, the
23 schedule of Exhibit 1? Did you have a chance to review
24 that at any time?
25    A. Yes.

Page 41

1    Q. Did you look at that back about the time this
2 was served originally, about 30 or 40 days ago?
3    A. I believe so.
4    Q. Did you have any responsibility or
5 involvement in pulling together the documents that are
6 called for in the Schedule A?
7    A. Yes.
8    Q. Okay. And when did you do that?
9    A. Over the last 30 to 40 days.
10    Q. Okay. So you've been involved continuously?
11    A. Pretty much.
12    Q. Off and on, okay.
13    And as far as you know, have you complied
14 with the document request here?
15    A. I believe my attorneys have.
16    Q. Okay.
17    A. I supplied what I could supply.
18    Q. And that would be these six boxes, as far as
19 you know, or whatever we've got?
20    A. I have not in point of fact seen what's in
21 those six boxes.
22    Q. Oh, okay.
23    A. But to the extent that I've been assured by
24 my attorneys that those boxes contain the information
25 they asked for, then I'm going to tell you it's in

11 (Pages 38 to 41)

Page 42

1   there.
2           MR. REID: Charles, if I could just ask you,
3   I take it these six boxes you produced here today
4   are at least in part in response to the Schedule A
5   to the Notice of Deposition.
6           MR. AMES: They're in response to request
7   number 1 through 31.
8           MR. REID: Okay. Oh, okay.
9           And may I ask, also, I haven't had a chance
10  to look at them yet, so did you identify which
11  request individual documents comply with?
12          MR. AMES: No. You didn't ask us to.
13          MR. REID: I take it you could do that
14  though?
15          MR. AMES: Well, we haven't set ourselves out
16  to do that yet, so...
17          MR. REID: Okay.
18  BY MR. REID:
19      Q. Are there any requested items, 1 to 31, for
20  which there are no documents? That might be able to
21  shorten things up a bit.
22          MR. AMES: The airplane is not here. There
23  are photographs of the airplane here. You're
24  welcome to let us know, and you can come and
25  inspect the airplane subject to the schedule.

Page 43

1           MR. REID: Sure. Where is the airplane?
2           THE WITNESS: In Addison, Texas.
3           MR. REID: It's in Texas, okay. So that's
4   Number 29.
5           Anything else that you didn't have documents,
6   or --
7           THE WITNESS: Well, number 10 --
8           MR. REID: Let me finish with him, and then
9   I'll ask you specifically, just to keep it in
10  order.
11          MR. AMES: I believe on Number 10, you asked
12  for not only Mr. Montgomery's logbooks, but
13  anybody else that had flown 960 Mike Alpha.
14          You have Mr. Montgomery's logbooks. He's
15  attempted to get them from other people, and
16  they've refused to give them to him.
17          MR. REID: Okay. Otherwise --
18          MR. AMES: You've got 18,400 pages of
19  documents there that, to the best of our ability,
20  are responsive to every request you've given us.
21          MR. REID: Okay.
22  BY MR. REID:
23      Q. I want to talk a little bit about your
24  individual training as a pilot. Where did you first
25  learn to fly?

Page 44

1       A. Dallas, Texas.
2       Q. And how did you learn to fly?
3       A. I was taught by a CFAA.
4       Q. And there's a part 141 and a part 91. Does
5   that mean something to you with regard to training?
6       A. They're part of the FAR. I don't know what
7   it says. I haven't reviewed those in a while.
8       Q. When did you first learn to fly?
9       A. I believe it was 1978.
10      Q. And what prompted you to do that?
11      A. I wanted to.
12      Q. Had you had any contact with aviation before
13  you decided to learn to fly?
14      A. What do you mean by contact?
15      Q. Well, had you been involved in the aviation
16  field in any way, I mean, through service or -- I
17  didn't ask you if you were in the service or not.
18      A. I was approved for flight training in the
19  Marine Corps, but didn't do it.
20      Q. So you did serve in the Marine Corps?
21      A. Yes.
22      Q. Honorably discharged?
23      A. Yes.
24      Q. When was that?
25      A. 1971 to '73.

Page 45

1       Q. Did you initially begin with a single
2   instructor?
3       A. Yes.
4       Q. And who was that?
5       A. Sheryl Gruggs. And Sheryl is S-H-E-R-Y-L,
6   and it's a male.
7       Q. Okay. And this was in 1978?
8       A. I believe so.
9       Q. And what particular aircraft did you --
10      A. 150. Cessna 150.
11      Q. And how long was your training, initial
12  training?
13      A. By that, do you mean how long did it take me
14  to get certified?
15      Q. Yeah. Sure.
16      A. I believe it took about six months.
17      Q. Okay. And what licenses or ratings do you
18  hold today?
19      A. I have a private pilot, multi-engine,
20  instrument.
21      Q. Anything else?
22      A. No.
23      Q. And at the present time, you're current?
24      A. I'm not multi-engine current, but I'm current
25  everything else.

12 (Pages 42 to 45)

Page 46

1    Q.  Okay.  When you were first being trained, did
2  you pass all your checks on the first attempts?
3      A.  Yes.
4      Q.  And do you do any current ongoing training or
5  safety training or safety proceedings or training
6  proceedings?
7      A.  Yes.
8      Q.  Tell me what you do on a regular basis.
9      A.  I've got the currency training once a year by
10  an authorized Mirage instructor.  And then I had been
11  going to the -- MMOPA puts on seminars a couple of
12  times a year, and I have been going to those at least
13  once a year.
14      Q.  Anything else?
15      A.  No.
16      Q.  You're familiar with something called a
17  bi-annual flight review?
18      A.  Yeah.  I actually get a bi-annual flight
19  review every year.  I know it's not required, but
20  that's part of the currency training.
21      Q.  Who does that for you?
22      A.  Lester Kyle has the last two times.
23      Q.  And who is that?
24      A.  He's about a 15,000-hour Arrow Star/Mirage
25  training specialist.  He's recognized by all the

Page 47

1  insurance companies as being one of the top Mirage
2  instructors in the country.
3      Q.  Tell me what that -- Just kind of briefly,
4  what does that include?
5      A.  What does what include?
6      Q.  The bi-annual review?
7      A.  Anything he wants it do.  He can make you
8  shoot any kind of instrument approach.  He can do ins
9  and out procedures, he can do emergency descent
10  procedures.
11      Q.  How long does it take?  I mean, give me an
12  idea of what's entailed when you have one of these with
13  him.
14      A.  Typically, he'll have two flying sessions of
15  two to three hours a piece, and you'll have at least a
16  day or a day and-a-half of ground school.
17      Q.  Now, are you familiar with the operating
18  instructions that relate to a particular aircraft?
19      A.  You mean the POH?
20      Q.  Right.
21      A.  Yes.
22      Q.  And --
23      A.  Not all aircraft, because I've --
24      Q.  No, but...
25      A.  I know that each aircraft has a POH.

Page 48

1      Q.  Okay.  Sure.
2         Tell me what aircraft you've regularly flown
3  throughout your career.  I mean, you've obviously had
4  planes before.  You were involved in the Malibu that
5  was involved in this case.
6      A.  I actually have time in 13 different types,
7  but the predominance of that time is either 172,
8  Cessna 172.  I forget what the designator for the Piper
9  Arrow is, but I have a fair amount of time in it.
10  Cessna 421.  Piper Seneca, I have quite a bit of time
11  in that.  And then the Malibu.
12      Q.  How many hours do you have altogether?
13      A.  755.
14      Q.  How many in the Malibu?
15      A.  I believe right at 250.
16      Q.  Do you know what an airworthiness directive
17  is?
18      A.  Yes.
19      Q.  Tell me what you understand --
20      A.  An AD?
21      Q.  An AD, right.
22      A.  Well, I don't know what the legal definition
23  of it is, but my understanding of it is it's something
24  put out by the manufacturer of an airplane or the
25  engine that modifies previous procedures or treatments,

Page 49

1  or it may mandate a physical repair or change to an
2  aircraft.
3      Q.  And have you had personal experience in
4  an AD?
5      A.  Yes.
6      Q.  How many times would you say?
7      A.  Once.
8      Q.  And what was that related to?
9      A.  There was an AD on the Mirage to change out
10  the -- There was a modification to the main spar
11  attachment, the wing, that involved the installation
12  of a -- I forget the technical term, but it was
13  basically to beef up the wing bolt attachments.  It was
14  an extra plate.  You had to take off the entire faring
15  around the wing root on both sides.  It was a four-day
16  repair.
17      Q.  And you were around when that was done on --
18      A.  Yes.  I watched it happen.
19      Q.  Was that done on Michael -- what was it MA?
20      A.  I believe it was, but that Mike Alpha was not
21  the airplane that I supervised.
22      Q.  Okay.  What was it?
23      A.  It was 85 Whiskey, the WOWAM airplane.
24      Q.  The WOWAM airplane, okay.
25         Are you familiar with service bulletins?

13 (Pages 46 to 49)

Page 50

1     A.  Yes.
2     Q.  And have you had personal experience with
3  service bulletins?
4     A.  Yes.
5     Q.  Tell me about that.
6     A.  There were the service bulletins we discussed
7  earlier, I forget the numbers, but they have to do with
8  the bearing problem in the 540 engine, the 10-hour
9  mandatory oil changes.
10    Q.  Okay.  And before those?
11    A.  Well, I mean, I read four or five different
12  publications a month, and there's service bulletins for
13  any number of things.
14    Q.  And it's a regular occurrence, would you say,
15  in the field of aviation?
16    A.  Yes.
17    Q.  Do you know or are you familiar with
18  something called service instructions?
19    A.  No.
20    Q.  And how about service advisories, does that
21  have any meaning to you?
22    A.  I've heard of them.  I've heard of them.  I
23  don't -- My understanding is an advisory has less --
24  it's more of a recommendation than a mandate.
25    Q.  Now, you mentioned earlier this concept of

Page 51

1  TBO.  Do you remember discussing that a few minutes
2  ago?
3     A.  I wouldn't call it a concept.
4     Q.  Well, you used the letters.
5     A.  Yes.
6     Q.  What does TBO mean to you?  What does it
7  stand for?
8     A.  Well, as I said earlier, time between
9  overhauls, I believe.  I'm not a legal expert on the
10  FAR's, but I believe if you're operating a for-hire --
11  aircraft for hire, you have to overhaul the engine at
12  that service interval.
13    It, to me, means that that's the length of
14  time the engine should operate normally without
15  failure.
16    Q.  Now, where did you get that impression
17  about -- or your understanding of what TBO means that
18  you just told me?
19    A.  It's common knowledge.  It's like tires last
20  40,000 miles.
21    Q.  When you say it's the time that an engine
22  should operate normally, what do you mean by
23  "normally"?
24    A.  It should function.  It should have -- It
25  should develop its rated power.  It should not burn

Page 52

1  excessive oil.  It should function normally.
2     Q.  Now, you mention tires should go
3  40,000 miles.
4     A.  As an example.
5     Q.  As an example.  But not all tires go
6  40,000 miles, obviously?
7     A.  Sure.
8     Q.  And I assume not all aircraft go whatever the
9  time -- 2,000 hours TBO?
10    A.  No, actually, 2,000 hours at the high end.
11    Q.  What variables exist, from your knowledge of
12  aircraft operation, what variables exist that will
13  impact TBO?
14    A.  I don't know that I've ever thought about
15  that.  I don't know that I can answer that question.
16    Q.  Let me ask you this question.
17    Do you have any understanding or any
18  knowledge of an engine that had to have something
19  replaced short of the recommended TBO, or has every
20  engine that you've ever been associated with exceeded
21  TBO without any changes at all?
22    A.  I don't know that I've ever owned an airplane
23  long enough for it to get to TBO in that cycle.
24    Q.  Okay.  But as you sit here today, you're
25  unaware of any variables that might impact TBO?  You

Page 53

1  can't think of anything?
2     A.  I think I would answer that by saying I don't
3  know what the determining factors are in deciding what
4  TBO is.
5     Q.  Okay.
6     A.  In other words, it doesn't seem to be a
7  function of the engine size or accessories or
8  horsepower rating or operating procedures.
9     I believe this engine on the Navaho with one
10  turbocharger actually has a lower TBO than this engine
11  does.  But I don't know that for a fact.  That's
12  supposition.
13    Q.  Well, is TBO something that -- In the course
14  of your experience, is that something you've talked
15  about or thought about on a regular basis?
16    A.  Certainly.
17    Q.  In what context?
18    A.  Well, it is a major calculation in the cost
19  of operating the aircraft.
20    Q.  In what regard?
21    A.  Well, the single most expensive thing you can
22  probably do to the typical piston engine aircraft is
23  overhaul the engine.  So to the extent that the engine
24  has a higher TBO, the operating cost ought to be lower
25  per hour.

14 (Pages 50 to 53)

Page 54

1   Q.  Do you know what New Piper says about TBO?
2   A.  No.
3   Q.  Do you know what --
4   A.  Other than this engine has a 2,000-hour TBO
5   or a 1,500 TBO, or the manufacturer of this engine says
6   that.
7   Q.  Well, which of the three is it that you're
8   familiar with?
9       You gave me three alternatives of what
10  New Piper might say about TBO.  Do you recall which
11  they actually say?
12  A.  I think -- I think the phraseology they use
13  is with a 2,000-hour TBO engine in their advertising.
14  Q.  And that would be an advertisement?
15  A.  Yes.
16  Q.  What about the Textron Lycoming?
17      MR. REID:  And I guess I'll just say for the
18  record, we've never cleared this up, the actual
19  name of the party that ought to be in this case is
20  Avco.  You know, we've said that in all of our
21  pleadings, and Charles, you and I talked about
22  interlineation amendment or something.
23      MR. AMES:  We've heard you, but you haven't
24  explained it to us.
25      MR. REID:  Well, it's just Avco is the

Page 55

1   corporate entity.
2       MR. AMES:  Okay.
3       MR. REID:  So let me just say, today, I'm
4   going to be using --
5       MR. MISKO:  Who built the engine, is that
6   what you're saying?
7       MR. REID:  Sure.
8       MR. MISKO:  Avco built the engine?
9       MR. REID:  Yeah.  That's the corporation that
10  ought to be a party to the case as opposed to
11  divisions and that sort of thing, but let me say
12  for the record today, and we'll clear it up later
13  and perhaps get the file corrected, if I use
14  Textron or Lycoming or Avco, I don't mean by that
15  to make any representation about the corporate
16  structure.
17      MR. AMES:  We understand.
18      MR. REID:  I'm using it sort of in the
19  vernacular.
20      MR. AMES:  Like your advertising does.
21      THE WITNESS:  We assumed that it was Textron,
22  because that's what's on the letterhead.
23  BY MR. REID:
24  Q.  Now, with regard to the engine manufacturer
25  then, what does it say, to your knowledge, about TBO?

Page 56

1   A.  Exactly that.
2   Q.  Which is what?
3   A.  This engine has a 1,600, 2,000, you know,
4   whatever the engine -- Every engine that I'm aware of
5   that they manufacture has a TBO, and they say so as
6   such.
7   Q.  Where do they say that?
8   A.  I think it's on their website.  I think it's
9   in their specification sheets.
10  Q.  And do you recall anything else that they say
11  about TBO besides what you told me?
12  A.  No.
13  Q.  I'm just curious, have you ever experienced
14  an engine failure in flight?
15  A.  No.
16  Q.  Have you ever, in your training, have you
17  received training specifically with regard to a
18  turbocharged aircraft?
19  A.  You're going to have to explain that to me.
20  Q.  You know what turbo means?
21  A.  Yes.  The reason I say that is because the
22  last three airplanes I've owned, four, have all been
23  turbocharged.
24  Q.  So the answer would be, yes, I do?
25  A.  Yes.

Page 57

1   Q.  Okay.
2   A.  Now, after they say this is special because
3   this is a turbocharged airplane?
4   Q.  Sure.
5   A.  Well, yeah, I mean, the classic training
6   there is overboost and to avoid overboost.
7   Q.  You've told me about your initial training,
8   and you've told me about some of your supplemental
9   reviews and training.
10      Have you had any other formal training with
11  regard to the operation of airplanes?
12  A.  Yes.
13  Q.  I want to know about all those.
14  A.  Okay.  I got my instrument ticket at -- I can
15  tell you where they are.  I can't remember the name.
16  It's a school in Panama City, Florida.  It's a pretty
17  well-known aviation training school.  I did two weeks
18  of training there and got my instrument ticket there.
19  Q.  And when was that, approximately?
20  A.  Nineteen...I think it was '82 or '83.
21  Q.  Okay.
22  A.  And it may have been earlier than that.  It
23  was pretty early in my flying career.
24  Q.  Okay.  What other training have you had?
25  A.  I went through, I believe, about 10 hours of

Page 58

1    Cessna 421 school, and it was a school in Dallas.
2        Q.  Okay.
3        A.  And that was both aircraft and simulator
4    time, and ground school.
5            I've had a number of hours of what I would
6    call dual instruction, and they're in my logbook, both
7    for instrument and for multi-engine.
8        Q.  That would be in Texas?
9        A.  Well, it would be all over the place.
10       Q.  Wherever you're flying?
11       A.  Yes.
12           Then I went to the factory school for the
13   Mirage.
14       Q.  Where is the factory school for the Mirage?
15       A.  Vero Beach.
16       Q.  New Piper?
17       A.  Right.
18       Q.  When was that?
19       A.  The summer of 1988.
20       Q.  How long was that?
21       A.  A week.
22           And then before, during, and after that, I
23   had 50 hours of dual instruction with a very high time
24   CFII Mirage pilot.
25       Q.  Where was that pilot located?

Page 59

1        A.  Dallas.
2            MR. AMES:  Why don't you ask him again the
3    year.  I think you both misspoke.
4    BY MR. REID:
5        Q.  Oh.  1988?
6        A.  1998.  Sorry.
7            THE WITNESS:  Thank you.
8    BY MR. REID:
9        Q.  So 1998 is when you had the Mirage training?
10       A.  Right.
11       Q.  In Vero Beach?
12       A.  Right.
13           MR. REID:  Thanks.
14   BY MR. REID:
15       Q.  Who put on the training in New Piper in
16   Vero Beach?
17       A.  I'm trying to remember the name.
18   Attitudes, Inc., I think.
19       Q.  That was the name of the company?
20       A.  I believe so.
21       Q.  So it was a private company?
22       A.  Well, it was represented to me as the factory
23   school.
24       Q.  Sure.
25       A.  It was at the factory.

Page 60

1        Q.  Okay.
2        A.  It may have been a different corporate
3    entity, but...
4            And it was the school recognized by the
5    insurance companies as being the factory school.
6        Q.  But you don't know whether the instructors
7    were employees of some Piper entity as opposed to this
8    Attitudes, Inc., or both, or neither?
9        A.  I don't know.
10       Q.  Okay.
11       A.  I know that some of them had certainly been
12   Piper employees at one point in time.  Whether they
13   still were...
14       Q.  What was the date, just so I kind of put it
15   in perspective, that you purchased the subject
16   aircraft, or that whoever purchased it purchased it?
17       A.  That's two different questions.
18       Q.  Okay.
19       A.  Which one do you want me to answer?
20       Q.  I realized that as soon as I said it.
21           When did you get an interest in the subject
22   aircraft?
23       A.  April of 2000, April or May.
24       Q.  And when did you get an interest in the WOWAM
25   aircraft?

Page 61

1        A.  May of '98.
2        Q.  And when in '98 was the training you did in
3    Vero?
4        A.  June or July.
5        Q.  So that training followed your obtaining an
6    interest in the WOWAM plane?
7        A.  Right.
8        Q.  During the week that you were there, was
9    there anybody who was involved in the training
10   connected with any of the component manufacturers of
11   the aircraft?
12       A.  You mean as a manufacturer's rep?
13       Q.  Anybody who was there who you understood to
14   be representing a manufacturer of any component who
15   participated in the training that you received?
16       A.  I'll go back to the factory school answer,
17   which is, I don't know the contractual arrangements or
18   the business organization, but this was the factory
19   school, so implicit to me, these people worked for the
20   manufacturer of the aircraft.
21           Did anybody represent themselves as being for
22   the avionics or the engine or the landing gear?
23       Q.  Exactly.
24       A.  No.
25       Q.  And specifically then, that would include

16 (Pages 58 to 61)

Page 62

1  nobody there represented themselves as having any
2  connection with Textron, Lycoming, or the engine
3  manufacturer?
4     A.  Not that I recall.
5        MR. REID: Let's take a little break.
6        MR. AMES: Okay. How long?
7        MR. REID: Ten minutes or something.
8        (Recess taken from 10:20 a.m. to 10:36 a.m.)
9  BY MR. REID:
10    Q.  A minute ago, we were talking about AD's and
11  so forth, and I forgot to ask you about STC's.
12       Do you know what those are, special type
13  certificates?
14    A.  I'm not an A & P.
15    Q.  I mean, supplemental type certificates.
16    A.  As I understand it, that is an FAA approved
17  modification by someone other than the factory to an
18  airplane company.
19    Q.  Have you had personal experience of any of
20  those on an of your aircrafts or aircrafts you've been
21  associated with?
22    A.  Yes.
23    Q.  Give me an example.
24    A.  Mike Alpha has spoilers on it that I believe
25  were added.

Page 63

1     Q.  And how did they come about?
2     A.  Well, I don't know, because --
3     Q.  Who got the certificate?
4     A.  I don't know. I didn't look at the logbook
5  entries, but I mean, there is an advertised
6  modification to the Mirage for wing spoilers.
7  Actually, there are two of them. And the factory now
8  has them, but they were on the airplane when I bought
9  it.
10    Q.  Okay. Any others that you've had any
11  involvement with, STC's?
12    A.  I've demoed the jet prop DLX Malibu. It's a
13  certain conversion of a Malibu. That's an STC. But I
14  don't own one.
15    Q.  Have there been any STC's that were planes
16  that you specifically were involved with or modified
17  while you had some relationship with the plane?
18    A.  Not that I'm aware of, other than the
19  spoilers I've already mentioned.
20    Q.  We were talking about the necessity of
21  overhauling engines a minute ago.
22    A.  Yes.
23    Q.  The recommendations and so forth.
24       Are you aware of any factors that would lead
25  to the necessity to overhaul an engine?

Page 64

1     A.  Well, I can think of several.
2     Q.  Okay.
3     A.  Compression, lowered compression rating below
4  specs, metal in the oil, excessive oil leakage or
5  consumption. That's all I can think of right now.
6     Q.  Are you aware of any variables associated
7  with how the plane is operated that would have an
8  impact or lead to an overhaul?
9     A.  Not if you operate it within the recommended
10 operating parameters of the manufacturer, no.
11    Q.  You can't think of any?
12    A.  Not -- No.
13    Q.  If you operate the aircraft outside of the
14 recommended parameters, can you think of any
15 operational issues that would lead to overhaul --
16    A.  Well, if you --
17    Q.  -- necessity?
18    A.  If you didn't have enough oil in the engine,
19 that would certainly create a problem. If you operated
20 the aircraft too rich, you could, theoretically, cake
21 up the valve components to where it wouldn't develop
22 enough power. If you operate the aircraft too lean,
23 you're going to reach temperatures in excess of that
24 recommended, which would create additional wear and
25 tear on the engine. If you operate it overboost, same

Page 65

1  condition.
2        In a turbocharged engine, if you don't let it
3  cool down properly after you land, you can create
4  coking in the oil, which can lead to reduced oil flow
5  to the bearing surfaces, which can ultimately fry the
6  turbo. If you cool the engine down or decent too
7  quickly, you can lead to cracked cylinder heads. It's
8  called shock cooling.
9        I don't know that there's a specific
10 recommended procedure for that other than to reduce
11 power every 2 inches for every 2,000 feet, you
12 everybody that I've ever talked to who flies
13 turbocharged aircraft knows about shock cooling. I
14 mean, it's a common problem.
15       I don't know if that's in the POH, but I
16 would certainly say that if you made a dramatic power
17 reduction at altitude, you're going to get shock
18 cooling, which could crack cylinder heads.
19    Q.  How about in the actual flight of the
20 aircraft; climbs at particular angles, are there
21 maneuvers that could ultimately lead to overhaul,
22 necessary overhaul?
23    A.  Well, I mean, the Malibu is not certified for
24 aerobatics, for example, so if you fly inverted, you're
25 going to lose oil pressure, which is going to cook the

17 (Pages 62 to 65)

Page 66

1    engine. But again, under the normal recommended
2    operating procedures, I don't know of anything that
3    would cause premature engine wear or failure.
4        Q.  Is it fair to say that in your experience,
5    you always fly within the operating parameters
6    recommended by the manufacturer of the airplane?
7        A.  Yes.
8        Q.  I take it you know some pilots, however, who
9    aren't as careful as you about that; is that fair to
10   say?
11       A.  No.
12       Q.  You don't know any?  Okay.
13       A.  I haven't flown with them.  What they do in
14   the cockpit --
15       Q.  Oh, you wouldn't know?
16       A.  I wouldn't know.
17       Q.  Okay.  That's fair.
18          Can you think of any other either operational
19   or maintenance issues that would lead to premature
20   overhaul?
21       A.  No.
22       Q.  Would it be your testimony there are no
23   others, or there just aren't others that you can think
24   of as you sit here today?
25       A.  The latter of the two.  There are none that I

Page 67

1    can think of.  There may be, but none that I ever --
2        Q.  You told us earlier that you had information
3    or information given by Lycoming on the one hand and
4    New Piper on the other, regarding the TBO.  You
5    remember that testimony?
6        A.  Yes.
7        Q.  When did you first get that information?
8    Let's start with New Piper.  When did you first learn
9    or hear the information that you testified to earlier
10   regarding TBO from New Piper?
11       A.  I had been aware of this aircraft as early as
12   1986.
13       Q.  1986?
14       A.  Yes.  A friend of mine had one of the first
15   Malibu's built.  I don't remember what the TBO was in
16   1986.
17          I do remember looking at some Piper brochures
18   maybe as early as 1995.
19       Q.  1995?
20       A.  Right, about the aircraft.
21          And as far as I know, the Mirage has had a
22   2,000-hour TBO they've been advertizing since then, and
23   it was one of the things that attracted me to that
24   aircraft.
25       Q.  So you believe there's a Piper brochure in

Page 68

1    1995 that made the representation about TBO that you've
2    testified to here today?
3        A.  Yes.
4        Q.  And how about representations about TBO from
5    the manufacturer of the engine?  You testified earlier
6    today that you thought you recalled such a
7    representation.  When did you first see that and what
8    form was it in?
9        A.  I believe it was a spec sheet, and I believe
10   it was part of the -- I don't remember if it was the
11   POH or exactly where it was, but it was in '97, '98,
12   somewhere in there.
13       Q.  Was it associated with a purchase of a
14   Mirage, or an interest in a Mirage, or after you
15   already had an interest in one?
16       A.  I think it was after I already had an
17   interest in one.
18       Q.  Do you or did you consider the reference to
19   TBO as a guarantee that someone was making to you that
20   your aircraft would reach a certain level TBO?
21       A.  Yes.
22       Q.  And who made the guarantee to you?
23       A.  I would call it an implicit warranty.
24       Q.  Why do you say that?
25       A.  Well, the literature I've seen, every bit of

Page 69

1    it, talks about a 2,000-hour TBO.
2        Q.  Without any modification?  Without any --
3    what's the word I'm looking for?
4           MR. MISKO:  Qualification.
5    BY MR. REID:
6        Q.  Qualification.  Thank you.
7           Without any qualification?
8        A.  Right.  And the warranty, as I recall, and I
9    haven't looked at it in a while, and I'm talking about
10   the manufacturer of the engine's warranty, allows for
11   proration on an hourly basis to that time.
12       Q.  We'll talk about different things here.  Is
13   it your testimony that the engine is warranted for
14   2,000 hours TBO; is that your testimony?
15       A.  I don't remember the exact language of the
16   warranty, but the language led me to believe that there
17   was, if not an outright warranty, there was certainly
18   an implied warranty, because of the way they styled the
19   language.  I think it's a time warranty as opposed to
20   anything else.
21       Q.  And who's the "they" that you just made
22   reference to?
23       A.  Lycoming.
24       Q.  Lycoming, okay.
25       A.  Textron Lycoming, Avco Lycoming.

Page 70

1    Q.   And how about New Piper, did they also make
2    such a promise to you?
3        A.   I would say so.
4        Q.   And that would be in those brochures you told
5    me about?
6        A.   Yes.  They also have a -- I haven't seen it
7    in a while, but they actually discuss the operating
8    cost of the aircraft.  And part of that operating cost
9    is a $50.00-an-hour engine reserve, which would lead
10   you to believe it's going to make it to 2,000 hours.
11       (Defendant's Exhibit No. 2 marked.)
12   BY MR. REID:
13       Q.   I'll show you Exhibit 2.  I'll ask you if
14   you've seen this before.  It's First Amended Class
15   Action Complaint.
16       A.   Yes.
17       Q.   Do you recall when you first saw it?
18       A.   In the last 30 days.
19       Q.   Did you see it before it was filed?
20       A.   I don't know.
21       Q.   Do you know that there was a preexisting
22   Complaint?
23       A.   Yes.
24       Q.   An original Complaint?
25       A.   Yes.

Page 71

1        Q.   Did you see that before it was filed?
2        A.   I don't know the answer.  I don't know.
3        Q.   You've read it now?
4        A.   Yes.
5        Q.   And is everything -- Are the factual
6    allegations contained in here true and correct as far
7    as you know?
8        A.   I believe there had been more than 270 Malibu
9    Mirages built since 1995.
10       Q.   Actually, I gave you my copy.  I was going to
11   ask you about that.
12       Anything else that's --
13       A.   Yes.  As far as I know, this is all factual.
14       Q.   All right.  Let me have that one back.  Let
15   me see what I was doing.  I had you something I wanted
16   to ask you about specifically.  Okay.
17       Okay.  I'll do that later.
18       In the Complaint, you say that you became an
19   owner in a Malibu Mirage in April 2000, and you refer
20   to the MA.
21       A.   Mike Alpha.
22       Q.   Right.
23       A.   Uh-huh.
24       Q.   Now, when you say you became an owner, what
25   does that mean?

Page 72

1        A.   Well, I purchased an interest in a -- I'm not
2    sure if it's a corporation, I think it is -- that owned
3    -- whose sole asset was that aircraft.
4        Q.   What was the name for that corporation?
5        A.   SKB Aviation.
6        Q.   SKB Aviation?
7        A.   Uh-huh.
8        Q.   What does the SKB stand for?
9        A.   Steven K. Boyd.
10       Q.   And who was that?
11       A.   My partner in SKB Aviation.
12       Q.   Are there any other partners?
13       A.   No.
14       Q.   And as I understand, you own a 25 percent
15   interest in that?
16       A.   Well, it's a little more complex than that.
17   I actually own half of SKB Aviation.  SKB Aviation owns
18   half of a Mirage, 960 Mike Alpha.
19       Q.   Who owns the other half of that airplane?
20       A.   J.M.S. Aviation, I think.
21       Q.   And do you have any interest in J.M.S.
22   Aviation?
23       A.   No.
24       Q.   And who is J.M.S.?
25       A.   Who is J.M.S.?  The correct way to say that

Page 73

1    would be what is J.M.S.
2        Q.   Okay.
3        A.   It's another corporation owned by, I think,
4    and I'm -- It stands for John, Mark, and Steve.
5        I didn't make this up.  It was already there
6    when I got there.
7        Q.   Okay.  Who is John, and who is Mark, and who
8    is Steve?
9        A.   These are three individuals that own a 1978
10   King Air and that also own the other half of the
11   Mirage.
12       MR. AMES:  Is that the clean copy of the
13   Complaint that you marked as Number 2?
14       MR. REID:  Yes, it is, the same one that you
15   have.
16       (Defendant's Exhibit No. 3 marked.)
17   BY MR. REID:
18       Q.   I want to show you Exhibit 3.  Would you just
19   look at this and tell me if you've seen any of this
20   before?
21       A.   Well, half of this is illegible.
22       Q.   Sure.  Sure.  I realize that.
23       A.   I mean, without a very thorough, careful
24   review, I'm not going to tell you what in here I have
25   or have not seen.

19 (Pages 70 to 73)

Page 74

1   Q. Okay. That's fine.
2   A. Because there's a lot of stuff in here.
3   Q. Let me ask you some questions that may or may
4   not clarify some of that.
5       When did you first become interested in
6   purchasing the subject airplane?
7   A. 960 Mike Alpha?
8   Q. Mike Alpha, right.
9   A. It became obvious to me, oh, after three or
10  four months that we were going to be in for a long,
11  difficult battle on the WOWAM aircraft. And I needed
12  something to fly, because I use this airplane in my
13  business, so I started looking around for an
14  alternative.
15  Q. By the way, have you resolved your
16  discussions that you had with the carrier about the
17  WOWAM aircraft?
18  A. No.
19  Q. That's still ongoing?
20  A. Yes.
21  Q. Is there any litigation growing out of that
22  at this point anywhere?
23  A. I believe we filed a cause of action.
24  Q. Where?
25  A. I believe in Dallas.

Page 75

1   Q. Against who?
2   A. The insurance carrier.
3   Q. Do you know who that is?
4   A. Well, it's a little confusing, but the net
5   effect is it's AIG.
6   Q. That's your insurance carrier, or the
7   insurance carrier --
8   A. It's the purported -- You know, that -- Yes.
9   Q. On the WOWAM aircraft?
10  A. Right.
11  Q. It's not a third party's insurance carrier
12  that you've sued?
13  A. What do you mean by "third party"?
14  Q. Lycoming or Piper or anybody like that?
15  A. No. This is strictly against the carrier for
16  failing to honor the policy.
17  Q. Okay. And who's representing you in that?
18  A. Mr. Misko.
19  Q. Okay.
20  A. Now, by that, I mean the Misko firm.
21  Q. Sure. I understand.
22      So you were telling me you began to think, at
23  some point after the WOWAM incident, that you might
24  need another aircraft for your business?
25  A. Yeah. I mean, at some point in time, you got

Page 76

1   to make the decision. We've been without an airplane
2   for three and-a-half months.
3   Q. So when was the WOWAM incident?
4   A. January 2nd of 2000.
5   Q. So now we're into March, April?
6   A. April.
7   Q. And you've reached the conclusion that you're
8   not going to get any money soon, it appears, from the
9   aircraft insurance?
10  A. Correct.
11  Q. And you had also seen lawyers at that point?
12  A. Yes.
13  Q. And you had the conversations that we talked
14  about earlier with the lawyers about the possible
15  causes of the WOWAM incident and so forth?
16  A. Yes.
17  Q. And at that point, you began looking for or
18  thinking about looking for a new airplane?
19  A. Right.
20  Q. So tell me what you did in going about
21  looking for a new airplane.
22  A. Well, all of my training, recent training,
23  last three years, and experience, has been in a Mirage.
24  At the time I purchased an interest in Mike Alpha, to
25  the extent I had formed an opinion, I was of the

Page 77

1   opinion that this was an isolated incident, an
2   aberration. So since other than the fact we had lost
3   an engine and it appeared to be an isolated instance, I
4   had been pleased with the overall performance of the
5   Mirage, and it suited my mission requirements. It was
6   the logical place to go.
7   Q. I wanted you to try to be as precise as you
8   can about this. When did you make the first contact or
9   when were you contacted the first time about purchasing
10  the Michael -- the Mike Alpha aircraft?
11  A. Well, I called him. I called Steve Boyd.
12  Q. So you had had all these thoughts and so
13  forth and you knew he had one?
14  A. Yes. I met him at the MMOPA convention the
15  previous fall.
16  Q. In 1999?
17  A. Yes.
18  Q. And where does -- where did he live?
19  A. In Addison -- Dallas.
20  Q. And do you know exactly when you first called
21  him?
22  A. No.
23  Q. Can you bracket it in any way?
24  A. April, May. April, early May.
25  Q. And tell me about that first conversation.

20 (Pages 74 to 77)

Page 78

1    A. I told him that -- I introduced myself,
2    because I had had drinks with him at the MMOPA, and I
3    asked him if he knew what had happened to the WOWAM
4    aircraft. We talked about that for a minute. And I
5    said, it appears that it's going to be a while before
6    anything concludes out of that matter, and in the
7    meantime, I need an airplane to fly, and would you be
8    interested in selling me an interest in Mike Alpha.
9          And he told me about having a Meridian
10   position reserved. And I said, well, I demoed the jet
11   prop and what did he think about that. We talked about
12   that for awhile.
13         Then he said, let me talk to my partners and
14   I'll get back to you.
15   Q. Now, at that point, you knew about that
16   particular aircraft, Mike Alpha?
17   A. Yes.
18   Q. You knew he owned it?
19   A. Yes. Well, I mean, I didn't know -- I didn't
20   know who owned it, but I knew he was flying it the
21   last -- the first and only time I had seen it.
22   Q. Now, you said that he told you he had a
23   Meridian position reserved?
24   A. Yes.
25   Q. Tell me what you mean by that.

Page 79

1    A. He had -- The meridian is the upgraded
2    turboprop version of the Mirage built by the New Piper
3    Aircraft Company.
4          There was a lot of excitement about it at
5    MMOPA, because it's the first time the airplane had
6    actually physically been present.
7          And Steve had put a deposit down that was
8    required to hold a delivery position for that new
9    Meridian aircraft.
10   Q. And were the Mirage owners the kind of
11   primary target for the new Meridian aircraft?
12   A. I don't know how to answer that. I have no
13   idea what the Piper marketing thought process was.
14   Q. But it was the next logical step up, if you
15   will?
16   A. That would be -- It would be my guess.
17   Q. Do you see that as having any effect on the
18   value of the Mirage planes out there?
19   A. No, because they're really two different
20   airplanes.
21   Q. So you had this conversation in April, May,
22   and he talked to his partners. Then what happened?
23   A. Well, then we agreed to a deal and then we
24   papered the transaction, and I started flying the
25   airplane.

Page 80

1    Q. So you bought -- You bought a percentage
2    interest in --
3    A. SKB Aviation.
4    Q. Right, SKB.
5          And was there any change in the registration
6    of the aircraft with the FAA as a result of your
7    becoming involved, as far as you know?
8    A. No.
9    Q. And you've told me about J.M.S. Aviation.
10   Did you know anything about the history of this
11   aircraft before you got involved with it?
12   A. I know it came originally from Muncie
13   Aviation, and it was owned by an organization up there,
14   I think it was called Rough Brothers. And then I think
15   there was another corporate entity. And then
16   SKB/J.M.S. bought it from them. And then registration
17   is pending for that change.
18   Q. Would that be P.B. Odom Enterprises that's
19   listed there?
20   A. I see that. That's the first time I've seen
21   that.
22   Q. So you don't know what P.B. Odom Enterprises
23   is?
24   A. No, I have no idea.
25   Q. But it appears to be the seller of this

Page 81

1    aircraft in April of '99?
2    A. Correct.
3    Q. Would that be consistent with your --
4    A. Well, that what I say, I don't recognize this
5    because of the title search, and I know we have the
6    title search that I did before I bought into the
7    aircraft. I don't remember Odom showing up.
8    Q. Is that in the boxes over here?
9    A. Yes, it is.
10   Q. And Rough Brothers is also mentioned in here
11   somewhere.
12   A. Well, I think they were the original owner,
13   but I don't know that to be a fact.
14   Q. And you mentioned Muncie Aviation.
15   A. They were the Piper distributor.
16   Q. And how about Daniels Leasing that's
17   mentioned in here, do you know that?
18   A. I don't recognize that name either.
19   Q. In researching, or before you bought the
20   plane, did you go back and evaluate or look at the
21   previous owners and what they did with it and how much
22   it was used by each one and so forth?
23   A. I looked at the logbooks.
24   Q. For the aircraft?
25   A. For the aircraft, yeah.

21 (Pages 78 to 81)

Page 82

1    Q. And you had them all the way back to zero?
2    A. Yes.
3    Q. And you reviewed those yourself?
4    A. Yes.
5    Q. Did you have any dealings with anybody from
6    Piper or New Piper at the time you were making this
7    transaction?
8    A. No.
9    Q. Did you have any dealings with anybody from
10   Lycoming or Textron Lycoming or the engine manufacturer
11   at the time you were purchasing a piece of
12   SKB Aviation?
13   A. No.
14   Q. Where does the plane usually stay? Is there
15   a particular location?
16   A. Yes. It's in a hangar at Addison Express at
17   Addison Airport. You're talking about Mike Alpha?
18   Q. Mike Alpha.
19       And who is responsible for the routine or
20   ordinary maintenance on that aircraft?
21   A. Mechanic?
22   Q. Well, is it a company or a person, or what is
23   it?
24   A. You know, I mean, I need a tighter definition
25   on the question, because, for example, if I fly the

Page 83

1    airplane and it's due for an oil change, I will phone
2    into the mechanic and say change the oil.
3    Q. Okay.
4    A. Which one are you talking about?
5    Q. I want to try to ultimately get it all.
6    Maybe the question was too broad to start with.
7        Tell me what involvement you personally had
8    in the maintenance of the aircraft.
9    A. Well, I confer with the mechanic on an
10   as-needed basis; specifically, this very burdensome and
11   onerous 10-hour oil change requirement. I watched him
12   cut the filters open to make sure he's doing that
13   properly, if it needs a new tire.
14   Any operational discrepancies that I see, I
15   phone him on, but so do the other people that fly the
16   airplane.
17   Q. Okay.
18   A. So we're all involved.
19   Q. Okay. So there is a single mechanic that
20   works on that airplane?
21   A. Yes.
22   Q. And what's his name?
23   A. Juan Oveida. I think it's O-V-E --
24       MR. BRANTON: I-D-A.
25       THE WITNESS. -- I-D-A.

Page 84

1    BY MR. REID:
2    Q. And by whom is he employed?
3    A. He owns his own firm, and I -- I didn't put
4    the corporate name down. I just have him as Juan
5    Oveida. We can find out.
6    Q. Okay.
7    A. He operates a license to FAA repair facility.
8    Q. Has he been the person responsible or
9    involved in the maintenance since you became an owner
10   of this corporation?
11   A. Yes.
12   Q. Do you know before Juan who did it? Before
13   Juan Oveida, who did it?
14   A. I don't know who specifically. I've looked
15   in the logbooks, and you see entries primarily from
16   Muncie.
17   Q. Okay.
18   A. You are aware that the logbooks will not show
19   who owned the airplane; it just shows who did the work?
20   Q. Sure.
21       Did you, before you purchased an interest in
22   the corporation Mike Alpha, did you look at any
23   literature or paper produced by anybody about the
24   aircraft?
25   A. Not that I recall. I mean, it's a year older

Page 85

1    aircraft identically equipped to the one I was flying.
2    Q. Okay.
3    A. So, you know, other than review of the POH,
4    I mean, it's the same airplane.
5    Q. And either as a result of this purchase or
6    after this purchase, did you go back to school anywhere
7    about the particular Malibu Mirage?
8    A. What do you mean "the particular Malibu
9    Mirage"?
10   Q. I'm sorry. About a Malibu Mirage. Did you
11   go to any school connected with Malibu Mirage as a
12   result of or following the purchase of Mike Alpha?
13   A. No. I'm scheduled for re-currency training
14   in March.
15   Q. And where will that be done?
16   A. In Dallas.
17   Q. You told us earlier about going to Vero. I
18   think you said it was in '97, does that sound right?
19   A. No, '98.
20   Q. I'm sorry, '98. That's right, in the spring
21   of '98.
22       Is that the only time you've been to the
23   school in Vero?
24   A. Factory school, yes.
25       Now, I've had a factory school representative

22 (Pages 82 to 85)

1  give me a BFI at the MMOPA fly-in last March.
2  Q.  Where was that?
3  A.  Kansas City.
4  Q.  Where was this person from?
5  A.  Vero Beach.
6  Q.  And what was his name or her name?
7  A.  Bob Stickle.
8  Q.  Bob Stickle, okay.
9  A.  I'm sorry.  That was '99.  No, it was 2000.
10  It was last year, last spring, because I didn't have an
11  airplane.  I had to fly somebody else's.
12  Q.  Was there any loan involved in your purchase
13  of the interest in this airplane?
14  A.  Yes.
15  Q.  And who financed that?
16  A.  SKB Aviation.
17  Q.  Oh, it was a loan directly from the company?
18  A.  Yes.
19  Q.  There's no bank involved?
20  A.  No.
21  Q.  Was there any requirement by the lender of
22  any paperwork about the aircraft itself?  I'm not
23  talking about the title and so forth, but I mean in
24  general, information about the aircraft, that you were
25  asked to get.

1  A.  I'm not sure I understand that question.
2  Q.  Yeah, it's a terrible question.
3  Never mind.  I'll get to it in a different
4  way later.
5  Was there a broker involved in the sale?
6  A.  No.
7  Q.  Now, I want to talk a little bit about a
8  previous aircraft that you had an interest in, the
9  WOWAM aircraft.
10  (Defendant's Exhibit No. 4 marked.)
11  BY MR. REID:
12  Q.  I'll show you Exhibit 4.
13  A.  What am I supposed to do with this?
14  Q.  Just leave it there.  She'll pick them all up
15  at the end.
16  Have you seen this before?
17  A.  Well, since I don't know what I'm looking at,
18  do you mind if I look at it before I answer that
19  question?
20  Q.  I assumed that you would.
21  MR. BATEMAN:  What was Exhibit 3?
22  MR. REID:  Exhibit 3 is some FAA
23  documentation relating to the aircraft we were
24  talking about with Mike Alpha.
25  MR. AMES:  What is this, Exhibit Number 4?

1  MR. REID:  This is Exhibit 4, which are some
2  bad copies of FAA --
3  THE WITNESS:  Terrible.
4  BY MR. REID:
5  Q.  And obviously, as this becomes important for
6  whatever reason, I'll try to get better copies.
7  A.  I was going to say.
8  Okay.  Now that I've looked at it, I have
9  seen -- I don't know why it's done the way it's done,
10  but that appears to be a copy of the registration of
11  9285 Whiskey.
12  Q.  Which is what we've called the WOWAM
13  aircraft?
14  A.  The WOWAM aircraft.
15  Q.  Now I want to talk about when did you first
16  become interested in purchasing any interest in the
17  WOWAM aircraft?
18  A.  In February of '97, I believe, I took my
19  first flight in a Mirage aircraft.
20  Q.  Whose plane was that?
21  A.  Don Zale's.
22  Q.  And why were you flying in that plane?
23  A.  Because I wanted to get back into aviation.
24  I had been flying rental aircraft at various times, and
25  I heard about them.  A friend of mine had a Malibu, and

1  he said good things about it, so...
2  And one of my good friends, who is a pilot,
3  had raved about what a great airplane the Mirage was,
4  so I got a demo ride in it, and I became interested in
5  acquiring an interest in a Mirage.
6  Q.  Now, who was the friend that raved about the
7  Mirage?
8  A.  Alan Busch.
9  Q.  Was that the lawyer we talked about earlier?
10  A.  Yes.  Yes.
11  Q.  And you didn't fly in Alan Busch's airplane?
12  A.  He didn't have one.
13  Q.  Okay.
14  A.  This is his cousin's airplane that he spent
15  some time in.
16  Q.  Was he a pilot?
17  A.  Yes, he is.
18  Q.  So Alan Busch is the one that raved about the
19  Mirage?
20  A.  Right.
21  Q.  And his experience is based on --
22  A.  A lot of trips.
23  Q.  -- his cousin's aircraft?
24  A.  Right.
25  Q.  And his cousin's name is what?

Page 90

1    A.  Don Zale.
2    Q.  And how do you spell the last name?
3    A.  Z-A-L-E.
4    Q.  I figured it was some complicated way.
5    A.  No.
6    Q.  Does Don Zale live in Dallas?
7    A.  Yes.
8    Q.  And what's his business, if you know?
9    A.  A company called Capitol Entertainment,
10   C-A-P-I-T-O-L.
11   Q.  So you called Mr. Zale, or vice versa?
12   A.  I called him.
13   Q.  And asked to go for a ride?
14   A.  Right.
15   Q.  So he flew the plane and you were a
16   passenger?
17   A.  I was right seat.
18   Q.  Right seat.
19       Did you know how to fly that aircraft at that
20   point?
21   A.  Specifically?  No.  That's the first time I
22   had ever been in one.
23   Q.  Okay.  First time you had ever been in one.
24       So you flew around?
25   A.  We took a trip, went hunting.

Page 91

1    Q.  And Mr. Zale gave you information about it
2    and talked to you about it?
3    A.  Yes.
4    Q.  What happened next?
5    A.  He recommended that I talk to the fellow that
6    had found him his airplane, who's a salesman with Texas
7    Piper.
8    Q.  The name?
9    A.  Larry Johnson.
10   Q.  Is he still with Texas Piper?
11   A.  He's with -- I think they're still d/b/a's,
12   Texas Piper, but his actual employer, as I understand
13   it. is Cutter Aviation.
14   Q.  So did you do that?
15   A.  I did, because I first asked him, Mr. Zale,
16   if he wanted a partner.  And he said no.  He said, but
17   you ought to call Larry Johnson, and I bet Larry can
18   find you an airplane to be a partner in.
19   Q.  Was it your intention at that point just to
20   get a partnership interest in whatever plane?
21   A.  Yes.
22   Q.  And did you actually own any airplane or any
23   interest in any airplane at that point in time?
24   A.  What airplane?
25   Q.  In any airplane, at the time you're having

Page 92

1    these conversations?
2    A.  No.
3    Q.  You were without any interest in an airplane?
4    A.  That's correct.
5    Q.  And this is all happening in February --
6    A.  '97.
7    Q.  So you talked to Larry Johnson.  Tell me
8    about that conversation.
9    A.  I said, this is how much money I'm prepared
10   to put into an airplane and do you know of anybody
11   that's looking for a partner.  And he said, no, but
12   I'll look around.  And that took a year.
13   Q.  And during that time, did you continue to
14   have conversations with him, or...
15   A.  Yes.
16   Q.  And did you look anywhere else for an
17   airplane or an interest in an airplane during that
18   year?
19   A.  Not that I recall.
20   Q.  Now, during that time, did you see any
21   documentation about airplanes?
22   A.  Yes.  He sent me all the Piper literature.
23   Q.  And you still have that specific literature?
24   A.  I don't know.
25   Q.  Do you know if it's in any of these boxes

Page 93

1    over here?
2    A.  There is some of the literature in those
3    boxes, yes, I believe.
4    Q.  And by that, I mean literature that you
5    remember getting during this February '97 --
6    A.  Sales brochures.  Well, I mean, this went on
7    over a year's period of time.
8    Q.  So he was constantly sending you literature?
9    A.  No, he wasn't constantly sending me.  The
10   process went on over a year.
11   Q.  Sure.
12   A.  I don't remember when he sent me a brochure.
13   I don't -- I mean, it wasn't that elaborate.  This was
14   an infrequent -- I'd call him and say, have you found
15   anybody yet.  And he'd say, no.
16   Q.  But you did see some brochures?
17   A.  Absolutely.
18   Q.  And you could identify those specific
19   brochures that you saw now?
20   A.  I'm not going to say that.  You know, I don't
21   know if the brochure -- if you said this is a brochure,
22   I don't know if I could say that is the exact brochure.
23   Q.  Okay.  That's what I'm trying to find out,
24   what you remember.
25   A.  Okay.

24 (Pages 90 to 93)

Page 94

1     Q.  Did you get any brochures from Textron
2  Lycoming or anybody?
3     A.  No.
4     Q.  Okay.  So ultimately, he must have told you
5  he found an airplane?
6     A.  Yes.
7     Q.  And when was that conversation?
8     A.  I'm going to say March of '98.
9     Q.  Tell me about the conversation.
10    A.  He just said -- He said, I think these people
11  might be interested in selling you an interest, you
12  need to give them a call.
13    Q.  And who are "these people"?
14    A.  John Vann and Wally Maya, M-A-Y-A.
15    Q.  Where do they live?
16    A.  Today?
17    Q.  Well, where did they live when you were
18  talking to them?
19    A.  They both lived in Dallas.
20    Q.  In Dallas?
21    A.  Uh-huh.
22    Q.  By the way, you mentioned Mr. Vann's -- you
23  called her his ex-fiance.
24    A.  Yes.
25    Q.  Is she ex by a marriage or ex by breaking up?

Page 95

1     A.  Well, if she's an ex by marriage, then she's
2  not his fiance.
3     Q.  Well, she could have been his ex-fiance.
4        So I take it by what you just said, she's an
5  ex by breaking up?
6     A.  Yes.  Well, I don't know the details.  I just
7  know he's married to somebody else.
8     Q.  Oh, he's married somebody else in the
9  meantime?
10    A.  Subsequent to.
11    Q.  Okay.  And what's her name?
12    A.  I have no idea.
13    Q.  Okay.  All right.  So did you call Mr. Vann
14  and Mr. Maya?
15    A.  I did.
16    Q.  And tell me about that conversation.
17    A.  Do you have an interest in selling an
18  ownership position in this aircraft.
19    Q.  They already owned the aircraft at that time,
20  or were they getting ready to buy it?
21    A.  No, they already owned it.  They bought it
22  new.
23    Q.  And do you know when they bought it?
24    A.  No.  It was about a year old, as I recall.
25    Q.  And what did they tell you?

Page 96

1     A.  They said, yes, they'd be interested, let's
2  get together, why don't you come out and look at the
3  airplane, how much time do you have, how much money do
4  you want to spend.
5     Q.  During this year, did you do anything about
6  learning to fly this particular airplane?
7     A.  No.
8     Q.  So you're waiting to get one?
9     A.  Right.
10    Q.  Okay.  So did you go out to see the plane?
11    A.  Yes.
12    Q.  And when was that, approximately?
13    A.  April of '98.
14    Q.  Tell me about that visit.
15    A.  I went out, I met Mr. Vann, he took me in the
16  hangar.  I remember being impressed with how immaculate
17  the airplane was.  I mean, they had it parked on carpet
18  in the hangar.  It was spotless.
19       I remember going inside, seeing if I could
20  get in the airplane, and I could.  That was sort of the
21  end of it.
22    Q.  Did you ride in the plane that day?
23    A.  No.
24    Q.  Okay.  What's the next thing that happened?
25    A.  I played golf with the other partner.

Page 97

1     Q.  Name?
2     A.  Wally Maya.
3     Q.  Oh, the other partner, okay.  I thought you
4  meant other than those two.
5        At that time, they were the two owners?
6     A.  They were the two owners.
7     Q.  Gotcha.
8        When was this; in that same time period?
9     A.  Yeah.
10    Q.  In your conversations, did they talk to you
11  about the airplane?
12    A.  Yes.
13    Q.  Did they make any representations about the
14  airplane to you, as far as you know?
15    A.  Well, I mean, it's a standard 1997 Malibu
16  Mirage, it's got this equipment on it, here are the
17  logbooks, here's what's been done to it.  You know,
18  have you had any operational problems with it; no, to
19  speak of.
20       I mean, we had -- I think there was a
21  turbo-bracket that went out.  It had its annual done
22  before I bought into it.  It was under warranty.  Just
23  sort of general information.
24    Q.  Did they show you any paperwork about the
25  aircraft?

25 (Pages 94 to 97)

Page 98

1      A.   Well, I saw the registration. I saw all the
2  appropriate -- the radio license and the certificate of
3  airworthiness and all that, because I asked for it.
4      Q.   Did you see any promotional or sales
5  literature about that airplane?
6      A.   Not from them.
7      Q.   So all you had seen you had received --
8      A.   From Larry Johnson.
9      Q.   These brochures we talked about a minute ago
10  from Larry Johnson?
11      A.   Right.
12      Q.   Did you ask them any questions about anything
13  you had read in the brochures?
14      A.   No, but I believe they were the ones that
15  showed me the operational computations for what it
16  would cost to operate this airplane per hour, the
17  dealer called it the DOC's.
18      Q.   Okay.
19      A.   And I asked them, I said, has this been true;
20  are the numbers in the book good. And they said, seem
21  to be very good.
22      Q.   And where were these numbers? You say "in
23  the book."
24      A.   Well, there was a piece of literature put out
25  by Piper that actually demonstrated the cost of

Page 99

1  operating this airplane on an hourly basis based on
2  certain presumptions. And I believe there were
3  300 hours a year of usage, 2,000-hour TBO, $100,000.00
4  for a factory re-mand. They made some presumptions
5  about insurance costs and hangarage and oil consumption
6  and what have you.
7      Q.   So they just presumed in the calculation that
8  you'd have to spend $100,000.00 after 2,000 hours?
9      A.   That was the factory-recommended number, was
10  $50.00 an hour engine reserve. $50.00 an hour times
11  2,000 hours is a $100,000.00.
12      Q.   No, no, I meant the cost of the new engine,
13  the re-manufactured --
14      A.   I've heard several different numbers on that.
15      Q.   And they showed you this piece of literature
16  that day?
17      A.   Well, at some point in time during the
18  negotiation.
19      Q.   And that contained a reference to 2,000 hours
20  TBO?
21      A.   Yes.
22      Q.   And do you remember exactly what it said in
23  its entirety about TBO?
24      A.   Yeah, 2,000 hours.
25      Q.   Nothing else?

Page 100

1      A.   Not that I recall.
2      Q.   No qualifications?
3      A.   Not that I remember.
4      Q.   In fact, you told me earlier today you've
5  never seen any qualifications on the 2,000 TBO number.
6      A.   Not that I recall.
7      Q.   Okay.  So what happened next?  You played
8  golf with Mr. Maya?
9      A.   He said I was an okay guy, let's let him in
10  the partnership.
11           And then we spent about -- We came to a
12  verbal agreement.  I wrote them a check.  And I started
13  flying the airplane with an instructor.
14           And then we worked on papering the
15  transaction, and that took a good long while, but it
16  ultimately got papered.
17           So I flew the aircraft, I went to flight
18  school.  The insurance company required me to get
19  50 hours in make and model before they would let me fly
20  it solo.  I did that.  And then we went on about our
21  business.
22      Q.   When was everything final so that you had
23  ordinary unlimited use of the aircraft?
24      A.   In May.  May or June.
25           Well, let me qualify that.  I didn't have

Page 101

1  unlimited use of the aircraft or access to it until
2  after I had gone to flight school, which was, I think,
3  in June.
4      Q.   Okay.
5      A.   But I had access to the airplane immediately.
6      Q.   And up until that point, had you received any
7  other literature, promotional or otherwise, about the
8  aircraft from any source?
9      A.   Well, I had read -- There had been a number
10  of articles on the Mirage, and various flying
11  publications, so yeah, I read all that stuff.
12      Q.   That would be by third parties?
13      A.   Yeah.
14      Q.   And not by Piper specifically.
15           Did you ever get any document from Lycoming
16  prior to your completing the transaction and owning
17  your interest in this aircraft?
18      A.   Well, I didn't, other than the literature,
19  no.
20      Q.   What literature did you get from Lycoming?
21      A.   Well, the brochures, which were Piper
22  brochures, but implicit in those brochures was the
23  2,000 -- I mean, it says 2,000-hour TBO.
24      Q.   Well, that wasn't my question.
25      A.   Okay.  What's your question?

26 (Pages 98 to 101)

Page 102

1    Q.  My question was, you told me about the
2  literature you got from Piper during that year --
3    A.  Right.
4    Q.  -- from Mr. Johnson, the Piper distributor.
5    My question is, did you ever get any
6  promotional literature from Lycoming, Textron, or
7  anybody who appeared to be the manufacturer of the
8  engine?
9    A.  Not -- No.
10   Q.  Now, have we talked about all of the
11  interests you've ever had in a Malibu Mirage?
12   A.  Yes.
13   Q.  Have you ever had an interest in any plane --
14  any other plane that had a Lycoming engine in it?
15   A.  I don't know.  I don't remember if the Seneca
16  had Lycoming or not.  That had been a long time ago.
17   Q.  Have you had experience in other aircraft
18  that you've flown or been involved with with this
19  concept of TBO?
20   A.  Yes.
21   Q.  Have you ever owned an engine that -- Have
22  you ever owned an aircraft long enough that you got to
23  the recommended TBO, the end of the recommended TBO
24  period?
25   A.  No.

Page 103

1    Q.  And is that because you had gotten out of the
2  plane sooner?
3    A.  Yes.
4    Q.  Have you ever had a plane that had to be
5  overhauled before the recommended TBO for any reason at
6  all; either had an interest in such a plane or flown
7  such a plane?
8    A.  That depends on how you want to classify the
9  WOWAM aircraft.
10   Q.  Okay.  All right.  I know about the WOWAM
11  aircraft.
12   A.  Other than that, no.
13   Q.  Do you know how many hours there were on the
14  WOWAM aircraft when you bought into it?
15   A.  I believe it was around 500.
16   Q.  Do you know how many hours on the Mike Alpha
17  aircraft when you bought into that?
18   A.  I believe it was around 1,200.
19   Q.  How did you arrive at the price that you paid
20  for the WOWAM interest?
21   A.  Well, they made a stated -- They put a stated
22  number on the table and said, if you want to buy an
23  interest in this airplane, this is the 88 value, and
24  we'll sell you up to X percent.
25   Q.  Do you know what they paid for the plane new?

Page 104

1    A.  I believe it was $785,000.00.
2    Q.  And what did they say was the value when you
3  were talking to them?
4    A.  750,000.
5    Q.  And did that seem like a reasonable
6  depreciated number to you.
7    A.  Yes.  Yes, it did.
8    Q.  Did you shop that around anywhere?
9    A.  I looked at some comparable figures, and
10  Controller, that's an aircraft -- it's like Trader
11  Plane.
12   Q.  And did you accept the 750 number in your
13  calculation of what you were willing to pay for an
14  interest in the plane?
15   A.  Yes.
16   Q.  And so if you wanted to buy a 25 percent
17  interest, you were willing to pay 25 percent of the
18  750,000?
19   A.  Correct.
20   Q.  And is that what you did?
21   A.  No.  I bought a third.
22   Q.  Okay.  And you bought into the partnership;
23  is that how it happened?
24   A.  I bought a membership in the limited
25  liability company.

Page 105

1    Q.  The L.L.C., right.
2    And was that L.L.C. created, as far as you
3  know, for any reason other than to hold title of this
4  aircraft, the WOWAM aircraft?
5    A.  Say that again?
6    Q.  Do you know of any other reason for that
7  L.L.C. other than to hold title to this WOWAM aircraft?
8    A.  No.
9    Q.  That was the reason?
10   A.  That's the only reason.
11   Q.  It had no other business?
12   A.  Right.
13   Q.  Now, when you were talking about purchasing
14  the interest in the interest of the Mike Alpha plane,
15  the interest in the company that had the interest, how
16  did you go about valuing that?
17   A.  Same way.
18   Q.  Okay.
19   A.  Looked at comps.
20   Q.  What did they pay new?  Do you know what the
21  original purchase price of Mike Alpha was?
22   A.  I do not.
23   Q.  And you said it had 1,200 hours at the time?
24   A.  About.
25   Q.  Who did you actually negotiate with for

27 (Pages 102 to 105)

Page 106

1    Mike Alpha?
2        A. Steve Boyd, SKB.
3        Q. Okay. And what value was he actually placing
4    on the plane at that point?
5        A. 600,000.
6        Q. And that would be a 1,200-hour --
7        A. Right.
8        Q. And was that the right number as far as you
9    were concerned?
10       A. I thought it was an exceptionally good deal,
11   because it was a year older airplane, and a year prior
12   to that, I just paid 750,000 equivalent for an
13   identical airplane, so...
14       Q. So did that become the operative number in
15   calculating your interest?
16       A. Yes.
17       Q. So you essentially paid 150,000?
18       A. Yes.
19       Q. In terms of the maintenance experience that
20   you had on both planes, when you were involved in the
21   WOWAM plane, as well as the later one, did you
22   subscribe to any service materials for the plane, or
23   did you rely on the mechanics to get that kind of
24   information?
25       A. Well, I subscribe to AOPA Pilot, Flying

Page 107

1    Magazine, and to three other publications that have to
2    do primarily with instrument flying, and they're
3    monthly, but one of them, and I can't remember which
4    one, also regularly puts out copies of service
5    bulletins.
6          So to that extent, you might say that I
7    relied on the mechanic to comply with service
8    bulletins, but you might also say that I read a great
9    deal of literature on an ongoing basis to make sure
10   that there weren't any out there.
11         Now, does that constitute official notice? I
12   don't know.
13       Q. Okay. Okay.
14       A. And I look at the MMOPA website.
15       Q. During the period of time that you were
16   flying the first plane and since you've been involved
17   with the second plane, have you personally discovered
18   any service bulletins, for instance, that you called
19   the mechanic up and told him about?
20       A. I don't know how to answer that question. I
21   mean, when you say I personally discovered.
22       Q. Did you read about something in a magazine
23   and say there's a service bulletin on our plane and
24   call the mechanic and say, do you know about this
25   service bulletin, and he said, no, I didn't know about

Page 108

1    it, or I did know about it?
2        A. The one time I called him, he did know about
3    it.
4        Q. And what was that; do you remember?
5        A. No. He usually -- I mean, he calls us.
6        Q. Okay. During all the relevant time period,
7    have you had any -- Are you aware of any AD's on either
8    airplane?
9        A. Well, there was the spar mod.
10       Q. You mentioned that earlier.
11       A. I don't know of any other AD's. I'm not sure
12   if the TIT probe was an AD, but I think it was, but our
13   airplane was exempt because of the kind of system it
14   had in it, both of them.
15       Q. Any others you can think of?
16       A. No.
17       Q. How about any mandatory service bulletins; do
18   you recall any of those associated with either
19   aircraft?
20       A. There's the oil change.
21       Q. The one we talked about earlier?
22       A. Yes.
23       Q. We'll talk about those more in a few minutes.
24       A. I don't -- None come to mind. I'm not saying
25   they weren't there, just none come to mind right now.

Page 109

1        Q. Have you ever had any litigation as a result
2    of AD's or mandatory service bulletins on aircraft?
3        A. No.
4        Q. What about STC's; are you familiar or do you
5    know whether either aircraft had any STC's?
6        A. I've already answered that question.
7          The spoilers on Mike Alpha were an STC.
8    That's the only STC I know of.
9        Q. Only one you know of, okay.
10       A. Well, we put a four-blade prop on 85 Whiskey.
11       Q. Who's "we"?
12       A. WOWAM.
13       Q. When did you do that?
14       A. May or June of '99.
15       Q. Tell me how that came about. Who's idea was
16   it?
17       A. John Vann's.
18       Q. And what caused him to want to do that?
19       A. We just had a turbocharger bracket failure
20   that was covered under warranty, but Henley's Aircraft,
21   who at the time was the local Addison Piper repair
22   facility, recommended that one of the ways to diminish
23   the vibration on the aircraft was to go to the
24   four-blade prop. This was about the same type Piper
25   had come out with a three-blade prop for the factory,

28 (Pages 106 to 109)

Page 110

1  and you couldn't get them.
2      Q.  You couldn't get a three?
3      A.  Couldn't get a three.
4      Q.  Now, who was the individual that specifically
5  recommended that the four-blade prop may have some
6  positive influence on vibration?
7      A.  Scott Lauper.  I think it's L-A-U-P-E-R.
8      Q.  And this person works for?
9      A.  Henley.
10     Q.  And that's a Piper distributor?
11     A.  Service center.  Was.
12     Q.  Was, okay.
13     A.  They had done several installations and had
14 noticed a market decrease in vibration-related repairs.
15     Q.  They had noticed a decrease in repairs
16 because of what?
17     A.  Lack of vibration.
18     Q.  On planes that have four-blade props?
19     A.  Right.
20     Q.  So who did the actual paperwork?  Was there
21 an STC --
22     A.  I don't know.  I don't know if it's an STC,
23 but I believe it is, because it's a supplemental part,
24 not factory, so I'm pretty sure it's an STC.  And it
25 had been STC.  So yes.

Page 111

1      Q.  And it was installed by...
2      A.  By Henley.
3      Q.  Was that done on Mike Alpha?
4      A.  No.
5      Q.  So what does Mike Alpha have?
6      A.  The factory two-blade.
7      Q.  Two blades?
8      A.  Yeah.
9      Q.  Have you had any work done on the bearings on
10 Mike Alpha?
11     A.  No.
12     Q.  Do you plan to have the recommended work done
13 on those?
14     A.  No.
15     Q.  Why is that?
16     A.  Because it's, as we read the service
17 bulletin, as long as you maintain the 10-hour oil
18 changes, it's not a safety-of-flight issue.  And it's
19 uneconomic at this stage in the aircraft's life to just
20 put con rod bearings, and in fact, that may in fact
21 exacerbate the problem rather than fix it.
22         And in a very cleverly-worded second service
23 bulletin, you're required to split the crank case and
24 check to see if the main bearings that are in that
25 motor are in fact a certain series of main bearings.

Page 112

1      And it's our understanding that they can't be, because
2  the main bearings that are the replacement main
3  bearings were not even made until 1999 or 2000.
4          So what the factory wants us, in effect, to
5  do is basically pay for a factory overhaul under the
6  guides of replacing the con rod bearings.
7          And after reading the testimony that I read
8  about the way the factory runs itself, I don't think I
9  want factory --
10     Q.  By the testimony, you mean the interviews
11 that are in the boxes over here?
12     A.  Yes.
13     Q.  So have you had any --
14     A.  Let me finish.
15     Q.  I'm sorry.  I thought you were.
16     A.  The understanding when I bought into
17 Mike Alpha was that this was a test period for about a
18 year until the Meridian became available, and that we
19 would sell the Malibu and become partners in the
20 Meridian if the partnership with the Malibu proved to
21 be satisfactory.
22     Q.  Okay.
23     A.  So this is an interim period deal.
24     Q.  So where are we on that continuum then?
25     A.  Well, I'm not sure.

Page 113

1      Q.  Does the year run in June this year?
2      A.  Well, the Meridian delivery is actually in
3  the third or fourth quarter of 2001.  And I -- We're
4  trying to figure out a way to convert that asset plus
5  this airplane into a TBM 700.
6      Q.  So you have every intention at this point,
7  and you always have had the intention to sell
8  Mike Alpha in the short-term?
9      A.  Right.
10     Q.  And that was your intention as of the time
11 you purchased into Mike Alpha?
12     A.  Well, that was the conditions.  I mean, it
13 was understood that that's what we were trading into.
14     Q.  Is that written down anywhere, that
15 agreement?
16     A.  No.
17     Q.  But you have an agreement with the partners
18 that -- You had an agreement when you purchased the
19 interest --
20     A.  I would call it an understanding.
21     Q.  Understanding.  You had an understanding with
22 the partners when you purchased the interest in
23 Mike Alpha that Mike Alpha would be sold as soon as you
24 could get a Meridian?
25     A.  That's right.

Page 114

1    Q.   And have you taken any steps towards selling
2    Mike Alpha?
3    A.   I believe it just got listed.
4    Q.   And what was it listed as, what price?
5    A.   I believe it's 623,000.
6    Q.   And who came up with that price?
7    A.   Larry Johnson.
8    Q.   He's the dealer person that you talked about
9    before, or distributor?
10   A.   Right.
11   Q.   And is that based on market research he's
12   done and so forth?
13   A.   I don't know what it's based on. Nothing
14   that I can tell is reality, because Larry Johnson just
15   sold a two-year newer aircraft with better equipment
16   for 625,000 that was a 500-hour airplane that was in
17   pristine condition.
18   Q.   What are your hours on this one, Mike Alpha?
19   A.   1460.
20   Q.   So you've put 260 since you've had it?
21   A.   Well, the group has.
22   Q.   That's what I mean. How much of that would
23   be you?
24   A.   Probably half.
25   Q.   So you think the 623 is a little on the high

Page 115

1    side?
2    A.   I think it's a lot on the high side. I think
3    if you offered me 500 for that airplane today, I'd jump
4    all over it.
5    Q.   I take it that the in the repairs, or in the
6    maintenance rather, you have not seen any metal in the
7    oil in the Mike Alpha?
8    A.   No.
9    Q.   That was a bad question. I want to make sure
10   your answer meant what I thought it meant.
11       Have you seen any metal in the oil in
12   Mike Alpha?
13   A.   Well, I don't look at the oil. We send it
14   off for analysis.
15   Q.   Sure.
16   A.   We've seen no reports back that there's been
17   any metal in the oil, other than the expected trace
18   amounts.
19   Q.   Have you had any experience with Mike Alpha,
20   any excessive oil usage?
21   A.   No.
22   Q.   How about with WOWAM; did you have any
23   excessive oil usage with WOWAM?
24   A.   No.
25   Q.   Did you ever have any metal in the oil in

Page 116

1    WOWAM as far as you know?
2    A.   No. And we did do 25-hour oil analysis.
3    Q.   In your training on the Mirage that you
4    received, were you taught anything specifically about
5    the operation of the engine on climb, cruise, and
6    descent?
7    A.   Yes.
8    Q.   Can you summarize that for me?
9    A.   Okay. Which training?
10   Q.   I'm sorry?
11   A.   Which training, the initial or the current?
12   Q.   Well, let's start with the initial.
13   A.   The initial? The initial training --
14   Q.   And then tell me how it's changed, if it has.
15   A.   The initial training is that you may fly the
16   airplane at max continuous power all the way to
17   18,000 feet. The best rate of climb I want to say is
18   125 knots and 1,000 feet a minute, full fuel -- I mean,
19   full rich, 42 inches.
20       Cruise, there's two or three different
21   settings depending on how much power you want to burn
22   and how much gas you want to burn, but we generally
23   flew it at 30-24; 30 inches of manifold pressure
24   2,400 RPM's.
25       We would lean for temp as opposed to fuel

Page 117

1    flow, but the fuel flow numbers were generally -- This
2    is depending on altitude, too. We pretty consistently
3    were using 20 to 21 gallons an hour. I've been told
4    you can lean to 18, but you can actually feel it if you
5    overlean the engine. There's a noticeable change. And
6    the cylinder head temperatures go up above 400, and you
7    get above 1650 on the TIT. We always flew it under
8    400, under 1625, which is about two or three gallons
9    rich of book.
10   Q.   Has that changed in your subsequent training?
11   A.   Well --
12   Q.   I mean, you told me earlier what your current
13   opinions are with the placard and all, but...
14   A.   Well, that's where I want to be very careful.
15   I don't know that this training has the endorsement of
16   the factory, but the guys from the factory all say
17   under 400, under 1650, and no more than five minutes
18   continuous max power, pull back to 35 inches of
19   manifold pressure, and you can pull the fuel burn back
20   as long as you're watching your cylinder head temps to,
21   generally speaking, about 33 gallons; whereas, full
22   fuel is 40.
23   Q.   That reminds me of something I wanted to ask
24   you earlier.
25       Those three criteria that you just mentioned

Page 118

1   are the same three that are contained in this placard
2   that your lawyers are sending out with the survey; is
3   that right?
4       A.  I believe so.
5       Q.  And you said the guys from the factory told
6   you that. Who are the guys from the factory that
7   you're talking about?
8       A.  Bob Stickle works for, I think they now call
9   it Simcom. Simcom bought Attitudes, Attitudes being
10  the original, quote, unquote, factory school. Stickle
11  does, I believe, still work for that organization.
12  Now, whether that has factory blessing or not, I'm not
13  certain.
14      Q.  He's the source of that?
15      A.  Well, he's not the only source. Lester Kyle
16  recommends that, too.
17      Q.  How do you spell that?
18      A.  K-Y-L-E.
19      Q.  Anybody else?
20      A.  I would say in numerous conversations with
21  other owners, that's just sort of the general opinion,
22  that you've got -- you can't run it more than five
23  minutes continuous max power.
24      Q.  And can you name any of these other owners
25  that you talked to about it?

Page 119

1       A.  Don Zale, Dick Duamais.
2       Q.  Where is he?
3       A.  Dallas. Dallas.
4       Q.  Okay.
5       A.  Steve Boyd flies the airplane that way. You
6   know, there's a lot of people I just met at the MMOPA
7   convention.
8       Q.  Can you think of anybody else that you would
9   attribute these recommendations to?
10      A.  No.
11      Q.  Now, Stickle you mentioned. Did you talk to
12  him directly about that?
13      A.  I was flying with him.
14      Q.  And he told you this is what I recommend?
15      A.  He said watch the cylinder head temps, watch
16  the TIT temps, and max continuous for no more than
17  five minutes.
18      Q.  Okay. And that man, he's the one that came
19  up with the 400 and the 1650 numbers?
20      A.  Yeah, as well as Kyle does.
21      Q.  And you talked to Kyle directly about this?
22      A.  Yeah.
23      Q.  And who is Kyle?
24      A.  He's another insurance type instructor,
25  independent contractor.

Page 120

1       Q.  And when did you first hear this from these
2   people, from anybody?
3       A.  I'm trying to remember.
4       Q.  Sure. Take your time.
5       A.  I would say in the spring of 2000, and I
6   can't be more precise than that.
7       Q.  And do you remember who the first person was?
8       A.  No.
9       Q.  This may have multiple answers depending on
10  which person you're talking about, but I'm trying to
11  find out why anybody would have made this
12  recommendation to you. To the extent they had
13  different reasons, I want to know the different reasons
14  of different people.
15      A.  Well, once we had the incident with
16  85 Whiskey, I started asking a lot of questions to a
17  lot of different people about what happened, why did
18  this happen. And I believe that's when this issue
19  that, well, I fly the airplane to max continuance to
20  five minutes. The Navaho says five minutes maximum
21  with the same stuff on it, but I remember distinctly
22  asking Steve Boyd if that's the way he flew the
23  airplane, and he said, yeah, we only use max
24  continuance for five minutes.
25      Q.  All right. Now, you had the WOWAM incident?

Page 121

1       A.  Right.
2       Q.  And then you start asking people what could
3   have caused the WOWAM incident?
4       A.  Right.
5       Q.  And you ultimately came up with those three
6   theories that you told me you talked to your lawyers
7   about in April of 2000, correct?
8       A.  Right.
9       Q.  And when somebody told you that they fly the
10  engine within these parameters, did they specifically
11  relate it to an incident such as the WOWAM, or was this
12  just general operating parameters they use?
13      A.  My impression was it was general operating
14  parameters.
15      Q.  And do you know why they chose those
16  operating parameters?
17      A.  No.
18      Q.  Nobody ever told you why; Stickle or Kyle
19  or --
20      A.  They just said sort of this is -- the engine
21  has a problem living if you run it at max continuous
22  power for more than five minutes. If you run it all
23  the way to altitude, the chances of you getting to TBO
24  are not good.
25      Q.  Did anybody give you any specific types of

31 (Pages 118 to 121)

Page 122

1 failures that you might expect if you didn't do that?
2    A. Not that I recall.
3    Q. And I take it you had not been operating the
4 WOWAM aircraft within what we'll call the revised
5 operating parameters?
6    A. No.
7    Q. And you had not -- Let's see. When you began
8 to operate the Mike Alpha, did you operate that within
9 these revised parameters?
10    A. Well, that's one reason I bought into it,
11 because they had already been operating that way, and
12 they made it to a pretty high time doing so.
13    Q. Do you expect that Mike Alpha is going to
14 make it to 2,000 hours?
15    A. No, I know it won't.
16    Q. Why is that?
17    A. Because you have to comply with the service
18 bulletin. No engine out there will make it to
19 2,000-hour TBO.
20    Q. Explain that to me.
21    A. Because you have to comply with the service
22 bulletin. It didn't make it. And in complying with
23 that service bulletin, if you change the con rod
24 bearings, you have to split the crank case. If you
25 split the crank case, it didn't make it, by definition.

Page 123

1    Q. But if you don't comply with it, as you've
2 not done yet, you believe it will make it?
3    A. I don't know.
4    Q. Do you have any reason to think it won't at
5 this point?
6    A. I'm going to answer that by saying that I
7 think there is a possibility that that engine -- in
8 fact, a reasonable possibility, that that engine will
9 not make it to TBO. And I fly it accordingly.
10       And let me tell you what I mean by that. I
11 do not fly night IMC. I do not fly IMC over the
12 mountains. If that airplane loses an engine, I have a
13 safe place to put it down with plenty of visibility.
14 It has, in effect, become a daytime IMC airplane, not
15 over the mountains.
16       MR. AMES: If you're going to another
17 subject, question, we're going to bring sandwiches
18 in. Do you want us to bring them in for you-all,
19 too?
20       MR. REID: No, we're going to leave for a
21 little bit, I think. Now is a good place to stop.
22 We'll be about an hour.
23    (Lunch recess taken from 12:05 p.m. to 1:23 p.m.)
24
25

32 (Pages 122 to 123)

**A**

aberration 77:2
ability 43:19
able 6:24 42:20
above 21:20,22 117:6,7
above-entitled 4:9
above-named 4:10
Absolutely 93:17
accept 104:12
access 101:1,5
accessories 53:7
accordingly 123:9
acquiring 89:5
action 3:10 9:3 70:15
   74:23
activity 30:4
actual 54:18 65:19
   91:12 110:20
actually 24:12 33:4,21
   33:24 36:15 38:7
   46:18 48:6 52:10
   53:10 54:11 63:7
   70:7 71:10 72:17
   79:6 91:22 98:25
   105:25 106:3 113:2
   117:4
AD 48:20,21 49:4,9
   108:12
added 62:25
Addison 43:2 77:19
   82:16,17 109:21
addition 20:13
additional 64:24
address 4:20,23 7:15
   7:18
addresses 7:5,6,8 8:7
adopt 22:19
adult 7:12
advanced 6:4
advertised 63:5
advertisement 54:14
advertising 54:13
   55:20
advertizing 67:22
advisories 50:20
advisory 3:22,23 50:23
AD's 62:10 108:7,11
   109:2
aerobatics 65:24
affidavit 3:16 12:3
after 15:23 32:14 38:16
   57:2 58:22 65:3
   68:14,16 74:9 75:23
   85:6 99:8 101:2
   112:7
again 59:2 66:1 105:5
against 12:22 75:1,15
agency 39:18
ago 17:14 18:20 33:3
   41:2 51:2 62:10
   63:21 98:9 102:16
agreed 79:23
agreement 100:12
   113:15,17,18
AIG 75:5
Air 37:21 73:10

aircrafts 62:20,20
aircraft's 111:19
airplane 9:6,16 10:16
   18:12 24:10 28:12
   29:5,7,7,8,10 32:15
   32:17 33:1,12 34:21
   35:2 38:12 40:3,5
   42:22,23,25 43:1
   48:24 49:21,23,24
   52:22 57:3 62:18
   63:8 66:6 72:19 74:6
   74:12 76:1,18,21 78:7
   79:5,25 83:1,16,20
   84:19 85:4 86:11,13
   89:3,11,14 91:6,18,22
   91:23,24,25 92:3,10
   92:17,17 94:5 96:3,6
   96:17,20 97:11,14
   98:5,16 99:1 100:13
   101:5 103:23 106:11
   106:13 108:8,13
   113:5 114:16 115:3
   116:16 119:5 120:19
   120:23 123:12,14
airplanes 24:1 28:6
   56:22 57:11 79:20
   92:21
airport 37:23,24 38:16
   82:17
Airways 9:23
airworthiness 48:16
   98:3
Alan 10:8,12 89:8,11
   89:18
allegations 71:6
allows 69:10
Alpha 28:10,12 29:5,6
   43:13 49:20 62:24
   71:21 72:18 74:7,8
   76:24 77:10 78:8,16
   82:17,18 84:22 85:12
   87:24 103:16 105:14
   105:21 106:1 109:7
   111:3,5,10 112:17
   113:8,11,23,23 114:2
   114:18 115:7,12,19
   122:8,13
already 12:9 19:17,21
   26:2 32:4 63:19
   68:15,16 73:5 95:19
   95:21 109:6 122:11
alternative 23:1 74:14
alternatives 54:9
altitude 65:17 117:2
   121:23
altogether 48:12
Alton 30:25
always 31:4 66:5 113:7
   117:7
Amended 3:10 15:17
   27:24 70:14
amendment 54:22
ames 2:4 14:12,13,17
   25:25 26:5 28:18
   40:13 42:6,12,15,22
   43:11,18 54:23 55:2

55:17,20 59:2 62:6
   73:12 87:25 123:16
amount 48:9
amounts 115:18
analysis 115:14 116:2
and-a-half 8:11 36:11
   47:16 76:2
angles 65:20
annual 97:21
another 17:4 30:24
   31:5 33:24 73:3
   75:24 80:15 119:24
   123:16
answer 21:3 29:13
   52:15 53:2 56:24
   60:19 61:16 71:2
   79:12 87:18 107:20
   115:10 123:6
answered 109:6
answers 120:9
Antonio 2:11
anybody 14:13 21:15
   28:18 35:18 39:8,14
   43:13 61:9,13,21
   75:14 82:5,9 84:23
   92:10 93:15 94:2
   102:7 118:19 119:8
   120:2,11 121:25
anyone 28:21
anything 6:21 8:18
   12:7 15:16 17:9
   18:19 23:21 27:5
   43:5 45:21 46:14
   47:7 53:1 56:10 66:2
   69:20 71:12 78:6
   80:10 96:5 98:12
   116:4
anywhere 8:4 74:22
   85:6 92:16 104:8
   113:14
AOPA 106:25
apologize 16:22
apparently 33:23
APPEARANCES 2:1
appeared 77:3 102:7
appears 76:8 78:5
   80:25 88:10
approach 47:8
appropriate 98:2
approved 44:18 62:16
approximately 14:24
   18:22 39:23 57:19
   96:12
April 18:25 33:6 34:3
   37:11 39:23 60:23,23
   71:19 76:5,6 77:24,24
   79:21 81:1 96:13
   121:7
area 37:5
around 32:20 37:8,9
   49:15,17 74:13 90:24
   92:12 103:15,18
   104:8
arrangements 61:17
arrive 23:1 103:19
Arrow 46:24 48:9

articles 101:10
Aside 12:9 28:24
asked 21:6 32:4 41:25
   43:11 78:3 86:25
   90:13 91:15 98:3,19
asking 30:17 120:16,22
   121:2
assembled 36:15
assembly 27:1,4 36:12
asset 72:3 113:4
assets 29:20
assigned 8:5
assignment 7:9
associated 9:10 12:11
   12:19 52:20 62:21
   64:6 68:13 108:18
associates 34:7
assume 15:11 20:22
   25:1 39:8 52:8
assumed 55:21 87:20
assured 41:23
as-needed 83:10
attachment 40:22
   49:11
attachments 49:13
attempt 33:11
attempted 43:15
attempts 46:2
attended 37:19,20
   38:11,16
attending 37:14
Attitudes 59:18 60:8
   118:9,9
attorney 13:19 14:10
attorneys 14:9 17:24
   38:2,3 39:23 41:15,24
attracted 67:23
attribute 119:9
authorize 22:8
authorized 46:10
available 112:18
Avco 2:19,23 54:20,25
   55:8,14 69:25
Avenue 4:22 5:5
aviation 31:14 39:14
   44:12,15 50:15 57:17
   72:5,6,11,17,17,20,22
   80:3,9,13 81:14 82:12
   86:16 88:23 91:13
avionics 61:22
avoid 57:6
aware 56:4 63:18,24
   64:6 67:11 84:18
   108:7
awhile 78:12
a.m 1:20 4:7 62:8,8

**B**

Bachelor's 6:1
back 25:1 27:16,17,19
   31:4 41:1 61:16
   71:14 78:14 81:20
   82:1 85:6 88:23
   115:16 117:18,19
background 17:1
bad 88:2 115:9

bank 31:1 86:19
based 24:9 89:21 99:1
   114:11,13
basically 49:13 112:5
basis 29:21 31:17 46:8
   53:15 69:11 83:10
   99:1 107:9
bateman 2:16 3:4,5
   87:21
battle 74:11
Beach 1:19 2:7 4:5,6
   22:7 58:15 59:11,16
   86:5
bearing 36:24 37:4,5,6
   37:7,8 50:8 65:5
bearings 111:9,20,24
   111:25 112:2,3,6
   122:24
became 7:12 71:18,24
   74:9 84:9 89:4
   112:18
become 74:5 88:16
   106:14 112:19 123:14
becomes 88:5
becoming 80:7
beef 49:13
before 4:2,9 5:2,8 8:22
   12:3,11 17:10 19:22
   20:4 21:10 24:12
   30:24 38:4,19 40:20
   44:12 48:4 50:10
   58:22 70:14,19 71:1
   73:20 78:5 80:11
   81:6,19 84:12,12,21
   87:16,18 97:22
   100:19 103:5 114:9
began 75:22 76:17
   122:7
begin 45:1
beginning 4:6
behalf 1:4 33:15
being 4:14 11:7 46:1
   47:1 60:5 61:21
   96:16 118:9
believe 11:3 13:4,18
   16:18 18:2 19:3,23
   20:25 21:24 22:10
   24:13 25:2,4,7 26:18
   33:6,14 34:4,18,18,20
   35:13 36:18 37:5
   41:3,15 43:11 44:9
   45:8,16 48:15 49:20
   51:9,10 53:9 57:25
   59:20 62:24 67:25
   68:9,9 69:16 70:10
   71:8 74:23,25 88:18
   93:3 98:14 99:2
   103:15,18 104:1
   110:23 114:3,5 118:4
   118:11 120:18 123:2
below 64:3
BENJAMINE 2:20
besides 8:20 28:18
   56:11
best 22:19 43:19
   116:17

**bet** 91:17
**better** 22:8 88:6 114:15
**between** 16:5 17:14 32:13 35:6 51:8
**BFI** 86:1
**Bismuth** 11:10
**bit** 14:5 42:21 43:23 48:10 68:25 87:7 123:21
**bi-annual** 46:17,18 47:6
**blades** 111:7
**blessing** 118:12
**blew** 34:25
**blow** 37:3
**blown** 9:3 32:9,10
**blows** 37:1
**Bob** 86:7,8 118:8
**bolt** 49:13
**book** 98:20,23 117:9
**boost** 22:9,14,16
**born** 5:22
**both** 22:7 49:15 58:3,6 59:3 60:8 94:19 106:20 108:14
**bought** 63:8 80:1,1,16 81:6,19 95:21,23 97:22 103:14,17 104:21,22,24 112:16 118:9 122:10
**Boulevard** 2:3
**box** 26:17
**boxes** 15:7,10 19:2 25:24 41:18,21,24 42:3 81:8 92:25 93:3 112:11
**Boyd** 72:9 77:11 106:2 119:5 120:22
**bracket** 77:23 109:19
**BRANTON** 2:10,12 83:24
**break** 62:5
**breaking** 94:25 95:5
**briefly** 47:3
**bring** 34:16 123:17,18
**broad** 83:6
**brochure** 67:25 93:12 93:21,21,22
**brochures** 67:17 70:4 93:6,16,19 94:1 98:9 98:13 101:21,22,22
**broker** 87:5
**Brothers** 80:14 81:10
**brought** 10:4
**built** 55:5,8 67:15 71:9 79:2
**bulletin** 107:23,25 111:17,23 122:18,22 122:23
**bulletins** 15:14,19,21 49:25 50:3,6,12 107:5 107:8,18 108:17 109:2
**bunch** 27:10 38:1,15
**burdensome** 83:10
**burn** 51:25 116:21,22 117:19
**burt** 2:6 4:4
**Busch** 10:8,12 89:8,18
**Busch's** 89:11
**business** 6:12 8:5,14 12:11 30:12,20 31:5,9 31:13,15 61:18 74:13 75:24 90:8 100:21 105:11
**buy** 95:20 103:22 104:16
**B-I-S-M-U-T-H** 11:10

**C**

**cake** 64:20
**calculating** 106:15
**calculation** 53:18 99:7 104:13
**California** 38:13
**call** 18:11 19:7 30:15 31:17 36:5 51:3 58:6 68:23 91:17 93:14 94:12 95:13 107:24 113:20 118:8 122:4
**called** 11:13 12:2 21:14 30:25 37:7 41:6 46:16 50:18 65:8 77:11,11,20 80:14 88:12 90:9,11,12 94:23 98:17 107:18 108:2
**calling** 35:5
**calls** 108:5
**came** 25:1,12,21,22 80:12 100:11 109:15 114:6 119:18 121:5
**candidate** 36:4
**Capitol** 90:9
**caps** 17:22
**CARBOY** 2:24 25:23
**career** 48:3 57:23
**careful** 66:9 73:23 117:14
**CARLTON** 2:17
**carpet** 96:17
**carrier** 39:11 40:4,6,7 74:16 75:2,6,7,11,15
**carriers** 38:20
**cartridge** 11:11 30:21 31:6
**case** 1:2 10:20,24 11:6 11:16 12:3,6,9,19,21 13:1,10,14,22 19:18 33:4 34:1 39:24 48:5 54:19 55:10 111:23 122:24,25
**cases** 12:17
**Cassese** 39:19
**Cast** 12:6
**Casting** 11:13
**cause** 4:9 37:5 66:3 74:23
**caused** 109:18 121:3
**causes** 76:15
**center** 110:11
**certain** 63:13 68:20 99:2 111:25 118:13
**certainly** 37:5 53:16 60:11 64:19 65:16 69:17
**certificate** 63:3 98:2
**certificates** 62:13,15
**certified** 4:15 45:14 65:23
**Cessna** 9:4 31:19,22 32:9 45:10 48:8,10 58:1
**CFAA** 44:3
**CFII** 58:24
**chance** 40:23 42:9
**chances** 121:23
**change** 49:1,9 80:5,17 83:1,2,11 108:20 117:5 122:23
**changed** 116:14 117:10
**changes** 24:21 50:9 52:21 111:18
**Chapman** 34:7
**charged** 14:3
**charles** 2:4 14:12,13 25:23 42:2 54:21
**charter** 31:16,21 35:13
**check** 100:12 111:24
**checks** 30:8 46:2
**chief** 30:20
**children** 5:1
**chose** 121:15
**citizen** 8:15
**City** 4:5 57:16 86:3
**Civ-Roettger** 1:2
**claim** 10:15 32:21 34:21 39:9
**claims** 27:13,14
**clarify** 74:4
**Class** 3:10 70:14
**classic** 57:5
**classify** 103:8
**clean** 73:12
**clear** 36:10 55:12
**cleared** 54:18
**clearing** 26:6
**cleverly-worded** 111:22
**client** 13:5,6,8,17
**climb** 22:19 116:5,17
**climbs** 65:20
**close** 5:16
**closest** 31:15
**cockpit** 66:14
**coking** 65:4
**college** 7:10,13
**columns** 25:17
**come** 17:15 33:22 42:24 63:1 96:2 108:24,25 109:25
**common** 51:19 65:14
**companies** 47:1 60:5
**company** 11:11,12 12:16,18 29:14,16,18 30:2,21 31:6,7 39:2,3 39:12,17 59:19,21 62:18 79:3 82:22 86:17 90:9 100:18 104:25 105:15
**company's** 11:17 13:11
**comparable** 104:9
**compare** 22:17
**Complaint** 3:10 15:18 27:24 70:15,22,24 71:18 73:13
**complete** 4:19
**completing** 101:16
**complex** 72:16
**complicated** 90:4
**complied** 41:13
**comply** 42:11 107:7 122:17,21 123:1
**complying** 122:22
**component** 61:10,14
**components** 64:21
**compression** 64:3,3
**comps** 105:19
**computations** 98:15
**con** 37:4 111:20 112:6 122:23
**concept** 50:25 51:3 102:19
**concerned** 106:9
**concludes** 78:6
**conclusion** 76:7
**condition** 37:7 65:1 114:17
**conditions** 113:12
**confer** 83:9
**configuration** 22:21 23:12
**confusing** 75:4
**connected** 61:10 85:11
**connection** 62:2
**consider** 68:18
**consistent** 81:3
**consistently** 117:2
**constantly** 93:8,9
**constitute** 107:11
**consumption** 64:5 99:5
**contact** 44:12,14 77:8
**contacted** 77:9
**contain** 23:16 41:24
**contained** 15:9 20:21 71:6 99:19 118:1
**content** 40:2
**context** 39:21 53:17
**continuance** 120:19,24
**continue** 92:13
**continuous** 21:19 22:15 22:24 23:10 36:19 116:16 117:18 118:23 119:16 121:21
**continuously** 41:10
**continuum** 112:24
**contractor** 119:25
**contractual** 61:17
**control** 26:23
**Controller** 104:10
**convention** 77:14 119:7
**conversation** 34:17,19 77:25 79:21 92:8 94:7,9 95:16
**conversations** 21:10 23:3,5,22 36:8 37:16 76:13 92:1,14 97:10 118:20
**conversion** 63:13
**convert** 113:4
**cook** 65:25
**cool** 65:3,6
**cooling** 65:8,13,18
**copies** 88:2,6 107:4
**copy** 71:10 73:12 88:10
**Corp** 2:19,23
**corporate** 30:5 55:1,15 60:2 80:15 84:4
**corporation** 55:9 72:2 72:4 73:3 84:10,22
**Corps** 44:19,20
**correct** 28:13 29:10 71:6 72:25 76:10 81:2 92:4 104:19 121:7
**corrected** 55:13
**correctly** 5:20
**correlate** 22:13
**corresponded** 38:24
**correspondence** 15:14 16:3,4,5 39:14
**cost** 53:18,24 70:8,8 98:16,25 99:12
**costs** 99:5
**counsel** 2:4,8,11,15,19 33:4,8 35:16 38:17,19
**counted** 5:20
**country** 47:2
**County** 4:6 37:24
**couple** 14:18 46:11
**course** 53:13
**court** 1:1 4:10 10:2,2
**COURTNEY** 2:16
**cousin's** 89:14,23,25
**covered** 109:20
**COWLES** 2:21
**Co-counsel** 2:23
**crack** 65:18
**cracked** 65:7
**crank** 37:8 111:23 122:24,25
**create** 64:19,24 65:3
**created** 105:2
**Creek** 2:3
**crime** 14:3
**criteria** 23:16 117:25
**Cross** 3:4
**cruise** 116:5,20
**curious** 56:13
**currency** 46:9,20
**current** 45:23,24,24 46:4 116:11 117:12
**customer** 13:17
**cut** 83:12
**CUTLER** 2:18
**Cutter** 91:13
**cycle** 52:23
**cylinder** 21:21 22:11 65:7,18 117:6,20 119:15

C-A-P-I-T-O-L 90:10

—— **D** ——
**D** 4:2
**daily** 29:21
**Dallas** 2:3,22 4:22 5:5
  5:12,21,22 10:1,9
  11:15,23 13:15,19,19
  37:24 44:1 58:1 59:1
  74:25 77:19 85:16
  90:6 94:19,20 119:3,3
**damages** 33:11
**DANFORTH** 4:2
**Daniels** 81:16
**date** 9:7 60:14
**dates** 33:2
**David** 11:18
**day** 47:16,16 96:22
  99:16
**days** 14:18,19,20 41:2,9
  70:18
**daytime** 123:14
**deal** 21:7 79:23 106:10
  107:9 112:23
**dealer** 27:15 98:17
  114:8
**dealing** 33:17
**dealings** 82:5,9
**decent** 65:6
**decided** 44:13
**deciding** 53:3
**decision** 76:1
**decline** 26:23
**decrease** 110:14,15
**defendant** 1:15 4:8
  12:14,16,19 13:3
**defendants** 1:9 11:8
**Defendant's** 3:8,9,11
  3:12,15,17,18,20,21
  3:23,24 40:10 70:11
  73:16 87:10
**defer** 31:17
**define** 35:7
**definition** 48:22 82:24
  122:25
**degree** 6:1,9,14 7:3
**degrees** 6:4
**delivery** 79:8 113:2
**demo** 89:4
**demoed** 63:12 78:10
**demonstrated** 98:25
**depending** 116:21
  117:2 120:9
**depends** 103:8
**deposed** 10:22,24 11:2
**deposit** 79:7
**deposition** 1:15 3:8 4:1
  8:22 9:8 14:6,8,17
  15:5 17:11 28:19,22
  42:5
**depositions** 11:25
**depreciated** 104:6
**descent** 47:9 116:6
**Describe** 25:16 27:12
**designator** 48:8
**details** 95:6

**determine** 17:2
**determining** 53:3
**develop** 51:25 64:21
**developed** 23:16,17
  37:14
**devices** 27:2
**Dick** 119:1
**Die** 11:13 12:6
**differed** 21:14 22:4
**different** 10:24 18:9,10
  21:25 22:12 40:17
  48:6 50:11 60:2,17
  69:12 79:19 87:3
  99:14 116:20 120:13
  120:13,14,17
**differently** 23:9
**difficult** 37:2 74:11
**diminish** 109:22
**direct** 3:3 4:17
**directive** 48:16
**directly** 86:17 119:12
  119:21
**discharged** 44:22
**discovered** 107:17,21
**discrepancies** 83:14
**discuss** 70:7
**discussed** 19:21,24 26:2
  50:6
**discussing** 39:13 51:1
**discussion** 21:7 34:15
  36:18
**discussions** 38:20 39:7
  74:16
**distinctly** 120:21
**distributor** 23:4 81:15
  102:4 110:10 114:9
**DISTRICT** 1:1,1
**DIVISION** 1:2
**divisions** 55:11
**DLX** 63:12
**document** 41:14 101:15
**documentation** 3:11
  87:23 92:21
**documents** 8:19 15:1,3
  15:9,13 25:23 41:5
  42:11,20 43:5,19
**DOC's** 98:17
**doing** 30:11 71:15
  83:12 122:12
**DOMBROFF** 2:13
**DOMINGUEZ** 2:8
**Don** 88:21 90:1,6 119:1
**done** 6:7 13:8 17:5 19:9
  49:17,19 85:15 88:9,9
  97:17,21 110:13
  111:3,9,12 114:12
  123:2
**dorm** 7:10
**down** 32:19 34:2 65:3,6
  79:7 84:4 113:14
  123:13
**drafted** 20:20
**dramatic** 65:16
**drinks** 78:2
**Drive** 2:7 4:5
**dual** 58:6,23

**Duamais** 119:1
**due** 83:1
**duly** 4:14
**during** 58:22 61:8
  92:13,17,20 93:5 96:5
  99:17 102:2 107:15
  108:6
**D.C** 2:15 8:8
**d/b/a** 1:8
**d/b/a's** 91:11

—— **E** ——
**E** 2:4
**each** 10:23 22:4 28:6
  47:25 81:22
**earlier** 50:7,25 51:8
  57:22 67:2,9 68:5
  76:14 85:17 89:9
  100:4 108:10,21
  117:12,24
**early** 57:23 67:11,18
  77:24
**education** 5:25 6:16
**educational** 6:6 7:2
**effect** 75:5 79:17 112:4
  123:14
**Eight** 30:23
**Eighteen** 22:25
**either** 12:11 27:15 48:7
  66:18 81:18 85:5
  103:6 108:7,18 109:5
**elaborate** 93:13
**Elkins** 11:22
**Ellis** 13:18
**else's** 86:11
**emergency** 47:9
**EMMANUEL** 2:17
**employed** 29:12 84:2
**employees** 26:11,12
  60:7,12
**employer** 91:12
**end** 52:10 87:15 96:21
  102:23
**ended** 33:25
**endorsement** 117:15
**engagement** 33:14
**engine** 9:4 16:14 21:18
  22:24 23:8,11 25:18
  27:2,4 32:10,10,19
  34:23 35:15,25 36:5
  37:1 38:14 48:25
  50:8 51:11,14,21
  52:18,20 53:7,9,10,22
  53:23,23 54:4,5,13
  55:5,8,24 56:3,4,4,14
  61:22 62:2 63:25
  64:18,25 65:2,6 66:1
  66:3 68:5 69:13 70:9
  77:3 82:10 99:10,12
  102:8,14,21 116:5
  117:5 121:10,20
  122:18 123:7,8,12
**engines** 16:8 36:14,16
  63:21
**engine's** 69:10
**enough** 52:23 64:18,22

102:22
**entailed** 47:12
**Enterprises** 80:18,22
**Entertainment** 90:9
**entire** 49:14
**entirety** 99:23
**entity** 55:1 60:3,7 80:15
**entries** 63:5 84:15
**equipment** 29:20 97:16
  114:15
**equipped** 23:9 85:1
**equivalent** 106:12
**ESQUIRE** 2:4,5,8,12
  2:16,20,23,24
**essentially** 40:3 106:17
**established** 31:25
**evaluate** 81:20
**even** 35:2 38:14 112:3
**ever** 7:8,14 8:4 12:2,10
  12:14,19 14:2 17:7
  31:13 52:14,20,22
  56:13,16 65:12 67:1
  90:22,23 101:15
  102:5,11,13,21,22
  103:4 109:1 115:25
  121:18
**every** 43:20 46:19
  52:19 56:4 65:11,11
  68:25 113:6
**everybody** 14:2 65:12
**everything** 45:25 71:5
  100:22
**Everything's** 25:25
**ex** 94:25,25 95:1,5
**exacerbate** 111:21
**exact** 69:15 93:22
**exactly** 20:6 36:10 37:2
  56:1 61:23 68:11
  77:20 99:22
**examination** 3:3,4,4,5
  4:17
**example** 7:10 23:8 52:4
  52:5 62:23 65:24
  82:25
**exceeded** 52:20
**exceptionally** 106:10
**excess** 64:23
**excessive** 52:1 64:4
  115:20,23
**excitement** 79:4
**executive** 30:20
**exempt** 108:13
**Exhibit** 3:8,9,11,12,15
  3:17,18,20,21,23,24
  40:10,12,20,23 70:11
  70:13 73:16,18 87:10
  87:12,21,22,25 88:1
**EXHIBITS** 3:7
**exist** 52:11,12
**expect** 122:1,13
**expected** 115:17
**expenses** 31:18
**expensive** 53:21
**experience** 49:3 50:2
  53:14 62:19 66:4
  76:23 89:21 102:17

106:19 115:19
**experienced** 32:18
  56:13
**expert** 51:9
**explain** 56:19 122:20
**explained** 54:24
**Express** 82:16
**extended** 8:6
**extent** 41:23 53:23
  76:25 107:6 120:12
**extra** 49:14
**ex-fiance** 94:23 95:3

—— **F** ——
**FAA** 3:11 62:16 80:6
  84:7 87:22 88:2
**facility** 22:7 84:7
  109:22
**fact** 35:11 41:20 53:11
  77:2 81:13 100:4
  111:20,20,25 123:8
**factors** 53:3 63:24
**factory** 22:7 58:12,14
  59:22,25 60:5 61:16
  61:18 62:17 63:7
  85:24,25 99:4 109:25
  110:24 111:6 112:4,5
  112:8,9 117:16,16
  118:5,6,10,12
**factory-recommended**
  99:9
**factual** 71:5,13
**failed** 35:1
**failing** 75:16
**failure** 51:15 56:14
  66:3 109:19
**failures** 25:18 122:1
**fair** 18:11,13 29:15
  31:8 48:9 66:4,9,17
**fall** 77:15
**familiar** 39:20 46:16
  47:17 49:25 50:17
  54:8 109:4
**family** 28:24
**far** 16:25 41:13,18 44:6
  67:21 71:6,13 80:7
  97:14 105:2 106:8
  116:1
**faring** 49:14
**FAR's** 28:6 51:10
**FBO's** 9:23,24
**February** 18:21 30:18
  88:18 92:5 93:5
**federal** 10:2
**feel** 117:4
**feet** 22:9,14,20 32:14
  32:14 65:11 116:17
  116:18
**fellow** 16:13 91:5
**few** 51:1 108:23
**fiance** 34:6 95:2
**field** 44:16 50:15
**FIELDS** 2:17
**Fifty** 5:18
**figure** 37:2 113:4
**figured** 90:4

figures 104:9
file 12:2 27:9 55:13
filed 4:8 70:19 71:1
    74:23
files 15:15 27:7
fill 18:3,14
filled 18:1
filters 83:12
final 100:22
financed 86:15
financial 31:9
find 84:5 91:18 93:23
    120:11
fine 74:1
finish 43:8 112:14
finished 7:13
firm 10:11 11:7,9,13,19
    11:21 12:22,24 13:4
    17:5 19:17 20:23
    30:25 33:13,22,25
    34:8 75:20 84:3
first 3:10 4:14 14:7
    17:13,17 19:12 20:17
    37:20 38:11 43:24
    44:8 46:1,2 67:7,8,14
    68:7 70:14,17 74:5
    77:8,9,20,25 78:21
    79:5 80:20 88:15,19
    90:21,23 91:15
    107:16 120:1,7
Fisk 16:11,13,16
five 21:18 22:4,13,17
    23:10 50:11 117:17
    118:22 119:17 120:20
    120:20,24 121:22
fix 17:3 111:21
Flagler 2:7 4:4
fleet 24:25
flew 90:15,24 100:17
    116:23 117:7 120:22
flies 65:12 119:5
flight 28:11 32:12 35:1
    44:18 46:17,18 56:14
    65:19 88:19 100:17
    101:2
Floor 2:3
florida 1:1,19 2:7,19
    4:3,6 18:18 57:16
flow 65:4 117:1,1
flown 43:13 48:2 66:13
    102:18 103:6
fly 43:25 44:2,8,13
    65:24 66:5 74:12
    78:7 82:25 83:15
    86:11 89:11 90:19
    96:6 100:19 116:15
    120:19 121:9 123:9
    123:11,11
flying 28:8 32:17 47:14
    57:23 58:10 78:20
    79:24 85:1 88:22,24
    100:13 101:10 106:25
    107:2,16 119:13
fly-in 86:1
followed 61:5
following 85:12

follows 4:15 15:23
forget 48:8 49:12 50:7
forgot 8:8 62:11
forgotten 11:3
form 9:20 30:5 31:5
    68:8
formal 31:24 57:10
formalized 38:13
formed 76:25
former 26:11
FORT 1:2
forth 7:13 37:15 62:11
    63:23 76:15 77:13
    81:22 86:23 114:12
for-hire 35:14 51:10
found 91:6 93:14 94:5
four 26:14,20 50:11
    56:22 74:10
fourth 113:3
four-blade 109:10,24
    110:5,18
four-day 49:15
fred 2:2,5 16:21
Gotcha 97:7
gotten 21:16 103:1
Graduate 6:12
great 21:6 89:3 107:8
greatly 26:25 27:3
GREG 2:24
ground 47:16 58:4
group 34:13 114:21
growing 74:21
grown 32:21
Gruggs 45:5
guarantee 68:19,22
guess 5:16 12:16 19:10
    19:11 54:17 79:16
guides 112:6
guy 29:4 100:9
guys 117:16 118:5,6

<hr />
                  H
half 14:20 72:17,18,19
    73:10,21 114:24
HALL 2:10
Hampsted 5:21
hand 67:3
hangar 82:16 96:16,18
hangarage 99:5
happen 49:18 120:18
happened 18:19 32:12
    78:3 79:22 91:4
    96:24 100:7 104:23
    120:17
happening 92:5
having 39:13 62:1 78:9
    79:17 91:25
Hawk 9:23
head 21:21 22:11 117:6
    117:20 119:15
heads 65:7,18
hear 67:9 120:1
heard 50:22,22 54:23
    88:25 99:14
Henley 110:9 111:2
Henley's 109:20
her 86:6 94:23 95:11

given 11:25 15:7 43:20
    67:3
go 8:5 34:2 39:22 52:2
    52:5,8 61:16 77:6
    81:20 85:6,11 90:13
    96:10 105:16 109:23
    117:6
going 19:7,10,11,23
    24:24 31:4 34:25
    36:5 41:25 46:11,12
    55:4 56:19 64:23
    65:17,25,25 70:10
    71:10 73:24 74:10
    76:8,20 78:5 85:17
    88:7 93:20 94:8
    96:19 122:13 123:6
    123:16,17,20
golf 96:25 100:8
gone 19:21 36:13 101:2
good 89:1,2 98:20,21
    100:15 106:10 121:24
    123:21
Gotcha 97:7

hereinunder 4:15
he'll 47:14
high 52:10 58:23
    114:25 115:2 122:12
higher 53:24
him 43:8,16 47:13 59:2
    77:11,14,21 78:1,2,3
    83:11,15 84:4 90:12
    91:6,15 92:14 93:14
    100:9 107:19 108:2
    109:18 119:12,13
hire 51:11
history 80:10
hold 9:20 30:22 45:18
    79:8 105:3,7
Holdings 29:17
home 7:14.21
homes 7:6
honor 75:16
Honorably 44:22
horsepower 53:8
hour 4:7 53:25 98:16
    99:10,10 117:3
    123:22
hourly 69:11 99:1
hours 6:15 47:15 48:12
    52:9,10 57:25 58:5,23
    69:14 70:10 99:3,8,11
    99:19,24 100:19
    103:13,16 105:23
    114:18 122:14
house 7:20,24
hunting 90:25
hypothesis 36:6

<hr />
                  I
idea 15:3,12 20:1 47:12
    79:13 80:24 95:12
    109:15
ideas 21:8,13
identical 106:13
identically 85:1
IDENTIFICATION
    3:7
identify 42:10 93:18
II 3:3,14
illegible 73:21
IMC 35:1 123:11,11,14
immaculate 96:16
immediately 101:5
impact 52:13,25 64:8
implicit 61:19 68:23
    101:22
implied 69:18
important 88:5
impressed 96:16
impression 51:16
    121:13
inc 1:8,8 2:15 59:18
    60:8
inches 22:9,14,15 65:11
    116:19,23 117:18
incident 9:11 34:12
    75:23 76:3,15 77:1
    120:15,25 121:3,11
include 47:4,5 61:25

independent 119:25
INDEX 3:1
individual 28:2 42:11
    43:24 110:4
individually 1:4 9:21
individuals 73:9
industry 35:9
influence 110:6
information 20:20
    25:18 41:24 67:2,3,7
    67:9 86:24 91:1
    97:23 106:24
infrequent 93:14
infringement 11:5
initial 45:11 57:7
    116:11,12,13,13,15
initially 45:1
injury 32:21 34:10
input 20:9 21:1 23:22
ins 47:8
inside 96:19
inspect 42:25
inspected 35:18 38:12
inspection 37:21 38:14
inspections 27:1 35:20
    37:15,18
inspectors 26:24
installation 49:11
installations 110:13
installed 111:1
instance 1:15 4:8 37:3
    77:3 107:18
instead 23:13 37:9
instruction 3:17,19,20
    58:6,23
instructions 47:18
    50:18
instructor 45:2 46:10
    100:13 119:24
instructors 23:4,5 47:2
    60:6
instrument 45:20 47:8
    57:14,18 58:7 107:2
insurance 38:20 39:2,3
    39:11,17,17 40:4 47:1
    60:5 75:2,6,7,11 76:9
    99:5 100:18 119:24
insurers 39:7
intention 91:19 113:6,7
    113:10
interest 28:7 60:21,24
    61:6 68:14,15,17 72:1
    72:15,21 76:24 78:8
    80:2 84:21 86:13
    87:8 88:16 89:5
    91:20,23 92:3,17
    94:11 95:17 101:17
    102:13 103:6,20,23
    104:14,17 105:14,14
    105:15,15 106:15
    113:19,22
interested 14:5 74:5
    78:8 88:16 89:4
    94:11 96:1
interests 102:11
interference 11:8

**interim** 1:12:23
**interlineation** 54:22
**interpret** 35:7
**interval** 51:12
**interviews** 15:15 26:10
  1:12:10
**introduced** 78:1
**inverted** 65:24
**investment** 30:4 31:1,5
  31:10
**investments** 30:9
**investor** 29:22
**involved** 9:3 22:1 39:11
  41:10 44:15 48:4,5
  49:11 61:9 63:16
  80:7,11 83:18 84:9
  86:12,19 87:5 102:18
  106:20 107:16
**involvement** 41:5 63:11
  83:7
**isolated** 77:1,3
**issue** 36:24 111:18
  120:18
**Issued** 15:24
**issues** 64:15 66:19
**items** 42:19
**I-D-A** 83:24,25

**J**

**J** 2:8 3:25
**January** 76:4
**Jefferson** 2:14
**jet** 63:12 78:10
**jim** 2:12 14:14
**job** 30:15,19,22,24
**john** 2:23 16:13,16
  33:23 73:4,7 94:14
  109:17
**Johnson** 91:9,17 92:7
  98:8,10 102:4 114:7
  114:14
**joint** 37:4
**jr** 1:4,15 2:2,5 3:2,16
  4:1,13,21
**Juan** 83:23 84:4,12,13
**July** 19:11,16 38:7 61:4
**jump** 115:3
**June** 19:11,16 38:7
  61:4 100:24 101:3
  109:14 113:1
**just** 7:18,24 9:1 10:18
  17:17 23:12 25:17
  26:1 27:23 30:9 32:2
  32:24,25 34:10,10,17
  34:18 36:20 37:23
  42:2 43:9 47:3 51:18
  54:17,25 55:3 56:13
  60:14 66:23 69:21
  73:18 84:4,19 87:14
  91:19 94:10 95:4,6
  97:22 99:7 106:12
  108:25 109:19 111:19
  114:3,14 117:25
  118:21 119:6 121:12
  121:20
**J.M.S** 72:20,21,24,25

**K**

**K** 72:9
**Kansas** 86:3
**keep** 43:9
**kept** 28:2
**kind** 47:3,8 60:14 79:10
  106:23 108:13
**kinds** 15:12
**King** 73:10
**Kitty** 9:23
**knew** 33:24 77:13 78:3
  78:15,18,20
**knots** 1:16:18
**knowledge** 51:19 52:11
  52:18 55:25
**knows** 65:13
**Kyle** 46:22 118:15
  119:20,21,23 121:18
**K-Y-L-E** 118:18

**L**

**Lack** 110:17
**lake** 7:24
**Lancaster** 37:23,24
  38:16
**land** 65:3
**landed** 32:20
**landing** 61:22
**language** 69:15,16,19
**Large** 4:4
**Larry** 91:9,17,17 92:7
  98:8,10 114:7,14
**last** 18:22 19:11 30:14
  33:6 41:9 46:22
  51:19 56:22 70:18
  76:23 78:21 86:1,10
  86:10 90:2
**late** 36:12
**later** 15:8 38:9 55:12
  71:17 87:4 106:21
**latter** 66:25
**Lauper** 110:7
**law** 2:2 6:19 17:5 20:23
  33:25
**lawsuit** 9:10 12:14 18:9
  18:9,10
**lawyer** 10:7 11:16
  13:10,11 89:9
**lawyers** 11:17 20:24
  33:18 76:11,14 118:2
  121:6
**lead** 7:3 63:24 64:8,15
  65:4,7,21 66:19 70:9
**leakage** 64:4
**lean** 64:22 116:25
  117:4
**learn** 17:13,15 19:12
  43:25 44:2,8,13 67:8
**learning** 96:6
**lease** 30:1
**Leasing** 81:16
**least** 42:4 46:12 47:15
**leave** 87:14 123:20
**led** 39:22 69:16

**legal** 24:8 48:22 51:9
**legally** 35:11
**lender** 86:21
**length** 51:13
**less** 50:23
**Lester** 46:22 118:15
**let** 21:19,21 40:13
  42:24 43:8 52:16
  55:3,11 65:2 71:14,14
  74:3 78:13 100:9,19
  100:25 112:14 123:10
**letter** 3:25 33:15
**letterhead** 55:22
**letters** 51:4
**let's** 18:18 62:5 67:8
  96:1 100:9 116:12
  122:7
**level** 68:20
**liability** 104:25
**license** 6:22 84:7 98:2
**licenses** 45:17
**life** 5:20 34:24 35:4,8
  111:19
**like** 8:15 37:1 51:19
  55:20 75:14 104:5,10
**limit** 36:19
**limited** 104:24
**line** 22:10,10
**LISA** 4:2
**listed** 80:19 114:3,4
**listened** 21:9
**literally** 30:1 37:8
**literature** 68:25 84:23
  92:22,23 93:2,4,8
  98:5,24 99:15 101:7
  101:18,20 102:2,6
  107:9
**litigation** 12:10 34:10
  74:21 109:1
**little** 14:5 43:23 62:5
  72:16 75:4 87:7
  114:25 123:21
**live** 5:8,19 77:18 90:6
  94:15,17
**lived** 4:23 5:2,2 8:4,9
  94:19
**lives** 4:25
**living** 121:21
**LLP** 2:6 4:4
**load** 22:21
**loan** 86:12,17
**Lobby** 2:14
**local** 109:21
**located** 58:25
**location** 82:15
**log** 28:11
**logbook** 28:8,14,16
  58:6 63:4
**logbooks** 15:18 27:25
  27:25 28:2,7,10 43:12
  43:14 81:23 84:15,18
  97:17
**logical** 77:6 79:14
**long** 4:23 5:6,14 30:2
  30:11,22 31:2 45:11
  45:13 47:11 52:23

**legal** 58:20 62:6 74:10
  100:15 102:16,22
  111:17 117:20
**look** 15:1 16:4 28:9,14
  40:13,22 41:1 42:10
  63:4 73:19 81:20
  84:22 87:18 92:12,16
  96:2 107:14 115:13
**looked** 15:4,9,13,17,20
  19:1,5 25:9 26:9 27:7
  27:21,24,25 28:10
  69:9 81:23 84:14
  88:8 104:9 105:19
**looking** 26:16 27:22
  67:17 69:3 74:13
  76:17,18,21 87:17
  92:11
**loosely** 34:25
**Lorraine** 4:21
**lose** 65:25
**loses** 123:12
**lost** 10:19,21 77:2
**lot** 74:2 79:4 89:22
  115:2 119:6 120:16
  120:17
**lots** 7:11
**lower** 53:10,24
**lowered** 64:3
**Lunch** 123:23
**lycoming** 1:8 23:11
  27:19 54:16 55:14
  62:2 67:3 69:23,24,25
  69:25 75:14 82:10,10
  94:2 101:15,20 102:6
  102:14,16
**L-A-U-P-E-R** 110:7
**L.L.C** 105:1,2,7

**M**

**M** 2:23
**MA** 49:19 71:20
**made** 27:14 37:3 65:16
  68:1,22 69:21 99:4
  103:21 112:3 120:11
  122:12
**magazine** 107:1,22
**mail** 17:18,19
**main** 2:22 37:4,4 49:10
  111:24,25 112:2,2
**maintain** 111:17
**maintenance** 66:19
  82:20 83:8 84:9
  106:19 115:6
**major** 53:18
**make** 24:20 40:3 47:7
  55:15 70:1,10 73:5
  76:1 77:8 83:12
  97:13 100:19 107:9
  115:9 122:14,18,22
  122:25 123:2,9
**making** 39:9 68:19
  82:6
**male** 45:6
**malfunction** 32:18
**Malibu** 16:14 48:4,11
  48:14 63:12,13 65:23

**legal** 71:8,19 85:7,8,10,11
  88:25 97:15 102:11
  112:19,20
**Malibu's** 67:15
**man** 119:18
**management** 16:6
  36:15
**mandate** 49:1 50:24
**mandatory** 50:9 108:17
  109:2
**maneuvers** 65:21
**manifold** 116:23
  117:19
**MANUEL** 2:8
**manufacture** 56:5
**manufacturer** 48:24
  54:5 55:24 61:14,20
  62:3 64:10 66:6 68:5
  69:10 82:10 102:7
**manufacturers** 61:10
**manufacturer's** 61:12
**manufactures** 22:1
**manufacturing** 31:7
**many** 8:24 25:3,6 26:13
  48:12,14 49:6 103:13
  103:16
**March** 1:20 4:7 18:23
  18:24 76:5 85:14
  86:1 94:8
**Marine** 44:19,20
**Mark** 73:4,7
**marked** 40:10 70:11
  73:13,16 87:10
**market** 110:14 114:11
**marketing** 79:13
**marriage** 94:25 95:1
**married** 95:7,8
**Mary's** 2:10
**Masten** 3:25
**material** 20:14
**materials** 20:5 106:22
**matter** 15:20 78:6
**matters** 26:20 29:3
  40:3
**max** 21:19 22:15,24
  36:19 116:16 117:18
  118:23 119:16 120:19
  120:23 121:21
**maximum** 22:5,13
  23:10 120:20
**may** 12:5 17:24 29:5
  35:1,24 42:9 49:1
  57:22 60:2,23 61:1
  67:1 74:3,3 77:24,24
  79:21 100:24,24
  109:14 110:5 111:20
  116:15 120:9
**Maya** 94:14 95:14 97:2
  100:8
**maybe** 6:9 27:19 30:15
  32:14 67:18 83:6
**Meadowood** 5:12
**mean** 9:16 12:5 13:19
  16:9 24:14 25:13
  27:10 28:3 44:5,14,16
  45:13 47:11,19 48:3

50:11 51:6,22 55:14
57:5 61:12 62:15
63:5 65:14,23 71:25
73:23 75:13,20,25
78:19,25 82:24 84:25
85:4,8 86:23 93:4,6
93:13 96:17 97:15,20
101:23 107:21 108:5
112:10 113:12 114:22
116:18 117:12 123:10
**meaning** 50:21
**means** 51:13,17 56:20
**meant** 97:4 99:12
115:10,10
**measurements** 22:12
**measuring** 27:2
**mechanic** 82:21 83:2,9
83:19 107:7,19,24
**mechanics** 23:3 29:2
106:23
**meet** 14:10 28:18
**meeting** 14:21 33:25
34:16 35:16 37:11
**meetings** 14:22
**meets** 35:15
**membership** 104:24
**mention** 16:3,9 52:2
**mentioned** 10:22 12:9
19:4 26:1 27:21
50:25 63:19 81:10,14
81:17 94:22 108:10
117:25 119:11
**meridian** 78:9,23 79:1
79:9,11 112:18,20
113:2,24
**met** 14:7,14 17:7 34:5
34:13 77:14 96:15
119:6
**metal** 64:4 115:6,11,17
115:25
**Miami** 2:19
**Michael** 49:19 77:10
**mid** 36:12
**might** 16:15 34:21 37:6
39:8 42:20 52:25
54:10 75:23 94:11
107:6,8 122:1
**Mike** 28:10,12 29:5,6
43:13 49:20 62:24
71:21 72:18 74:7,8
76:24 77:10 78:8,16
82:17,18 84:22 85:12
87:24 103:16 105:14
105:21 106:1 109:7
111:3,5,10 112:17
113:8,11,23,23 114:2
114:18 115:7,12,19
122:8,13
**miles** 51:20 52:3,6
**mind** 35:24 37:11 87:3
87:18 108:24,25
**mine** 28:1 67:14 88:25
**Miniature** 11:13 12:6
**minute** 33:3 62:10
63:21 78:4 98:9
116:18

**minutes** 21:19 22:4,13
22:17,20,24,25 23:10
51:1 62:7 108:23
117:17 118:23 119:17
120:20,20,24 121:22
**Mirage** 16:14 46:10
47:1 49:9 58:13,14,24
59:9 63:6 67:21
68:14,14 71:19 72:18
73:11 76:23 77:5
79:2,10,18 85:7,9,10
85:11 88:19 89:3,5,7
89:19 97:16 101:10
102:11 116:3
**Mirages** 71:9
**misko** 2:2,5 14:14
16:19 19:7,12 20:23
33:21,22,24,25 34:1,5
34:7 37:11 55:5,8
69:4 75:18,20
**Misko's** 33:4
**mission** 77:5
**misspoke** 59:3
**mixed** 35:13
**MMOPA** 17:20,21
46:11 77:14 78:2
79:5 86:1 107:14
119:6
**mod** 108:9
**model** 100:19
**modification** 49:10
62:17 63:6 69:2
**modified** 40:18 63:16
**modifies** 48:25
**money** 76:8 92:9 96:3
**montgomery** 1:4,15 3:2
3:16,25 4:1,13,21
**Montgomery's** 43:12
43:14
**month** 50:12
**monthly** 107:3
**months** 17:14 18:20
45:16 74:10 76:2
**more** 21:18 36:20
50:24 71:8 72:16
108:23 117:17 118:22
119:16 120:6 121:22
**morning** 15:8
**most** 53:21
**motor** 111:25
**mountains** 123:12,15
**much** 14:16 26:21
34:17 41:11 81:21
92:9 96:3,3 114:22
116:21,22
**multiple** 120:9
**multi-engine** 45:19,24
58:7
**Muncie** 80:12 81:14
84:16
**must** 94:4
**myself** 9:19 32:2 34:6
78:1
**M-A-Y-A** 94:14
**M-M-O-P-A** 17:21

## N

**N** 2:10
**name** 4:19 9:15,18 10:4
11:9 12:24 13:16
16:13 25:12 29:16
39:16,19 54:19 57:15
59:17,19 72:4 81:18
83:22 84:4 86:6,6
89:25 90:2 91:8
95:11 97:1 118:24
**named** 13:3
**names** 9:24 26:15
**Navaho** 23:9 53:9
120:20
**necessarily** 7:3
**necessary** 65:22
**necessity** 63:20,25
64:17
**need** 75:24 78:7 82:24
94:12
**needed** 74:11
**needs** 83:13
**negotiate** 105:25
**negotiation** 99:18
**negotiations** 38:20
**neither** 60:8
**net** 75:4
**never** 54:18 87:3 100:5
**new** 1:8 2:15 22:18
23:16 35:2 54:1,10
58:16 59:15 67:4,8,10
70:1 76:18,21 79:2,8
79:11 82:6 83:13
95:22 99:12 103:25
105:20
**newer** 114:15
**next** 79:14 91:4 96:24
100:7
**night** 35:1 123:11
**nine** 17:14 18:20 30:3
**Nineteen** 57:20
**nobody** 25:20 62:1
121:18
**none** 66:25 67:1 108:24
108:25
**normal** 22:20 66:1
**normally** 51:14,22,23
52:1
**North** 2:7 4:4
**Notary** 4:3
**Nothing** 99:25 114:13
**notice** 3:8 4:8 42:5
107:11
**noticeable** 117:5
**noticed** 110:14,15
**number** 3:22,23 16:14
21:17 23:3 26:23,25
27:2 36:4 37:3 42:7
43:4,7,11 50:13 58:5
73:13 87:25 99:9
100:5 101:9 103:22
104:6,12 106:8,14
**numbers** 25:18,21 50:7
98:20,22 99:14 117:1
119:19
**numerous** 118:20

**N.W** 2:14

## O

**obtaining** 61:5
**obvious** 74:9
**obviously** 7:10 48:3
52:6 88:5
**occurrence** 50:14
**Odom** 80:18,22 81:7
**off** 30:13 37:23 38:16
41:12 49:14 115:14
**offense** 30:16
**offensive** 30:15
**offer** 31:16 40:1
**offered** 115:3
**office** 2:2 11:23 14:23
29:19,20 30:1 33:5
38:2 40:17
**official** 107:11
**oh** 11:1,1 13:12 14:20
16:20 26:3 27:10
32:16 38:1 41:22
42:8 59:5 66:15 74:9
86:17 95:8 97:3
**oil** 29:22 31:9 50:9 52:1
64:4,4,18 65:4,4,25
83:1,2,11 99:5 108:20
111:17 115:7,11,13
115:17,20,23,25
116:2
**old** 5:17 11:7 35:3
95:24
**older** 84:25 106:11
**once** 7:12 26:24 40:17
46:9,13 49:7 120:15
**one** 10:5 11:2,3 12:17
15:22,23 17:23 22:4
23:13 25:6,7 31:5
32:2 36:4,16 37:20
38:9,11,15 40:14 47:1
47:12 53:9 60:12,19
63:14 67:3,14,23
68:15,17 71:14 73:14
77:13 81:22 83:4
85:1 89:2,12,18 90:22
90:23 96:8 106:21
107:3,4 108:2,21
109:9,22 114:18
119:18 122:10
**onerous** 83:11
**ones** 28:9 98:14
**ongoing** 46:4 74:19
107:9
**only** 24:6,7 43:12 78:21
85:22 105:10 109:8,9
118:15 120:23
**open** 83:12
**operate** 21:18 22:23
24:2 51:14,22 64:9,13
64:22,25 98:16 122:8
122:8
**operated** 64:7,19
**operates** 84:7
**operating** 21:7,14 23:2
35:11,13 47:17 51:10
53:8,19,24 64:10 66:2

66:5 70:7,8 99:1
121:12,13,16 122:3,5
122:11
**operation** 35:12,14,14
52:12 57:11 116:5
**operational** 64:15
66:18 83:14 97:18
98:15
**operative** 106:14
**operators** 23:4
**opinion** 76:25 77:1
118:21
**opinions** 117:13
**opposed** 33:18 39:23
55:10 60:7 69:19
116:25
**order** 43:10
**ordinary** 82:20 100:23
**organization** 39:15
61:18 80:13 118:11
**original** 70:24 81:12
105:21 118:10
**originally** 41:2 80:12
**other** 6:6,16 7:2,9 8:6
8:19 10:22 11:2,25
12:15 17:2 20:14
21:17,23 22:1 23:4
25:9 29:1,19 32:2
33:18 36:17 37:9
43:15 53:6 54:4
57:10,24 62:17 63:18
65:10 66:18 67:4
72:12,19 73:10 77:2
83:15 85:3 96:25
97:3,4 101:7,18
102:14,17 103:12
105:3,6,7,11 107:1
108:11 115:17 118:21
118:24
**others** 1:5 7:23 8:2
63:10 66:23,23
108:15
**otherwise** 43:17 101:7
**ought** 53:24 54:19
55:10 91:17
**ourselves** 42:15
**out** 16:13 18:1,3,14
19:21,22 20:4,5,6,8
20:14,16 21:11 24:13
31:16 32:21 33:3
36:9 37:2 42:15 47:9
48:24 49:9 74:21
78:6 79:18 84:5
93:23 96:2,10,15
97:21 98:24 103:1
107:4,10 109:25
113:4 118:2 120:11
122:18
**outright** 69:17
**outside** 64:13
**Oveida** 83:23 84:5,13
**over** 15:7 25:4,7 26:25
41:9 58:9 81:8 93:1,7
93:10 112:11 115:4
123:11,15
**overall** 77:4

overboost 57:6,6 64:25
overhaul 35:14 51:11
   53:23 63:25 64:8,15
   65:21,22 66:20 112:5
overhauled 103:5
overhauling 63:21
overhauls 25:19 35:6
   51:9
overlean 117:5
own 18:16 19:24 28:7
   29:9,14 31:22 32:7
   35:23 63:14 72:14,17
   73:9,10 84:3 91:22
owned 8:14 52:22
   56:22 72:2 73:3
   78:18,20 80:13 84:19
   95:19,21 102:21,22
owner 16:25 27:15
   71:19,24 81:12 84:9
owners 9:16,18 16:14
   21:17 79:10 81:21
   97:5,6 118:23,24
ownership 9:20 28:7
   95:18
owner/operators 36:9
owning 101:16
owns 30:1 72:17,19
   84:3
O-V-E 83:23

P
P 62:14
PAGE 3:1,7
pages 15:6 43:18
paid 103:19,25 106:12
   106:17
Palm 1:19 2:7 4:5,6
Panama 57:16
paper 84:23
papered 79:24 100:16
papering 100:14
papers 34:16
paperwork 8:18 86:22
   97:24 110:20
parameters 64:10,14
   66:5 121:10,12,14,16
   122:5,9
parked 96:17
part 34:15 42:4 44:4,4
   44:6 46:20 68:10
   70:8 110:23
parted 37:4
participated 61:15
particular 10:16 18:3
   45:9 47:18 65:20
   78:16 82:15 85:7,8
   96:6
parties 101:12
partner 9:6 30:25
   33:23 72:11 91:16,18
   92:11 96:25 97:3
partners 9:21 33:18
   72:12 78:13 79:22
   112:19 113:17,22
partnership 30:5 31:23
   31:24,25 91:20

100:10 104:22 112:20
parts 27:1
party 54:19 55:10
   75:13
party's 75:11
pass 46:2
passenger 90:16
patent 11:5,8
pay 104:13,17 105:20
   112:5
PEASE 2:23
pending 4:9 9:25 11:14
   13:14 80:17
people 26:15 29:2,2
   37:17 38:1,2,15 39:8
   39:24 43:15 61:19
   83:15 94:10,13 119:6
   120:2,14,17 121:2
per 28:2,3,6 53:25
   98:16
percent 72:14 103:24
   104:16,17
percentage 80:1
performance 77:4
perhaps 55:13
period 8:6 36:9,10 93:7
   97:8 102:24 107:15
   108:6 112:17,23
periods 17:22
permanent 7:6
person 32:3 33:17
   82:22 84:8 86:4
   110:8 114:8 120:7,10
personal 28:8 30:9
   32:21 34:9 49:3 50:2
   62:19
personally 13:3 15:4
   33:13 83:7 107:17,21
perspective 60:15
phone 83:1,15
photographic 8:14
photographs 42:23
phraseology 54:12
physical 49:1
physically 79:6
pick 87:14
piece 29:9 47:15 82:11
   98:24 99:15
PIERCE 1:2
pilot 24:9 32:18 43:24
   45:19 58:24,25 89:2
   89:16 106:25
pilots 17:2 29:1 66:8
Pinon 29:17
piper 1:8 2:15 16:2,5
   27:17,18,19 40:2 48:8
   48:10 54:1,10 58:16
   59:15 60:7,12 67:4,8
   67:10,17,25 70:1
   75:14 79:2,13 81:15
   82:6,6 91:7,10,12
   92:22 98:25 101:14
   101:21 102:2,4
   109:21,24 110:10
piston 53:22
placard 20:15,18,21

21:2,11 23:15,21
   117:13 118:1
place 58:9 77:6 123:13
   123:21
places 8:7
placing 106:3
plaintiff 1:6 2:4,8,11
   9:13 10:4 12:10
   13:16
plaintiffs 10:5
plan 27:3 111:12
plane 32:9 37:19 38:21
   61:6 63:17 64:7
   81:20 82:14 88:20,22
   90:15 91:20 96:10,22
   102:13,14 103:2,4,6,7
   103:25 104:11,14
   105:14 106:4,21,22
   107:16,17,23
planes 48:4 63:15
   79:18 106:20 110:18
plant 26:24,25 36:13
plate 49:14
played 96:25 100:7
pleadings 54:21
pleased 77:4
plenty 123:13
plus 113:4
POH 15:17 22:6 23:9
   27:21,22 47:19,25
   65:15 68:11 85:3
point 19:18 34:19
   36:19 38:3 41:20
   60:12 74:22 75:23,25
   76:11,17 78:15 90:20
   91:19,23 99:17 101:6
   106:4 113:6 123:5
policy 75:16
position 78:10,23 79:8
   95:18
positive 110:6
possess 8:20
possibility 36:21 123:7
   123:8
possible 76:14
post 24:2
potential 36:23,25
power 21:19 22:5,13,15
   22:24 23:10 36:19
   51:25 64:22 65:11,16
   116:16,21 117:18
   118:23 121:22
practice 10:9
practitioner 10:13
precise 7:18 77:7 120:6
predecessor 40:16
predominance 48:7
preexisting 70:21
premature 25:18 66:3
   66:19
preparation 15:4 17:10
   19:5 26:9
prepare 14:7
prepared 21:11 92:9
preparing 14:17 25:14
   28:19

present 29:12 35:20
   37:25 38:13 45:23
   79:6
pressure 65:25 116:23
   117:19
presumed 99:7
presumptions 99:2,4
pretty 26:21 34:17
   41:11 57:16,23
   110:24 117:2 122:12
previous 26:4 48:25
   77:15 81:21 87:8
previously 31:2
price 103:19 105:21
   114:4,6
primarily 84:15 107:2
primary 79:11
prior 5:19 27:1 33:25
   101:16 106:11
pristine 114:17
private 31:1 45:19
   59:21
probably 38:7 53:22
   114:24
probe 108:12
problem 10:16 35:24
   50:8 64:19 65:14
   111:21 121:21
problems 16:15 17:2,4
   97:18
procedure 65:10
procedures 21:7,14,23
   21:25 23:2 47:9,10
   48:25 53:8 66:2
proceeding 12:3
proceedings 46:5,6
process 79:13 93:10
produced 42:3 84:23
Professional 4:3
programs 7:2
promise 70:2
promotional 98:4
   101:7 102:6
prompted 44:10
prop 63:12 78:11
   109:10,24,25 110:5
properly 65:3 83:13
properties 29:22
props 110:18
proration 69:11
proved 112:20
Public 4:3
publications 50:12
   101:11 107:1
pucillo 2:6 4:4
pull 117:18,19
pulling 41:5
purchase 68:13 85:5,6
   85:12 86:12 105:21
purchased 60:15,16,16
   72:1 76:24 84:21
   113:11,18,22
purchasing 74:6 77:9
   82:11 88:16 105:13
purported 75:8
purpose 27:22

pursuant 4:7
put 24:6,10 48:24 59:15
   60:14 79:7 84:3
   92:10 98:24 103:21
   109:10 111:20 114:20
   123:13
puts 46:11 107:4
P-I-N-O-N 29:17
P.A 2:18
P.B 80:18,22
P.C 2:13
p.m 1:20 123:23,23

Q
QC 27:3
qualification 69:4,6,7
qualifications 100:2,5
qualifies 6:23
qualify 100:25
quality 26:23
quarter 113:3
question 21:3 52:15,16
   82:25 83:6 87:1,2,19
   101:24,25 102:1,5
   107:20 109:6 115:9
   123:17
questions 20:13 24:17
   60:17 74:3 98:12
   120:16
quickly 9:1 65:7
quite 48:10
quote 118:10

R
R 2:16
radio 98:2
rate 22:19 116:17
rated 51:25
rather 111:21 115:6
rating 53:8 64:3
ratings 45:17
raved 89:3,6,18
reach 64:23 68:20
reached 76:7
read 20:11 24:12,15,16
   24:16 32:7 50:11
   71:3 98:13 101:9,11
   107:8,22 111:16
   112:7
reading 112:7
ready 14:6 95:20
reality 114:14
realize 73:22
realized 60:20
really 79:19
reason 7:9 19:18 24:6,7
   24:8 34:20 35:2
   56:21 88:6 103:5
   105:3,6,9,10 122:10
   123:4
reasonable 104:5 123:8
Reasoner 38:25 39:1
reasons 120:13,13
recall 9:21 11:16 12:1,7
   23:24 24:22 33:7
   39:16 54:10 56:10

62:4 69:8 70:17
84:25 92:19 95:24
100:1,6 108:18 122:2
**recalled** 68:6
**received** 22:6 56:17
61:15 98:7 101:6
116:4
**recent** 76:22
**recess** 62:8 123:23
**recognize** 81:4,18
**recognized** 46:25 60:4
**recommend** 22:8
119:14
**recommendation** 22:18
50:24 120:12
**recommendations**
63:23 119:9
**recommended** 20:15
20:17,21 21:2,13 22:1
23:15,19 52:19 64:9
64:14,24 65:10 66:1,6
91:5 102:23,23 103:5
109:22 110:5 111:12
**recommends** 118:16
**record** 54:18 55:12
**recover** 33:11
**Recross** 3:5
**red** 22:9,10
**Redirect** 3:4
**reduce** 65:10
**reduced** 26:25 65:4
**reduction** 65:17
**refer** 71:19
**reference** 68:18 69:22
99:19
**refused** 40:4 43:16
**regard** 18:3,14 44:5
53:20 55:24 56:17
57:11
**regarding** 16:7 31:21
67:4,10
**Registered** 4:2
**registration** 3:13 80:5
80:16 88:10 98:1
**registrations** 8:19
**regular** 30:15 46:8
50:14 53:15
**regularly** 48:2 107:4
**reid** 2:20 3:3,4 4:18
16:23 17:22,25 26:3,6
26:8 40:11,14,15 42:2
42:8,13,17,18 43:1,3
43:8,17,21,22 54:17
54:25 55:3,7,9,18,23
59:4,8,13,14 62:5,7,9
69:5 70:12 73:14,17
84:1 87:11,22 88:1,4
123:20
**relate** 47:18 121:11
**related** 9:2 32:10 49:8
**relating** 3:11 31:13
87:23
**relationship** 31:16
63:17
**relatively** 35:2
**relaxed** 27:3

**relevant** 108:6
**relied** 107:7
**rely** 106:23
**remember** 9:24 10:3
13:12,13,16 15:19
18:19 21:6 26:19
29:4 33:15 38:23
39:13,16,19 51:1
57:15 59:17 67:5,15
67:17 68:10 69:15
81:7 93:5,12,24 96:16
96:19 99:22 100:3
102:15 107:3 108:4
120:3,7,21
**reminds** 117:23
**removal** 27:2
**rental** 88:24
**rents** 29:19
**rep** 61:12
**repair** 49:1,16 84:7
109:21
**repairable** 40:9
**repairs** 110:14,15
115:5
**replaced** 52:19
**replacement** 112:2
**replacing** 112:6
**Reporter** 4:3
**reports** 115:16
**represent** 39:1 61:21
**representation** 55:15
68:1,7
**representations** 68:4
97:13
**representative** 85:25
**represented** 59:22 62:1
**representing** 61:14
75:17
**request** 41:14 42:6,11
43:20
**requested** 42:19
**required** 46:19 79:8
100:18 111:23
**requirement** 83:11
86:21
**requirements** 77:5
**research** 114:11
**researching** 81:19
**reserve** 70:9 99:10
**reserved** 78:10,23
**residence** 7:14
**resident** 13:20
**resolved** 10:18 13:22
13:24 74:15
**resolving** 39:24
**response** 42:4,6
**responses** 25:3,6
**responsibility** 41:4
**responsible** 82:19 84:8
**responsive** 43:20
**result** 6:9 80:6 85:5,12
109:1
**results** 25:1
**retain** 33:4,13
**retained** 19:17 33:8
38:19

**review** 27:9,23 40:23
46:17,19 47:6 73:24
85:3
**reviewed** 44:7 82:3
**reviews** 57:9
**revised** 122:4,9
**re-currency** 85:13
**re-mand** 99:4
**re-manufactured** 99:13
**rich** 64:20 116:19
117:9
**Richard** 13:18
**ride** 89:4 90:13 96:22
**right** 10:15 25:25 26:5
32:1 38:18 39:22
47:20 48:15,21 58:17
59:10,12 61:7 64:5
67:20 69:8 71:14,22
74:8 75:10 76:19
80:4 85:18,20 89:20
89:24 90:14,17,18
95:13 96:9 98:11
102:3 103:10 105:1
105:12 106:7,8
108:25 110:19 113:9
113:25 114:10 118:3
120:25 121:1,4,8
**road** 34:2
**Robert** 9:19 32:5
**rod** 37:4 111:20 112:6
122:23
**role** 11:6
**root** 49:15
**rotates** 37:8
**Rough** 80:14 81:10
**roughly** 36:14
**routine** 82:19
**RPM's** 116:24
**run** 113:1 118:22
121:21,22
**runs** 112:8

---
**S**

**S** 1:4,15 3:2 4:1,13,21
**safe** 123:13
**safety** 46:5,5
**safety-of-flight** 111:18
**sale** 87:5
**sales** 93:6 98:4
**salesman** 91:6
**Salvage** 37:21
**same** 17:2 20:19 23:8
23:11,12 26:20 64:25
73:14 85:4 97:8
105:17 109:24 118:1
120:21
**San** 2:11
**sandwiches** 123:17
**satisfactory** 112:21
**saw** 17:10 20:7,19
25:13 70:17 93:19
98:1,1
**saying** 22:23 53:2 55:6
108:24 123:6
**says** 23:9 24:5 44:7
54:1,5 101:23 120:20

**schedule** 40:23 41:6
42:4,25
**scheduled** 85:13
**school** 6:12,19,23 47:16
57:16,17 58:1,1,4,12
58:14 59:23 60:4,5
61:16,19 85:6,11,23
85:24,25 100:18
101:2 118:10
**Scott** 110:7
**search** 81:5,6
**seasons** 18:19
**seat** 90:17,18
**second** 2:18 7:14 17:6
19:4,4 107:17 111:22
**securities** 6:22,25 12:22
12:25
**see** 11:1 18:18 20:4,17
40:16 68:7 70:19
71:1,15 79:17 80:20
83:14 84:15 92:20
93:16 96:10 98:4
111:24 122:7
**seeing** 96:19
**seem** 53:6 98:20 104:5
**seen** 23:24 40:20 41:20
68:25 70:6,14 73:19
73:25 76:11 78:21
80:20 87:16 88:9
98:7 100:5 115:6,11
115:16
**sell** 6:25 103:24 112:19
113:7
**seller** 80:25
**selling** 78:8 94:11
95:17 114:1
**seminars** 46:11
**send** 115:13
**sending** 20:7 93:8,9
118:2
**Seneca** 48:10 102:15
**sent** 16:13 20:14 21:11
24:24 92:22 93:12
**sequence** 38:5
**series** 111:25
**serve** 44:20
**served** 41:2
**service** 3:17,19,20
15:14,19,21 44:16,17
49:25 50:3,6,12,18,20
51:12 106:22 107:4,7
107:18,23,25 108:17
109:2 110:11 111:16
111:22 122:17,21,23
**sessions** 47:14
**set** 22:18 40:17 42:15
**settings** 116:21
**settled** 10:18 13:25
14:1
**seven** 5:19
**several** 36:1 64:1 99:14
110:13
**shaft** 37:8
**sheet** 68:9
**sheets** 56:9
**Sheryl** 45:5,5

**She'll** 87:14
**shock** 65:8,13,17
**shoot** 47:8
**shop** 104:8
**short** 6:15 52:19
**shorten** 42:21
**short-term** 113:8
**show** 40:12 70:13 73:18
84:18 87:12 97:24
**showed** 98:15 99:15
**showing** 81:7
**shows** 84:19
**shut** 32:19
**side** 115:1,2
**sides** 49:15
**signed** 33:14
**Simcom** 118:9,9
**SIMILARLY** 1:5
**simulator** 58:13
**since** 67:22 71:9 77:2
84:9 87:17 107:16
114:20
**single** 45:1 53:21 83:19
**Sisk** 16:19,20 17:7 25:5
**sit** 52:24 66:24
**SITUATED** 1:5
**six** 15:7,10 17:14 18:20
31:3 41:18,21 42:3
45:16
**size** 23:12 53:7
**SKB** 72:5,6,8,11,17,17
80:3,4 82:12 86:16
106:2
**SKB/J.M.S** 80:16
**slightly** 23:8
**SMITH** 2:18
**SMU** 6:3,13,19
**sold** 113:23 114:15
**sole** 10:13 72:3
**solo** 100:20
**some** 6:24 10:15 17:1,3
26:11 30:5 36:18
39:24 57:8 60:7,11
63:17 66:8 67:17
74:3,4 75:23,25 87:22
88:1 89:15 90:4 93:2
93:16 99:4,17 104:9
110:5
**somebody** 86:11 95:7,8
121:9
**someone** 11:7 39:10
62:17 68:19
**something** 13:7,8 37:6
44:5 46:16 48:23
50:18 52:18 53:13,14
54:22 62:7 71:15
74:12 107:22 117:23
**sometime** 36:11
**sometimes** 37:2
**somewhat** 34:25
**somewhere** 8:5 17:14
18:25 32:13 68:12
81:11
**soon** 60:20 76:8 113:23
**sooner** 103:2
**sorry** 5:4,24 59:6 85:10

85:20 86:9 112:15
116:10
**sort** 36:4 55:11,18
96:20 97:23 118:21
121:20
**sound** 85:18
**sounds** 8:15 39:20
**source** 101:8 118:14,15
**southern** 1:1 5:5
**Southwest** 12:25
**spar** 49:10 108:9
**speak** 28:21 97:19
**speaking** 117:21
**spec** 68:9
**special** 3:22,23 57:2
62:12
**specialist** 46:25
**specific** 65:9 92:23
93:18 121:25
**specifically** 14:10 15:20
20:22 33:7 43:9
56:17 61:25 63:16
71:16 83:10 84:14
90:21 101:14 110:4
116:4 121:10
**specification** 56:9
**specs** 35:15 64:4
**spell** 90:2 118:17
**spend** 14:16 96:4 99:8
**spent** 89:14 100:11
**split** 111:23 122:24,25
**spoilers** 62:24 63:6,19
109:7
**spoke** 38:23
**spotless** 96:18
**spring** 18:21,22 85:20
86:10 120:5
**spun** 37:7
**St** 2:10
**stage** 111:19
**stand** 51:7 72:8
**standard** 35:9 97:15
**standards** 27:3
**stands** 73:4
**start** 22:18 67:8 83:6
116:12 121:2
**started** 74:13 79:24
100:12 120:16
**Star/Mirage** 46:24
**state** 4:3,6 8:19 10:2,3
**stated** 103:21,21
**STATES** 1:1
**stay** 82:14
**STC** 63:13 109:7,8
110:21,22,24,25
**STC's** 62:11 63:11,15
109:4,5
**step** 79:14
**steps** 114:1
**Steve** 73:4,8 77:11 79:7
106:2 119:5 120:22
**Steven** 72:9
**Stickle** 86:7,8 118:8,10
119:11 121:18
**still** 10:9 60:13 74:19
91:10,11 92:23

118:11
**Stone** 31:1
**stop** 123:21
**Street** 2:10,14,18,22
**strictly** 75:15
**strike** 12:15 36:5,13
**structure** 29:24,25
55:16
**study** 6:6
**stuff** 74:2 101:11
120:21
**styled** 69:18
**subject** 15:20 16:7 18:8
18:15,16 26:20 28:12
29:7,8 34:14 42:25
60:15,21 74:6 123:17
**subscribe** 106:22,25
**subsequent** 95:10
117:10
**substance** 21:2
**successfully** 32:20
**sue** 9:22
**sued** 11:7,12,12 75:12
**suggested** 20:1
**suggestions** 24:20
**suit** 9:25
**Suite** 2:7,10,14,18,22
4:5
**suited** 77:5
**summarize** 116:8
**summary** 26:1,3
**summer** 58:19
**sundry** 37:17
**supervised** 49:21
**supplemental** 57:8
62:15 110:23
**supplied** 41:17
**supply** 41:17
**suppose** 6:23
**supposed** 34:24 35:4,5
87:13
**supposition** 53:12
**sure** 7:12 20:15 31:8,11
35:22 38:6 43:1
45:15 48:1 52:7 55:7
57:4 59:24 72:2
73:22,22 75:21 83:12
84:20 87:1 93:11
107:9 108:11 110:24
112:25 115:9,15
120:4
**surfaces** 65:5
**survey** 16:11,13 17:4,9
17:18 19:1,4,5,6,7,8
19:13,20,21,24 20:1,4
20:5,7,14,19 21:10
24:16,17 25:5,11 26:4
118:2
**surveyed** 17:16
**surveys** 15:14 16:9,10
24:12,23 25:9 26:4
33:3
**sworn** 4:14
**system** 108:13
**S-H-E-R-V-L** 45:5
**S-I-S-K** 16:19

**S.E** 2:18

**T**

**table** 103:22
**take** 5:22 6:14 7:5 15:6
22:20 40:13 42:3,13
45:13 47:11 49:14
62:5 66:8 95:4 115:5
120:4 122:3
**taken** 1:15 4:2 8:22
62:8 114:1 123:23
**takeoff** 32:14
**talk** 15:8 29:2 37:18
43:23 69:12 78:13
87:7 88:15 91:5
97:10 108:23 119:11
**talked** 33:24 53:14
54:21 65:12 76:13
78:4,11 79:22 89:9
91:2 92:7 98:9
102:10 108:21 114:8
118:25 119:21 121:6
**talking** 14:5 18:21
21:16 29:7,8 34:9
39:25 62:10 63:20
69:9 82:17 83:4
86:23 87:24 94:18
104:3 105:13 118:7
120:10
**talks** 69:1
**Talmadge** 31:1
**Tannenbaum** 11:18
**target** 79:11
**taught** 44:3 116:4
**TBM** 113:5
**TBO** 35:6,7,15 51:1,6
51:17 52:9,13,19,21
52:23,25 53:4,10,13
53:24 54:1,4,5,10,13
55:25 56:5,11 67:4,10
67:15,22 68:1,4,19,20
69:1,14 99:3,20,23
100:5 101:23 102:19
102:23,23 103:5
121:23 122:19 123:9
**tear** 64:25
**technical** 17:1 49:12
**technicians** 36:12
**tell** 4:19 5:2,25 6:11,18
7:18 9:1,15,18 10:23
12:21 14:7 16:12
19:8 22:4 25:16
32:12 37:19 39:20
41:25 46:8 47:3 48:2
48:19 50:5 57:15
73:19,24 76:20 77:25
78:25 83:7 92:7 94:9
95:16,25 96:14
109:15 114:14 116:14
123:10
**telling** 75:22
**temp** 116:25
**temperature** 21:20
22:11
**temperatures** 21:21
64:23 117:6

**temporary** 7:8
**temps** 117:20 119:15
119:16
**Ten** 5:7,15 62:7
**term** 49:12
**terms** 27:4 106:19
**terrible** 87:2 88:3
**test** 112:17
**testified** 4:15 67:9 68:2
68:5
**testify** 4:14
**testimony** 66:22 67:5
69:13,14 112:7,10
**Texas** 2:3,11,22 4:22
5:5,12,21 7:20,25
8:16,20 43:2,3 44:1
58:8 91:6,10,12
**textron** 1:8,8 15:25
16:5 23:11 26:11,24
27:20 36:13 39:10
40:2 54:16 55:14,21
62:2 69:25 82:10
94:1 102:6
**thank** 16:20 30:16 59:7
69:6
**Thanks** 26:6 59:13
**their** 11:23 38:2 54:13
56:8,9
**themselves** 61:21 62:1
**theoretically** 64:20
**theories** 17:3 36:1,2,17
37:10 121:6
**they'd** 96:1
**thing** 53:21 55:11
96:24
**things** 42:21 50:13
67:23 69:12 89:1
**think** 5:10,12 6:22 8:25
10:3 12:5 15:17,18,22
19:16 20:16 21:8
22:8 26:14 29:13
31:22 34:3 35:9,12
37:13 53:1,2 54:12,12
56:8,8 57:20 59:3,18
64:1,5,11,14 66:18,23
67:1 68:16 69:19
72:2,20 73:3 75:22
78:11 80:14,14 81:12
83:23 85:18 91:11
94:10 97:20 101:2
108:12,15 110:7
112:8 114:25 115:2,2
118:8 119:8 123:4,7
123:21
**thinking** 29:1 39:9
76:18
**third** 25:11 26:4 34:24
75:11,13 101:12
104:21 113:3
**Thirteen** 4:24
**Thomas** 2:14
**thompson** 2:21 9:19
32:5
**thorough** 73:23
**though** 42:14
**thought** 34:1 38:4

52:14 53:15 68:6
79:13 97:3 106:10
112:15 115:10
**thoughts** 77:1
**three** 6:15 8:9,25 10:24
35:3 36:22 47:15
54:7,9 56:22 73:9
74:9 76:2,23 107:1
110:2,3 116:20 117:8
117:25 118:1 121:5
**three-blade** 109:25
**through** 29:23,25 30:5
42:7 44:16 57:25
**throughout** 48:3
**ticket** 57:14,18
**tighter** 82:24
**time** 8:6 11:2,10 14:16
18:15,17 20:16,19
21:8 29:6,12 30:14
33:8 34:7,22 35:6,16
36:3,10,11,19,20 38:8
40:24 41:1 45:23
48:6,7,9,10 51:8,14
51:21 52:9 58:4,23
60:12 69:11,19 75:25
76:24 77:9 78:21
79:5 80:20 82:6,11
85:22 89:15 90:21,23
91:23,25 92:13,20
93:7 95:19 96:3 97:5
97:8 99:17 102:16
105:23 107:15 108:2
108:6 109:21 113:10
120:4 122:12
**times** 8:24 10:23,25
46:12,22 49:6 88:24
99:10
**tire** 83:13
**tires** 51:19 52:2,5
**TIT** 21:20 22:10
108:12 117:7 119:16
**title** 81:5,6 86:23 105:3
105:7
**today** 12:4 42:3 45:18
52:24 55:3,12 66:24
68:2,6 94:16 100:4
115:3
**together** 34:13 41:5
96:2
**told** 8:7 17:24 19:14,20
25:21 29:4 31:22
51:18 56:11 57:7,8
67:2 70:4 78:1,9,22
80:9 85:17 94:4
100:4 102:1 107:19
117:3,12 118:5
119:14 121:6,9,18
**Toni** 34:7
**Tony** 39:19
**top** 47:1
**total** 40:4
**totaled** 40:3
**towards** 114:1
**trace** 115:17
**Tracy** 38:25 39:1
**Trader** 104:10

Page 10

**trades** 13:7
**trading** 113:13
**trainable** 32:8
**trained** 46:1
**training** 6:24 22:6,7
  24:9 43:24 44:5,18
  45:11,12 46:4,5,5,9
  46:20,25 56:16,17
  57:5,7,9,10,17,18,24
  59:9,15 61:2,5,9,15
  76:22,22 85:13 116:3
  116:9,11,13,15
  117:10,15
**transaction** 79:24 82:7
  100:15 101:16
**treatments** 48:25
**Trickle** 12:5
**tried** 10:18,20,21
**trip** 90:25
**trips** 89:22
**true** 71:6 98:19
**truth** 4:15
**try** 77:7 83:5 88:6
**trying** 6:22 17:1 29:4
  29:13 33:2 38:5
  59:17 93:23 113:4
  120:3,10
**turbo** 23:13 56:20 65:6
**turbocharged** 56:18,23
  57:3 65:2,13
**turbocharger** 53:10
  109:19
**turboprop** 79:2
**turbo-bracket** 97:21
**turned** 32:20 36:9
**Turtle** 2:3
**two** 5:1 6:19 8:11,11
  9:23 10:22 15:22
  22:12 23:4,14 26:4
  28:6 36:11 46:22
  47:14,15 57:17 60:17
  63:7 66:25 79:19
  97:4,5,6 111:7 116:20
  117:8
**two-blade** 111:6
**two-year** 114:15
**type** 30:12 31:5 62:12
  62:15 109:24 119:24
**types** 48:6 121:25
**typical** 53:22
**Typically** 47:14

- - - **U** - - -
**Uh-huh** 10:14 71:23
  72:7 94:21
**ultimately** 13:22 39:22
  65:5,21 83:5 94:4
  100:16 121:5
**unaware** 52:25
**under** 66:1 97:22
  109:20 112:5 117:7,8
  117:17,17
**understand** 23:13
  24:23 48:19 55:17
  62:16 72:14 75:21
  87:1 91:12

**understanding** 35:23
  48:23 50:23 51:17
  52:17 112:1,16
  113:20,21,21
**understood** 61:13
  113:13
**underwriters** 39:15
**uneconomic** 111:19
**UNITED** 1:1
**unlimited** 100:23 101:1
**unquote** 118:10
**until** 101:1,6 112:3,18
**upgraded** 79:1
**usage** 99:3 115:20,23
**use** 34:25 54:12 55:13
  74:12 100:23 101:1
  120:23 121:12
**used** 51:4 81:22
**useful** 34:24 35:4,8
**using** 55:4,18 117:3
**usually** 82:14 108:5

- - - **V** - - -
**vacation** 7:21
**value** 79:18 103:23
  104:2 106:3
**valuing** 105:16
**valve** 64:21
**Vann** 33:23 34:6 94:14
  95:13 96:15
**Vann's** 34:6 94:22
  109:17
**variables** 52:11,12,25
  64:6
**various** 27:1 34:7 36:8
  37:16 38:2 88:24
  101:10
**verbal** 100:12
**vernacular** 55:19
**Vero** 22:7 58:15 59:11
  59:16 61:3 85:17,23
  86:5
**versa** 90:11
**version** 79:2
**very** 58:23 73:23 83:10
  98:21 111:22 117:14
**vibration** 109:23 110:6
  110:17
**vibration-related**
  110:14
**vice** 90:11
**Vinson** 11:22
**visibility** 123:13
**visible** 35:2
**visit** 96:14
**volume** 1:14 3:2,3,7,14
  15:3
**vs** 1:7

- - - **W** - - -
**W** 3:16,25
**waiting** 96:8
**Wally** 94:14 97:2
**want** 7:17,19 21:18,19
  21:21 23:17 37:18
  43:23 57:13 60:19

73:18 83:5 87:7
  88:15 96:4 103:8,22
  109:18 112:9 115:9
  116:17,21,22 117:14
  120:13 123:18
**wanted** 44:11 71:15
  77:7 88:23 91:16
  104:16 117:23
**wants** 47:7 112:4
**WARD** 2:17
**warranted** 69:13
**warranty** 15:15 27:7,9
  27:13,14 68:23 69:8
  69:10,16,17,18,19
  97:22 109:20
**Washington** 2:15 8:8
**wasn't** 32:14 34:11
  38:13 93:9,13 101:24
**watch** 119:15,15
**watched** 49:18 83:11
**watching** 117:20
**way** 5:17 14:14 31:14
  34:24 37:9 44:16
  69:18 72:25 74:15
  77:23 82:1 87:4 88:9
  90:4 94:22 105:17
  112:8 113:4 116:16
  119:5 120:22 121:23
  122:11
**ways** 109:22
**wear** 64:24 66:3
**website** 17:23 56:8
  107:14
**week** 14:25 17:10 19:5
  25:13 58:21 61:8
**weeks** 57:17
**welcome** 42:24
**well** 7:11 12:15,16
  14:14 16:11 17:16
  20:6 21:16 22:19
  23:17 31:6 33:14
  34:23 35:9 36:8,23
  37:1,16,23 39:6 40:1
  42:15 43:7 44:15
  48:22 50:11 51:4,8
  53:13,18,21 54:7,25
  57:5 58:9 59:22 63:2
  64:1,16 65:23 68:25
  72:1,16 73:21 75:4
  76:22 77:11 78:10,19
  79:23 81:4,12 82:22
  83:9 87:17 93:6
  94:17 95:1,3,6 97:15
  98:1,24 99:17 100:25
  101:9,18,21,24
  103:21 106:21,25
  108:9 109:10 112:25
  113:2,12 114:21
  115:13 116:12 117:11
  117:14 118:15 119:20
  120:15,19 122:10
**well-known** 57:17
**went** 6:12,19 19:22
  20:4,5,6,15 24:13
  57:25 58:12 90:25
  93:6,10 96:15 97:21

100:17,20
**were** 5:22 7:6 8:5,13
  9:3,14 10:22 11:8
  13:3 14:22 15:8,22
  17:4 21:9,25 24:8,24
  25:3,6,7,14 26:10,13
  26:20,20 27:10 33:17
  34:9 36:1,14,17,22
  37:10,11 38:1,3 44:17
  46:1 48:4 49:17 50:6
  60:7,13 61:8 62:10,25
  63:8,15,16,20 74:10
  75:22 77:9 79:10
  81:12,15 82:6,11
  86:24 87:23 88:22
  90:15 92:3 94:17
  95:20 97:5,6 98:14,22
  99:2 101:21 103:13
  104:3,13,17 105:13
  106:9,20 107:15
  109:7 112:3,15
  113:13 116:4 117:1,3
**weren't** 107:10 108:25
**West** 1:19 2:7,14 4:5
**we'll** 15:8 17:6 55:12
  69:12 103:24 108:23
  122:4 123:22
**we're** 5:16 12:3 18:21
  19:23 20:7 76:5
  83:18 113:3 123:17
  123:20
**we've** 15:7 41:19 54:18
  54:20,23 76:1 88:12
  115:16
**while** 8:13 23:25 44:7
  63:17 69:9 70:7 78:5
  100:15
**Whiskey** 3:13 18:7
  49:23 88:11 109:10
  120:16
**whole** 4:14 38:1
**wife** 5:1 28:23
**william** 1:4,15 3:2 4:1
  4:13,21
**Williamsport** 26:24
**willing** 104:13,17
**wing** 49:11,13,15 63:6
**WITNESS** 3:1 4:16
  16:20 17:23 43:2,7
  55:21 59:7 83:25
  88:3
**word** 22:9 34:25 69:3
**words** 53:6
**work** 7:9 84:19 111:9
  111:12 118:11
**worked** 12:22 33:2
  61:19 100:14
**workers** 36:13
**working** 7:13
**works** 29:5 83:20 110:8
  118:8
**worse** 40:4
**wouldn't** 23:17 31:17
  51:3 64:21 66:15,16
**WOWAM** 18:11 28:14
  28:16 29:9 33:11,16

33:23 34:11,21 35:17
  35:24 37:19 49:23,24
  60:24 61:6 74:11,17
  75:9,23 76:3,15 78:3
  87:9 88:12,14,17
  103:9,10,14,20 105:4
  105:7 106:21 109:12
  115:22,23 116:1
  120:25 121:3,11
  122:4
**WOWAM's** 39:6
**write** 30:8
**writing** 32:7
**written** 113:14
**wrote** 20:20 39:17
  100:12

- - - **X** - - -
**X** 103:24

- - - **Y** - - -
**yeah** 6:8 7:7,22 11:24
  28:5 38:10 40:14
  45:15 46:18 55:9
  57:5 75:25 81:25
  87:2 97:9 99:24
  101:11,13 111:8
  119:20,22 120:23
**year** 18:22 19:11 33:6
  46:9,12,13,19 59:3
  84:25 86:10 92:12,18
  93:10 95:24 96:5
  99:3 102:2 106:11,11
  112:18 113:1,1
**years** 4:24 5:7,8,15,20
  6:20 8:9,11,12 30:3
  30:13,23 31:3 35:3
  36:11 76:23
**year's** 93:7
**yesterday** 25:13 28:9
**you-all** 123:18

- - - **Z** - - -
**Zale** 90:1,6,11 91:1,15
  119:1
**Zale's** 88:21
**zero** 82:1
**Z-A-L-E** 90:3

- - - **$** - - -
**$100,000.00** 99:3,8,11
**$50.00** 99:10,10
**$50.00-an-hour** 70:9
**$785,000.00** 104:1

- - - **0** - - -
**00-14284** 1:2

- - - **1** - - -
**1** 1:20 3:8 4:7 40:10,12
  40:20,23 42:7,19
**1,000** 116:18
**1,200** 103:18 105:23
**1,200-hour** 106:6
**1,500** 54:5

**1,600** 56:3
**1/10/97** 3:19
**1:23** 123:23
**10** 3:23 43:7,11 57:25
**10-hour** 50:8 83:11
  111:17
**10/30/00** 3:16
**10:20** 62:8
**10:36** 62:8
**100** 2:18 15:6 25:4,7
  36:14
**1025** 2:14
**11** 3:24
**11/5/99** 3:17
**11819** 5:21
**12:05** 1:20 123:23
**125** 116:18
**13** 48:6
**135** 35:12,12
**141** 44:4
**1460** 114:19
**15,000-hour** 46:24
**150** 45:10,10
**150,000** 106:17
**155** 3:15
**158** 3:17,18
**160** 3:20
**162** 3:21,23
**1625** 117:8
**1650** 21:20 117:7,17
  119:19
**1700** 2:10
**1701** 2:7 4:5
**172** 48:7,8
**1750** 22:10
**18** 22:20,24 117:4
**18,000** 22:9,14,20
  116:17
**18,400** 43:18
**19th** 2:3
**1971** 44:25
**1973** 8:11
**1975** 8:11
**1978** 44:9 45:7 73:9
**1982** 13:2
**1986** 9:9 67:12,13,16
**1988** 58:19 59:5
**1989** 11:3
**1995** 67:18,19 68:1
  71:9
**1997** 97:15
**1998** 59:6,9
**1999** 77:16 112:3

--- **2** ---

**2** 3:9 65:11 70:11,13
  73:13
**2nd** 76:4
**2,000** 52:9,10 56:3
  65:11 69:14 70:10
  99:8,11,19,24 100:5
  101:23 122:14
**2,000-hour** 54:4,13
  67:22 69:1 99:3
  101:23 122:19
**2,400** 116:24

**2/24/00** 3:25
**20** 117:3
**200** 32:13
**2000** 18:22 37:12 60:23
  71:19 76:4 86:9
  112:3 120:5 121:7
**20007** 2:15
**2001** 1:20 4:7 113:3
**21** 117:3
**210** 3:4
**228** 3:24
**23** 5:8
**244** 3:4
**25** 30:13 72:14 104:16
  104:17
**25-hour** 116:2
**250** 48:15
**256** 3:5
**260** 114:20
**270** 71:8
**29** 43:4

--- **3** ---

**3** 3:11 13:2 73:16,18
  87:21,22
**30** 30:13 41:2,9 70:18
  116:23
**30-24** 116:23
**300** 2:14 32:14 99:3
**31** 42:7,19
**33** 117:21
**33131** 2:19
**33401** 2:7
**35** 117:18
**3811** 2:3

--- **4** ---

**4** 3:3,12 87:10,12,25
  88:1
**40** 3:8 27:10 41:2,9
  117:22
**40,000** 51:20 52:3,6
**400** 21:22 117:6,8,17
  119:19
**4000** 2:18,22
**42** 5:4 22:9,14,15
  116:19
**421** 9:4 31:16 48:10
  58:1
**4210** 4:21
**4520** 5:5
**4650** 5:12

--- **5** ---

**5** 3:15 37:3
**5/16/00** 3:20
**50** 27:11 58:23 100:19
**500** 22:11 32:14 103:15
  115:3
**500-hour** 114:16
**515** 2:7 4:4
**540** 50:8
**56-500** 3:23
**588** 15:22,23
**59-800** 3:22

--- **6** ---

**6** 3:17
**600,000** 106:5
**623** 114:25
**623,000** 114:5
**625,000** 114:16

--- **7** ---

**7** 3:18
**70** 3:9
**700** 2:10 113:5
**73** 3:11 44:25
**750** 104:12
**750,000** 104:4,18
  106:12
**75202** 2:22
**75205** 4:22 5:5
**75219** 2:3
**75220** 5:13
**75230** 5:21
**755** 48:13
**78205** 2:11

--- **8** ---

**8** 3:20
**82** 57:20
**83** 57:20
**85** 49:23 109:10 120:16
**87** 3:12
**88** 103:23

--- **9** ---

**9** 3:21
**9:02** 1:20 4:7
**90s** 36:12
**901** 2:22
**91** 44:4
**91's** 35:12
**9285** 3:13 18:7 88:11
**960** 28:10,12 43:13
  72:18 74:7
**97** 68:11 85:18 88:18
  92:6 93:5
**98** 61:1,2 68:11 85:19
  85:20,21 94:8 96:13
**99** 30:18 81:1 86:9
  109:14



Page 124

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                   FORT PIERCE DIVISION
                 CASE NO. 00-14284 Civ-Roettger
 3

 4    WILLIAM S. MONTGOMERY, JR.,
      INDIVIDUALLY AND ON BEHALF OF
 5    ALL OTHERS SIMILARLY SITUATED,

 6                    Plaintiff,

 7    vs.

 8    THE NEW PIPER AIRCRAFT, INC. AND
      TEXTRON, INC. d/b/a TEXTRON LYCOMING,
 9
                      Defendants.
10    _____/

11

12

13

14
                        VOLUME II
15       DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
          TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                      West Palm Beach, Florida
20                    March 1, 2001
                      1:23 p.m. - 4:56 p.m.
21

22

23

24

25
```

Page 125

1   APPEARANCES:
2
       LAW OFFICE OF FRED MISKO, JR.
3      3811 Turtle Creek Boulevard, 19th Floor
       Dallas, Texas 75219
4      Counsel for the Plaintiff
       BY: CHARLES E. AMES, ESQUIRE
5         FRED MISKO, JR., ESQUIRE
6
       BURT & PUCILLO, LLP
7      515 North Flagler Drive, Suite 1701
       West Palm Beach, Florida 33401
8      Counsel for the Plaintiff
       BY: MANUEL J. DOMINGUEZ, ESQUIRE
9
10     BRANTON & HALL
       700 N. St. Mary's Street, Suite 1700
11     San Antonio, Texas 78205
       Counsel for the Plaintiff
12     BY: JIM BRANTON, ESQUIRE
13
       DOMBROFF & GILMORE, P.C
14     1025 Thomas Jefferson Street, N.W
       Suite 300, West Lobby
15     Washington, D.C. 20007
       Counsel for New Piper Aircraft, Inc.
16     BY: COURTNEY R. BATEMAN, ESQUIRE
17
       CARLTON, FIELDS, WARD, EMMANUEL,
18     SMITH & CUTLER, P.A
       100 S.E. Second Street, Suite 4000
19     Miami, Florida 33131
       Counsel for Avco Corp.
20     BY: BENJAMINE REID, ESQUIRE
21
       COWLES & THOMPSON
22     901 Main Street, Suite 4000
       Dallas, Texas 75202
23     Co-counsel for Avco Corp
       BY: JOHN M. PEASE, ESQUIRE
24        GREG CARBOY, ESQUIRE
25

Page 127

1          - - - -
2          CONTINUED DIRECT EXAMINATION
3   BY MR. REID:
4       Q. Have you had any training as a mechanic?
5       A. No formal training.
6       Q. You don't have any certificates?
7       A. No.
8       Q. Any training at all that would permit you to,
9   you know, respond to service bulletins or to do
10  anything about an airplane from a mechanical point of
11  view; any certifications by anybody?
12      A. No.
13      Q. And I just want to make it clear, you are the
14  individual who made the judgment not to comply with two
15  service bulletins that have been issued by the
16  manufacturers; is that correct?
17      A. No.
18      Q. Who made that decision on the Mike Alpha
19  plane?
20      A. The owners, all four of us. Now, I didn't
21  speak to anybody but Mr. Boyd.
22      Q. You and Mr. Boyd talked it over and came to
23  the conclusion together that you would -- that you
24  would choose not to follow the recommendations of the
25  owners -- of the manufacturers with regard to the two

Page 126

1              INDEX
    WITNESS:                            PAGE
2   (VOLUME II)
3   WILLIAM S. MONTGOMERY, JR.,
       Continued Direct Examination by Mr. Reid      127
4      Cross Examination by Mr. Bateman              210
       Redirect Examination by Mr. Reid              244
5      Recross Examination by Mr. Bateman            256
6
7
8   EXHIBITS FOR IDENTIFICATION               PAGE
    (VOLUME II)
9
    Defendant's Exhibit No. 5             155
10  Affidavit of W. Montgomery, Jr. 10/30/00
11  Defendant's Exhibit No. 6             158
    Service Instruction 11/5/99
12
    Defendant's Exhibit No. 7             158
13  Service Instruction 1/10/97
14  Defendant's Exhibit No. 8             160
    Service Instruction 5/16/00
15
    Defendant's Exhibit No. 9             162
16  Special Advisory Number 59-800
17  Defendant's Exhibit No. 10            162
    Special Advisory Number 56-500
18
    Defendant's Exhibit No. 11            228
19  Letter to J. Masten from W. Montgomery 2/24/00
20
21
22
23
24
25

Page 128

1   service bulletins?
2       A. Well, let's be careful about that statement,
3   because --
4       Q. It was just a question.
5       A. All right. In our opinion, the wording of
6   those two bulletins allows us the option of simply
7   changing the oil to prevent a safety of flight issue.
8       Q. Okay. I didn't mean to quibble about what it
9   said, but you made the judgment to do what you're
10  doing?
11      A. We did collectively, yes.
12      Q. Collectively. And it would be you and
13  Mr. Boyd. Anybody else responsible for that decision?
14      A. While I didn't actually discuss it with
15  Mr. Boyd vis-a-vis the other two partners, the
16  presumption from the way he spoke was that he had
17  talked to them.
18      Q. So Mr. Boyd would know what the other two
19  partners, what their opinion is about this subject?
20      A. Yes.
21      Q. Directly?
22      A. Yes.
23      Q. But as far as you know, they haven't come and
24  told you they want to do something different?
25      A. Correct.

2 (Pages 125 to 128)

Page 129

1    Q. And I'm interested in knowing what you
2  consider your personal expertise to be that warrants
3  your decision to take a different course of action from
4  that recommended by the manufacturer.
5    A. Well, I don't think we're doing that.
6    Q. Okay. So it's fair to say that you don't
7  have expertise that would warrant your ignoring the
8  manufacturer recommendation?
9    A. I don't think we're doing that.
10   Q. No, I understand that, but do you believe you
11 have expertise to do that, however, or would you rely
12 on the manufacturer for that information?
13   A. I am not holding myself out as a mechanical
14 expert. In our reading of the two service bulletins,
15 there appears to be a choice about what to do. And we
16 have chosen to make the decision to change the oil
17 every 10 hours and look for metal.
18   Q. Did you discuss this course of action with
19 the mechanic that works on the plane as well, or was he
20 not involved in this decision making?
21   A. I have discussed it with him.
22   Q. And does he have a view about whether or not
23 you should do something different from what you're
24 doing?
25   A. It's my understanding that he thought we were

Page 130

1  okay to continue to change the oil and look for metal.
2    Q. When you say, "it's my understanding," did he
3  tell you that --
4    A. I believe he did.
5    Q. -- or are you surmising it?
6        And he looked at the service bulletins and
7  said you don't have to comply -- you don't have to go
8  in and send the plane in for any work; you can just go
9  ahead by checking the oil regularly? That was his
10 conclusion, your mechanic?
11   A. I believe so.
12   Q. And what's his name?
13   A. Juan Oveida.
14   Q. Right. Okay. I did remember. I remember
15 Juan Oveida. I didn't remember which plane.
16       Is he the mechanic on both the planes that
17 you had an interest in?
18   A. No.
19   Q. Who was the mechanic on the other plane?
20   A. Who was?
21   Q. Yes.
22   A. Emmett (phonetic).
23   Q. Okay. Now, we talked briefly about your
24 listing the plane for sale, before lunch. Do you
25 recall that conversation?

Page 131

1    A. Yes.
2    Q. Is there a brochure that's been prepared for
3  that listing?
4    A. I don't know.
5    Q. From your experience, what typically does the
6  broker or -- Is it a broker you're dealing with; is
7  that a proper term?
8    A. Well, it's the salesman for Texas Piper, who,
9  as I understand it, as part of his agreement to sell
10 Mr. Boyd a Meridian, agreed to sell the Mirage so as to
11 not own two airplanes.
12   Q. So have you seen anything in writing that's
13 been prepared for any prospective purchaser of your
14 plane?
15   A. No.
16   Q. If I wanted to accept your $500,000.00 that
17 you said you'd be willing to jump on today before
18 lunch, where would I go to do that; would I go to the
19 broker?
20   A. I would call Larry Johnson. I don't know if
21 he's prepared what is normally called a spec sheet yet
22 or not, but typically, a spec sheet has a list of the
23 equipment on the airplane, the total time, pictures. I
24 just haven't asked.
25   Q. And it is your -- As you sit here today, it's

Page 132

1  your intention to sell that plane, Mike Alpha, to
2  somebody without having taken any actions concerning
3  repairs or replacements pursuant to the service
4  bulletins?
5    A. Yes.
6    Q. And have you told Mr. Johnson that that's
7  your intention, that you're not going to have anything
8  else done to the plane along those lines?
9    A. I haven't spoken to Mr. Johnson.
10   Q. Did I say the wrong name?
11   A. No.
12   Q. Okay. You just know from other sources?
13 From who, Mr. Burg?
14   A. Boyd.
15   Q. Boyd. I mean, you know from talking to him
16 that Mr. Johnson's done all this?
17   A. Mr. Johnson's done all what?
18   Q. Listed the plane for $623,000.00.
19   A. The only thing that I know is that Mr. Boyd
20 said to Mr. Johnson when Mr. Johnson asked for his next
21 $50,000.00 deposit was that Mr. Boyd said to
22 Mr. Johnson, when you start marketing my airplane, I
23 will pay you the other $50,000.00. What the result of
24 that conversation has been, I have no idea.
25   Q. But you did hear that he listed it, you told

3 (Pages 129 to 132)

Page 133

1    me earlier?
2      A.   That is an implicit assumption on my part
3    that Mr. Johnson has now listed the airplane at 635.
4    I did hear that statement from Steve Boyd.
5      Q.   635 or 623?  You said 623 before lunch.
6      A.   No, I don't believe I did.
7      Q.   Okay.  But just so we're clear, it's 635 that
8    it's been listed as?
9      A.   That's my understanding.  I believe the 623
10   number came from the sale of Mr. Zale's airplane.
11     Q.   Mr. Zale's airplane, which one was that?
12     A.   24 Delta Zulu.
13     Q.   Have we talked about that plane?
14     A.   Well, we haven't named it by pin number, but
15   we have talked about it.
16     Q.   Help me.  I'm having a senior moment.
17     A.   This is the 1998 that was a loaded airplane
18   that was sold, a 500-hour airplane.
19     Q.   You did mention that.
20     A.   Yeah.
21     Q.   And that was sold for six...
22     A.   625.
23     Q.   Yeah, I have that.
24     A.   Okay.  I don't know where 623 came from.
25     Q.   It doesn't matter.  If I wrote it down wrong

Page 134

1    or if I misheard it, we'll get it right now.  It's
2    being listed for 635.  There's no dispute about that,
3    right?
4      A.   I'm sorry?
5      Q.   I said, there's no dispute about that; that
6    is the right number, 635?
7      A.   That's what I was told by Steve.
8      Q.   Okay.  Oh, by the way, I did want to ask you,
9    your log that was produced, did you mean to produce
10   everything, the whole log, or were there some pages
11   that weren't copied for whatever reason?
12     A.   Of my personal logbook?
13     Q.   Yeah.
14     A.   I believe they're all there.
15     Q.   Is it supposed to have the dates and the
16   various check-offs when you got certain certificates or
17   certain -- in the back of it?
18     A.   Yes, it does.  And she did not know to copy
19   that.  We can rectify that.
20     Q.   Okay.  I looked at it at lunch and I noticed
21   that.  It's not there, so...
22     A.   She didn't know to -- My secretary didn't
23   know that.
24     Q.   Okay.
25     A.   That was not an intentional omission.

Page 135

1      Q.   When is the last time you looked at all these
2    documents in the boxes?
3      A.   Well, I never looked at all of them.
4      Q.   Okay.
5      A.   I've looked at various components of that
6    stack over there as late as yesterday.
7      Q.   From those boxes or from another source?
8      A.   Well, some of them from those boxes, and some
9    of them from our set of those boxes.
10     Q.   Okay.  Do you know when these copies were
11   actually made?
12     A.   No.
13     Q.   You told us a little bit earlier at lunch
14   about how you're using the plane now?
15     A.   Yes.
16     Q.   Tell me about your partners that use the
17   plane.  Do they use it in a different way from you?
18     A.   Well, two of them don't fly it much, if any.
19     Q.   Why is that?
20     A.   Well, they own the King Air, too, and they
21   generally have a mission profile that suits the King
22   Air better.
23     Q.   Okay.
24     A.   Steve flies it the way I do, which is to
25   say --

Page 136

1      Q.   Daytime?
2      A.   Daytime IMC.  I'm not going to tell you he
3    doesn't come in at dusk, but if he does, it's probably
4    high ceilings.
5      Q.   Never over the mountains?
6      A.   Not that I'm aware of.
7      Q.   Okay.
8      A.   He also flies by the 35-inch -- by our
9    revised operating parameters.
10     Q.   And all the people that you named today have
11   all -- it's your understanding they have chosen to fly
12   by the what I'll call the modified or the revised
13   operating parameters?
14     A.   Yes.
15     Q.   Instead of the manufacturer's recommended?
16     A.   Yes.
17     Q.   Now, you told me that you met with the
18   lawyers in is it April of 2000?
19     A.   Yes.
20     Q.   Because you weren't getting any progress on
21   the WOWAM claim and so forth?
22     A.   Yes.
23     Q.   And you've retained the lawyers at about that
24   time?
25     A.   I think I believe it was in that time frame.

4 (Pages 133 to 136)

Page 137

1    Q. Now, before you got there, did the lawyers
2  know anything about this particular dispute or the
3  WOWAM incident? Had they been contacted by anybody
4  before, or were you the first contact with the lawyers?
5    A. As far as I know, John Vann, my partner, was
6  the one that initiated that whole contact.
7    Q. Do you know when he first contacted them?
8    A. No.
9    Q. When you went in in April, was it your sense
10  that they were kind of up to speed on things, or were
11  they just beginning the learning curve?
12    A. I would say they had some awareness, but were
13  really just getting into it at that point.
14    Q. Well, the three theories you told me, you
15  remember way back this morning we talked about that you
16  discussed with them in April?
17    A. Yes.
18    Q. Did they have knowledge of those already, or
19  did you bring those to the table?
20    A. I don't know that that came up in that
21  context. It was, here's where we are, we can't get a
22  response from the insurance company, we can't get a
23  response from Piper, we can't get a response from
24  Lycoming, we've been stonewalled into the ground, do we
25  have a case here.

Page 138

1    Q. Okay.
2    A. I don't know that we got into specific
3  operating or failure theories.
4    Q. But at some point, did those come from you or
5  did they come from some other source?
6    A. I don't know.
7    Q. So you don't remember if you first heard them
8  from your lawyers or whether you maybe mentioned them
9  to your lawyers?
10    A. I really don't know.
11    Q. When was the decision made that you would
12  become a plaintiff in any lawsuit?
13    A. Well, I think it was in April they said, yes,
14  you have a case with WOWAM, and we'll take it on. And
15  WOWAM is actually the plaintiff in that case.
16    Q. And that's the suit against the insurance
17  carrier that you told me about this morning?
18    A. Well, I believe there's more than one action.
19  I believe there's an action against Piper and Textron
20  in that situation as well.
21    Q. Who's the plaintiff in that case?
22    A. I believe it's WOWAM and John Vann and his
23  passengers.
24    Q. Have you seen --
25    A. And me by -- I don't know if I'm a named

Page 139

1  plaintiff, but since I own half of WOWAM...
2    Q. Okay. So it's your understanding that the
3  claim has been filed on behalf of WOWAM -- That's an
4  L.L.C.?
5    A. Yes.
6    Q. It's your understanding a claim has been made
7  on behalf of WOWAM against Piper or New Piper and
8  Textron; is that correct?
9    A. Yes.
10    Q. And the other plaintiffs in that case you say
11  are Mr. Vann and his passengers?
12    A. That is my understanding.
13    Q. Have you seen that Complaint?
14    A. I don't know that I have.
15    Q. Okay. Do you know approximately when that
16  was filed?
17    A. I don't. I think it was sometime in the last
18  half of 2000. And the reason I'm a little fuzzy on it
19  is because you got two separate causes of action, and
20  there was a statute of limitations against the
21  insurance company of one year. So I know that happened
22  towards the end of the year. I don't know about the
23  WOWAM actual Complaint. I don't know when that was
24  filed.
25    Q. Okay. But as far as you know, both of those

Page 140

1  cases are going on, the one against the insurance
2  company --
3    A. As far as I know.
4    Q. And who is the principal contact on behalf of
5  WOWAM with the lawyers? I mean, who deals with the
6  lawyers? Do you?
7    A. It depends on which facet. If it's the hull,
8  it's me. If it's the PI side, it's Mr. Vann and his
9  folks.
10    Q. So you've been moderately involved or majorly
11  involved, or what? How would you describe your
12  involvement on an ongoing basis with that litigation on
13  behalf of WOWAM?
14    A. I've been involved. I don't know moderately,
15  majorly, you know, I don't know.
16    Q. Well, have you helped in pulling documents
17  together, for instance, that might have been required,
18  or things like that?
19    A. I don't know if there's been a request for
20  documents yet, so the answer to that question is
21  probably not.
22    Q. Okay. At some point in time, the subject
23  arose, I assume, about filing a class action?
24    A. Yes.
25    Q. And when did that subject arise?

5 (Pages 137 to 140)

Page 141

1    A. This is absolutely a guess. I'm going to say
2  sometime between September and December.
3    Q. Of 2000?
4    A. Right.
5    Q. And Can you tell me how it came about? I
6  don't want you to tell me about specific conversations
7  with your lawyer, that would be attorney/client
8  privilege, but can you give me an idea of how your
9  thinking as -- You understand you're the class
10 representative in the case?
11   A. I understand.
12   Q. So give me your thought process that went
13 into filing a class action in Florida over this matter.
14   A. Well, in the WOWAM instance, we thought for
15 quite some time that that was a either unique or
16 unusual circumstance. And then we started getting bids
17 to fix the airplane and we started talking to people
18 and we saw the survey and we started talking to some
19 more people, and it became increasingly apparent to the
20 attorneys that this was not an isolated instance at
21 all. In fact, it was endemic to the, E-N-D-E-M-I-C
22 fleet, and that the failure rate for this engine was
23 extremely high.
24      I have seen one calculation that tells me
25 that the probability of that engine making it to TBO if

Page 142

1  operated per the manufacturer's recommendation is about
2  4 percent.
3      And I find it extremely interesting that the
4  minute we sent them a letter, or a letter out
5  recommending these modified operating procedures, the
6  response from your client and from Piper was fairly
7  swift, and the first part of it was the only people
8  that are authorized to make these modifications to
9  operating procedures are OEM's, but, oh, by the way, if
10 you want your best performance from your aircraft, do
11 exactly what we told them to do.
12      That was followed shortly thereafter by the
13 two service bulletins.
14   Q. When were they, do you remember, off the top
15 of your head?
16   A. I know one was September 2nd or August 29th,
17 right in there. And I don't remember when -- The
18 second one was very close behind it.
19   Q. So I interrupted you. You were telling me
20 how you came to the conclusion to file a class action
21 in Florida.
22   A. Well, my attorneys said we've got a class
23 problem. And I said, sounds like it to me.
24      I have no real knowledge of the reasons for
25 doing a class action versus not doing a class action,

Page 143

1  and they educated me a little bit.
2    Q. So can you give me a date when the decision
3  was made to file the Florida class action?
4    A. No, I don't have an exact date.
5    Q. Can you --
6    A. Second half of 2000.
7    Q. Can you bracket it in terms of how long
8  before the Complaint was actually filed?
9    A. No.
10   Q. You were involved partially in the
11 investigation that was carried out to reach the
12 conclusion to file the class action?
13   A. What do you mean by that?
14   Q. You were talking to -- You said you were
15 talking to people. You told me today about learning
16 information from users and other owners and people like
17 that. Did that go into the decision, ultimately, to
18 file a class action?
19   A. I don't know if it did or didn't.
20   Q. What do you understand is the specific
21 failing of the engine or the aircraft that forms the
22 basis of your lawsuit, the lawsuit connected with
23 Mike Alpha?
24   A. As I understand it, it's brought under the
25 Florida Deceptive Trade Practices Act in that they have

Page 144

1  offered, in the stream of commerce, an item which they
2  represent will do certain things, and it won't do those
3  things.
4    Q. What does it represent it will do? What are
5  those things?
6    A. That the airplane will fly to a certain
7  cruise speed and it will achieve certain rates of
8  climb, and that it can be flown to altitude at full
9  power, and that it has a 2,000-hour TBO engine, and
10 that it knew that this engine probably couldn't do
11 that.
12   Q. Any of those things?
13   A. Yeah. And it kept selling them anyway.
14   Q. And at what speed is it represented that the
15 plane will maintain, that you say it will maintain?
16   A. Well, it depends on the altitude and the
17 power settings, but I can't -- You know, without
18 looking at the pilot's book, I can't tell you, because
19 it depends on air pressure and temperature and all that
20 sort of thing.
21   Q. But you're saying there's some representation
22 that the plane will achieve a certain speed and it will
23 not achieve that, that was a misrepresentation?
24   A. Yes.
25   Q. That was --

6 (Pages 141 to 144)

Page 145

1   A.  Or, if you do, the engine will not survive.
2   Q.  And what rate of climb representation was
3   specifically made that you're familiar with?
4        These were made to you, by the way, you
5   believe, these representations?
6   A.  I think they're made to anybody that has an
7   interest in purchasing this airplane.
8   Q.  Well, I'm interested in -- We'll talk about
9   other people in a minute, but as a starting point, do
10  you believe they were made to you personally?
11  A.  Well, if it's in the pilot operating handbook
12  and I'm going to buy the airplane and I'm looking at
13  the POH, I'm going to say, yes, that representation is
14  made to me.
15  Q.  So the speed representation that you
16  mentioned comes out of the POH?
17  A.  And the climb rates and the fuel burns.
18  Q.  That's a new one.  You didn't mention that
19  the last time.
20  A.  I didn't complete the list.
21  Q.  I'm sorry, I thought you had completed your
22  list.
23       Fuel burns, that's five.  What else?  What
24  other misrepresentations do you believe --
25  A.  The TBO.

Page 146

1   Q.  You mentioned that one.
2        Any other things to add to the list?
3   A.  Not at this time.
4   Q.  Okay.  You told me as to speed you can't tell
5   me the speed in the abstract, it's relative, the speed
6   representation that was made?
7   A.  Well, the book says the airplane -- I don't
8   think they say so, but it's a still air type of
9   configuration; in other words, no head winds,
10  tail winds.  The airplane will do 250 knots at
11  25,000 feet.
12  Q.  Do you believe that's false?
13  A.  The airplane can do that, but the engine
14  won't survive if you do it.
15  Q.  What do you base that on?
16  A.  Because if you run them at full power up to
17  altitude, they won't live.
18  Q.  When you say "they won't live," what do you
19  mean?
20  A.  They won't make it to TBO.
21  Q.  Okay.  And what do you base that on?
22  A.  The surveys.
23  Q.  Now, you mentioned rates of climb.  What
24  rates of climb misrepresentation do you believe was
25  made to you; and where was it made, first of all?

Page 147

1   A.  It's in the POH.
2   Q.  POH?
3   A.  It's in the performance standards for the
4   airplane.
5   Q.  Okay.
6   A.  At full power, the airplane will climb at
7   1,000 feet a minute.  I think it's best angle of climb.
8   I get best angle and best rate of climb confused, but
9   it's either best angle or best rate, but anyway, it's
10  1,000 feet a minute.
11       Well, the airplane can technically do that,
12  but the motor won't live if you do, or statistics show
13  us that it won't.
14  Q.  What statistics?
15  A.  Of the survey.
16  Q.  The two that you talked about this morning
17  that are in the boxes?
18  A.  Yes.
19  Q.  So would it be fair to say that so far these
20  two representations, your proof that they're false
21  would be the statistical proof shown in those surveys?
22  A.  I believe that's correct.
23  Q.  As opposed to any actual examples that you
24  know of?
25  A.  Well, we certainly have at least one example,

Page 148

1   9285 Whiskey.
2   Q.  And so that plane was flown regularly at
3   250 knots and so forth at the maximum rate of climb?
4   That's how you-all used that plane before that --
5   A.  We flew it by the recommended procedures in
6   the POH.
7   Q.  Sure.
8   A.  Full power to 18,000 feet.
9   Q.  And then you mentioned altitude at full
10  power.  That's another representation you said was made
11  that you believe to be false that somebody knew to be
12  false.  Now, where is that representation contained?
13  A.  You're going to have to define "altitude at
14  full power" for me.
15  Q.  You said it, so I can't define it.
16  A.  Okay.
17  Q.  You told me that's one of the false
18  representations somebody made to you.  And if you want
19  to retract that one, that's okay.
20  A.  I think I probably should retract that one,
21  because I'm not sure I understand what I said.
22  Q.  Okay.  And TBO 2,000, we talked about a fair
23  amount of that already.
24  A.  Right.
25  Q.  And finally, you said the fuel burns was a

7 (Pages 145 to 148)

Page 149

1 false representation.
2    A. Well, you can't achieve the operating
3 temperatures that you need to achieve to make the
4 engine live and achieve the fuel burn rates that are in
5 the POH. And if you run the fuel burn rates, you're
6 going to be top of the green or close to the red.
7    Q. And you told me that you believe that if you
8 follow the book, that the engine won't live. That's
9 your term?
10    A. That's correct.
11    Q. And you had been flying the WOWAM aircraft
12 for some period of time by the book?
13    A. As far as I know, it had been operated by the
14 book its entire life.
15    Q. And likewise, your current airplane has been
16 operated by the book throughout its life?
17    A. It's my understanding that to the extent the
18 ownership knew about it, that airplane had been
19 operated under the modified parameters for the time it
20 had been in possession of SKB.
21    Q. When did SKB start using your modified
22 parameters?
23    A. Well, let's not call them my modified
24 parameters.
25       It's my understanding that the people

Page 150

1 involved in SKB and J.M.S. had been using the 35-inch
2 configuration for as long as they owned the airplane.
3    Q. And how long would that be?
4    A. I believe it was a couple years.
5    Q. How many hours would you say?
6    A. I don't know. I do know that that engine had
7 a top overhaul at about 1,000 hours.
8    Q. Do you know anything about the reason for
9 that?
10    A. No.
11    Q. Do you know what they found to be wrong when
12 they did the overhaul?
13    A. No. And I -- No.
14    Q. How do you know about that overhaul?
15    A. Mr. Boyd told me about it.
16    Q. Did he own the plane at the time when the
17 overhaul took place?
18    A. I believe he did. I remember seeing an entry
19 in a logbook, but the date's not clear to me.
20    Q. And did he tell you that he thought the
21 reason for that overhaul was because they had been
22 running the plane by the book?
23    A. He didn't tell me.
24       The normal reason to do a top is to lower
25 compression.

Page 151

1    Q. Would you have considered that to be a
2 defective condition that led to that overhaul, or is
3 that just something that grew out of the ordinary use
4 of the plane?
5    A. I don't know. I've never had enough
6 experience with a single engine to know if a top is
7 normal or not. And I've heard it both ways. I've
8 heard, yes, you need to do it automatically almost at
9 1,000 hours, and I've heard, no, you're not to do it.
10    Q. Well, what would have contributed to doing it
11 or not doing it; what would have happened? Were they
12 misusing the aircraft in some way?
13    A. I have no idea.
14    Q. But there had to have been some factor that
15 led to the condition that caused the overhaul to be
16 done?
17    A. If you say so.
18    Q. No, I'm asking you if that's the case, or do
19 they just do it for fun?
20    A. No. I think that when you do a top overhaul,
21 given the expense, you do it because of a condition.
22    Q. When you were using the WOWAM engine
23 according to the book and believed that the engine
24 wouldn't live, did you ever advise anybody from Piper
25 or Lycoming that there was something wrong with their

Page 152

1 recommended operating parameters?
2    A. No.
3    Q. We're talking about this particular class
4 action lawsuit.
5       In one of the pleadings that your lawyers
6 filed, there was a reference made to a representation
7 that the engine in your aircraft, and it was put in
8 quote marks, is the strongest, most reliable
9 six-cylinder engine in general aviation.
10       Do you know where that came from, that
11 particular statement?
12    A. I believe it came from the Textron Lycoming
13 website.
14    Q. And do you believe that statement to be true
15 or not true?
16    A. No, I don't think that's true.
17    Q. You don't? What engine would you say is
18 more -- is stronger or more reliable than the Textron
19 Lycoming six-cylinder engine?
20    A. Well, I'm going to say that's an overbroad
21 question, because from conversations I've heard, this
22 same engine in a different configuration with one
23 turbocharger on it routinely makes it to the TBO. And
24 I don't have that much experience with Teledyne
25 Continental engines. I've only had one airplane that

8 (Pages 149 to 152)

Page 153

1   had it on there -- had them on there that I'm aware of.
2   I don't know about the Seneca. I don't know if that
3   was Continental or not.
4       Q. I guess my question though is, if you say
5   that that is a false statement that it's the strongest,
6   most reliable six-cylinder engine in general aviation,
7   if it's false, I'm trying to find out how it's false.
8           It sounds like you're saying that it's not
9   the strongest, most reliable engine, which leads me to
10  the question what would be if it isn't this engine.
11      A. I haven't gone into that research then.
12  There could be any number of them.
13      Q. But you're satisfied without that research,
14  as you sit here today, that it's not the Textron
15  Lycoming engine?
16      A. Yes, I am. It's not this model of that
17  engine.
18      Q. And when you say this model, be more precise.
19      A. I forget the exact -- it's the AE2 engine.
20  It's the Malibu Mirage engine.
21      Q. Did someone ever make a representation to you
22  that this was the world's finest single-engine piston
23  aircraft?
24      A. Someone did not. All of the literature.
25      Q. And whose literature says that?

Page 154

1       A. Piper's.
2       Q. Piper's, okay.
3           And when did you first see a piece of
4   literature that said that?
5       A. I'd say as early as '96, and probably before
6   that, because they've been advertising the airplane for
7   quite some time.
8       Q. Is it fair to say that any information you
9   got about the Lycoming engine came from Piper
10  literature?
11      A. No.
12      Q. Okay. Tell me where you got -- where you
13  received any written representations before you
14  purchased your plane about the engine from Textron
15  Lycoming.
16      A. Which plane?
17      Q. Well, let's start with Mike Alpha.
18      A. Literature I had seen was off their website.
19  There's a page that's been printed, it's got the
20  specifications of all the Textron Lycoming engines,
21  their TBO's, number of cylinders, horsepower. I
22  believe it's off their web page.
23      Q. And when did you first look at their website?
24      A. I'd say sometime around June or July of 2000.
25      Q. And when did you buy into the WOWAM plane?

Page 155

1       A. May of '98.
2       Q. And when did you buy into the Mike Alpha
3   plane?
4       A. April or May, 2000.
5       Q. So you saw the Lycoming website after you
6   purchased your Mike Alpha plane?
7       A. Yeah.
8       Q. And it has some references to TBO in there?
9       A. Yes.
10      Q. Okay. Now, before you purchased the last
11  plane, the Mike Alpha plane, did you have any other
12  written information that came from Textron Lycoming?
13      A. The service bulletins.
14      Q. And when did you get those?
15      A. Oh, I'm sorry. Before?
16      Q. Yeah, before.
17      A. I'm sorry. Not that I recall.
18          (Defendant's Exhibit No. 5 marked.)
19  BY MR. REID:
20      Q. Okay. Let me show you Exhibit 5. It's your
21  affidavit. Do you remember signing that?
22      A. Yes.
23      Q. Now, you attached Exhibit A to this
24  affidavit, correct?
25      A. Well, I didn't.

Page 156

1       Q. Well, did you sign the affidavit?
2       A. I did.
3       Q. And it makes reference to Exhibit A?
4       A. Right.
5       Q. And Exhibit A was attached to the affidavit?
6       A. You asked me if I did it.
7       Q. You mean you didn't staple them together?
8       A. Right.
9       Q. Okay. They were stapled together before you
10  executed the affidavit?
11      A. Right.
12      Q. And Exhibit A was attached as examples of
13  representations?
14      A. Right.
15      Q. And can you tell me in Exhibit A where it
16  makes reference to 2,000 hours TBO for the engine?
17          MR. AMES: I'm going to object to your
18      question, because you're implying that the
19      material's attached. That's not what his
20      affidavit says.
21  BY MR. REID:
22      Q. Did you find it?
23      A. No.
24      Q. The only reference that I found, and I looked
25  through this, to Lycoming, is on, if you'll look with

9 (Pages 153 to 156)

| | Page 157 | | | Page 159 |
|---|---|---|---|---|
| 1 | me, it's on the fourth page, it's got a propeller. | | 1 | A. Are you asking me? |
| 2 | Fourth from the top, you see that? | | 2 | Q. Yes, sir. |
| 3 | A. You understand there's two different | | 3 | A. Yeah, okay. |
| 4 | brochures here? | | 4 | Q. Yeah. I just really want to know if you've |
| 5 | Q. Yeah. I mean, whatever is there is there. | | 5 | seen these before. |
| 6 | I'm just asking about this one particular one. | | 6 | A. Yes. |
| 7 | A. Okay. | | 7 | Q. When did you first see them? |
| 8 | Q. Did you look at both of them looking for the | | 8 | A. I'd say it's been in the last six months. |
| 9 | 2,000-hour TBO? | | 9 | Q. Well, you saw them before you filed the |
| 10 | A. Yeah. | | 10 | lawsuit? |
| 11 | Q. And did you find it in either one? | | 11 | A. I believe so. Six months may be a little |
| 12 | A. No. | | 12 | (indicating). I'm sorry, I know you can't do that |
| 13 | Q. And now go to the page I asked you to look | | 13 | (indicating). That may be a little vague. |
| 14 | at. I see in the second paragraph it says, "With a | | 14 | Q. Did you see them before you purchased |
| 15 | 350 horsepower Lycoming TIO-340-AE2A engine and dual | | 15 | Mike Alpha? |
| 16 | turbochargers, the Mirage arrives within minutes of | | 16 | A. I don't know that I did. |
| 17 | many light jets and turboprops." | | 17 | Q. These are the kinds of things that we talked |
| 18 | That's the only reference I see to Lycoming | | 18 | about this morning that sometimes you notice in |
| 19 | engines in the brochure. Do you consider that to be a | | 19 | magazines and other sources? |
| 20 | representation about the engine in any way? | | 20 | A. Yes. |
| 21 | A. No. If you look back, oh, it's probably | | 21 | Q. And you call your mechanic or sometimes your |
| 22 | roughly in the middle. | | 22 | mechanic would see them? |
| 23 | Q. Okay. | | 23 | A. Right. |
| 24 | A. There's references to that same engine, but | | 24 | Q. And you never asked your mechanic if he saw |
| 25 | no, I don't see a TBO on here. | | 25 | either one of these? |

| | Page 158 | | | Page 160 |
|---|---|---|---|---|
| 1 | Q. Okay. The engine is just identified as | | 1 | A. Not this one. |
| 2 | coming with the plane? | | 2 | Q. Okay. |
| 3 | A. Right. | | 3 | MR. REID: Just for the record, I guess I |
| 4 | Q. Yeah, okay. | | 4 | should have said Exhibit 6 is dated November 5, |
| 5 | So there's nothing attached to this | | 5 | 1999. Exhibit 7 is dated January 10, 1997. |
| 6 | affidavit, Exhibit A, which represents any false | | 6 | (Defendant's Exhibit No. 8 marked.) |
| 7 | representations about the Lycoming engine; is that fair | | 7 | BY MR. REID: |
| 8 | to say? | | 8 | Q. And I'm going to show you Exhibit 8, which is |
| 9 | A. I guess not. | | 9 | dated May 16th, 2000. I neglected to hand you that |
| 10 | MR. BATEMAN: What number was that? | | 10 | before. Would the same testimony be true about that, |
| 11 | MR. REID: Five. | | 11 | that you saw those recently as part of the litigation |
| 12 | MR. BATEMAN: And what was the date of the | | 12 | as opposed to having seen them before you purchased |
| 13 | affidavit? | | 13 | Mike Alpha? |
| 14 | MR. REID: The affidavit was dated | | 14 | A. I agree. |
| 15 | October 30, 2000. | | 15 | Q. I'm sorry? |
| 16 | BY MR. REID: | | 16 | A. I just answered. I said I agree with you. |
| 17 | Q. Do you recall why you executed this | | 17 | Q. Each of these seem to have this language: |
| 18 | affidavit? | | 18 | "Because of variations in the manner in which engines |
| 19 | A. I assume it was something to do with the | | 19 | are operated and maintained, Textron Lycoming can give |
| 20 | filing of the class action. | | 20 | no assurance that any individual operator will achieve |
| 21 | (Defendant's Exhibits 6 and 7 marked.) | | 21 | the recommended TBO." |
| 22 | BY MR. REID: | | 22 | Do you see that language at the end of the |
| 23 | Q. I'll show you Exhibit 6 and Exhibit 7. | | 23 | first paragraph? |
| 24 | These are identified as service instruction | | 24 | A. Which document are we looking at? |
| 25 | documents. Do you see that? | | 25 | Q. Well, look at Number 6. |

10 (Pages 157 to 160)

Page 161

1    A.  Okay.
2    Q.  It's in all three of them.
3    A.  Yes, I see that.
4    Q.  And the sentence before that says, "Service
5    experience, variations in operating conditions, and
6    frequency of operation are some of the factors taken
7    into consideration when a TBO is established."
8        Do you see that as well?
9    A.  Yes.
10   Q.  And then the last paragraph reads,
11   "Reliability and average service life cannot be
12   predicted when an engine has undergone any modification
13   not approved by Textron Lycoming. The TBO's shown in
14   the table are recommendations for engines as
15   manufactured, without considering any modifications
16   that may alter the life of the engine."
17       Do you see that?
18   A.  Yeah.
19   Q.  And that's all three of these, isn't it,
20   6, 7, and 8?
21   A.  Okay.
22   Q.  Is that correct?
23   A.  Yes.
24   Q.  And would you agree that those sentences that
25   I just read to you could be considered qualifications

Page 162

1    of a statement that a particular plane has a TBO of
2    2,000 hours?
3    A.  Yes.
4        (Defendant's Exhibit No. 9 and 10 marked.)
5    BY MR. REID:
6    Q.  Now I want to show you Exhibits 9 and 10.
7    I should have done them in reverse. Let's look at
8    Number 10 first.
9        You recognize this document? It's called
10   Special Advisory Number 56-500?
11   A.  Yes.
12   Q.  When did you first get this?
13   A.  I would say in June or July of this year --
14   or 2000. Sorry.
15   Q.  Then Exhibit 9 is dated August 31st, 2000.
16   When did you first see this?
17   A.  I would say within the same 30-day period
18   after the issuance.
19   Q.  Now, are these the documents that you were
20   referring to earlier today where you said you
21   interpreted these not to require anything other than a
22   stepped-up oil check and analysis?
23   A.  Yes.
24   Q.  Can you show me the specific language that
25   you relied on in reaching the conclusion that oil

Page 163

1    checks in perpetuity were appropriate substitutes for
2    any action by the manufacturer?
3    A.  Well, the second one --
4    Q.  Exhibit 10?
5    A.  Yes. Exhibit 10, only deals with engines of
6    500 hours or less, so we can put that away.
7    Q.  All right.
8    A.  The first one, time of compliance, "Next oil
9    change, not to exceed 10 hours of operation, and at
10   each 10 hours thereafter, until new connecting rod
11   bearings," part number so-and-so, "are installed."
12   Q.  Okay. That's the language that tells you you
13   do not need to have new connecting rod bearings
14   installed?
15   A.  Let me read you the next paragraph. I'm
16   going to skip the first sentence.
17       "The failure results in a disintegration of
18   the bearing most likely due to delamination of the
19   bearing surface. Lycoming has found no apparent
20   operational or dimensional cause for these two
21   occurrences."
22   Q.  Is that all? Are you going to read some more
23   or not?
24   A.  No, that's enough.
25   Q.  Okay. And that phrase and that sentence --

Page 164

1    A.  Let me -- I'm sorry, there is one other.
2    Q.  Okay.
3    A.  Last sentence of that paragraph, "The
4    extended timing for the start of the replacement
5    program is necessary to ensure the availability of the
6    new replacement rod bearings."
7    Q.  Okay. So based on those phrases and that
8    last sentence, you've concluded that there is no
9    requirement -- there is no safety requirement that they
10   be replaced; is that correct?
11   A.  Yes.
12   Q.  In the section just prior, in the phrases
13   that you didn't read just now, just prior to that, it
14   refers to the following: "Lycoming will be instituting
15   a mandatory replacement program to equip the subject
16   engines with connecting rod bearings with increased
17   durability. The program will be initiated on
18   October 2, 2000."
19       When you saw that this was a mandatory
20   replacement program, you did not believe that required
21   that you have the work done?
22   A.  But it doesn't say that -- You want to define
23   "time of compliance" with me -- for me?
24   Q.  No.
25   A.  Okay.

11 (Pages 161 to 164)

Page 165

1    Q.  I don't have to answer questions.

2    A.  Okay.  There's a --

3    Q.  That's fine.

4       The interpretation that you just gave me,

5 picking those sentences out, are you the original

6 source of that, or did somebody else point those

7 sentences out to you and say that's a good reason for

8 not taking -- not sending the plane in to have the rod

9 bearings replaced?

10    A.  Well, I discussed it with the mechanic, I

11 discussed it with Steve Boyd, and if you look at all

12 the factors, we felt like we would actually be doing

13 more harm by taking it apart, because then you get to

14 the second service bulletin that says if you have these

15 crank shaft bearings and you've got to split the case,

16 and all of a sudden, you're into an engine overhaul.

17    Q.  And you believe that, as you referred to it

18 this morning as carefully worded, you believe Textron,

19 this is all a ruse, if you will, to try to permit

20 Textron to do more work that will cost you more money?

21 That's your interpretation of this?

22    A.  I didn't say that.  What I do say is that I

23 think this is -- I think this is a ruse by Textron to

24 basically force you on a premature engine overhaul

25 without them having to pay for it.

Page 166

1    Q.  And you don't believe that there's any safety

2 reason for requiring people to replace these rod

3 bearings; you've made that determination?

4    A.  I think if there was a real safety issue,

5 they would have said so and called it a safety of

6 flight issue.  They don't do that here.

7    Q.  That wasn't my question.

8       Based on what you just said then, you do not

9 believe that there is any safety issue that requires

10 replacement of these rod bearings, based on the course

11 of action that you've taken?

12    A.  Provided you comply with the 10-hour oil

13 change and filter examination and so forth.

14    Q.  Sure.

15       And are you aware, from talking to people in

16 the field, whether people are actually having this work

17 done or not?

18    A.  Some people are.  Some are not.

19    Q.  All right.  So is it fair to say that some

20 owners and users of comparable airplanes have

21 interpreted Exhibits 9 and 10 in a manner different

22 from the way you interpret them?

23    A.  Yes.

24    THE WITNESS:  2:30 break?

25    MR. REID:  Yeah.

Page 167

1    MR. AMES:  Five minutes?

2    MR. REID:  You can take one now if you want

3 to.

4    MR. AMES:  Let's do it.

5    (Recess taken from 2:23 p.m. to 2:32 p.m.)

6 BY MR. REID:

7    Q.  We talked this morning about your review of

8 the Complaint and so forth.  Aside from counsel, I'd

9 like to know who you have talked to about this

10 litigation in your role as either class representative

11 or otherwise.

12    A.  I don't remember.

13    Q.  Okay.  Well, let's see what we can remember.

14 Let's start with people who own Piper -- that own these

15 comparable airplanes.  Have you spoken to other owners

16 of these airplanes since the lawsuit was filed?

17    A.  Yes.

18    Q.  How many people have you talked to?

19    A.  Just owners, or everybody?

20    Q.  Well, let start with owners, and we'll go and

21 work it out.

22       And actually, I probably made it narrower

23 than I meant to.  I said from the time the lawsuit was

24 filed, but let's go back to the time after you met with

25 your lawyers and you retained your lawyers to represent

Page 168

1 you in some action, which, as you know, ended up as a

2 class action.

3       Tell me the conversations that you can recall

4 with owners of these planes.

5    A.  I talked to Don Zale.  Steve Boyd I guess

6 constitutes an owner, even though he's a partner.  I

7 talked to John Vann.  I talked to three or four others.

8    Q.  And what would the substance of those

9 conversations be?

10    A.  Well, in named instances, did they want to

11 participate in this or not.

12    Q.  And what is "in this"?

13    A.  In a potential class action lawsuit.

14    Q.  So you went to all the people you've

15 mentioned, plus a few whose names you can't remember --

16    A.  Right.

17    Q.  -- to ask them if they'd like to be part of

18 the class action?

19    A.  Right.

20    Q.  And did any of them say they would be?

21    A.  Not that I recall.

22    Q.  So they all said they didn't want to be

23 involved in a class action?

24    A.  Well, the main guys all said no.

25    Q.  Did they tell you why they didn't want to be

12 (Pages 165 to 168)

Page 169

1   in a class action?
2       A.  Yes.
3       Q.  And what's the reason?
4       A.  They all have Meridians on order and they're
5   afraid of retaliation from Piper.
6       Q.  What about the other people that weren't
7   named?
8       A.  One of them was going to switch to a DLX.
9   I think the other two said I don't want to get involved
10  in something like that.
11      Q.  Now, of all the people that you've discussed,
12  the ones you named plus the ones that you can't name,
13  have any of those people had the replacements done on
14  their planes?
15      A.  The only one that's had the replacements done
16  is Don Zale.
17      Q.  And do you know what they did to his plane?
18      A.  They took -- They replaced the con rods.
19  They did the bearing change, whatever that is.
20      Q.  That's all they did?
21      A.  As far as I know.
22      Q.  And all the other folks, at this point,
23  elected not to have the replacement done, or they just
24  haven't gotten around to it?
25      A.  I don't know if they -- We made a conscious

Page 170

1   election; we being John Boyd and myself, made a
2   conscious election not to.  John Vann is not an issue,
3   because the engine is down already.  The other fellows,
4   I don't know.
5       Q.  Were you asked by your attorneys to try to
6   find some folks who would participate as class
7   representatives; was that the reason you were having
8   these conversations?
9       A.  Yes.
10      Q.  And are you continuing to do that, find
11  people to talk about it and ask them to be involved?
12      A.  No.
13      Q.  When did you stop?
14      A.  When I talked to everybody that I personally
15  knew.
16      Q.  Now, have you talked to anybody else about
17  the lawsuit, people who aren't owners particularly, but
18  might be pilots who fly these from time to time, or
19  people who are thinking about buying them, things like
20  that?  Is there anybody else you talked to about the
21  class action case?
22      A.  Only in a really vague, sort of generalistic
23  way.  I mean, the people that fly the airplanes
24  generally own them.
25      Q.  Okay.

Page 171

1       A.  They're not rentals, that I'm aware of.
2       Q.  Okay.  Do you know Wizmith (phonetic), a guy
3   named Wizmith?
4       A.  I know who he is.
5       Q.  Did you ever have any conversations with him
6   about it?
7       A.  No.
8       Q.  And is it your testimony then that all of the
9   people that you talked to, the ones you named, plus the
10  several whose names you can't remember, all fear
11  retaliation from Piper and they think there will be
12  some impact on their ability to buy the new airplane if
13  they join in the class action?
14      A.  That was my impression.
15      Q.  And has in fact anybody -- Did anybody give
16  you any examples of anything that's happened to them
17  thus far as a result of this?
18      A.  Well, no, but they just started shipping the
19  Meridian in, depending on who you want to listen to,
20  October, November.
21      Q.  So these are owners of a plane that believe
22  they have some problem with their planes, who plan
23  anyway, irrespective of the problems, to upgrade to
24  kind of the next generation, and those people are
25  fearful of suggesting that there's a problem with their

Page 172

1   plane, because they're afraid they won't be able to --
2   Piper won't sell them a new Meridian?  That's your
3   testimony?
4       A.  Well, I mean, I'm not going to speculate on
5   what their specific reasons are.  And the Meridian --
6   and the reason everybody's going to the Meridian, it's
7   my understanding, is that you get much greater
8   reliability and much better performance, albeit at a
9   much higher cost.
10      Q.  The intimidation or the retribution or
11  whatever that they're worried about is that Piper won't
12  sell them a Meridian?
13      A.  I think Piper will sell them, but then you
14  get into the warranty issues.
15      Q.  Piper will give them a lesser warranty
16  because they made a claim against them?
17      A.  I would say lesser warranty service.
18      Q.  And this would be through the service
19  centers?
20      A.  Or the factory direct.
21      Q.  Okay.  Now, you understand that Piper and
22  Textron have made this proposal to people, volunteered
23  to have people come in and have their planes modified,
24  correct?
25      A.  Yeah.

13 (Pages 169 to 172)

Page 173

1    Q.  And notwithstanding that, these people that
2    you've talked to believe that Piper invited these
3    people to come in and get their planes fixed, but then
4    they're going to turn around and give them poor
5    warranty service on the new plane they're going to sell
6    them that cost more than this one; that's your
7    testimony?
8    A.  That's my opinion.
9    Q.  Okay.  In the Complaint, you allege that
10   New Piper manufactured and sold 270 Malibu Mirage
11   planes with an AE2A engine since July of '95.  Do you
12   recall that?
13   A.  That's what the Complaint alleges, but if
14   you'll recall, much earlier today I said I thought the
15   number was more than that.
16   Q.  Okay.  Do you know what the number is?
17   A.  I've heard varying numbers as high as 500.
18   Q.  You also allege in the Complaint that Textron
19   Lycoming sold, re-manufactured, overhauled, AE2A
20   engines for more than 465 Malibu Mirage aircrafts.
21   Where did that number come from?
22   A.  My attorneys got that number.
23   Q.  You don't have any basis for knowing that?
24   A.  No, I don't.
25   Q.  And you allege in the Complaint that you seek

Page 174

1    to represent a class of 2,000 owners and former owners.
2    Where did that number come from?
3    A.  I believe my attorneys determined that
4    number.
5    Q.  Tell me how they determined that number.
6    A.  I don't know.  But if you -- I mean,
7    mathematically, if you say that there's 500 of these
8    Mirages out there and that the typical ownership
9    period, from what they've told me, is two and-a-half
10   years, and then you run the math on the fleet life, you
11   get very quickly that number.
12   Q.  So you're counting everybody who ever had an
13   ownership interest in a Mirage in that 2,000, or your
14   lawyers were?
15   A.  I believe that's true, but again, how they
16   did it, I'm not exactly sure.
17   Q.  And it's your belief that all of those prior
18   owners have been damaged as a result of this; people
19   who have sold the planes to somebody new, all those
20   people have been damaged or harmed from their ownership
21   in this plane?
22   A.  I'm not an expert on a class action, this is
23   the first one I've ever been in, but it's my
24   understanding, yes, those people have been harmed one
25   way or the other.

Page 175

1    Q.  If they sold their planes before there was
2    ever an incident or any knowledge of an incident, do
3    you believe that the bearing issue would have affected
4    the price?
5    A.  Say that again.
6    Q.  Yeah, let's take the WOWAM aircraft.
7        Before the incident occurred, before there
8    had been any reference anywhere to any incidents, do
9    you believe that the WOWAM airplane was reduced in
10   value as reflected in the sale price?
11   A.  I would think that would depend on when you
12   put it in the marketplace.
13   Q.  Well, I'm assuming it was in the marketplace
14   before anybody knew about any problems.
15   A.  No, we never put it up for sale.
16   Q.  When you bought it.  When you bought into the
17   plane.
18   A.  Well, when I bought the plane --
19   Q.  Did you get a lower price -- Let me ask it
20   this way.
21       When you bought the WOWAM plane, when you
22   bought into it, did you get a lower price because of
23   the engine or the bearings?
24   A.  No.
25   Q.  So whoever sold it to you got full value for

Page 176

1    the plane as of that time; is that fair to say,
2    whatever the full value was?
3    A.  Yes.  Yes.
4    Q   And you told me this morning that both the
5    WOWAM plane and the Mike Alpha plane, what you paid was
6    the fair value of the plane.
7    A.  No, that's not what I said.  I said that was
8    true for WOWAM.  What I said in Mike Alpha's case --
9    Q.  You got a better deal?
10   A.  I got a much better deal.
11   Q.  Right.
12   A   What I didn't know was why I got a much
13   better deal.
14   Q.  And now you're saying you believe you got a
15   better deal for what reason?
16   A.  Because I think -- I think by that time,
17   there were enough failures and they were widespread
18   enough that people were beginning to figure out that
19   this airplane had a systemic engine problem.
20   Q.  Well, you knew about the problem before you
21   bought it, didn't you?
22   A.  Well, when I knew about it, I thought that
23   was an isolated instance.  If I had known that the
24   failure rate was as high as we found out it was, I
25   wouldn't have bought it.

14 (Pages 173 to 176)

Page 177

1    Q.  And by "failure rate," you mean bearing
2  failures?
3    A.  Engine failures, which I'm presuming are
4  caused by bearings and/or --
5    Q.  And do you know how many incidents of rod
6  bearings -- connecting rod bearings failure there have
7  been?
8    A.  I remember a number of failures, and I've
9  seen different statistics, but I believe the number of
10  total engine failures is 111.  How many of those are
11  directly attributable to rod bearing failure, I've seen
12  numbers as low as 25 and as high as 65.
13    Q.  So you know of 65 rod bearing failures that
14  you've seen written about somewhere?
15    A.  I believe that's the number.
16    Q.  And how many main bearing failures are you
17  familiar with?
18    A.  I don't know the answer to that.
19    Q.  Okay.  And this all came out of some
20  statistics your lawyers had or from some other source?
21    A.  Surveys, what have you.
22    Q.  Well, you've told me about two surveys.
23    A.  Yeah.
24    Q.  Is that what you're talking about?
25    A.  Right.

Page 178

1    Q.  No other surveys?
2    A.  Not that I recall.
3    Q.  On the Mike Alpha plane, you bought that
4  plane even though it had had an engine overhaul; is
5  that right?
6    A.  It had a top overhaul.
7    Q.  You knew about that, right?
8    A.  Yes.
9    Q.  And did you assume it was done with Lycoming
10  parts?
11    A.  Yes.
12    Q.  And you knew that that plane had not made it
13  to the 2,000-hour TBO when you bought it?
14    A.  Yes.
15    Q.  And you knew all that before you bought the
16  plane?
17    A.  Yes.
18    Q.  And you bought it anyway?
19    A.  Yes.
20    Q.  Now, are you familiar with a subscription
21  service that you can get Textron Lycoming advisories
22  and so forth -- I'm sorry, not advisories -- service
23  instructions?  Is there such a subscription service?
24    A.  I don't know if there is or isn't.
25    Q.  If you buy a plane new, do you know whether

Page 179

1  these go to the owners, these kind of service
2  instructions; do you know if they go to the owners of
3  new aircraft?
4    A.  I don't know what the procedure is.
5    Q.  Okay.  So you don't know, when you bought
6  into WOWAM, whether the people who bought the WOWAM
7  plane knew -- had received Exhibits 7, 8, and 9?
8    A.  I don't know if they had or hadn't.  I know
9  they couldn't have received 8 or 9 because of the dates
10  on them.
11    Q.  Right.  And you didn't ask them about any
12  kind of service instructions they received?
13    A.  No, I didn't.
14    Q.  And until you saw these in the litigation
15  recently, you had never even seen these before; is that
16  correct?
17    A.  Well, I saw the service bulletins, or
18  whatever you call them.
19    Q.  Service instructions?
20    A.  Service instructions.  I saw part of those.
21  You've got special advisories.
22    Q.  Yeah.  I'm looking at exhibits --
23    A.  Okay.  You got -- You want me to name them?
24    Q.  6, 7, and 8.  There are three.
25    A.  No, I hadn't seen these.

Page 180

1    Q.  You had not seen these before you filed the
2  lawsuit, for instance?
3    A.  Right.
4    Q.  The two surveys you told me about this
5  morning, you had nothing to do with those going out,
6  being tabulated or anything?  You just saw them when
7  they came back?
8    A.  Right.
9    Q.  Did you even know it was being done?
10    A.  Well, the Fisk survey was either done --
11    Q.  Sisk?
12    A.  Sisk was either done or was in the process of
13  being done when I found out about it.  The Misko survey
14  I knew was being done.
15    Q.  Did you have any input into how that would be
16  worded or what would be asked or who it would be sent
17  to or any of that?
18    A.  No.
19    Q.  And when was the Misko survey sent out?
20    A.  I think in June or July of last year.
21    Q.  And that's the one that included the placard?
22    A.  I believe so.
23    Q.  And included some information about operating
24  parameters and things like that?
25    A.  I believe they were sent together.

15 (Pages 177 to 180)

Page 181

1  Q. Right.
2  A. I don't know that to be a fact, but I believe
3  they were.
4  Q. And you had been involved in developing those
5  new operating parameters in talking with other
6  mechanics and owners and things like that; is that
7  correct?
8  A. Yes.
9  Q. And did you approve or sign off on the form
10 of those materials that were sent out with the Misko
11 survey since it was based in part on work you had done?
12 A. I don't know that I was asked to approve or
13 disprove, but I was sent, as part of -- I was surveyed.
14 Q. Sure.
15 A. And I got the placard. I think I got a
16 placard. I don't really remember, but he said, is
17 this -- what do you think about this. And I said,
18 looks good.
19 Q. And you did tell me you don't have one of
20 those placards up in your airplane?
21 A. No.
22 Q. So while you know about it, do your
23 co-owners?
24 A. Absolutely.
25 Q. They know about it?

Page 182

1  A. They fly it that way.
2  Q. Why didn't you put that placard up in your
3  aircraft?
4  A. Because we fly it that way.
5  Q. That's the only reason you didn't put it up?
6  A. That's the only reason.
7  Q. Is there any legal reason not to put it up
8  that you're aware of?
9  A. No.
10 Q. Is there any legal reason not to comply with
11 the revised operating instructions that are sent out by
12 a lawyer?
13 A. Not that I'm aware of.
14 Q. Do you understand if a lawyer, for instance,
15 sent out operating instructions that maybe went the
16 other way, permitted more aggressive use of the plane,
17 do you believe that would be appropriate for a -- would
18 you, as a pilot, be comfortable following those
19 instructions?
20 A. No.
21 Q. There's reference in the Complaint to
22 searching FAA accident records. Have you seen the
23 results of those searches?
24 A. I don't know if those are in the survey or
25 not. I know I did some looking myself. Apparently,

Page 183

1  there's a database you can either get -- and I can't
2  remember if it was in paper form or on the internet, or
3  both.
4  Q. What did you find out when you searched the
5  FAA accident?
6  A. That there are accidents with Mirages, and in
7  several instances, it's not clear what the cause was.
8  Q. This list of bearing failure, connecting rod
9  bearing failure examples and main bearing examples that
10 you gave, is that information contained in the
11 documents over here in the box, those lists?
12 A. I believe it is.
13 Q. Okay. In your Complaint, in paragraph 9, you
14 make reference to 60 in-flight engine failures. Is
15 that material contained in the boxes?
16 A. I believe so.
17 Q. Has someone determined what was the cause of
18 those 60 in-flight engine failures?
19 A. It's been a while since I've looked at that
20 list, but I believe that there are some indicators of
21 what caused them, but I don't think every single one --
22 I don't think there's a description for every single
23 one.
24 Q. And do you know how many of those were
25 Lycoming engines versus say Teledyne Continental

Page 184

1  engines?
2  A. I think they were all Lycoming, or if not
3  all, substantively all.
4  Q. Okay. You make reference in the next
5  paragraph to a particular purchaser who had bearing
6  metal in the oil after 324 hours, and you say that
7  Textron refused to install a new engine, and the owner
8  was forced to settle for a re-manufactured engine with
9  used parts. Who is that person that you're describing
10 there?
11 A. I'm not sure. I had the attorneys prepare
12 the pleadings, so...
13 Q. That's not a fact -- That's not a situation
14 you know of personally?
15 A. No. I've heard of it. I just don't remember
16 the guy's name.
17 Q. And you believe that it was inappropriate to
18 put a re-manufactured engine in instead of a new
19 engine?
20 A. That's an odd choice of words. I think
21 it's -- I think it's -- I think if I had a 320-hour
22 engine, I would want a new engine.
23 Q. Can you envision a situation where there were
24 negotiations about this between the owner and the
25 manufacturer?

16 (Pages 181 to 184)

Page 185

1    A. I'm sure there were.
2    Q. Can you envision a situation where there were
3  factors that you and I can't know about as we sit here
4  today that might have led to that result?
5    A. I don't have any way to answer that. I don't
6  know.
7    Q. In determining whether the reference in here
8  that the owner was forced suggests that that was not
9  the best thing for the owner. You would agree with
10 that, "forced to accept a re-manufactured engine"?
11   A. Well, again, I would say that with that low
12 time an engine with problems, I would want a new
13 engine.
14   Q. Okay. Well, my question is, in your
15 Complaint that we're traveling under here, you say that
16 the owner was forced to settle for a re-manufactured
17 engine. And I'm asking you if you understand that to
18 mean that there was a problem with making that owner --
19 there was a problem with that owner having a
20 re-manufactured engine?
21   A. Well, I would say there would be some
22 ultimate diminishment in the value of the airplane,
23 because you've got a re-mand engine on what amounts to
24 a brand new airplane, or close to it.
25   Q. You also allege that New Piper and Textron,

Page 186

1  in paragraph 11, have known for several years of
2  excessive major component failure in the Malibu Mirage
3  AE2A engine due to defects with the bearings, main and
4  rod bearings.
5    First of all, how many years is several years
6  that these companies knew this, in your opinion?
7    A. From the correspondence I've seen, they were
8  aware of this problem as early as 1996.
9    Q. And you believe that in 1996 these two
10 companies knew of defects in the main bearing and in
11 the connecting rod bearing?
12   A. I don't know that they narrowed it down to
13 the rod bearings just yet. I think they knew that
14 there were some defects.
15   Q. Okay.
16   A. I think the rod bearings were certainly a
17 prime suspect.
18   Q. In that previous paragraph, 10, when it said
19 the owner was forced. Do you have any understanding of
20 what the word "forced" means in that context?
21   A. I would take that to mean that the factory's
22 position was you take a factory re-mand or you don't
23 take anything. And I would say that's tantamount to
24 force.
25   Q. Is it typical in general aviation that if you

Page 187

1  get a re-manufactured engine, the counting, the hours,
2  goes back to zero?
3    A. It depends on -- It depends on a factory
4  re-mand or not.
5    Q. Okay. Assuming it's a factory re-mand.
6    A. It is considered to be a zero time engine, as
7  I understand it, even though the crank and the case may
8  not be in fact zero time.
9    Q. Who sets the rules and regulations for
10 whether you call it a zero time engine or not; is that
11 the FAA?
12   A. I don't know, but I would presume so.
13   Q. It's a regulation though; it's not just
14 something somebody makes up?
15   A. It's a regulation, yeah.
16   Q. So somebody in authority believes that a
17 re-manufactured engine, it's appropriate to put
18 zero time for purposes of that plane ever being
19 re-sold or whatever?
20   A. Yes.
21   Q. Do you know whether or not in the Lycoming
22 situation the factory re-manufactured engines have to
23 meet the same production test specs as new engines?
24   A. I don't know what the factory rules are.
25 I've seen -- I've seen interviews to indicate that the

Page 188

1  specs may be different for factory remands than they
2  are for new engines.
3    Q. Those are the four interviews that you told
4  us about?
5    A. Yeah.
6    Q. That you told me were in those boxes?
7    A. Right.
8    Q. Obviously, I have not had a chance to look at
9  those yet.
10   You make reference to New Piper and Lycoming
11 being warned by component suppliers of the excessive
12 failure rate resulting in safety of flight conditions
13 in your Complaint. What is that a reference to?
14   A. I believe that came from the bearing
15 manufacturer.
16   Q. And you believe the bearing manufacturer
17 reported that there was a safety of flight issue with
18 regard to bearings that they were selling?
19   A. I believe so. In fact, I think they declined
20 to sell them bearings after a while.
21   Q. But you understand that that bearing
22 manufacturer does not sell bearings anymore to
23 Textron Lycoming?
24   A. I believe that's the case.
25   Q. Do you know who they started getting them

17 (Pages 185 to 188)

Page 189

1  from?
2     A. I do not.
3     Q. Would a replacement engine -- Let's assume
4  you've got a Piper, a Malibu Mirage, would a
5  replacement engine make you whole as far as any
6  diminution in value to your plane?
7        MR. MISKO: Replacement engine, new engine?
8        MR. REID: Yeah.
9        MR. MISKO: Factory new?
10       MR. REID: Yeah.
11       MR. MISKO: Out of the box?
12       MR. REID: Right.
13 BY MR. REID:
14    Q. Would that make you whole?
15    A. No.
16    Q. Why not?
17    A. Which airplane do you want to talk about?
18    Q. Well, let's talk about either one. We'll
19 talk about both of them.
20    A. Well, the 85 Whiskey, no one will repair that
21 airplane and certify that the pressure records will
22 remain intact. The only way you can fix it, I've been
23 told by the expert in the field, is to put a new
24 fuselage on it. You can send me a new engine all day.
25       On top of that, and this will get to Mike

Page 190

1  Alpha, even if you had a factory brand new engine, not
2  a re-mand, a brand new engine, if you operate that
3  engine under the POH conditions, there is a substantial
4  likelihood that that engine will not make it to TBO so
5  that the overall value of the aircraft is diminished.
6  And that's what's showing up out in the field right
7  now.
8     Q. So you're saying that any New Piper
9  Malibu Mirage, as it's sold now, is defective?
10    A. It's defective in the sense that it will not
11 meet the performance specs that are in the book and
12 have the engine survive.
13    Q. To 2,000 hours?
14    A. Right. And as I understand it, they finally
15 suspended production of the Mirage.
16    Q. Suspended production of what?
17    A. The Mirage.
18    Q. Do you know why they did that?
19    A. Well, the party line is that they need to
20 build new Meridians.
21    Q. Do you think that's not true?
22    A. I think it's subject to interpretation.
23    Q. So you don't think there's a market out there
24 for the Meridians?
25    A. I don't think it's as big as they think it

Page 191

1  is.
2     Q. Okay. So in your opinion, on planes such as
3  the Mike Alpha, a brand new manufactured engine, brand
4  new engine, would not eliminate the damage, as far as
5  you know?
6     A. No.
7     Q. What would it take then to eliminate the
8  damage?
9     A. Well, I think they need to do a complete
10 re-engineering and development program on the way they
11 built that engine and operate it and manufacture it to
12 bring it into tolerances.
13    Q. Into what tolerances?
14    A. Well, they need to tighten up the tolerances
15 from what I've read, but outside examiners have said
16 that those engines aren't close to spec. That's
17 problem one.
18       Problem two, I've heard that the cooling
19 system needs to be reconfigured and they need to admit
20 to the reality that the airplane won't last -- You
21 can't run the engine more than five minutes at full
22 power and have it lift.
23       Now, would that bring a resuscitation in
24 fleet values? I don't know.
25    Q. Outside examiners you said. A minute ago you

Page 192

1  used that phrase. Who are they?
2     A. Victor.
3     Q. Who?
4     A. Victor Aircraft Engines.
5     Q. Tell me about that.
6     A. Well, I believe he's the guy that holds the
7  STC for the Continental 550 conversion and the old
8  Malibus, the ones that had the 310 engines on them.
9  And I've heard him say that he's pulled apart, you
10 know, a brand new engine and it's not into specs.
11    Q. What's his whole name?
12    A. It's unpronounce -- I never can remember how
13 to pronounce it. Victor something or other.
14    Q. Can you spell it?
15    A. No. I'd have to see it.
16    Q. And what's his company called?
17    A. I think it's called Victor Engineering or
18 Victor Aircraft Engineering.
19    Q. Where is he located at?
20    A. I think he's in Florida.
21    Q. And that's the basis for your statement a
22 minute ago that Lycoming engines are not built at the
23 factory to the specification?
24    A. Well, that and the interviews, and the fact
25 that there seems to be an inordinate high failure rate.

18 (Pages 189 to 192)

1    Q.  Compared to what?
2    A.  25 percent?
3    Q.  Compared to what?
4    A.  I haven't heard of any other general aviation
5    engines failing at 25 percent rate.  Now, do I have --
6    I don't have statistics to back that up.
7    Q.  And the 25 percent comes from the Misko
8    survey and the Sisk survey?
9    A.  Right.
10   Q.  And no other basis?
11   A.  No.
12   Q.  Okay.  You mentioned MMOPA a few times today.
13   A.  Yes.
14   Q.  What's your involvement with MMOPA?
15   A.  I'm a member.
16   Q.  Anything else?
17   A.  No.
18   Q.  You been on any committees or anything?
19   A.  No.
20   Q.  Have you ever written any articles for any of
21   their publications or anything like that, or for their
22   website?
23   A.  No.
24   Q.  When you fly currently, do you fly VFR or
25   IFR?

1    A.  Both.
2    Q.  Is there one more than the other?
3    A.  Well, by definition, where I fly most of the
4    time is pretty much VFR.
5    Q.  And has that been the case since you've been
6    flying the Malibu Mirage?
7    A.  Yes.
8    Q.  And what's a typical length of flight for you
9    in the WOWAM and in the Mike Alpha planes?
10   A.  Oh, it's all over the place.  I mean --
11   Q.  You don't have a typical --
12   A.  I don't have a typical trip.  It can be an
13   hour and-a-half, it can be seven hours, it can be three
14   and-a-half hours.
15   Q.  How about altitude; do you typically fly a
16   particular altitude more than any other?
17   A.  It's a function of the trip length.  In other
18   words, the shorter the trip, it doesn't make any sense
19   to go high, all other conditions being equal.
20   Q.  Okay.
21   A.  It depends on the wind.  But just as a rule
22   of thumb, the longer the trip, the higher you want to
23   go.
24   Q.  Okay.  How about fuel; what fuel load do you
25   usually take?

1    A.  Normally, full.
2    Q.  Full?
3    A.  Yeah.
4    Q.  And do you typically fly with passengers or
5    without passengers?
6    A.  Again, it goes all over the place.  I'd say
7    probably half my flying is single pilot with no
8    passengers, and I've had two passengers, I've had one
9    passenger.
10   Q.  How about baggage; do you typically have
11   baggage?
12   A.  No, not much.
13   Q.  Can you give me an idea of the air speed that
14   you typically use?  And I assume you're going to tell
15   me if it's varied over the two airplanes and over the
16   time that you --
17   A.  Well, I would, but I mean, I flew the two
18   airplanes, you know, once we made this operating
19   revision, the same.
20   Q.  Okay.  So what --
21   A.  What I typically see as true air speed, TAS,
22   is 145 knots, 150 knots.
23   Q.  How about power settings; do you use the
24   same?
25   A.  Yeah, 30-24.

1    Q.  Okay.
2    A.  Now, that's in cruise.  Climb is 35-25.
3    Q.  And now you say your flying is almost
4    entirely in the day?
5    A.  Yeah.
6    Q.  When did that change?
7    A.  I'd say it changed after Mr. Vann had his
8    incident.
9    Q.  And how about the mountain restriction that
10   you have now, when did that change?
11   A.  After Mr. Vann had his incident.
12   Q.  Immediately after?
13   A.  Yeah.
14   Q.  So you didn't wait until you found out a
15   little more about what the problem or problems might
16   have been; you immediately made a change?
17   A.  Right.  I don't do a lot of mountain flying
18   anyway, but...
19   Q.  Did you immediately change the parameters
20   right after his incident as well?
21   A.  Well, I couldn't.
22   Q.  Why not?
23   A.  I didn't have an airplane to fly.
24   Q.  I understand, but you got one shortly
25   thereafter.

Page 197

1     A.  A year and -- Well, I guess it was about
2  five months.
3     Yeah, I started out flying that airplane with
4  a modified parameter.
5     Q.  Tell me how you do descents.
6     A.  Pull back 2 inches per 2,000 feet, generally
7  speaking, until you get down to cool temperatures, cool
8  cylinder heads; cool being 325, 350.
9     Q.  Did you regularly fly at night before
10 Mr. Vann's incident?
11    A.  Oh, 20 percent of the time, 15 percent of the
12 time.  And a lot of those flights are what I call
13 transition flights.  They start out during the day and
14 end up at dark.
15    Q.  So I could check that by looking at your log,
16 how many hours?  It would show day or night flights?
17    A.  Yeah.
18    Q.  And you think it was about 20 percent of your
19 total flight time?  What was your total?
20    A.  It might not have been that high.
21    Q.  What I'm trying to find out is, is it a
22 significant change when you say you stopped flying at
23 night from what you had been doing, or was it not a
24 significant change?
25    A.  I'd say it was some change.  I don't know if

Page 198

1  it was a dramatic change.
2     Q.  And the mountains, you said you didn't fly in
3  the mountains much anyway before the WOWAM?
4     A.  That's right.
5     Q.  Are you personally paying the cost of this --
6  not legal fees, but just the cost of this case as it
7  proceeds?
8     A.  No.
9     Q.  You're not?
10    A.  No.
11    Q.  Have you been told that you'll be required --
12 you could be required to?
13    A.  No.
14    Q.  Do you understand that under the rules that
15 if you're not successful in the lawsuit, you could be
16 called upon to pay the out-of-pocket costs, taxable
17 costs, of the other side?
18    A.  No.
19    Q.  Does that make any difference in your
20 thinking about whether you want to be a class
21 representative or not?
22    A.  No.
23    Q.  You're willing to take on that obligation
24 personally?
25    A.  I wouldn't call it an obligation.  I would

Page 199

1  say it was a risk.
2     Q.  Well, you're willing to take on that risk?
3     A.  Yeah.
4     Q.  Okay.  Do you know a Professor Heinz in
5  Oklahoma?
6     A.  No.
7     Q.  Do you know if there are any other surveys
8  that are being done on behalf of your U.S. class
9  representative or your attorneys as counsel for the
10 class?
11    A.  I saw something on the MMOPA board about some
12 survey that was from the Oklahoma school, but it was
13 just there's one being done, and someone -- I forget
14 who disavowed any interest in it.
15    Q.  Somebody disavowed any interest in it?
16    A.  It may have been the school itself.
17    Q.  Well, have you talked with your attorneys
18 about that survey back?
19       MR. DOMINGUEZ:  I think that would be
20    privileged if they had.
21       MR. REID:  I'm not going to ask him what they
22    said.  I just want to know if there was a
23    conversation about that survey.  I've been careful
24    about that.
25 BY MR. REID:

Page 200

1     Q.  Have you had a conversation with your
2  attorneys about that particular survey?
3     A.  I don't think it's come up.
4     Q.  And your only reference or notice of that
5  survey is you say you saw something on the MMOPA
6  website?
7     A.  I believe that's where I saw it.
8     Q.  Are you familiar with any other --
9     A.  Or it may have been, you know, I get the AOPA
10 On-line Magazine.  It may have been in there.
11    Q.  Are you aware of any other surveys or any
12 other activity that your lawyers are undertaking for
13 this case on your behalf?
14    A.  No.
15    Q.  Are you aware of any contacts being made by
16 your attorneys with possible class members in this
17 case?
18    A.  Well, I'm sure they're talking to people,
19 additional class -- potential class members.
20    Q.  So you do know that that's a fact then, that
21 your --
22    A.  Yes.
23    Q.  -- attorneys have contacted --
24    A.  I'm sure they have.
25    Q.  -- putative class members?

20 (Pages 197 to 200)

Page 201

1    A. Right.
2    Q. Do you know how many?
3    A. No.
4    Q. You mentioned that you had talked to some and
5  you were trying to sign some people up to be class
6  representatives and you were not successful.
7        Do you know if your attorneys have been
8  successful in signing anybody else up to be a class
9  representative?
10   A. I believe they have.
11   Q. And how many people have agreed to sign up as
12 far as you know?
13   A. I think it's four or five.
14   Q. And do you know how many people have said,
15 no, they don't want to sign up?
16   A. No.
17   Q. Were you involved in the settlement
18 discussions of any of this with the lawyers out in
19 Texas?
20       MR. AMES: Would you rephrase your question?
21       MR. REID: Yeah.
22 BY MR. REID:
23   Q. There were some settlement discussions that
24 went out in Texas. Some lawyers meant, there was a
25 demand made, back and forth discussions and all that,

Page 202

1  and it all related to the Texas litigation that you
2  said your L.L.P. Or L.L.C. is a party to.
3        My question is, were you personally involved,
4  or did you have knowledge of those discussions?
5    A. No.
6    Q. Did you see the settlement materials that
7  were prepared by your attorneys to send to
8  representatives of my client or Piper or other people,
9  demand information?
10   A. I don't recall. I don't think so.
11   Q. Did you see any videotapes that were prepared
12 that were sent out to possible class representatives in
13 this case?
14       MR. AMES: Why don't we take a quick stop
15 here?
16       MR. REID: Okay.
17       MR. AMES: Why don't you make clear that what
18 you're talking about, the WOWAM Texas litigation,
19 has nothing to do with the Piper Florida
20 litigation.
21       MR. REID: I did. I said the Texas
22 litigation that his company was party to.
23       MR. AMES: I don't think he understood and I
24 don't think the record is clear.
25       MR. REID: I understand.

Page 203

1        MR. AMES: Let's go ahead and continue. I
2  just wanted you to clarify --
3        MR. DOMINGUEZ: It wasn't clear to me when
4  you asked the question.
5        MR. REID: We talked about it. You weren't
6  in here earlier today, we talked about it at
7  length.
8  BY MR. REID:
9    Q. I'll ask you again.
10       In my discussion with you just now about
11 settlement talks and so forth and so on, I was talking
12 about the Texas litigation that you and I talked about
13 earlier today, the WOWAM, the personal injury suits,
14 and all that.
15   A. Okay. I don't know anything about the
16 personal injury side at all.
17   Q. You told me that this morning.
18   A. I understand that there have been brief talks
19 about the potential of settling the hull issue on the
20 WOWAM aircraft.
21   Q. Okay.
22   A. Including partially with me.
23   Q. And my question is, have you seen the
24 videotapes that purport to be a reenactment of the
25 WOWAM incident?

Page 204

1    A. Yes.
2    Q. And did you see those before they were sent
3  to the other side when they were in production?
4    A. I don't know.
5    Q. You don't remember when you saw them?
6    A. Well, I don't remember the first date I saw
7  them. I don't know if I saw them before or after they
8  were sent.
9    Q. All right. You don't remember when you first
10 saw them?
11   A. No.
12   Q. Did you see them before they were finished,
13 or did you see the final version?
14   A. No. All I saw was the final version.
15   Q. And did you authorize those to be sent to
16 owners of Malibu Mirage planes who may be in this
17 class?
18   A. Why would that be for me to authorize?
19   Q. My question is, did you authorize it?
20   A. I wasn't asked to authorize it.
21   Q. Okay. I didn't ask you that question, but I
22 could.
23       Did anybody ask you, as class representative,
24 whether these should be sent out to the people that you
25 purport to represent in the case?

21 (Pages 201 to 204)

Page 205

1    A.  Oh, I see what you're saying.
2        I don't think they asked me.  I think they
3    said, we're sending out this videotape.
4    Q.  Okay.  So you knew before it went out that it
5    was being sent out to Malibu Mirage owners?
6    A.  Right.
7    Q.  And you knew that those people would be
8    potentially part of a class, could be part of a class
9    that you were going to be the representative of?
10   A.  Right.
11   Q.  Do you know if any of that material was
12   submitted to the Texas or the Florida Bar before it was
13   sent out?
14   A.  No.
15   Q.  And are you aware of whether anybody called
16   in or as a result of getting that said I'd like to be
17   part of this case, part of this class action?
18   A.  I don't know.
19   Q.  You haven't heard?
20   A.  I haven't heard.
21       MR. REID:  Okay.  Let's take a break.
22       (Recess taken from 3:25 p.m. to 3:35 p.m.)
23   BY MR. REID:
24   Q.  You mention that you saw a website or
25   somewhere about this professor in Oklahoma doing this

Page 207

1    lawyers you told me?
2    A.  No.
3    Q.  And at this point, you don't know who funded
4    that survey?
5    A.  I don't know anything about it.
6    Q.  Well, specifically, you don't know who funded
7    it?
8    A.  No.
9    Q.  And did you attempt to look at the survey,
10   read it, or contact anybody about it?
11   A.  No, because it was that recent.  I've been
12   traveling, I've been --
13   Q.  Do you plan to?
14   A.  Now that I've spoken with you, I will.
15   Q.  Have you spoken with anybody who received the
16   videotapes which attempted to do some sort of a
17   reconstruction of this event, the WOWAM event; have you
18   spoken to anybody that received those tapes?
19   A.  Yes.
20   Q.  Who?
21   A.  Mr. Boyd.
22   Q.  Did he receive it just out of the blue, or
23   did you give it to him directly?
24   A.  I think he just got it out of the blue,
25   I think.  I don't know that.

Page 206

1    survey.
2    A.  Yes.
3    Q.  That was fairly recently I take it you saw
4    that?
5    A.  Yes.
6    Q.  Now, you're a class representative, and you
7    know about two previous surveys, and you've had this
8    history with this airplane.
9    A.  Yes.
10   Q.  And based on all that, as I understand it,
11   you really don't recall having any discussions with
12   your lawyers or anybody else about that subject matter;
13   you kind of just blew it off, to use the vernacular?
14       MR. AMES:  What do you mean "subject matter"?
15   BY MR. REID:
16   Q.  The survey.  Professor Heinz's survey.
17   A.  I think the reason I didn't talk about it is
18   because I think what I remember about what I read was
19   they disconnected themselves from any survey.
20   Q.  The university did?
21   A.  Right.  So...
22   Q.  Do you know who funded that survey?
23   A.  I just found out about it.  I found out that
24   it might exist less than a week ago.
25   Q.  And you have not discussed it with your

Page 208

1    Q.  And when did you have this discussion with
2    him about it?
3    A.  Oh, it's been some months.  I don't know how
4    many.
5    Q.  And tell me what the discussion was.
6    A.  He said, that's pretty scary.  And I said,
7    the scary thing about that is it's a great training
8    film for pilots who get involved in an incident like
9    that, because the biggest risk may be the passengers.
10   Q.  Meaning what?
11   A.  Well, I can't personally think of a much
12   worse situation to be in than night IMC losing engine
13   in the dark.  To add to that a hysterical person when
14   you're trying your level best to get the airplane down
15   in one piece, it never dawned on me that that could be
16   very distracting when you need all your focus on flying
17   the airplane.
18   Q.  And what other discussions did you have with
19   Mr. Boyd.  Is it Boyd?
20   A.  Boyd, B-O-Y-D.
21   Q.  Sometimes it sounds like you end it with a
22   "T."
23   A.  It's my accent.
24   Q.  What accent?
25   A.  The Texas accent.

22 (Pages 205 to 208)

Page 209

1    Q.  Okay.  Go ahead.
2    A.  Go ahead what?  I thought I answered your
3  question.
4    Q.  Did you have any other conversations with him
5  about it?
6    A.  No.
7    Q.  Did he tell you before he saw that video or
8  after that video that he didn't want to be part of the
9  class?
10   A.  I don't recall.
11       MR. REID:  That's all I have right now.
12   We'll let him finish, and then we'll see.
13       One of the difficulties I have is, of course,
14  is I had, as you know, asked about getting the
15  documents ahead of time, and we couldn't work that
16  out.  There may be some questions that I have when
17  I look at the 18,000 pages, so I'll maybe want to
18  talk to you about a follow-up.  Maybe I don't have
19  to file a motion.  Maybe we can do it by
20  telephone.
21       MR. AMES:  That's fine.  We can discuss it.
22   Let's go ahead and put off the record that
23  the plaintiffs have, in response to the deposition
24  notice and the subpoena, have supplied Textron
25  with 18,400-plus documents that are responsive.

Page 210

1        MR. REID:  And I don't remember if we did
2   this this morning.  I thought we had done that on
3   the record, but if we didn't, can we also just
4   add, because I'd like it to be there, that they
5   are not categorized or grouped in any way that
6   would identify which documents comply with which
7   of the 31 specific items.
8        MR. AMES:  That's correct.  And you didn't
9   ask us to do it.
10       MR. REID:  Well, some would say you have an
11  obligation to do that under the rule, but we'll
12  look at them.
13       So that's all I have for right now.
14       MR. AMES:  How much more time do we have?
15       MR. REID:  140 minutes less what I just did.
16           CROSS EXAMINATION
17  BY MR. BATEMAN:
18   Q.  Mr. Montgomery, my name is Courtney Bateman.
19  I represent New Piper Aircraft.
20   A.  Is it Courtney?
21   Q.  Yes.  C-O-U-R-T-N-E-Y.
22   A.  Okay.
23   Q.  Did you fly 85 Whiskey, the WOWAM aircraft,
24  using the numbers that were called out in the POH?
25   A.  Yes.

Page 211

1    Q.  Did you fly it using the modified procedures
2  that you had talked about; not running at maximum power
3  for more than five minutes, and those sort of things?
4    A.  No.
5    Q.  Okay.  You did, however, fly 0 Mike Alpha
6  using the modified procedures?
7    A.  That's correct.
8    Q.  You did not, so I'm clear on this, you did
9  not use those modified procedures in flying 85 Whiskey?
10   A.  No, because by the time I found out about
11  them, 85 Whiskey was on the ground permanently.
12   Q.  I'm going to rehash some old ground here, and
13  I'm sorry, I'm just trying to make sure everything's
14  covered.
15       How did you learn about 0 Mike Alpha being
16  available for purchase?
17   A.  I didn't know if it was.  I mean, I met
18  Steve Boyd at the MMOPA convention in Kansas City and
19  he was in Dallas, a real nice guy, and I called him and
20  said, would you have any interest in selling an
21  interest in the airplane, because I don't have an
22  airplane.
23   Q.  And at that time he said yes?
24   A.  He said, let's talk about it.
25   Q.  You did not go through any dealer or

Page 212

1  distributor in finding Mr. Boyd?
2    A.  No.
3    Q.  Okay.  Did you rely on any oral
4  representations in purchasing 0 Mike Alpha?
5    A.  Tell me what you mean by that.
6    Q.  Did anyone make any representations to you
7  verbally about the performance or other aspects of
8  0 Mike Alpha that you relied on and decided to buy the
9  airplane?
10   A.  No.
11   Q.  You had indicated that you had received, when
12  you were back and you were initially considering a
13  Malibu Mirage, you received some promotional brochures
14  from the Texas Piper gentleman.
15   A.  Right, Larry Johnson.
16   Q.  Larry Johnson.
17       Since Larry sent you those materials, did you
18  receive anything else in the process of purchasing
19  0 Mike Alpha or purchasing your interest in
20  0 Mike Alpha?
21   A.  Larry gave me a videotape one time, and I
22  can't remember exactly when that was.
23   Q.  What was the subject matter of the videotape?
24   A.  A new -- We had talked about trading
25  85 Whiskey in for a newer airplane, I believe, a newer

23 (Pages 209 to 212)

Page 213

1  version.
2     Q. You don't recall when you received the
3  videotape?
4     A. No.
5     Q. It was, I guess, before 85 Whiskey crashed?
6     A. Yeah.
7     Q. So then after that videotape, did you receive
8  any other brochures or promotional materials that you
9  relied on in purchasing 0 Mike Alpha?
10    A. No.
11    Q. Any written representations then that
12  New Piper or Textron made to you that you had received
13  when purchasing 85 Whiskey rather than 0 Mike Alpha,
14  correct?
15    A. I'm sorry, say that again.
16       MR. BATEMAN: Could you read it back?
17       (The pending question was read back by the
18    court reporter.)
19       MR. BATEMAN: Let me withdraw that.
20  BY MR. BATEMAN:
21    Q. Your Complaint makes certain representations
22  were made by the defendant, New Piper?
23    A. Right.
24    Q. The representations you're talking about
25  there, those are contained in marketing brochures or

Page 215

1        No, beyond that, he didn't say I'll guarantee
2  this airplane will go 215 knots.
3     Q. Any representations made by other people that
4  you relied on in purchasing 85 Whiskey?
5     A. The only thing that I remember is, and I
6  don't remember if it was Wally Maya or John Vann
7  telling me that the typical fuel burn was 20 to 21
8  gallons an hour cruise that they recommended, and that
9  was a little higher than the book, about 2 gallons an
10  hour higher than the book.
11    Q. Any other representations that they made that
12  you recall?
13    A. Not that I recall.
14    Q. Did they make any representations to you
15  regarding cylinder head temperature?
16    A. They like to keep it at 400 or less, and they
17  like to keep the TIT up at 1625 or 1650 or less.
18    Q. So they like to keep the CHT, cylinder head
19  temperature, at what?
20    A. 400 or less.
21    Q. And the TIT at 1650?
22    A. Or less.
23    Q. Do you know if the POH for that airplane
24  calls out figures for either the cylinder head
25  temperature or the TIT?

Page 214

1  materials that you received while you were in the
2  process of obtaining 85 Whiskey, correct?
3     A. Or before.
4     Q. Or before?
5     A. Yes.
6     Q. You did not receive any new materials between
7  the time 85 Whiskey crashed and the time you found
8  0 Mike Alpha?
9     A. No, let's not use the word "crashed." It was
10  a gear uplanding.
11    Q. Fair enough. I will accept that.
12    A. It was a great piece of flying. I went out
13  there. You're lucky there's not four dead people.
14    Q. Gear uplanding then.
15       Between the time of 85 Whiskey's
16  gear uplanding and your purchase of 0 Mike Alpha, did
17  you receive any additional materials from New Piper or
18  Textron?
19    A. No.
20    Q. In buying 85 Whiskey now, did you rely on any
21  oral representations regarding aircraft performance?
22    A. I'm thinking. I think the only thing that
23  Larry Johnson said was that -- orally as opposed to the
24  written material he gave me -- was that it's a great
25  airplane, you know, it's got great performance.

Page 216

1     A. I've seen them, but I haven't seen them in a
2  while, and I think they're higher than that. I think
3  the maximum is 1750 on the TIT and I think it's 450 or
4  475 on the cylinder head temperature. And the redline
5  is higher than both of those numbers on both gauges.
6     Q. Did Mr. Maya or Mr. Vann tell you how it was
7  that they recommended you keep the cylinder head
8  temperature at 400 degrees or less?
9     A. They just said they like to -- they like to
10  operate the engine in a -- they want to keep it cool,
11  relatively speaking.
12    Q. And did they tell you how they did that?
13    A. Well, it's fuel flow, relative to other
14  settings. That's the 2 gallons an hour, a little bit
15  rich.
16    Q. In order then to hit the or meet these
17  numbers, the 400 degree cylinder head temperature, the
18  1650 TIT, they ran the fuel mixture a little rich?
19    A. Just a little bit.
20    Q. Did they make any other changes that you're
21  aware of?
22    A. Not that I'm aware of.
23    Q. Okay. Other than the representations that
24  Mr. Maya and Mr. Vann made to you, do you recall anyone
25  else making any oral representations to you regarding

Page 217

1  the Mirage's performance before purchasing 85 Whiskey?
2      A. No.
3      Q. Do you recall how many brochures you saw that
4  Mr. Johnson has sent to you?
5      A. I think it was two. And it was brochures and
6  what I'm going to call collateral material,
7  spec sheets. There was a videotape. And that was at
8  different times, so...
9      Q. And did you receive all of this stuff prior
10 to purchasing 85 Whiskey?
11     A. I think I may have gotten a '98 brochure
12 afterwards, but considerably afterwards; I mean, like a
13 year-and-a-half later.
14     Q. Considerably after you purchased an interest
15 in 85 Whiskey?
16     A. Right.
17     Q. You had said that you received two brochures.
18 Was the '98 brochure one of the two you're thinking of?
19     A. Yeah.
20     Q. You said spec sheets. Tell me what you can
21 about those.
22     A. Just standard equipment, specifications,
23 useful load.
24     Q. Was it on Piper paper?
25     A. It was part of the brochure. And I say that.

Page 218

1  It may have been an insert. But, yeah, it was Piper
2  material.
3      Q. And did you retain copies of that material?
4      A. I think so. And I'm -- I'm not sure where
5  the brochure came from that's in the exhibits. I don't
6  remember if that's my brochure or if that's just a
7  brochure, so the answer is I don't know.
8      Q. When you say it's in the exhibits, is it the
9  brochure that was attached to the affidavit that
10 Mr. Reid asked you about?
11     A. Yeah. Well, one of those is the '98
12 brochure, but that postdates the '98 85 Whiskey
13 aquisition, so the other brochure, I don't remember
14 if that's mien or just one somebody picked up.
15     Q. Is it the same year as the brochure that you
16 picked up?
17     A. Yeah, it's a '97, because that's the airplane
18 I bought was a '97.
19     Q. So the information would be the same; you're
20 just not sure if it's a copy of what Mr. Montgomery had
21 in his file or it came from somewhere else?
22     A. Right.
23     Q. Does that affidavit include the spec sheets
24 that you referenced?
25     A. Yes, it does.

Page 219

1      Q. All right. So as far as what Mr. Johnson
2  sent you, it's all attached to that affidavit other
3  than the videotape, correct?
4      A. I think so.
5      Q. And what, to your recollection, did the
6  videotape include?
7      A. It was just a standard, you know, here's the
8  latest and greatest piston airplane there is, typical
9  walk-around shots, flying shots, flying comfort at
10 25,000 feet, blah, blah, blah.
11     Q. Just so we're clear, all the information, all
12 the marketing brochures and materials you received from
13 New Piper or Textron are contained in the exhibits to
14 the affidavit, which was itself marked as an exhibit
15 here?
16     A. I believe so.
17     Q. I'm sorry?
18     A. I believe so.
19     Q. Okay. Have you compared contents of the
20 brochures that you received with brochures that were
21 sent out in years prior to or subsequent to 1997/1998?
22     A. No.
23     Q. So you don't know if there's different
24 information in those brochures from what you received?
25     A. No.

Page 220

1      Q. When did you attend training down in
2  Vero Beach?
3      A. June of 1998.
4      Q. Was that the only time?
5      A. Yes.
6      Q. And you have not been back for any currency
7  training back there?
8      A. No.
9      Q. What was the gentleman's name that gave you
10 your training down there; was it Stickle?
11     A. Bob was one of the guys. It was the
12 Attitude's group. There were five or six instructors.
13     Q. Since your training down there, were you in
14 communication with Mr. Stickle?
15     A. On a couple of occasions.
16     Q. What occasions were they?
17     A. I phoned him once to ask his advice on some
18 nav. radio configuration. And he was the instructor
19 that gave me my bi-annual flight review at the March of
20 last year MMOPA seminar.
21     Q. Any other times you recall speaking with
22 Mr. Stickle?
23     A. No.
24     Q. So subsequent to your training at Vero, once
25 you talked to him about nav. radios, and a second time

25 (Pages 217 to 220)

## Page 221

1 was he gave you your BFR?
2 A. Yeah.
3 Q. And that was in March of 2000?
4 A. I believe so.
5 Q. And he, at that time, told you about these
6 modified procedures for operating the Mirage?
7 A. Right, because we had now had the 85 Whiskey
8 incident.
9 Q. And was that the first time you had heard
10 about the modified procedures?
11 A. No. I think I actually first heard about
12 them from Terry Winson at Avex.
13 Q. What's the last name?
14 A. Winson, W-I-N-S-O-N.
15 Q. At Avex?
16 A. Avex.
17 Q. When did you talk to Mr. Winson?
18 A. Oh, in February, maybe even as early as
19 January. He made a bid to repair 85 Whiskey.
20 Q. And you think that in your conversations with
21 him about 85 Whiskey he mentioned the modified
22 operating procedures?
23 A. Yeah.
24 Q. When I'm saying "modified operating
25 procedures," I'm talking about being able to run at

## Page 222

1 max power for more than five minutes.
2 A. Right. Right.
3 Q. Other than Mr. Winson, do you recall anyone
4 else telling you about these modified procedures?
5 A. I talked about them with Bob Stickle, and he
6 agreed. I talked to some other people at the MMOPA
7 seminar, but I don't remember specific names.
8 Q. And the MMOPA seminar was in March?
9 A. Yeah, Kansas City.
10 Q. So you're aware that at least some Mirage
11 owners used modified procedures before you purchased
12 0 Mike Alpha, correct?
13 A. Yes.
14 Q. Your logbook here, other than the
15 endorsements, I guess we'll need copies of those,
16 do you log all of your flight time?
17 A. Yes.
18 Q. So there's not going to be anything missing
19 from there?
20 A. No, unless she didn't -- my secretary didn't
21 copy every page.
22 Q. But aside from copying --
23 A. That's all.
24 Q. -- you enter all of your flight time?
25 A. Every bit.

## Page 223

1 Q. Do you log attendance at MMOPA seminars?
2 A. No.
3 Well, let me qualify that answer. I don't
4 make a logbook entry that I attended a MMOPA seminar,
5 but if I got a review, if I got an instruction that was
6 signable off, if I got anything like that that was
7 endorsable by a CFII, yes.
8 Q. That would be in your logbook?
9 A. That would be in my logbook.
10 Q. Would there be anything in there that says,
11 done at MMOPA convention, or anything like that?
12 A. I couldn't honestly tell you, because I
13 haven't looked.
14 Q. 85 Whiskey was the first Malibu type aircraft
15 you owned, correct?
16 A. What do you mean by "Malibu type aircraft"?
17 Q. Malibu type certificate; Malibu Mirage,
18 Malibu Meridian.
19 A. Yes.
20 Q. You had indicated that when you were going to
21 purchase 85 Whiskey, you consulted some publication
22 regarding the market price. What was the name of that?
23 A. Oh, the --
24 Q. Controller?
25 A. Aircraft Controller. And I also looked at

## Page 224

1 Trader Plane.
2 Q. And the first one was an Aircraft Controller?
3 A. I think it's called the AC Controller or the
4 Controller.
5 Q. Is that something you subscribe to? Does it
6 come out periodically?
7 A. I don't know how often it's published. I
8 think it's published either weekly or biweekly. And,
9 no, I don't subscribe to either one, the other being
10 Trader Plane.
11 Q. Why did you look at those two publications?
12 A. Well, because they are generally acknowledged
13 to be the two most -- I would say that they have the
14 two highest numbers of available aircraft for sale,
15 new -- I mean, used -- Well, new and used.
16 Q. Are they akin to a blue book, or are they a
17 series of classified ads?
18 A. A series of classified ads.
19 Q. Okay. Is there anything like a blue book, a
20 Kelly Blue Book, except for airplanes?
21 A. I'm sure there is.
22 Q. Are you aware of it?
23 A. I've never seen one, but I mean, people talk
24 about blue book values all the time. All the financial
25 institutions have them. I've just never seen one.

26 (Pages 221 to 224)

Page 225

1     Q.  I've got an entry here about 25-hour oil
2  changes in 85 Whiskey.  Did you change your oil in
3  85 Whiskey every 25 hours?
4     A.  And have it analyzed.  We did.
5     Q.  How long did it take, by the way, to change
6  the oil?  How long is the airplane normally down?
7     A.  I've never bothered to time it.  I guess half
8  a day, but I don't know.
9     Q.  How many total hours flight time do you have?
10    A.  752.
11    Q.  And how many of those hours were in a
12 Malibu Mirage?
13    A.  Almost 250.  It may be 250.
14    Q.  Did you own any airplanes prior to owning
15 85 Whiskey?
16    A.  Yes.
17    Q.  What kinds were they?
18    A.  Cessna 421A.
19    Q.  Anything else?
20    A.  Piper Seneca 3.
21    Q.  When did you buy the Seneca?
22    A.  I'd have to look at my logbook to be sure,
23 but I think 1981 or '82.
24    Q.  How long did you own it?
25    A.  A year and-a-half, maybe two years.

Page 226

1     Q.  Why did you sell it?
2     A.  There were three people in the partnership,
3  and two of them wanted out.
4     Q.  What was the next airplane you owned?
5     A.  421.
6     Q.  And when did you buy it?
7     A.  I think late 1984.
8     Q.  You indicated in response to one of
9  Mr. Reid's questions that the damages of loss or value
10 of the aircraft would depend when you put it in the
11 marketplace.  Did I write that down right?
12    A.  I don't think so.
13    Q.  You said something about it depends when you
14 put it in the marketplace.  Do you remember that
15 testimony?
16    A.  No.
17    Q.  Now, you testified you thought you got a much
18 better deal for 0 Mike Alpha than you expected, because
19 by that time, there were enough problems known in the
20 market to affect purchase price.  Is that accurate?
21    A.  That's what I think.
22    Q.  But you didn't know about those problems at
23 that time?
24    A.  No, I knew about them.  I had begun to find
25 out that there -- that the 85 Whiskey was not any

Page 227

1     problem -- a unique problem or an unusual problem; that
2  there may be other problems, but I had no idea to the
3  extent of them.
4     Q.  What did you know and when did you know it?
5     Let me try and break that down.
6     A.  Please.
7     Q.  As of February 2000, is it fair to say that
8  you understood that 85 Whiskey's engine failure was due
9  to systemic improper manufacturing?
10    A.  No.
11    Q.  Is it fair to say that by February of 2000,
12 you thought that --
13    A.  I'm sorry, February of 2000?
14    Q.  Yes.
15    A.  No.
16    Q.  Fair to say that as of February 2000, that
17 you believed that 85 Whiskey's engine failure was due
18 to a fundamental flaw in design?
19    A.  No.
20    Q.  Is it your understanding as of February 2000,
21 that in fact there had been more than 40 failures of
22 this engine since 1996?
23    A.  No.
24    Q.  And is it your understanding that as of
25 February 2000, or is it your belief that as of

Page 228

1     February 2000, you believe that the failure rate
2  appears to have affected approximately 25 percent of
3  the aircraft utilizing the engine?
4     A.  No.
5     Q.  Did you, sir, in February of 2000 write a
6  letter to John Masten at Textron Lycoming?
7     A.  Yes.
8     Q.  And, in fact, in that letter, didn't you
9  represent that it's your understanding that at a recent
10 Piper distributor meeting Mike Wolf of Textron informed
11 those present that there had been more than 40 failures
12 of the engine?
13    A.  I may be a little off on the time frames.  If
14 I said it in the letter, then I knew about it,
15 obviously.  I mean, there was a lot going on between
16 January and February, March.
17          MR. BATEMAN:  Can we have this marked as the
18    next exhibit?
19          MR. REID:  What do you want to call it?
20          MR. BATEMAN:  Whatever the next one is.
21          MR. REID:  11.
22          (Defendant's Exhibit No. 11 marked.)
23 BY MR. BATEMAN:
24    Q.  Let me hand you, sir, what's been marked as
25 Exhibit 11 and ask you if you can identify that.

27 (Pages 225 to 228)

Page 229

1    A.  It's a letter I wrote to John Masten,
2    ipso facto, the four questions I just answered for you.
3    I was wrong on the timing.
4       Q.  And you wrote that letter on or about
5    February 24th of 2000?
6       A.  Right.
7       Q.  And that is your signature on the letter?
8       A.  Yes, it is.
9       Q.  And you purchased 0 Mike Alpha in April or
10   May of 2000?
11      A.  Right.
12      Q.  Purchased an interest in it I should say.
13      A.  Right.
14      Q.  I want to talk to you a little bit, sir,
15   about your damages.
16      A.  I'm sorry, what did you say?
17      Q.  I want to talk to you about the damages.
18      A.  I thought you said you were going to attack
19   me about my damages.
20      MR. REID:  That's a Freudian slip if there
21   ever was one.
22   BY MR. BATEMAN:
23      Q.  Your Complaint indicates that some of the
24   damages suffered by Malibu Mirage owners include, first
25   off, excessive maintenance costs.

Page 230

1       What excessive maintenance costs have you
2    incurred as a result of your ownership in 0 Mike Alpha?
3       A.  We've got the cost of the added oil changes.
4    If we comply, and so far, we've decided not to do that,
5    we'll have the loss of service and whatever costs are
6    incurred in the bearing fix.  We'll have the premature
7    overhaul costs of the engine.  And I believe there's
8    been a diminution in value of probably $100,000.00 in
9    less than a year.
10      Q.  Of how much, $100,000.00 you said?
11      A.  At least.  And it may be my total investment.
12   I'm not sure yet.  I don't know what it's worth if we
13   try to sell it.
14      Q.  First off, the oil change, have you submitted
15   the invoices for those oil changes to either New Piper
16   or Textron?
17      A.  Not yet, but we will.  And I say not yet,
18   because the way the service -- We have all these little
19   quaint terms for service bulletin, service
20   instructions, AD's.  The way it's worded, it implies
21   that this is a warranty item.  And Mike Alpha's out of
22   warranty.  So the implication is that it won't get paid
23   for.
24      Q.  But you don't know whether it will or not?
25      A.  We haven't tried, no.

Page 231

1       Q.  Do you have any plans to submit those?
2       A.  Yes.
3       Q.  When are you going to do that?
4       A.  Soon.
5       Q.  Weeks, months?
6       A.  Soon.
7       Q.  Have you spoken to other people about costs
8    associated with these oil changes and whether they've
9    been reimbursed from New Piper Textron?
10      A.  No.
11      Q.  And you said that there would be down time
12   associated with compliance with the service bulletin
13   regarding replacement of the bearings, correct?
14      A.  Well, there would be more than down time.  I
15   mean, what you have, in our opinion there, is an
16   economic requirement for an engine overhaul thinly
17   disguised as an attempt to replace con rod bearings.
18      Q.  And thus far, you've opted not to undergo
19   that?
20      A.  That's correct, because it's not mandatory.
21   Lycoming is being very ingenious, for lack of
22   a better word, in their wording of their directive.
23   It's not an AD, and it's not life threatening, but it's
24   mandatory.
25      Q.  So far though, you have not incurred any

Page 232

1    damages associated with premature engine overhaul or
2    replacement?
3       A.  We haven't incurred them yet, but they're
4    there.  They're going to be there.
5       Q.  If you ever have the procedure done, correct?
6       A.  Well, or when the motor doesn't make it to
7    TBO, or, or, or.
8       Q.  But you haven't had it done yet?
9       A.  Not yet, because it's not economically
10   prudent to do so.
11      Q.  Okay.  Have you ever had to use alternate
12   transportation because of limitations you've placed on
13   0 Mike Alpha?
14      A.  Not often.  I'd say once or twice.
15      Q.  Tell me about those times.
16      A.  Well, I didn't make a notation of it.  It's
17   just the weather was such that the ceilings were not
18   down to minimums, but my personal minimums are higher
19   than the FAA minimums.  And I just -- I didn't want to
20   be caught in weather that was that low if I had a
21   problem.
22      Q.  So what did you do?
23      A.  I flew commercial or drove.
24      Q.  Where did you go?
25.     A.  Well, most recently, Los Angeles last.

28 (Pages 229 to 232)

Page 233

1    Q. I'm sorry?
2    A. Los Angeles.
3    Q. When did you go there?
4    A. It's been less than a month.
5    Q. And how did you travel to Los Angeles?
6    A. Commercial air.
7    Q. And that was a flight you would have
8    otherwise made in a Mirage?
9    A. Right.
10   Q. If you had not been following these
11   limitations?
12   A. Right.
13   Q. Other than the trip to Los Angeles, any other
14   incidents you can think of?
15   A. There was a trip to Georgetown, which is
16   north of Austin, Texas. I ended up driving. I was
17   stuck in Fredericksburg, Texas last fall, in October,
18   because again, at the time, it was heavy IMC.
19   Q. How long were you stuck in Fredericksburg?
20   A. Two nights.
21   Q. Two nights?
22   A. Uh-huh.
23   Q. Where is Fredericksburg?
24   A. West of Austin.
25   Q. You couldn't make it out of the airport for

Page 234

1    two days?
2    A. Not safely. Not -- I mean, it was -- Not by
3    my personal minimums, no. My personal minimums are
4    higher for takeoff than they are for landing.
5    Q. But I thought your personal restrictions on
6    this airplane just included IMC at night?
7    A. Well, or minimum IMC during the day.
8    Q. Okay Tell me about that. What is that? I
9    didn't get that in my notes.
10   A. I'm sorry. I probably wasn't very clear
11   about it.
12   I wouldn't knowingly take off in this
13   airplane and fly on approach to minimums, even during
14   the day.
15   Q. What are your minimums then?
16   A. Well, for landing minimums, it's double the
17   published minimum. And for takeoff, I want 1,000-foot
18   ceiling.
19   Q. You need any forward visibility?
20   A. Well, yeah, that goes 1,000 foot, and I want
21   at least a mile, or three-quarters of a mile.
22   Q. And for two days in Fredericksburg it never
23   got 1,000-foot ceiling?
24   A. Day and-a-half.
25   Q. Do you know of anyone else --

Page 235

1    A. And by the way, in Texas, elsewhere there are
2    probably mountains, but in Texas, they're hills.
3    Q. And so are you saying that --
4    A. I'm being facetious.
5    Q. All right. Do you know of anyone else who's
6    imposed these sorts of personal restrictions on their
7    use of their Mirages?
8    A. I don't think Mr. Zale will fly at night IMC.
9    I know Mr. Boyd won't.
10   Now, again, both of those gentlemen, because
11   I've been with them, have concluded trips after dark,
12   but not long after dark, and with high ceilings, in the
13   two times that I can think of. And I wasn't with
14   Mr. Boyd. I was with Mr. Zale.
15   Q. I'm sorry, you weren't with Mr. Boyd, but you
16   were with Mr. Zale?
17   A. Right.
18   Q. Do they have similar daytime IMC limitations
19   to what you impose?
20   A. I've never asked them.
21   Q. One of the allegations of damages in the
22   Complaint is loss of use of hangar time and cost of
23   insurance for the aircraft.
24   Have you lost use of hangar time or the cost
25   of insurance for your aircraft?

Page 236

1    A. I must confess, when I saw that, I didn't
2    know what that meant. I think what it means is that I
3    had to pay for the use of a hangar that I had no
4    airplane to put in.
5    Q. And has that ever happened to you?
6    A. With 85 Whiskey it did.
7    Q. Okay. How about 0 Mike Alpha?
8    A. No.
9    And what was the second part of that
10   question?
11   Q. Cost of insurance for the aircraft.
12   A. I believe we carried a policy on 85 Whiskey
13   for five or six months after it went down. And I think
14   we still have -- I think we still have -- I don't know
15   what you call it in Florida, but in Texas, if you
16   have -- It's the basic car insurance. I mean, the
17   plane can't fly, so it's not going anywhere. I think
18   we just have insurance to protect it from further loss,
19   but I'm not going to swear to that. I know we talked
20   about it, but I'm not sure it's ever been done.
21   Q. And that you're talking about 85 Whiskey?
22   A. Right.
23   Q. Now, in your experience, does the value of an
24   aircraft generally decrease year-by-year?
25   A. Sometimes.

29 (Pages 233 to 236)

1    Q. And does it ever increase?

2    A. Sometimes.

3    Q. Tell me when it's increased.

4    A. Well, for example, I demoed one of the

5  TBM-700's back in 19...I believe it was '94. And those

6  airplanes are worth as much or more today as they were

7  in 1994.

8    Q. A 1994 TBM 700 is worth as much today as it

9  was in 1994?

10    A. Or more, yeah.

11       I believe our Seneca, we owned it for a year,

12  year and-a-half, maybe even two years, and it broke

13  even.

14       My primary Malibu flight instructor bought a

15  Citation jet, flew it for a year, and sold it for more

16  than he paid for it.

17    Q. Your purchase price for Mike Alpha reflected

18  an airplane value of $600,000.00, right?

19    A. That's correct.

20    Q. And are you listing it now through

21  Larry Johnson?

22    A. I'm not. Steve Boyd is. Yes. That's my

23  understanding. I haven't seen any proof of that.

24    Q. All right. Do you know if the failure,

25  pardon the pejorative, to comply with the recommended

1  bearing overall has any impact on the sale value of the

2  Mike Alpha?

3    A. I would have to say not since Mr. Johnson

4  thinks it's worth more than a two-year newer airplane

5  with a third of the time on it.

6    Q. What airplane is that?

7    A. 234 Delta Zulu.

8    Q. That's Mr. Zale's airplane?

9    A. That's correct.

10       In fact, one could argue that it's actually

11  more valuable because it's not had the instruction

12  complied with.

13    Q. How could one argue that?

14    A. Because he says it's worth more money.

15    Q. Mister...

16    A. Mr. Johnson.

17    Q. But did Mr. Zale's airplane had the bearing

18  retrofit?

19    A. Yes, it did.

20    Q. Did you talk to Mr. Johnson about whether

21  that factored into his valuation of the aircraft?

22    A. I haven't talked to Mr. Johnson at all about

23  this, because Mr. Johnson doesn't want to talk to me,

24  because Mr. Johnson is a defendant, or his company is.

25    Q. In what aviation?

1    A. 85 Whiskey.

2    Q. Have you talked to Mr. Boyd about this?

3    A. Yes.

4    Q. About whether the failure to replace the rod

5  bearings has impacted the sale price?

6    A. Not in that manner.

7    Q. In what manner?

8    A. Well, I mean, he and I have talked two or

9  three times, and I said, do we do this. And he said,

10  we don't see the economic value in doing it. In fact,

11  there may be economic harm in doing it, because you end

12  up with a bastard engine.

13    Q. Why do you end up with a bastard engine?

14    A. Well, if you comply with the two -- I want to

15  be correct about this.

16       There are two -- There's a service advisory,

17  number 59800, and there's 56500, and I'm missing one,

18  there's another one, but the net effect of those, if

19  you comply with those advisories is that you have to

20  replace the main crank shaft main bearings and the

21  con rod bearings, and the only thing that Lycoming is

22  willing to pay for is the con rod bearings.

23       Well, if you split the case, you're

24  85 percent of the cost of an overhaul, or 60 percent.

25  You're more than halfway there.

1       So if you complied, what you'd have is an

2  engine with 1,400-some-odd hours time on it with new

3  connecting rods and new crank rods, but in terms of

4  market value, it's going to be classified as a

5  1,400-hour engine.

6    Q. It would have been classified as a 1,400-hour

7  engine whether or not you had cracked the crank case

8  and replaced the bearings, right?

9    A. I understand that, but if you're going to go

10  through the cost and expense, most of which is going to

11  be born by the operator, mainly us, to fix those main

12  bearings, then you might as well go ahead and spend the

13  money to do an overhaul, if you look at the economic

14  benefit and the down time.

15    Q. When the airplane got -- When the

16  0 Mike Alpha got the top overhaul at 1,000 hours, did

17  that reset the clock as far as TBO goes?

18    A. No.

19    Q. So that was a bastard airplane or bastard

20  engine at that time, too, then?

21    A. No.

22    Q. Okay. Explain to me -- it wasn't zeroed out

23  when you did the top overhaul?

24    A. No. Top doesn't zero it out.

25    Q. Okay. So what was done in this top overhaul?

Page 241

1     A.   Well, I don't know what exactly was done to
2   this engine, but a top overhaul, I believe, includes a
3   valve job, rings, it may or may not include piston pins
4   or piston bearings. But it's generally done, as I
5   understand it, because of a loss of compression which
6   indicates ring wear. And I've heard stories all over
7   the place about this is good, bad, normal, mildly
8   indifferent, so I can't tell you.
9     Q.   But in that regard then, the top overhaul
10   that was done didn't reset the clocks, so you still had
11   1,000-hour engine that you had to put money into to get
12   the top overhaul, right?
13     A.   That's right.
14     Q.   Have you quantified your damages as a result
15   of ownership of 0 Mike Alpha?
16     A.   What do you mean by that?
17     Q.   Do you have a number? Can you say right now,
18   sitting here today, just up until today, we've incurred
19   this much in damages?
20     A.   I don't think we have a -- I mean, I could be
21   looking at a total loss of my investment in that
22   corporation which owns that airplane, because I don't
23   know that we can sell it at all.
24     Q.   And that's if you can't sell it?
25     A.   Right.

Page 242

1     Q.   And if you can sell it, that's not going to
2   be true, right?
3     A.   Right, but you still have the question of the
4   engine.
5     Q.   Okay. I'm backing up. I'm saying to date.
6   Whatever happens in the future, we're going to look at
7   that as well, but I'm talking to date, have you
8   quantified damages as a result of ownership in
9   0 Mike Alpha?
10     A.   I'm going to let my attorney answer that one.
11     Q.   You have not?
12     A.   I haven't made that calculation.
13     Q.   Have you incurred excessive maintenance cost?
14     A.   I don't have any way of knowing that.
15     Q.   Okay. Have you incurred increased operating
16   costs?
17     A.   I would say so.
18     Q.   In what form?
19     A.   Higher fuel burn, more oil changes.
20     Q.   And you knew about the -- I'm sorry, what was
21   the first thing you said, power fuel changes?
22     A.   Higher fuel burn.
23     Q.   Higher fuel burn. You knew about that when
24   you purchased the aircraft, right?
25     A.   Right.

Page 243

1     Q.   And as far as the extra oil changes, you're
2   not sure whether someone's going to reimburse you for
3   that or not?
4     A.   Don't know.
5     Q.   Other than that, have you incurred any
6   increased operating costs?
7     A.   Not that I'm aware of.
8     Q.   And you have not done an engine overhaul, so
9   you haven't had any premature engine overhaul or
10   replacement costs yet, correct?
11     A.   Yet.
12     Q.   Have you had to cancel any flights or
13   reschedule them because of extended time periods
14   required for maintenance of 0 Mike Alpha?
15     A.   I'm thinking. I'm not ignoring you.
16       I'm going to say once or twice, but not for
17   any what I would call extended period of time. I mean,
18   not for weeks.
19     Q.   Days, hours? Can you quantify it at all?
20     A.   I would say hours.
21       You understand because we knew about it, we
22   planned around it.
23       MR. BATEMAN: Let me check my notes. I don't
24   think I've got anything else right now to ask the
25   witness.

Page 244

1       MR. REID: Okay. I have a few follow-up
2   questions.
3           REDIRECT EXAMINATION
4   BY MR. REID:
5     Q.   Is it fair to say that when you were going
6   through these various types of damages; excessive oil
7   changes, maintenance, and so forth, some of those
8   damages will apply to people who have had the bearing
9   fix or overhaul done, and some of those damages would
10   apply to people who have not had the repair; is that
11   fair to say?
12     A.   I want you to repeat the question, because I
13   want to make sure I understand it.
14     Q.   Whether or not a particular class member has
15   suffered those various items of damages will depend in
16   part on whether or not that class member has had the
17   overhaul done on the bearings?
18     A.   I would say a very minor part.
19     Q.   Well, for instance, if you've -- In your
20   case, you're doing the oil changes on a shorter basis,
21   and that's one of the items of damage, correct?
22     A.   Right.
23     Q.   If the bearing fix had been performed, then
24   that particular person wouldn't be doing the same level
25   of oil changes that you're doing, so that --

31 (Pages 241 to 244)

Page 245

1    A. True.
2    Q. -- that class member would have different
3    damages, perhaps, from yours?
4    A. In that very minor instance, yes.
5    Q. Okay. Well, it's one of the five things you
6    listed in your Complaint.
7    A. Right.
8    Q. So...
9        And likewise, increased operating costs, that
10   applies to you, because you haven't -- you've chosen
11   not to do the fix, but a class member who has chosen to
12   do the fix would have a different level of damage in
13   that category?
14   A. I don't agree with that statement.
15   Q. So you believe after you do the fix, you
16   continue to have increased operating costs?
17   A. Yes, I do.
18   Q. Okay. And then, of course, premature engine
19   overhaul would only relate to somebody who had an
20   engine overhaul and it was deemed to be premature; is
21   that correct?
22   A. Well, by definition -- And again, this is --
23   And I understand you're the messenger, not the -- what
24   is it?
25   Q. I get your point. I understand what you're

Page 246

1    saying.
2    A. More of Textron sophistry.
3    Q. My question was Textron sophistry?
4    A. No. The wording of their various
5    instructions is Textron sophistry.
6    Q. Well, if somebody's engine goes in excess of
7    2,000 hours, even under your interpretation, that would
8    not be a premature overhaul, would it?
9    A. No, that would not.
10   Q. So if there was a bearing problem after
11   2,000 hours, that class member, or putative class
12   member, wouldn't have premature engine overhaul
13   damages?
14   A. I would have to agree with that statement.
15   Q. And in your case, you've decided, based on
16   economics, not to have this overhaul done, not to have
17   this fix done, because you believe it would be more
18   expensive to do it, for the reasons that you told us?
19   A. Right.
20   Q. Whereas, somebody else in the class may make
21   a different decision about that?
22   A. They could.
23   Q. And somebody else in the class might decide
24   that there's a safety issue here and have it done for
25   safety reasons?

Page 247

1    A. They could.
2    Q. And that would be different from your
3    conclusion, wouldn't it, that it's not a safety-related
4    issue, that it's an economic issue?
5    A. Right.
6    Q. Okay. And just so we're clear, you told us
7    earlier you have an interpretation of Exhibit 9, which
8    is the special advisory. And now you've said that you
9    believe there's a question in special advisory as to
10   whether or not additional oil and filters would be
11   covered under warranty in your plane.
12       You remember you said that to Mr. Bateman?
13   A. I did.
14   Q. Now, let me read this language to you and see
15   if this is the language you're talking about.
16       "Until the bearing replacement is completed,
17   the cost of the additional oil and filter changes will
18   be covered under warranty. Warranty applications
19   should be forwarded to the New Piper Aircraft Warranty
20   Department."
21       Now, your testimony is that that's vague and
22   you don't know whether or not the cost of new -- of
23   additional oil and filter changes would be covered
24   under warranty?
25   A. Are you looking at 9?

Page 248

1    Q. Nine, yes, sir?
2    A. Show me where you're looking at.
3    Q. Last sentence, last paragraph.
4    A. All right. This fails to address, in my
5    opinion, the question of engines that are not under
6    warranty.
7    Q. Okay. And that's your interpretation?
8    A. Right.
9    Q. And that's the reason you haven't sent in, so
10   far, you haven't sent in your oil change -- additional
11   oil change and filter change expenses?
12   A. That's correct.
13   Q. Because you're not sure, in evaluating this,
14   whether or not they would be covered?
15   A. That's correct.
16   Q. And if a putative class member had actually
17   sent in their request and their engine, being not under
18   warranty, and it was covered, then they would be in a
19   different situation from you?
20   A. Slightly.
21   Q. Well, completely. They'd be getting paid and
22   you wouldn't. In other words, it would be interpreted
23   in their case to cover it even though the engine was
24   out of warranty?
25   A. All right.

32 (Pages 245 to 248)

Page 249

1    Q. So that's another disagreement you have with
2  the language in the Textron document?
3    A. Well, we're going to correct that
4  immediately. We're going to apply for payment.
5    Q. Okay. And have you changed your opinion
6  about whether or not to have the special advisory fix
7  performed as a result of the deposition today?
8    A. No.
9    Q. Okay. So you still believe that it's not
10 mandatory and that it's in fact a ruse to get people to
11 have to spend more money with Textron than they would
12 otherwise have to spend? You still believe that today
13 at the end of your deposition as you did when you came
14 in?
15   A. I do.
16   Q. Did you get the Engine Operator's Manual on
17 either one of the planes that we've talked about today?
18   A. I'm not sure I know what you're talking
19 about.
20   Q. Okay. So you haven't seen anything called
21 Engine Operator's Manual?
22   A. Unless it's -- I haven't seen a specific
23 distinct booklet called Engine's Operating Manual
24 separate and apart from the POH.
25   Q. Is there a separate warranty that comes

Page 250

1  with -- that relates to the engine?
2    A. I believe there is.
3    Q. And do you know who actually issues that
4  warranty, who signs it?
5    A. No.
6    Q. Okay. And do you know what it says?
7    A. I don't know verbatim. What I remember out
8  of it is that -- Well, I better not comment. I haven't
9  looked at it in a while.
10   Q. As you sit here today, you don't remember
11 what it says?
12   A. No.
13   Q. And do you remember what form it comes in?
14 Is it in the POH or is it somewhere else?
15   A. I don't remember, because I haven't seen it
16 in quite some time.
17   Q. Do you know what the length of the warranty
18 was, the warranty period on either of these planes?
19   A. I believe it's two years.
20   Q. Was either plane out of warranty when you
21 bought into it?
22   A. 0 Mike Alpha was.
23   Q. But there still was some warranty period
24 existing on the 85 Whiskey?
25   A. That's right.

Page 251

1    Q. Okay. Now, you mentioned that there was a
2  change to a four-blade propeller?
3    A. Right.
4    Q. And that was on --
5    A. 85 Whiskey.
6    Q. Exactly.
7       And you mentioned that that had some effect,
8  you thought, positive effect on vibration?
9    A. Yes.
10   Q. Did you notice any other changes in the
11 operation of the aircraft or in any of the data that
12 you would review as you operate it?
13   A. It seemed to have a little bit better takeoff
14 performance.
15   Q. Did it affect the cylinder head temperature?
16   A. No.
17   Q. Did it affect the oil temperature?
18   A. No.
19   Q. Do you remember specifically that it didn't?
20   A. I saw no change.
21   Q. I want to talk to you about the Cessna 421
22 incident that we talked about today. We talked about
23 it briefly. You said the engine blew?
24   A. It was a blown engine.
25   Q. A blown engine while it was in flight?

Page 252

1    A. Right.
2    Q. And you sued two fixed base operators?
3    A. Right.
4    Q. And who was the other defendant?
5    A. The charter operator.
6    Q. Now, what was the basis of that lawsuit?
7    A. Fuel contamination.
8    Q. And is that ultimately what you felt caused
9  the engine to --
10   A. There wasn't any question.
11   Q. And that engine had how many hours on it?
12   A. Eigty-five.
13   Q. And do you know what the TBO recommended by
14 the manufacturer of that engine was?
15   A. I believe it's 1,600, but I haven't --
16 That's 20 years ago.
17   Q. And that airplane did not make it to TBO; is
18 that fair to say?
19   A. That's fair to say.
20   Q. And the reason that it didn't make it had
21 nothing to do with the manufacture or design; is that
22 fair to say?
23   A. That's correct.
24   Q. It had to do with -- It's not really
25 maintenance or operation. It had to do with -- What

33 (Pages 249 to 252)

Page 253

1  would you call the fuel?  I guess it would be part of
2  operation.  It had to do with some operational activity
3  and maybe maintenance.  We'll call it maintenance
4  activity.
5      A.  I'd say -- Well, it was mis-fueled.
6      Q.  Okay.  Somebody made a mistake?
7      A.  Yes.
8      Q.  In the way they dealt with the plane,
9  interacted with the plane in its ordinary use?
10     A.  I suppose you could couch it that way.  The
11 fact is, it was mis-fueled.
12     Q.  And what happened at the end of the case?
13     A.  We lost.
14     Q.  You lost?  The jury ruled?
15     A.  The jury ruled against us.
16     Q.  The jury ruled against you on the claim,
17 okay.
18         Do you know what insurance on the 85 Whiskey
19 costs, what the premium is on that?
20     A.  About $12,000.00 a year.
21     Q.  And what was the premium on Mike Alpha?
22     A.  It's not quite as much.  I want to say 10,500
23 or eleven.  I know it cost $250.00 to add me to the
24 policy.
25     Q.  And that is the rate that it continues to be,

Page 255

1  those as that?
2      A.  I would say that they are the result of
3  discussions.  Some of them are my opinions, some of
4  them are other people's opinions.
5      Q.  And who are these other people that you've
6  had these discussions with?
7      A.  Counsel.
8      Q.  Anybody besides counsel?
9      A.  No.
10     Q.  All right.  And when you've talked to these
11 potential class members that you've mentioned at
12 various times today about the case and all, have you
13 shared with them your belief, for instance, that you're
14 not going to do the fix because you think it's really a
15 ruse and it's really an attempt to do something
16 different from what it appears on the surface?  Have
17 you passed that information along to these potential
18 class members that you've had conversations with?
19     A.  Yes and no.  In some instances yes, and in
20 some instances no.
21     Q.  Do you remember which persons you --
22     A.  No.  I mean, I talked to Don Zale about this,
23 and he said, well, I'm going to go ahead and have the
24 bearing fixed.
25     Q.  But the result is, as far as you know, none

Page 254

1  roughly that rate?
2      A.  Yes.  Well, I assume so.  I haven't received
3  notice to the contrary.
4          MR. REID:  All right.  Let's take just a
5  short break, and I think we're through.
6          MR. AMES:  Okay.
7          THE WITNESS:  If we're through, why do we
8  need a short break?
9          MR. REID:  Because I want to make sure we're
10 through.
11         (Recess taken from 4:48 p.m. to 4:52 p.m.)
12 BY MR. REID:
13     Q.  Very briefly.
14         Today, you've used a fair number of -- I
15 won't call them derogatory phrases, but in terms of the
16 language in some of the Textron papers that we've
17 talked about, you've said it was a ruse.  You know the
18 kinds of words I'm talking about that you've used
19 today.
20         Are those your words, or has someone else
21 told you that they felt that those documents were in
22 fact ruses to do things and nefarious and so forth and
23 so on?
24         Are those words that you came up with, or are
25 you reciting those from someone else that has described

Page 256

1  of the people that you've described this to have been
2  willing to join in the class, the seven or eight people
3  that we've described today?
4      A.  Right.
5      Q.  And as far as you know, are they all going to
6  have the fix done at some point in time?
7      A.  No.
8      Q.  Do you know anybody besides yourself whose
9  made the judgment they're just not going to do it
10 because they think it's not being offered for the right
11 purpose?
12     A.  No.
13     Q.  You're the only person that you know of?
14     A.  Well, Steve Boyd, but he's partner.
15     Q.  In your same claim?
16     A.  Right.
17     Q.  Any other owner that you know, from any
18 source -- Do you know anyone else that's made the
19 determination that because it's not what it appears to
20 be on the surface, they are not going to have this
21 bearing overhauled?
22     A.  No.
23         MR. REID:  That's all I have.  Thanks.
24         RECROSS EXAMINATION
25 BY MR. BATEMAN:

34 (Pages 253 to 256)

Page 257

```
 1        Q.  Have you posted any messages on the MMOPA
 2   message board?
 3        A.  No.
 4        Q.  Have you posted any messages related to the
 5   Malibu Mirages on any bulletin board, internet chat
 6   room, or anything like that?
 7        A.  No.
 8        Q.  Have you written any letters to any flying
 9   publication concerning the Malibu Mirage?
10        A.  No.
11           MR. BATEMAN:  That's it.  Thanks.
12           MR. REID:  Does he waive reading and signing?
13           MR. MISKO:  No.  We'll sign it.
14           MR. AMES:  No.  We'll sign, but if you'll
15   just send the original to us with the exhibits and
16   an errata sheet.
17           THE COURT REPORTER:  Sure.  Thank you.
18           (The deposition was concluded at 4:56 p.m.)
19
20
21
22
23
24
25
```

Page 259

```
 1   RULE 1.310 FLORIDA RULES OF CIVIL PROCEDURE PROVIDES:
 2
 3   (E) ANY CHANGES IN FORM OR SUBSTANCE WHICH THE WITNESS
        DESIRES TO MAKE SHALL BE ENTERED UPON THE
 4      DEPOSITION BY THE OFFICER WITH A STATEMENT OF THE
        REASONS GIVEN BY THE WITNESS FOR MAKING THEM.
 5
 6   PAGE      LINE      CHANGE      REASON
 7
 8
 9
10
11
12
13
14
15
16
17
18
19   Under penalty of perjury, I declare that I have read my
20   deposition and that it is true and correct subject to
21   any changes in form or substance entered here
22
23
24
                                   Date:_____
25   WILLIAM S. MONTGOMERY, JR.
```

Page 258

```
 1   THE STATE OF FLORIDA,)
 2   COUNTY OF PALM BEACH.)
 3
 4        I, WILLIAM S. MONTGOMERY, JR., do hereby
 5   certify that I have read the foregoing transcript of my
 6   deposition given on March 1, 2001, and that together
 7   with any additions or corrections made herein, it is
 8   true and correct, to the best of my belief.
 9
10
11
12           WILLIAM S. MONTGOMERY, JR.
13
14           SWORN TO AND SUBSCRIBED BEFORE ME
             THIS_____DAY OF_____, 2001.
15
16
17           NOTARY PUBLIC, STATE OF FLORIDA
             AT LARGE MY COMMISSION EXPIRES:
18
19
20
21
22
23
24
25
```

Page 260

```
 1              CERTIFICATE
 2    THE STATE OF FLORIDA,  )
 3                           )
 4    COUNTY OF PALM BEACH.  )
 5         I, LISA D. DANFORTH, Registered Professional
 6    Reporter and Notary Public, State of Florida at Large,
 7         DO HEREBY CERTIFY that I was authorized to
 8    and did stenographically report the foregoing
 9    deposition; and that the transcript is a true and
10    correct transcription of the testimony given by the
11    witness.
12         I further certify that I am not a relative,
13    employee, attorney or counsel of any of the parties,
14    nor am I a relative or employee of any of the parties'
15    attorney or counsel connected with the action, nor am I
16    financially interested in the action.
17         Dated this 7th day of March, 2001.
18
19
20           _____
             LISA D. DANFORTH, RPR
21           Notary Public-State of Florida
             CC# 545357
22           My Commission Expires August 9, 2004
23
24
25
```

35 (Pages 257 to 260)

Page 261

1
2
                    Florida Court Reporting
3                    1801 Australian Avenue South
                    Suite 104
4                    West Palm Beach, FL 33409
5
6    March 7, 2001
7
8    Charles E. Ames, Esquire
     Law Office of Fred Misko, Jr.
9    Turtle Creek Centre - 19th Floor
     3811 Turtle Creek Boulevard
10   Dallas, Texas 75219
11   RE: Montgomery vs. The New Piper Aircraft, Inc.
12   Dear Mr. Ames:
13   Enclosed is your copy of the deposition of WILLIAM S.
     MONTGOMERY, JR. taken in the above styled case on
14   March 1, 2001.
15   Please have the witness read your copy of the
     deposition, noting any corrections on the errata sheet
16   at the back of the transcript. The witness should sign
     the errata sheet and have it notarized.
17
     After completing the errata sheet, if you will return
18   it to me, I will forward it on to the other attorney in
     the case.
19
     Thank you for your assistance in this matter.
20
     Sincerely,
21
22
     Lisa D. Danforth, RPR
23
     cc: Benjamine Reid, Esquire
24       Courtney R. Bateman, Esquire
25

36 (Page 261)

**A**

ability 171:12
able 172:1 221:25
above 261:13
absolutely 141:1
  181:24
abstract 146:5
AC 224:3
accent 208:23,24,25
accept 131:16 185:10
  214:11
accident 182:22 183:5
accidents 183:6
according 151:23
accurate 226:20
achieve 144:7,22,23
  149:2,3,4 160:20
acknowledged 224:12
Act 143:25
action 129:3,18 138:18
  138:19 139:19 140:23
  141:13 142:20,25,25
  143:3,12,18 152:4
  158:20 163:2 166:11
  168:1,2,13,18,23
  169:1 170:21 171:13
  174:22 205:17 260:15
  260:16
actions 132:2
activity 200:12 253:2,4
actual 139:23 147:23
actually 128:14 135:15
  138:15 143:8 165:12
  166:16 167:22 221:11
  238:10 248:16 250:3
AD 231:23
add 146:2 208:13 210:4
  253:23
added 230:3
additional 200:19
  214:17 247:10,17,23
  248:10
additions 258:7
address 248:4
admit 191:19
ads 224:17,18
advertising 154:6
advice 220:17
advise 151:24
advisories 178:21,22
  179:21 239:19
advisory 126:16,17
  162:10 239:16 247:8
  247:9 249:6
AD's 230:20
AE2 153:19
AE2A 173:11,19 186:3
affect 226:20 251:15,17
affected 175:3 228:2
affidavit 126:10 155:21
  155:24 156:1,5,10,20
  158:6,13,14,18 218:9
  218:23 219:2,14
afraid 169:5 172:1
after 155:5 162:18
  167:24 184:6 188:20

196:7,11,12,20 204:7
  209:8 213:7 217:14
  235:11,12 236:13
  245:15 246:10 261:17
afterwards 217:12,12
again 174:15 175:5
  185:11 195:6 203:9
  213:15 233:18 235:10
  245:22
against 138:16,19
  139:7,20 140:1
  172:16 253:15,16
aggressive 182:16
ago 191:25 192:22
  206:24 252:16
agree 160:14,16 161:24
  185:9 245:14 246:14
agreed 131:10 201:11
  222:6
agreement 131:9
ahead 130:9 203:1
  209:1,2,15,22 240:12
  255:23
air 135:20,22 144:19
  146:8 195:13,21
  233:6
aircraft 124:8 125:15
  142:10 143:21 149:11
  151:12 152:7 153:23
  175:6 179:3 182:3
  190:5 192:4,18
  203:20 210:19,23
  214:21 223:14,16,25
  224:2,14 226:10
  228:3 235:23,25
  236:11,24 238:21
  242:24 247:19 251:11
  261:11
aircrafts 173:20
airplane 127:10 131:23
  132:22 133:3,10,11
  133:17,18 141:17
  144:6 145:7,12 146:7
  146:10,13 147:4,6,11
  149:15,18 150:2
  152:25 154:6 171:12
  175:9 176:19 181:20
  185:22,24 189:17,21
  191:20 196:23 197:3
  206:8 208:14,17
  211:21,22 212:9,25
  214:25 215:2,23
  218:17 219:8 225:6
  226:4 234:6,13 236:4
  237:18 238:4,6,8,17
  240:15,19 241:22
  252:17
airplanes 131:11
  166:20 167:15,16
  170:23 195:15,18
  224:20 225:14 237:6
airport 233:25
akin 224:16
albeit 172:8
allegations 235:21
allege 173:9,18,25

185:25
alleges 173:13
allows 128:6
almost 151:8 196:3
  225:13
along 132:8 255:17
Alpha 127:18 132:1
  143:23 154:17 155:2
  155:6,11 159:15
  160:13 176:5 178:3
  190:1 191:3 194:9
  211:5,15 212:4,8,19
  212:20 213:9,13
  214:8,16 222:12
  226:18 229:9 230:2
  232:13 236:7 237:17
  238:2 240:16 241:15
  242:9 243:14 250:22
  253:21
Alpha's 176:8 230:21
already 137:18 148:23
  170:3
alter 161:16
alternate 232:11
altitude 144:8,16
  146:17 148:9,13
  194:15,16
ames 125:4 156:17
  167:1,4 201:20
  202:14,17,23 203:1
  206:14 209:21 210:8
  210:14 254:6 257:14
  261:8,12
amount 148:23
amounts 185:23
analysis 162:22
analyzed 225:4
and-a-half 174:9
  194:13,14 217:13
  225:25 234:24 237:12
and/or 177:4
Angeles 232:25 233:2,5
  233:13
angle 147:7,8,9
another 135:7 148:10
  239:18 249:1
answer 140:20 165:1
  177:18 185:5 218:7
  223:3 242:10
answered 160:16 209:2
  229:2
Antonio 125:11
anybody 127:11,21
  128:13 137:3 145:6
  151:24 170:16,20
  171:15,15 175:14
  201:8 204:23 205:15
  206:12 207:10,15,18
  255:8 256:8
anymore 188:22
anyone 212:6 216:24
  222:3 234:25 235:5
  256:18
anything 127:10
  131:12 132:7 137:2
  150:8 162:21 171:16

180:6 186:23 193:16
  193:18,21 203:15
  207:5 212:18 222:18
  223:6,10,11 224:19
  225:19 243:24 249:20
  257:6
anyway 144:13 147:9
  171:23 178:18 196:18
  198:3
anywhere 175:8 236:17
AOPA 200:9
apart 165:13 192:9
  249:24
apparent 141:19
  163:19
Apparently 182:25
APPEARANCES
  125:1
appears 129:15 228:2
  255:16 256:19
applications 247:18
applies 245:10
apply 244:8,10 249:4
approach 234:13
appropriate 163:1
  182:17 187:17
approve 181:9,12
approved 161:13
approximately 139:15
  228:2
April 136:18 137:9,16
  138:13 155:4 229:9
aquisition 218:13
argue 238:10,13
arise 140:25
arose 140:23
around 154:24 169:24
  173:4 243:22
arrives 157:16
articles 193:20
aside 167:8 222:22
asked 131:24 132:20
  156:6 157:13 159:24
  170:5 180:16 181:12
  203:4 204:20 205:2
  209:14 218:10 235:20
asking 151:18 157:6
  159:1 185:17
aspects 212:7
assistance 261:19
associated 231:8,12
  232:1
assume 140:23 158:19
  178:9 189:3 195:14
  254:2
assuming 175:13 187:5
assumption 133:2
assurance 160:20
attached 155:23 156:5
  156:12,19 158:5
  218:9 219:2
attack 229:18
attempt 207:9 231:17
  255:15
attempted 207:16
attend 220:1

attendance 223:1
attended 223:4
Attitude's 220:12
attorney 242:10 260:13
  260:15 261:18
attorneys 141:2
  142:22 170:5 173:22
  174:3 184:11 199:9
  199:17 200:2,16,23
  201:7 202:7
attorney/client 141:7
attributable 177:11
August 142:16 162:15
  260:22
Austin 233:16,24
Australian 261:3
authority 187:16
authorize 204:15,18,19
  204:20
authorized 142:8 260:7
automatically 151:8
availability 164:5
available 211:16
  224:14
Avco 125:19,23
Avenue 261:3
average 161:11
Avex 221:12,15,16
aviation 152:9 153:6
  186:25 193:4 238:25
aware 136:6 153:1
  166:15 171:1 182:8
  182:13 186:8 200:11
  200:15 205:15 216:21
  216:22 222:10 224:22
  243:7
awareness 137:12
away 163:6

**B**

back 134:17 137:15
  157:21 167:24 180:7
  187:2 193:6 197:6
  199:18 201:25 212:12
  213:16,17 220:6,7
  237:5 261:16
backing 242:5
bad 241:7
baggage 195:10,11
Bar 205:12
base 146:15,21 252:2
based 164:7 166:8,10
  181:11 206:10 246:15
basic 236:16
basically 165:24
basis 140:12 143:22
  173:23 192:21 193:10
  244:20 252:6
bastard 239:12,13
  240:19,19
bateman 125:16 126:4
  126:5 158:10,12
  210:17,18 213:16,19
  213:20 228:17,20,23
  229:22 243:23 247:12
  256:25 257:11 261:24

**beach** 124:19 125:7
220:2 258:2 260:4
261:4
**bearing** 163:18,19
169:19 175:3 177:1
177:11,13,16 183:8,9
183:9 184:5 186:10
186:11 188:14,16,21
230:6 238:1,17 244:8
244:23 246:10 247:16
255:24 256:21
**bearings** 163:11,13
164:6,16 165:9,15
166:3,10 175:23
177:4,6,6 186:3,4,13
186:16 188:18,20,22
231:13,17 239:5,20
239:21,22 240:8,12
241:4 244:17
**became** 141:19
**become** 138:12
**before** 130:24 131:17
133:5 137:1,4 143:8
148:4 154:5,13
155:10,15,16 156:9
159:5,9,14 160:10,12
161:4 175:1,7,7,14
176:20 178:15 179:15
180:1 197:9 198:3
204:2,7,12 205:4,12
209:7 213:5 214:3,4
217:1 222:11 258:14
**beginning** 137:11
176:18
**begun** 226:24
**behalf** 124:4 139:3,7
140:4,13 199:8
200:13
**behind** 142:18
**being** 134:2 170:1
180:6,9,13,14 187:18
188:11 194:19 197:8
199:8,13 200:15
205:5 211:15 221:25
224:9 231:21 235:4
248:17 256:10
**belief** 174:17 227:25
255:13 258:8
**believe** 129:10 130:4,11
133:6,9 134:14
136:25 138:18,19,22
145:5,10,24 146:12
146:24 147:22 148:11
149:7 150:4,18
152:12,14 154:22
159:11 164:20 165:17
165:18 166:1,9
171:21 173:2 174:3
174:15 175:3,9
176:14 177:9,15
180:22,25 181:2
182:17 183:12,16,20
184:17 186:9 188:14
188:16,19,24 192:6
200:7 201:10 212:25
219:16,18 221:4

228:1 230:7 236:12
237:5,11 241:2
245:15 246:17 247:9
249:9,12 250:2,19
252:15
**believed** 151:23 227:17
**believes** 187:16
**benefit** 240:14
**benjamine** 125:20
261:23
**besides** 255:8 256:8
**best** 142:10 147:7,8,8,9
147:9 185:9 208:14
258:8
**better** 135:22 172:8
176:9,10,13,15
226:18 231:22 250:8
251:13
**between** 141:2 184:24
214:6,15 228:15
**beyond** 215:1
**BFR** 221:1
**bid** 221:19
**bids** 141:16
**big** 190:25
**biggest** 208:9
**bit** 135:13 143:1 216:14
216:19 222:25 229:14
251:13
**biweekly** 224:8
**bi-annual** 220:19
**blah** 219:10,10,10
**blew** 206:13 251:23
**blown** 251:24,25
**blue** 207:22,24 224:16
224:19,20,24
**board** 199:11 257:2,5
**Bob** 220:11 222:5
**book** 144:18 146:7
149:8,12,14,16
150:22 151:23 190:11
215:9,10 224:16,19
224:20,24
**booklet** 249:23
**born** 240:11
**both** 130:16 139:25
151:7 157:8 176:4
183:3 189:19 194:1
216:5,5 235:10
**bothered** 225:7
**bought** 175:16,16,18,21
175:22 176:21,25
178:3,13,15,18 179:5
179:6 218:18 237:14
250:21
**Boulevard** 125:3 261:9
**box** 183:11 189:11
**boxes** 135:2,7,8,9
147:17 183:15 188:6
**Boyd** 127:21,22 128:13
128:15,18 131:10
132:14,15,19,21
133:4 150:15 165:11
168:5 170:1 207:21
208:19,19,20 211:18
212:1 235:9,14,15

237:22 239:2 256:14
**bracket** 143:7
**brand** 185:24 190:1,2
191:3,3 192:10
**BRANTON** 125:10,12
**break** 166:24 205:21
227:5 254:5,8
**brief** 203:18
**briefly** 130:23 251:23
254:13
**bring** 137:19 191:12,23
**brochure** 131:2 157:19
217:11,18,25 218:5,6
218:7,9,12,13,15
**brochures** 157:4
212:13 213:8,25
217:3,5,17 219:12,20
219:20,24
**broke** 237:12
**broker** 131:6,6,19
**brought** 143:24
**build** 190:20
**built** 191:11 192:22
**bulletin** 165:14 230:19
231:12 257:5
**bulletins** 127:9,15
128:1,6 129:14 130:6
132:4 142:13 155:13
179:17
**Burg** 132:13
**burn** 149:4,5 215:7
242:19,22,23
**burns** 145:17,23
148:25
**BURT** 125:6
**buy** 145:12 154:25
155:2 171:12 178:25
212:8 225:21 226:6
**buying** 170:19 214:20
**B-O-Y-D** 208:20

——— **C** ———
**C** 260:1,1
**calculation** 141:24
242:12
**call** 131:20 136:12
149:23 159:21 179:18
187:10 197:12 198:25
217:6 228:19 236:15
243:17 253:1,3
254:15
**called** 131:21 162:9
166:5 192:16,17
198:16 205:15 210:24
211:19 224:3 249:20
249:23
**calls** 215:24
**came** 127:22 133:10,24
137:20 141:5 142:20
152:10,12 154:9
155:12 177:19 180:7
188:14 218:5,21
249:13 254:24
**cancel** 243:12
**car** 236:16
**CARBOY** 125:24

**careful** 128:2 199:23
**carefully** 165:18
**CARLTON** 125:17
**carried** 143:11 236:12
**carrier** 138:17
**case** 124:2 137:25
138:14,15,21 139:10
141:10 151:18 165:15
170:21 176:8 187:7
188:24 194:5 198:6
200:13,17 202:13
204:25 205:17 239:23
240:7 244:20 246:15
248:23 253:12 255:12
261:13,18
**cases** 140:1
**categorized** 210:5
**category** 245:13
**caught** 232:20
**cause** 163:20 183:7,17
**caused** 151:15 177:4
183:21 252:8
**causes** 139:19
**cc** 260:21 261:23
**ceiling** 234:18,23
**ceilings** 136:4 232:17
235:12
**centers** 172:19
**Centre** 261:9
**certain** 134:16,17
144:2,6,7,22 213:21
**certainly** 147:25
186:16
**certificate** 223:17
**certificates** 127:6
134:16
**certifications** 127:11
**certify** 189:21 258:5
260:7,12
**Cessna** 225:18 251:21
**CFII** 223:7
**chance** 188:8
**change** 129:16 130:1
163:9 166:13 169:19
196:6,10,16,19
197:22,24,25 198:1
225:2,5 230:14
248:10,11,11 251:2
251:20 259:6
**changed** 196:7 249:5
**changes** 216:20 225:2
230:3,15 231:8
242:19,21 243:1
244:7,20,25 247:17
247:23 251:10 259:3
259:21
**changing** 128:7
**charles** 125:4 261:8
**charter** 252:5
**chat** 257:5
**check** 162:22 197:15
243:23
**checking** 130:9
**checks** 163:1
**check-offs** 134:16
**choice** 129:15 184:20

**choose** 127:24
**chosen** 129:16 136:11
245:10,11
**CHT** 215:18
**circumstance** 141:16
**Citation** 237:15
**City** 211:18 222:9
**CIVIL** 259:1
**Civ-Roettger** 124:2
**claim** 136:21 139:3,6
172:16 253:16 256:15
**clarify** 203:2
**class** 140:23 141:9,13
142:20,22,25,25
143:3,12,18 152:3
158:20 167:10 168:2
168:13,18,23 169:1
170:6,21 171:13
174:1,22 198:20
199:8,10 200:16,19
200:19,25 201:5,8
202:12 204:17,23
205:8,8,17 206:6
209:9 244:14,16
245:2,11 246:11,11
246:20,23 248:16
255:11,18 256:2
**classified** 224:17,18
240:4,6
**clear** 127:13 133:7
150:19 183:7 202:17
202:24 203:3 211:8
219:11 234:10 247:6
**client** 142:6 202:8
**climb** 144:8 145:2,17
146:23,24 147:6,7,8
148:3 196:2
**clock** 240:17
**clocks** 241:10
**close** 142:18 149:6
185:24 191:16
**collateral** 217:6
**collectively** 128:11,12
**come** 128:23 136:3
138:4,5 172:23 173:3
173:21 174:2 200:3
224:6
**comes** 145:16 193:7
249:25 250:13
**comfort** 219:9
**comfortable** 182:18
**coming** 158:2
**comment** 250:8
**commerce** 144:1
**commercial** 232:23
233:6
**commission** 258:17
260:22
**committees** 193:18
**communication** 220:14
**companies** 186:6,10
**company** 137:22
139:21 140:2 192:16
202:22 238:24
**comparable** 166:20
167:15

compared 193:1,3
219:19
Complaint 139:13,23
143:8 167:8 173:9,13
173:18,25 182:21
183:13 185:15 188:13
213:21 229:23 235:22
245:6
complete 145:20 191:9
completed 145:21
247:16
completely 248:21
completing 261:17
compliance 163:8
164:23 231:12
complied 238:12 240:1
comply 127:14 130:7
166:12 182:10 210:6
230:4 237:25 239:14
239:19
component 186:2
188:11
components 135:5
compression 150:25
241:5
con 169:18 231:17
239:21,22
concerning 132:2 257:9
concluded 164:8
235:11 257:18
conclusion 127:23
130:10 142:20 143:12
162:25 247:3
condition 151:2,15,21
conditions 161:5
188:12 190:3 194:19
confess 236:1
configuration 146:9
150:2 152:22 220:18
confused 147:8
connected 143:22
260:15
connecting 163:10,13
164:16 177:6 183:8
186:11 240:3
conscious 169:25 170:2
consider 129:2 157:19
considerably 217:12,14
consideration 161:7
considered 151:1
161:25 187:6
considering 161:15
212:12
constitutes 168:6
consulted 223:21
contact 137:4,6 140:4
207:10
contacted 137:3,7
200:23
contacts 200:15
contained 148:12
183:10,15 213:25
219:13
contamination 252:7
contents 219:19
context 137:21 186:20

Continental 152:25
153:3 183:25 192:7
continue 130:1 203:1
245:16
continued 126:3 127:2
continues 253:25
continuing 170:10
contrary 254:3
contributed 151:10
Controller 223:24,25
224:2,3,4
convention 211:18
223:11
conversation 130:25
132:24 199:23 200:1
conversations 141:16
152:21 168:3,9 170:8
171:5 209:4 221:20
255:18
conversion 192:7
cool 197:7,7,8 216:10
cooling 191:18
copied 134:11
copies 135:10 218:3
222:15
copy 134:18 218:20
222:21 261:13,15
copying 222:22
Corp 125:19,23
corporation 241:22
correct 127:16 128:25
139:8 147:22 149:10
155:24 161:22 164:10
172:24 179:16 181:7
210:8 211:7 213:14
214:2 219:3 222:12
223:15 231:13,20
232:5 237:19 238:9
239:15 243:10 244:21
245:21 248:12,15
249:3 252:23 258:8
259:20 260:10
corrections 258:7
261:15
correspondence 186:7
cost 165:20 172:9 173:6
198:5,6 230:3 235:22
235:24 236:11 239:24
240:10 242:13 247:17
247:22 253:23
costs 198:16,17 229:25
230:1,5,7 231:7
242:16 243:6,10
245:9,16 253:19
couch 253:10
counsel 125:4,8,11,15
125:19 167:8 199:9
255:7,8 260:13,15
counting 174:12 187:1
COUNTY 258:2 260:4
couple 150:4 220:15
course 129:3,18 166:10
209:13 245:18
court 124:1 213:18
257:17 261:2
courtney 125:16

210:18,20 261:24
cover 248:23
covered 211:14 247:11
247:18,23 248:14,18
COWLES 125:21
Co-counsel 125:23
co-owners 181:23
cracked 240:7
crank 165:15 187:7
239:20 240:3,7
crashed 213:5 214:7,9
Creek 125:3 261:9,9
cross 126:4 210:16
cruise 144:7 196:2
215:8
currency 220:6
current 149:15
currently 193:24
curve 137:11
CUTLER 125:18
cylinder 197:8 215:15
215:18,24 216:4,7,17
251:15
cylinders 154:21
C-O-U-R-T-N-E-Y
210:21

**D**

D 260:5,20 261:22
Dallas 125:3,22 211:19
261:10
damage 191:4,8 244:21
245:12
damaged 174:18,20
damages 226:9 229:15
229:17,19,24 232:1
235:21 241:14,19
242:8 244:6,8,9,15
245:3 246:13
danforth 260:5,20
261:22
dark 197:14 208:13
235:11,12
data 251:11
database 183:1
date 143:2,4 158:12
204:6 242:5,7 259:24
dated 158:14 160:4,5,9
162:15 260:17
dates 134:15 179:9
date's 150:19
dawned 208:15
day 189:24 196:4
197:13,16 225:8
234:7,14,24 258:14
260:17
days 234:1,22 243:19
daytime 136:1,2 235:18
dead 214:13
deal 176:9,10,13,15
226:18
dealer 211:25
dealing 131:6
deals 140:5 163:5
dealt 253:8
Dear 261:12

December 141:2
Deceptive 143:25
decide 246:23
decided 212:8 230:4
246:15
decision 127:18 128:13
129:3,16,20 138:11
143:2,17 246:21
declare 259:19
declined 188:19
decrease 236:24
deemed 245:20
defective 151:2 190:9
190:10
defects 186:3,10,14
defendant 124:15
213:22 238:24 252:4
Defendants 124:9
Defendant's 126:9,11
126:12,14,15,17,18
155:18 158:21 160:6
162:4 228:22
define 148:13,15
164:22
definition 194:3 245:22
degree 216:17
degrees 216:8
delamination 163:18
Delta 133:12 238:7
demand 201:25 202:9
demoed 237:4
Department 247:20
depend 175:11 226:10
244:15
depending 171:19
depends 140:7 144:16
144:19 187:3,3
194:21 226:13
deposit 132:21
deposition 124:15
209:23 249:7,13
257:18 258:6 259:4
259:20 260:9 261:13
261:15
derogatory 254:15
descents 197:5
describe 140:11
described 254:25 256:1
256:3
describing 184:9
description 183:22
design 227:18 252:21
DESIRES 259:3
determination 166:3
256:19
determined 174:3,5
183:17
determining 185:7
developing 181:4
development 191:10
difference 198:19
different 128:24 129:3
129:23 135:17 152:22
157:3 166:21 177:9
188:1 217:8 219:23
245:2,12 246:21

247:2 248:19 255:16
difficulties 209:13
dimensional 163:20
diminished 190:5
diminishment 185:22
diminution 189:6 230:8
direct 126:3 127:2
172:20
directive 231:22
directly 128:21 177:11
207:23
disagreement 249:1
disavowed 199:14,15
disconnected 206:19
discuss 128:14 129:18
209:21
discussed 129:21
137:16 165:10,11
169:11 206:25
discussion 203:10
208:1,5
discussions 201:18,23
201:25 202:4 206:11
208:18 255:3,6
disguised 231:17
disintegration 163:17
disprove 181:13
dispute 134:2,5 137:2
distinct 249:23
distracting 208:16
distributor 212:1
228:10
DISTRICT 124:1,1
DIVISION 124:2
DLX 169:8
document 160:24 162:9
249:2
documents 135:2
140:16,20 158:25
162:19 183:11 209:15
209:25 210:6 254:21
doing 128:10 129:5,9
129:24 142:25,25
151:10,11 165:12
197:23 205:25 239:10
239:11 244:20,24,25
DOMBROFF 125:13
DOMINGUEZ 125:8
199:19 203:3
Don 168:5 169:16
255:22
done 132:8,16,17
151:16 162:7 164:21
166:17 169:13,15,23
178:9 180:9,10,12,13
180:14 181:11 199:8
199:13 210:2 223:11
232:5,8 236:20
240:25 241:1,4,10
243:8 244:9,17
246:16,17,24 256:6
double 234:16
down 133:25 170:3
186:12 197:7 208:14
220:1,10,13 225:6
226:11 227:5 231:11

Page 4

231:14 232:18 236:13
240:14
**dramatic** 198:1
**Drive** 125:7
**driving** 233:16
**drove** 232:23
**dual** 157:15
**due** 163:18 186:3 227:8
227:17
**durability** 164:17
**during** 197:13 234:7,13
**dusk** 136:3
**D.C** 125:15
**d/b/a** 124:8

—————— E ——————
**E** 125:4 259:3 260:1,1
261:8
**each** 160:17 163:10
**earlier** 133:1 135:13
162:20 173:14 203:6
203:13 247:7
**early** 154:5 186:8
221:18
**economic** 231:16
239:10,11 240:13
247:4
**economically** 232:9
**economics** 246:16
**educated** 143:1
**effect** 239:18 251:7,8
**eight** 256:2
**Eigty-five** 252:12
**either** 141:15 147:9
157:11 159:25 167:10
180:10,12 183:1
189:18 215:24 224:8
224:9 230:15 249:17
250:18,20
**elected** 169:23
**election** 170:1,2
**eleven** 253:23
**eliminate** 191:4,7
**elsewhere** 235:1
**EMMANUEL** 125:17
**Emmett** 130:22
**employee** 260:13,14
**Enclosed** 261:13
**end** 139:22 160:22
197:14 208:21 239:11
239:13 249:13 253:12
**ended** 168:1 233:16
**endemic** 141:21
**endorsable** 223:7
**endorsements** 222:15
**Engineering** 192:17,18
**engines** 152:25 154:20
157:19 160:18 161:14
163:5 164:16 173:20
183:25 184:1 187:22
187:23 188:2 191:16
192:4,8,22 193:5
248:5
**Engine's** 249:23
**enough** 151:5 163:24
176:17,18 214:11

226:19
**ensure** 164:5
**enter** 222:24
**entered** 259:3,21
**entire** 149:14
**entirely** 196:4
**entry** 150:18 223:4
225:1
**envision** 184:23 185:2
**equal** 194:19
**equip** 164:15
**equipment** 131:23
217:22
**errata** 257:16 261:15
261:16,17
**esquire** 125:4,5,8,12,16
125:20,23,24 261:8
261:23,24
**established** 161:7
**evaluating** 248:13
**even** 168:6 178:4
179:15 180:9 187:7
190:1 221:18 234:13
237:12,13 246:7
248:23
**event** 207:17,17
**ever** 151:24 153:21
171:5 174:12,23
175:2 187:18 193:20
229:21 232:5,11
236:5,20 237:1
**every** 129:17 183:21,22
222:21,25 225:3
**everybody** 167:19
170:14 174:12
**everybody's** 172:6
**everything** 134:10
**everything's** 211:13
**exact** 143:4 153:19
**exactly** 142:11 174:16
212:22 241:1 251:6
**examination** 126:3,4,4
126:5 127:2 166:13
210:16 244:3 256:24
**examiners** 191:15,25
**example** 147:25 237:4
**examples** 147:23
156:12 171:16 183:9
183:9
**exceed** 163:9
**except** 224:20
**excess** 246:6
**excessive** 186:2 188:11
229:25 230:1 242:13
244:6
**executed** 156:10 158:17
**exhibit** 126:9,11,12,14
126:15,17,18 155:18
155:20,23 156:3,5,12
156:15 158:6,23,23
160:4,5,6,8 162:4,15
163:4,5 219:14
228:18,22,25 247:7
**exhibits** 126:8 158:21
162:6 166:21 179:7
179:22 218:5,8

219:13 257:15
**exist** 206:24
**existing** 250:24
**expected** 226:18
**expense** 151:21 240:10
**expenses** 248:11
**expensive** 246:18
**experience** 131:5 151:6
152:24 161:5 236:23
**expert** 129:14 174:22
189:23
**expertise** 129:2,7,11
**expires** 258:17 260:22
**Explain** 240:22
**extended** 164:4 243:13
243:17
**extent** 149:17 227:3
**extra** 243:1
**extremely** 141:23 142:3
**E-N-D-E-M-I-C**
141:21

—————— F ——————
**F** 260:1
**FAA** 182:22 183:5
187:11 232:19
**facet** 140:7
**facetious** 235:4
**fact** 141:21 171:15
181:2 184:13 187:8
188:19 192:24 200:20
227:21 228:8 238:10
239:10 249:10 253:11
254:22
**facto** 229:2
**factor** 151:14
**factored** 238:21
**factors** 161:6 165:12
185:3
**factory** 172:20 186:22
187:3,5,22,24 188:1
189:9 190:1 192:23
**factory's** 186:21
**failing** 143:21 193:5
**fails** 248:4
**failure** 138:3 141:22
163:17 176:24 177:1
177:6,11 183:8,9
186:2 188:12 192:25
227:8,17 228:1
237:24 239:4
**failures** 176:17 177:2,3
177:8,10,13,16
183:14,18 227:21
228:11
**fair** 129:6 147:19
148:22 154:8 158:7
166:19 176:1,6
214:11 227:7,11,16
244:5,11 252:18,19
252:22 254:14
**fairly** 142:6 206:3
**fall** 233:17
**false** 146:12 147:20
148:11,12,17 149:1
153:5,7,7 158:6

**familiar** 145:3 177:17
178:20 200:8
**far** 128:23 137:5
139:25 140:3 147:19
149:13 169:21 171:17
189:5 191:4 201:12
219:1 230:4 231:18
231:25 240:17 243:1
248:10 255:25 256:5
**fear** 171:10
**fearful** 171:25
**February** 221:18 227:7
227:11,13,16,20,25
228:1,5,16 229:5
**fees** 198:6
**feet** 146:11 147:7,10
148:8 197:6 219:10
**fellows** 170:3
**felt** 165:12 252:8
254:21
**few** 168:15 193:12
244:1
**field** 166:16 189:23
190:6
**FIELDS** 125:17
**figure** 176:18
**figures** 215:24
**file** 142:20 143:3,12,18
209:19 218:21
**filed** 139:3,16,24 143:8
152:6 159:9 167:16
167:24 180:1
**filing** 140:23 141:13
158:20
**film** 208:8
**filter** 166:13 247:17,23
248:11
**filters** 247:10
**final** 204:13,14
**finally** 148:25 190:14
**financial** 224:24
**financially** 260:16
**find** 142:3 153:7
156:22 157:11 170:6
170:10 183:4 197:21
226:24
**finding** 212:1
**fine** 165:3 209:21
**finest** 153:22
**finish** 209:12
**finished** 204:12
**first** 137:4,7 138:7
142:7 146:25 154:3
154:23 159:7 160:23
162:8,12,16 163:8,16
174:23 186:5 204:6,9
221:9,11 223:14
224:2 229:24 230:14
242:21
**Fisk** 180:10
**five** 145:23 158:11
167:1 191:21 197:2
201:13 211:3 220:12
222:1 236:13 245:5
**fix** 141:17 189:22 230:6
240:11 244:9,23

245:11,12,15 246:17
249:6 255:14 256:6
**fixed** 173:3 252:2
255:24
**FL** 261:4
**Flagler** 125:7
**flaw** 227:18
**fleet** 141:22 174:10
191:24
**flew** 148:5 195:17
232:23 237:15
**flies** 135:24 136:8
**flight** 128:7 166:6
188:12,17 194:8
197:19 220:19 222:16
222:24 225:9 233:7
237:14 251:25
**flights** 197:12,13,16
243:12
**Floor** 125:3 261:9
**florida** 124:1,19 125:7
125:19 141:13 142:21
143:3,25 192:20
202:19 205:12 236:15
258:1,17 259:1 260:2
260:6,21 261:2
**flow** 216:13
**flown** 144:8 148:2
**fly** 135:18 136:11 144:6
170:18,23 182:1,4
193:24,24 194:3,15
195:4 196:23 197:9
198:2 210:23 211:1,5
234:13 235:8 236:17
**flying** 149:11 194:6
195:7 196:3,17 197:3
197:22 208:16 211:9
214:12 219:9,9 257:8
**focus** 208:16
**folks** 140:9 169:22
170:6
**follow** 127:24 149:8
**followed** 142:12
**following** 164:14
182:18 233:10
**follow-up** 209:18 244:1
**foot** 234:20
**force** 165:24 186:24
**forced** 184:8 185:8,10
185:16 186:19,20
**foregoing** 258:5 260:8
**forget** 153:19 199:13
**form** 181:9 183:2
242:18 250:13 259:3
259:21
**formal** 127:5
**former** 174:1
**forms** 143:21
**FORT** 124:2
**forth** 136:21 148:3
166:13 167:8 178:22
201:25 203:11 244:7
254:22
**forward** 234:19 261:18
**forwarded** 247:19
**found** 150:11 156:24

163:19 176:24 180:13
196:14 206:23,23
211:10 214:7
**four** 127:20 168:7
188:3 201:13 214:13
229:2
**fourth** 157:1,2
**four-blade** 251:2
**frame** 136:25
**frames** 228:13
**fred** 125:2,5 261:8
**Fredericksburg** 233:17
233:19,23 234:22
**frequency** 161:6
**Freudian** 229:20
**from** 126:19 127:10
128:16 129:3,23
131:5 132:12,13,15
133:4,10,24 135:7,7,8
135:9,17 137:22,23
137:23 138:4,5,8
142:6,6,10 143:16
151:24 152:10,12,21
154:9,14 155:12
157:2 166:15,22
167:5,8,23 169:5
170:18 171:11 173:21
174:2,9,20 177:20
186:7 188:14 189:1
191:15 193:7 197:23
199:12 205:22 206:19
212:14 214:17 218:5
218:21 219:12,24
221:12 222:19,22
231:9 236:18 245:3
247:2 248:19 249:24
254:11,25 255:16
256:17
**fuel** 145:17,23 148:25
149:4,5 194:24,24
215:7 216:13,18
242:19,21,22,23
252:7 253:1
**full** 144:8 146:16 147:6
148:8,9,14 175:25
176:2 191:21 195:1,2
**fun** 151:19
**function** 194:17
**fundamental** 227:18
**funded** 206:22 207:3,6
**further** 236:18 260:12
**fuselage** 189:24
**future** 242:6
**fuzzy** 139:18

_ _ _ **G** _ _ _
**gallons** 215:8,9 216:14
**gauges** 216:5
**gave** 165:4 183:10
212:21 214:24 220:9
220:19 221:1
**gear** 214:10,14,16
**general** 152:9 153:6
186:25 193:4
**generalistic** 170:22
**generally** 135:21

170:24 197:6 224:12
236:24 241:4
**generation** 171:24
**gentleman** 212:14
**gentleman's** 220:9
**gentlemen** 235:10
**Georgetown** 233:15
**getting** 136:20 137:13
141:16 188:25 205:16
209:14 248:21
**GILMORE** 125:13
**give** 141:8,12 143:2
160:19 171:15 172:15
173:4 195:13 207:23
**given** 151:21 258:6
259:4 260:10
**go** 130:7,8 131:18,18
143:17 157:13 167:20
167:24 179:1,2
194:19,23 203:1
209:1,2,22 211:25
215:2 232:24 233:3
240:9,12 255:23
**goes** 187:2 195:6
234:20 240:17 246:6
**going** 132:7 136:2
140:1 141:1 145:12
145:13 148:13 149:6
152:20 156:17 160:8
163:16,22 169:8
172:4,6 173:4,5 180:5
195:14 199:21 205:9
211:12 217:6 222:18
223:20 228:15 229:18
231:3 232:4 236:17
236:19 240:4,9,10
242:1,6,10 243:2,16
244:5 249:3,4 255:14
255:23 256:5,9,20
**gone** 153:11
**good** 165:7 181:18
241:7
**gotten** 169:24 217:11
**great** 208:7 214:12,24
214:25
**greater** 172:7
**greatest** 219:8
**green** 149:6
**GREG** 125:24
**grew** 151:3
**ground** 137:24 211:11
211:12
**group** 220:12
**grouped** 210:5
**guarantee** 215:1
**guess** 141:1 153:4
158:9 160:3 168:5
197:1 213:5 222:15
225:7 253:1
**guy** 171:2 192:6 211:19
**guys** 168:24 220:11
**guy's** 184:16

_ _ _ **H** _ _ _
**half** 139:1,18 143:6
195:7 225:7

**halfway** 239:25
**HALL** 125:10
**hand** 160:9 228:24
**handbook** 145:11
**hangar** 235:22,24
236:3
**happened** 139:21
151:11 171:16 236:5
253:12
**happens** 242:6
**harm** 165:13 239:11
**harmed** 174:20,24
**having** 132:2 133:16
160:12 165:25 166:16
170:7 185:19 206:11
**head** 142:15 146:9
215:15,18,24 216:4,7
216:17 251:15
**heads** 197:8
**hear** 132:25 133:4
**heard** 138:7 151:7,8,9
152:21 173:17 184:15
191:18 192:9 193:4
205:19,20 221:9,11
241:6
**heavy** 233:18
**Heinz** 199:4
**Heinz's** 206:16
**Help** 133:16
**helped** 140:16
**high** 136:4 141:23
173:17 176:24 177:12
192:25 194:19 197:20
235:12
**higher** 172:9 194:22
215:9,10 216:2,5
232:18 234:4 242:19
242:22,23
**highest** 224:14
**hills** 235:2
**him** 129:21 132:15
171:5 192:9 199:21
207:23 208:2 209:4
209:12 211:19 220:17
220:25 221:21
**history** 206:8
**hit** 216:16
**holding** 129:13
**holds** 192:6
**honestly** 223:12
**horsepower** 154:21
157:15
**hour** 194:13 215:8,10
216:14
**hours** 129:17 150:5,7
151:9 156:16 162:2
163:6,9,10 184:6
187:1 190:13 194:13
194:14 197:16 225:3
225:9,11 240:2,16
243:19,20 246:7,11
252:11
**hull** 140:7 203:19
**hysterical** 208:13

_ _ _ **I** _ _ _

**idea** 132:24 141:8
151:13 195:13 227:2
**IDENTIFICATION**
126:8
**identified** 158:1,24
**identify** 210:6 228:25
**IFR** 193:25
**ignoring** 129:7 243:15
**II** 124:14 126:2,8
**IMC** 136:2 208:12
233:18 234:6,7 235:8
235:18
**immediately** 196:12,16
196:19 249:4
**impact** 171:12 238:1
**impacted** 239:5
**implication** 230:22
**implicit** 133:2
**implies** 230:20
**implying** 156:18
**impose** 235:19
**imposed** 235:6
**impression** 171:14
**improper** 227:9
**inappropriate** 184:17
**inc** 124:8,8 125:15
261:11
**inches** 197:6
**incident** 137:3 175:2,2
175:7 196:8,11,20
197:10 203:25 208:8
221:8 251:22
**incidents** 175:8 177:5
233:14
**include** 218:23 219:6
229:24 241:3
**included** 180:21,23
234:6
**includes** 241:2
**Including** 203:22
**increase** 237:1
**increased** 164:16 237:3
242:15 243:6 245:9
245:16
**increasingly** 141:19
**incurred** 230:2,6
231:25 232:3 241:18
242:13,15 243:5
**INDEX** 126:1
**indicate** 187:25
**indicated** 212:11
223:20 226:8
**indicates** 229:23 241:6
**indicating** 159:12,13
**indicators** 183:20
**indifferent** 241:8
**individual** 127:14
160:20
**INDIVIDUALLY**
124:4
**information** 129:12
143:16 154:8 155:12
180:23 183:10 202:9
218:19 219:11,24
255:17
**informed** 228:10

**ingenious** 231:21
**initially** 212:12
**initiated** 137:6 164:17
**injury** 203:13,16
**inordinate** 192:25
**input** 180:15
**insert** 218:1
**install** 184:7
**installed** 163:11,14
**instance** 124:15 140:17
141:14,20 176:23
180:2 182:14 244:19
245:4 255:13
**instances** 168:10 183:7
255:19,20
**instead** 136:15 184:18
**instituting** 164:14
**institutions** 224:25
**instruction** 126:11,13
126:14 158:24 223:5
238:11
**instructions** 178:23
179:2,12,19,20
182:11,15,19 230:20
246:5
**instructor** 220:18
237:14
**instructors** 220:12
**insurance** 137:22
138:16 139:21 140:1
235:23,25 236:11,16
236:18 253:18
**intact** 189:22
**intention** 132:1,7
**intentional** 134:25
**interacted** 253:9
**interest** 130:17 145:7
174:13 199:14,15
211:20,21 212:19
217:14 229:12
**interested** 129:1 145:8
260:16
**interesting** 142:3
**internet** 183:2 257:5
**interpret** 166:22
**interpretation** 165:4,21
190:22 246:7 247:7
248:7
**interpreted** 162:21
166:21 248:22
**interrupted** 142:19
**interviews** 187:25
188:3 192:24
**intimidation** 172:10
**investigation** 143:11
**investment** 230:11
241:21
**invited** 173:2
**invoices** 230:15
**involved** 129:20 140:10
140:11,14 143:10
150:1 168:23 169:9
170:11 181:4 201:17
202:3 208:8
**involvement** 140:12
193:14

Page 6

**in-flight** 183:14,18
**ipso** 229:2
**irrespective** 171:23
**isolated** 141:20 176:23
**issuance** 162:18
**issue** 128:7 166:4,6,9
  170:2 175:3 188:17
  203:19 246:24 247:4
  247:4
**issued** 127:15
**issues** 172:14 250:3
**item** 144:1 230:21
**items** 210:7 244:15,21

**— J —**

**J** 125:8 126:19
**January** 160:5 221:19
  228:16
**Jefferson** 125:14
**jet** 237:15
**jets** 157:17
**JIM** 125:12
**job** 241:3
**john** 125:23 137:5
  138:22 168:7 170:1,2
  215:6 228:6 229:1
**Johnson** 131:20 132:6
  132:9,20,20,22 133:3
  212:15,16 214:23
  217:4 219:1 237:21
  238:3,16,20,22,23,24
**Johnson's** 132:16,17
**join** 171:13 256:2
**jr** 124:4,15 125:2,5
  126:3,10 258:4,12
  259:25 261:8,13
**Juan** 130:13,15
**judgment** 127:14 128:9
  256:9
**July** 154:24 162:13
  173:11 180:20
**jump** 131:17
**June** 154:24 162:13
  180:20 220:3
**jury** 253:14,15,16
**just** 127:13 128:4 130:8
  131:24 132:12 133:7
  137:11,13 151:3,19
  157:6 158:1 159:4
  160:3,16 161:25
  164:12,13,13 165:4
  166:8 167:19 169:23
  171:18 180:6 184:15
  186:13 187:13 194:21
  198:6 199:13,22
  203:2,10 206:13,23
  207:22,24 210:3,15
  211:13 216:9,19
  217:22 218:6,14,20
  219:7,11 224:25
  229:2 232:17,19
  234:6 236:18 241:18
  247:6 254:4 256:9
  257:15
**J.M.S** 150:1

**— K —**

**Kansas** 211:18 222:9
**keep** 215:16,17,18
  216:7,10
**Kelly** 224:20
**kept** 144:13
**kind** 137:10 171:24
  179:1,12 206:13
**kinds** 159:17 225:17
  254:18
**King** 135:20,21
**knew** 144:10 148:11
  149:18 170:15 175:14
  176:20,22 178:7,12
  178:15 179:7 180:14
  186:6,10,13 205:4,7
  226:24 228:14 242:20
  242:23 243:21
**knots** 146:10 148:3
  195:22,22 215:2
**knowing** 129:1 173:23
  242:14
**knowingly** 234:12
**knowledge** 137:18
  142:24 175:2 202:4
**known** 176:23 186:1
  226:19

**— L —**

**lack** 231:21
**landing** 234:4,16
**language** 160:17,22
  162:24 163:12 247:14
  247:15 249:2 254:16
**large** 258:17 260:6
**Larry** 131:20 212:15
  212:16,17,21 214:23
  237:21
**last** 135:1 139:17
  145:19 155:10 159:8
  161:10 164:3,8
  180:20 191:20 220:20
  221:13 232:25 233:17
  248:3,3
**late** 135:6 226:7
**later** 217:13
**latest** 219:8
**law** 125:2 261:8
**lawsuit** 138:12 143:22
  143:22 152:4 159:10
  167:16,23 168:13
  170:17 180:2 198:15
  252:6
**lawyer** 141:7 182:12,14
**lawyers** 136:18,23
  137:1,4 138:8,9 140:5
  140:6 152:5 167:25
  167:25 174:14 177:20
  200:12 201:18,24
  206:12 207:1
**leads** 153:9
**learn** 211:15
**learning** 137:11 143:15
  229:14 230:18 251:13
**least** 147:25 222:10
  230:11 234:21
**led** 151:2,15 185:4

**legal** 182:7,10 198:6
**length** 194:8,17 203:7
  250:17
**less** 163:6 206:24
  210:15 215:16,17,20
  215:22 216:8 230:9
  233:4
**lesser** 172:15,17
**let** 155:20 163:15 164:1
  167:20 175:19 209:12
  213:19 223:3 227:5
  228:24 242:10 243:23
  247:14
**letter** 126:19 142:4,4
  228:6,8,14 229:1,4,7
**letters** 257:8
**let's** 128:2 149:23
  154:17 162:7 167:4
  167:13,14,24 175:6
  189:3,18 203:1
  205:21 209:22 211:24
  214:9 254:4
**level** 208:14 244:24
  245:12
**life** 149:14,16 161:11
  161:16 174:10 231:23
**lift** 191:22
**light** 157:17
**like** 140:18 142:23
  143:16 153:8 165:12
  167:9 168:17 169:10
  170:19 180:24 181:6
  193:21 205:16 208:8
  208:21 210:4 215:16
  215:17,18 216:9,9
  217:12 223:6,11
  224:19 257:6
**likelihood** 190:4
**likely** 163:18
**likewise** 149:15 245:9
**limitations** 139:20
  232:12 233:11 235:18
**line** 190:19 259:6
**lines** 132:8
**lisa** 260:5,20 261:22
**list** 131:22 145:20,22
  146:2 183:8,20
**listed** 132:18,25 133:3
  133:8 134:2 245:6
**listen** 171:19
**listing** 130:24 131:3
  237:20
**lists** 183:11
**literature** 153:24,25
  154:4,10,18
**litigation** 140:12
  160:11 167:10 179:14
  202:1,18,20,22
  203:12
**little** 135:13 139:18
  143:1 159:11,13
  196:15 215:9 216:14
  216:18,19 228:13
  229:14 230:18 251:13
**live** 146:17,18 147:12
  149:4,8 151:24

**LLP** 125:6
**load** 194:24 217:23
**loaded** 133:17
**Lobby** 125:14
**located** 192:19
**log** 134:9,10 197:15
  222:16 223:1
**logbook** 134:12 150:19
  222:14 223:4,8,9
  225:22
**long** 143:7 150:2,3
  225:5,6,24 233:19
  235:12
**longer** 194:22
**look** 129:17 130:1
  154:23 156:25 157:8
  157:13,21 160:25
  162:7 165:11 188:8
  207:9 209:17 210:12
  224:11 225:22 240:13
  242:6
**looked** 130:6 134:20
  135:1,3,5 156:24
  183:19 223:13,25
  250:9
**looking** 144:18 145:12
  157:8 160:24 179:22
  182:25 197:15 241:21
  247:25 248:2
**looks** 181:18
**Los** 232:25 233:2,5,13
**losing** 208:12
**loss** 226:9 230:5 235:22
  236:18 241:5,21
**lost** 235:24 253:13,14
**lot** 196:17 197:12
  228:15
**low** 177:12 185:11
  232:20
**lower** 150:24 175:19,22
**lucky** 214:13
**lunch** 130:24 131:18
  133:5 134:20 135:13
**lycoming** 124:8 137:24
  151:25 152:12,19
  153:15 154:9,15,20
  155:5,12 156:25
  157:15,18 158:7
  160:19 161:13 163:19
  164:14 173:19 178:9
  178:21 183:25 184:2
  187:21 188:10,23
  192:22 228:6 231:21
  239:21
**L.L.C** 139:4 202:2
**L.L.P** 202:2

**— M —**

**M** 125:23
**made** 127:14,18 128:9
  135:11 138:11 139:6
  143:3 145:3,4,6,10,14
  146:6,25,25 148:10
  148:18 152:6 166:3
  167:22 169:25 170:1
  172:16,22 178:12

195:18 196:16 200:15
  201:25 213:12,22
  215:3,11 216:24
  221:19 233:8 242:12
  253:6 256:9,18 258:7
**Magazine** 200:10
**magazines** 159:19
**main** 125:22 168:24
  177:16 183:9 186:3
  186:10 239:20,20
  240:11
**mainly** 240:11
**maintain** 144:15,15
**maintained** 160:19
**maintenance** 229:25
  230:1 242:13 243:14
  244:7 252:25 253:3,3
**major** 186:2
**majorly** 140:10,15
**make** 127:13 129:16
  142:8 146:20 149:3
  153:21 183:14 184:4
  188:10 189:5,14
  190:4 194:18 198:19
  202:17 211:13 212:6
  215:14 216:20 223:4
  232:6,16 233:25
  244:13 246:20 252:17
  252:20 254:9 259:3
**makes** 152:23 156:3,16
  187:14 213:21
**making** 129:20 141:25
  185:18 216:25 259:4
**Malibu** 153:20 173:10
  173:20 186:2 189:4
  190:9 194:6 204:16
  205:5 212:13 223:14
  223:16,17,17,18
  225:12 229:24 237:14
  257:5,9
**Malibus** 192:8
**mandatory** 164:15,19
  231:20,24 249:10
**manner** 160:18 166:21
  239:6,7
**Manual** 249:16,21,23
**MANUEL** 125:8
**manufacture** 191:11
  252:21
**manufactured** 161:15
  173:10 191:3
**manufacturer** 129:4,8
  129:12 163:2 184:25
  188:15,16,22 252:14
**manufacturers** 127:16
  127:25
**manufacturer's** 136:15
  142:1
**manufacturing** 227:9
**many** 150:5 157:17
  167:18 177:5,10,16
  183:24 186:5 197:16
  201:2,11,14 208:4
  217:3 225:9,11
  252:11
**March** 124:20 220:19

221:3 222:8 228:16
258:6 260:17 261:6
261:14
marked 155:18 158:21
160:6 162:4 219:14
228:17,22,24
market 190:23 223:22
226:20 240:4
marketing 132:2
213:25 219:12
marketplace 175:12,13
226:11,14
marks 152:8
Mary's 125:10
Masten 126:19 228:6
229:1
material 183:15 205:11
214:24 217:6 218:2,3
materials 181:10 202:6
212:17 213:8 214:1,6
214:17 219:12
material's 156:19
math 174:10
mathematically 174:7
matter 133:25 141:13
206:12,14 212:23
261:19
max 222:1
maximum 148:3 211:2
216:3
may 155:1,4 159:11,13
160:9 161:16 187:7
188:1 199:16 200:9
200:10 204:16 208:9
209:16 217:11 218:1
225:13 227:2 228:13
229:10 230:11 239:11
241:3,3 246:20
Maya 215:6 216:6,24
maybe 138:8 182:15
209:17,18,19 221:18
225:25 237:12 253:3
mean 128:8 132:15
134:9 140:5 143:13
146:19 156:7 157:5
170:23 172:4 174:6
177:1 185:18 186:21
194:10 195:17 206:14
211:17 212:5 217:12
223:16 224:15,23
228:15 231:15 234:2
236:16 239:8 241:16
241:20 243:17 255:22
Meaning 208:10
means 186:20 236:2
meant 167:23 201:24
236:2
mechanic 127:4 129:19
130:10,16,19 159:21
159:22,24 165:10
mechanical 127:10
129:13
mechanics 181:6
meet 187:23 190:11
216:16
meeting 228:10

member 193:15 244:14
244:16 245:2,11
246:11,12 248:16
members 200:16,19,25
255:11,18
mention 133:19 145:18
205:24
mentioned 138:8
145:16 146:1,23
148:9 168:15 193:12
201:4 221:21 251:1,7
255:11
Meridian 131:10
171:19 172:2,5,6,12
223:18
Meridians 169:4
190:20,24
message 257:2
messages 257:1,4
messenger 245:23
met 136:17 167:24
211:17
metal 129:17 130:1
184:6
Miami 125:19
middle 157:22
mien 218:14
might 140:17 170:18
185:4 196:15 197:20
206:24 240:12 246:23
Mike 127:18 132:1
143:23 154:17 155:2
155:6,11 159:15
160:13 176:5,8 178:3
189:25 191:3 194:9
211:5,15 212:4,8,19
212:20 213:9,13
214:8,16 222:12
226:18 228:10 229:9
230:2,21 232:13
236:7 237:17 238:2
240:16 241:15 242:9
243:14 250:22 253:21
mildly 241:7
mile 234:21,21
minimum 234:7,17
minimums 232:18,18
232:19 234:3,3,13,15
234:16
minor 244:18 245:4
minute 142:4 145:9
147:7,10 191:25
192:22
minutes 157:16 167:1
191:21 210:15 211:3
222:1
Mirage 131:10 153:20
157:16 173:10,20
174:13 186:2 189:4
190:9,15,17 194:6
204:16 205:5 212:13
221:6 222:10 223:17
225:12 229:24 233:8
257:9
Mirages 174:8 183:6
235:7 257:5

Mirage's 217:1
misheard 134:1
misko 125:2,5 180:13
180:19 181:10 189:7
189:9,11 193:7
257:13 261:8
misrepresentation
144:23 146:24
misrepresentations
145:24
missing 222:18 239:17
mission 135:21
mistake 253:6
Mister 238:15
misusing 151:12
mis-fueled 253:5,11
mixture 216:18
MMOPA 193:12,14
199:11 200:5 211:18
220:20 222:6,8 223:1
223:4,11 257:1
model 153:16,18
moderately 140:10,14
modification 161:12
modifications 142:8
161:15
modified 136:12 142:5
149:19,21,23 172:23
197:4 211:1,6,9 221:6
221:10,21,24 222:4
222:11
moment 133:16
money 165:20 238:14
240:13 241:11 249:11
montgomery 124:4,15
126:3,10,19 210:18
218:20 258:4,12
259:25 261:11,13
month 233:4
months 159:8,11 197:2
208:3 231:5 236:13
more 138:18 141:19
152:18,18 153:18
163:22 165:13,20,20
173:6,15,20 182:16
191:21 194:2,16
196:15 210:14 211:3
222:1 227:21 228:11
231:14 237:6,10,15
238:4,11,14 239:25
242:19 246:2,17
249:11
morning 137:15 138:17
147:16 159:18 165:18
167:7 176:4 180:5
203:17 210:2
most 152:8 153:6,9
163:18 194:3 224:13
232:25 240:10
motion 209:19
motor 147:12 232:6
mountain 196:9,17
mountains 136:5 198:2
198:3 235:2
much 135:18 152:24
172:7,8,9 173:14

176:10,12 194:4
195:12 198:3 208:11
210:14 226:17 230:10
237:6,8 241:19
253:22
must 236:1
myself 129:13 170:1
182:25

— — — — N — — — —

N 125:10
name 130:12 132:10
169:12 179:23 184:16
192:11 210:18 220:9
221:13 223:22
named 133:14 136:10
138:25 168:10 169:7
169:12 171:3,9
names 168:15 171:10
222:7
narrowed 186:12
narrower 167:22
nav 220:18,25
necessary 164:5
need 149:3 151:8
163:13 190:19 191:9
191:14,19 208:16
222:15 234:19 254:8
needs 191:19
nefarious 254:22
neglected 160:9
negotiations 184:24
net 239:18
never 135:3 136:5
151:5 159:24 175:15
179:15 192:12 208:15
224:23,25 225:7
234:22 235:20
new 124:8 125:15
139:7 145:18 163:10
163:13 164:6 171:12
172:2 173:5,10
174:19 178:25 179:3
181:5 184:7,18,22
185:12,24,25 187:23
188:2,10 189:7,9,23
189:24 190:1,2,8,20
191:3,4 192:10
210:19 212:24 213:12
213:22 214:6,17
219:13 224:15,15
230:15 231:9 240:2,3
247:19,22 261:11
newer 212:25,25 238:4
next 132:20 163:8,15
171:24 184:4 226:4
228:18,20
nice 211:19
night 197:9,16,23
208:12 234:6 235:8
nights 233:20,21
Nine 248:1
none 255:25
normal 150:24 151:7
241:7
normally 131:21 195:1

225:6
north 125:7 233:16
notarized 261:16
notary 258:17 260:6,21
notation 232:16
notes 234:9 243:23
nothing 158:5 180:5
202:19 252:21
notice 159:18 200:4
209:24 251:10 254:3
noticed 134:20
noting 261:15
notwithstanding 173:1
November 160:4
171:20
number 126:16,17
133:10,14 134:6
153:12 154:21 158:10
160:25 162:8,10
163:11 173:15,16,21
173:22 174:2,4,5,11
177:8,9,15 239:17
241:17 254:14
numbers 173:17
177:12 210:24 216:5
216:17 224:14
N.W 125:14

— — — — O — — — —

object 156:17
obligation 198:23,25
210:11
obtaining 214:2
obviously 188:8 228:15
occasions 220:15,16
occurred 175:7
occurrences 163:21
October 158:15 164:18
171:20 233:17
odd 184:20
OEM's 142:9
off 142:14 154:18,22
181:9 206:13 209:22
223:6 228:13 229:25
230:14 234:12
offered 144:1 256:10
office 125:2 261:8
OFFICER 259:4
often 224:7 232:14
oh 134:8 142:9 155:15
157:21 194:10 197:11
205:1 208:3 221:18
223:23
oil 128:7 129:16 130:1
130:9 162:22,25
163:8 166:12 184:6
225:1,2,6 230:3,14,15
231:8 242:19 243:1
244:6,20,25 247:10
247:17,23 248:10,11
251:17
okay 128:8 129:6 130:1
130:14,23 132:12
133:7,24 134:8,20,24
135:4,10,23 136:7
138:1 139:2,15,25

140:22 146:4,21
147:5 148:16,19,22
154:2,12 155:10,20
156:9 157:7,23 158:1
158:4 159:3 160:2
161:1,21 163:12,25
164:2,7,25 165:2
167:13 170:25 171:2
172:21 173:9,16
177:19 179:5,23
183:13 184:4 185:14
186:15 187:5 191:2
193:12 194:20,24
195:20 196:1 199:4
202:16 203:15,21
204:21 205:4,21
209:1 210:22 211:5
212:3 216:23 219:19
224:19 232:11 234:8
236:7 240:22,25
242:5,15 244:1 245:5
245:18 247:6 248:7
249:5,9,20 250:6
251:1 253:6,17 254:6
**Oklahoma** 199:5,12
205:25
**old** 192:7 211:12
**omission** 134:25
**once** 195:18 220:17,24
232:14 243:16
**one** 133:11 137:6
138:18 139:21 140:1
141:24 142:16,18
145:18 146:1 147:25
148:17,19,20 152:5
152:22,25 157:6,6,11
159:25 160:1 163:3,8
164:1 167:2 169:8,15
173:6 174:23,24
180:21 181:19 183:21
183:23 189:18,20
191:17 194:2 195:8
196:24 199:13 208:15
209:13 212:21 217:18
218:11,14 220:11
224:2,9,23,25 226:8
228:20 229:21 235:21
237:4 238:10,13
239:17,18 242:10
244:21 245:5 249:17
**ones** 169:12,12 171:9
192:8
**ongoing** 140:12
**only** 132:19 142:7
152:25 156:24 157:18
163:5 169:15 170:22
182:5,6 189:22 200:4
214:22 215:5 220:4
239:21 245:19 256:13
**On-line** 200:10
**operate** 190:2 191:11
216:10 251:12
**operated** 142:1 149:13
149:16,19 160:19
**operating** 136:9,13
138:3 142:5,9 145:11

149:2 152:1 161:5
180:23 181:5 182:11
182:15 195:18 221:6
221:22,24 242:15
243:6 245:9,16
249:23
**operation** 161:6 163:9
251:11 252:25 253:2
**operational** 163:20
253:2
**operator** 160:20 240:11
252:5
**operators** 252:2
**Operator's** 249:16,21
**opinion** 128:5,19 173:8
186:6 191:2 231:15
248:5 249:5
**opinions** 255:3,4
**opposed** 147:23 160:12
214:23
**opted** 231:18
**option** 128:6
**oral** 212:3 214:21
216:25
**orally** 214:23
**order** 169:4 216:16
**ordinary** 151:3 253:9
**original** 165:5 257:15
**other** 128:15,18 130:19
132:12,23 138:5
139:10 143:16 145:9
145:24 146:2,9
155:11 159:19 162:21
164:1 167:15 169:6,9
169:22 170:3 174:25
177:20 178:1 181:5
182:16 192:13 193:4
193:10 194:2,16,17
194:19 198:17 199:7
200:8,11,12 202:8
204:3 208:18 209:4
212:7 213:8 215:3,11
216:13,20,23 218:13
219:2 220:21 222:3,6
222:14 224:9 227:2
231:7 233:13,13
243:5 248:22 251:10
252:4 255:4,5 256:17
261:18
**others** 124:5 168:7
**otherwise** 167:11 233:8
249:12
**out** 129:13 142:4
143:11 145:16 151:3
153:7 165:5,7 167:21
174:8 176:18,24
177:19 180:5,13,19
181:10 182:11,15
183:4 189:11 190:6
190:23 196:14 197:3
197:13,21 201:18,24
202:12 204:24 205:3
205:4,5,13 206:23,23
207:22,24 209:16
210:24 211:10 214:12
215:24 219:21 224:6

226:3,25 230:21
233:25 240:22,24
248:24 250:7,20
**outside** 191:15,25
**out-of-pocket** 198:16
**Oveida** 130:13,15
**over** 127:22 135:6
136:5 141:13 183:11
194:10 195:6,15,15
241:6
**overall** 190:5 238:1
**overbroad** 152:20
**overhaul** 150:7,12,14
150:17,21 151:2,15
151:20 165:16,24
178:4,6 230:7 231:16
232:1 239:24 240:13
240:16,23,25 241:2,9
241:12 243:8,9 244:9
244:17 245:19,20
246:8,12,16
**overhauled** 173:19
256:21
**own** 131:11 135:20
139:1 150:16 167:14
167:14 170:24 225:14
225:24
**owned** 150:2 223:15
226:4 237:11
**owner** 168:6 184:7,24
185:8,9,16,18,19
186:19 256:17
**owners** 127:20,25
143:16 166:20 167:15
167:19,20 168:4
170:17 171:21 174:1
174:1,18 179:1,2
181:6 204:16 205:5
222:11 229:24
**ownership** 149:18
174:8,13,20 230:2
241:15 242:8
**owing** 225:14
**owns** 241:22

———— **P** ————
**page** 126:1,8 154:19,22
157:1,13 222:21
259:6
**pages** 134:10 209:17
**paid** 176:5 230:22
237:16 248:21
**palm** 124:19 125:7
258:2 260:4 261:4
**paper** 183:2 217:24
**papers** 254:16
**paragraph** 157:14
160:23 161:10 163:15
164:3 183:13 184:5
186:1,18 248:3
**parameter** 197:4
**parameters** 136:9,13
149:19,22,24 152:1
180:24 181:5 196:19
**pardon** 237:25
**part** 131:9 133:2 142:7

160:11 163:11 168:17
179:20 181:11,13
205:8,8,17,17 209:8
217:25 236:9 244:16
244:18 253:1
**partially** 143:10 203:22
**participate** 168:11
170:6
**particular** 137:2 152:3
152:11 157:6 162:1
184:5 194:16 200:2
244:14,24
**particularly** 170:17
**parties** 260:13,14
**partner** 137:5 168:6
256:14
**partners** 128:15,19
135:16
**partnership** 226:2
**parts** 178:10 184:9
**party** 190:19 202:2,22
**passed** 255:17
**passenger** 195:9
**passengers** 138:23
139:11 195:4,5,8,8
208:9
**pay** 132:23 165:25
198:16 236:3 239:22
**paying** 198:5
**payment** 249:4
**PEASE** 125:23
**pejorative** 237:25
**penalty** 259:19
**pending** 213:17
**people** 136:10 141:17
141:19 142:7 143:15
143:16 145:9 149:25
166:2,15,16,18
167:14,18 168:14
169:6,11,13 170:11
170:17,19,23 171:9
171:24 172:22,23
173:1,3 174:18,20,24
176:18 179:6 200:18
201:5,11,14 202:8
204:24 205:7 214:13
215:3 222:6 224:23
226:2 231:7 244:8,10
249:10 255:5 256:1,2
**people's** 255:4
**per** 142:1 197:6
**percent** 142:2 193:2,5,7
197:11,11,18 228:2
239:24,24
**performance** 142:10
147:3 172:8 190:11
212:7 214:21,25
217:1 251:14
**performed** 244:23
249:7
**perhaps** 245:3
**period** 149:12 162:17
174:9 243:17 250:18
250:23
**periodically** 224:6
**periods** 243:13

**perjury** 259:19
**permanently** 211:11
**permit** 127:8 165:19
**permitted** 182:16
**perpetuity** 163:1
**person** 184:9 208:13
244:24 256:13
**personal** 129:2 134:12
203:13,16 232:18
234:3,3,5 235:6
**personally** 145:10
170:14 184:14 198:5
198:24 202:3 208:11
**persons** 255:21
**phoned** 220:17
**phonetic** 130:22 171:2
**phrase** 163:25 192:1
**phrases** 164:7,12
254:15
**PI** 140:8
**picked** 218:14,16
**picking** 165:5
**pictures** 131:23
**piece** 154:3 208:15
214:12
**PIERCE** 124:2
**pilot** 145:11 182:18
195:7
**pilots** 170:18 208:8
**pilot's** 144:18
**pin** 133:14
**pins** 241:3
**piper** 124:8 125:15
131:8 137:23 138:19
139:7,7 142:6 151:24
154:9 167:14 169:5
171:11 172:2,11,13
172:15,21 173:2,10
185:25 188:10 189:4
190:8 202:8,19
210:19 212:14 213:12
213:22 214:17 217:24
218:1 219:13 225:20
228:10 230:15 231:9
247:19 261:11
**Piper's** 154:1,2
**piston** 153:22 219:8
241:3,4
**placard** 180:21 181:15
181:16 182:2
**placards** 181:20
**place** 150:17 194:10
195:6 241:7
**placed** 232:12
**plaintiff** 124:6 125:4,8
125:11 138:12,15,21
139:1
**plaintiffs** 139:10
209:23
**plan** 171:22 207:13
**plane** 127:19 129:19
130:8,15,19,24
131:14 132:1,8,18
133:13 135:14,17
144:15,22 148:2,4
150:16,22 151:4

154:14,16,25 155:3,6
155:11,11 158:2
162:1 165:8 169:17
171:21 172:1 173:5
174:21 175:17,18,21
176:1,5,5,6 178:3,4
178:12,16,25 179:7
182:16 187:18 189:6
224:1,10 236:17
247:11 250:20 253:8
253:9
planes 130:16 168:4
169:14 171:22 172:23
173:3,11 174:19
175:1 191:2 194:9
204:16 249:17 250:18
planned 243:22
plans 231:1
pleadings 152:5 184:12
Please 227:6 261:15
plus 168:15 169:12
171:9
POH 145:13,16 147:1,2
148:6 149:5 190:3
210:24 215:23 249:24
250:14
point 127:10 137:13
138:4 140:22 145:9
165:6 169:22 207:3
245:25 256:6
policy 236:12 253:24
poor 173:4
position 186:22
positive 251:8
possession 149:20
possible 200:16 202:12
postdates 218:12
posted 257:1,4
potential 168:13
200:19 203:19 255:11
255:17
potentially 205:8
power 144:9,17 146:16
147:6 148:8,10,14
191:22 195:23 211:2
222:1 242:21
Practices 143:25
precise 153:18
predicted 161:12
premature 165:24
230:6 232:1 243:9
245:18,20 246:8,12
premium 253:19,21
prepare 184:11
prepared 131:2,13,21
202:7,11
present 228:11
pressure 144:19 189:21
presume 187:12
presuming 177:3
presumption 128:16
pretty 194:4 208:6
prevent 128:7
previous 186:18 206:7
price 175:4,10,19,22
223:22 226:20 237:17

239:5
primary 237:14
prime 186:17
principal 140:4
printed 154:19
prior 164:12,13 174:17
217:9 219:21 225:14
privilege 141:8
privileged 199:20
probability 141:25
probably 136:3 140:21
144:10 148:20 154:5
157:21 167:22 195:7
230:8 234:10 235:2
problem 142:23 171:22
171:25 176:19,20
185:18,19 186:8
191:17,18 196:15
227:1,1,1 232:21
246:10
problems 171:23
175:14 185:12 196:15
226:19,22 227:2
procedure 179:4 232:5
259:1
procedures 142:5,9
148:5 211:1,6,9 221:6
221:10,22,25 222:4
222:11
proceeds 198:7
process 141:12 180:12
212:18 214:2
produce 134:9
produced 134:9
production 187:23
190:15,16 204:3
Professional 260:5
professor 199:4 205:25
206:16
profile 135:21
program 164:5,15,17
164:20 191:10
progress 136:20
promotional 212:13
213:8
pronounce 192:13
proof 147:20,21 237:23
propeller 157:1 251:2
proper 131:7
proposal 172:22
prospective 131:13
protect 236:18
Provided 166:12
PROVIDES 259:1
prudent 232:10
public 258:17 260:6
publication 223:21
257:9
publications 193:21
224:11
Public-State 260:21
published 224:7,8
234:17
PUCILLO 125:6
Pull 197:6
pulled 192:9

pulling 140:16
purchase 211:16
214:16 223:21 226:20
237:17
purchased 154:14
155:6,10 159:14
160:12 217:14 222:11
229:9,12 242:24
purchaser 131:13
184:5
purchasing 145:7
212:4,18,19 213:9,13
215:4 217:1,10
purport 203:24 204:25
purpose 256:11
purposes 187:18
pursuant 132:3
put 152:7 163:6 175:12
175:15 182:2,5,7
184:18 187:17 189:23
209:22 226:10,14
236:4 241:11
putative 200:25 246:11
248:16
P.A 125:18
P.C 125:13
p.m 124:20,20 167:5,5
205:22,22 254:11,11
257:18

———— Q ————
quaint 230:19
qualifications 161:25
qualify 223:3
quantified 241:14
242:8
quantify 243:19
question 128:4 140:20
152:21 153:4,10
156:18 166:7 185:14
201:20 202:3 203:4
203:23 204:19,21
209:3 213:17 236:10
242:3 244:12 246:3
247:9 248:5 252:10
questions 165:1 209:16
226:9 229:2 244:2
quibble 128:8
quick 202:14
quickly 174:11
quite 141:15 154:7
250:16 253:22
quote 152:8

———— R ————
R 125:16 260:1 261:24
radio 220:18
radios 220:25
ran 216:18
rate 141:22 145:2
147:8,9 148:3 176:24
177:1 188:12 192:25
193:5 228:1 253:25
254:1
rates 144:7 145:17
146:23,24 149:4,5

rather 213:13
RE 261:11
reach 143:11
reaching 162:25
read 161:25 163:15,22
164:13 191:15 206:18
207:10 213:16,17
247:14 258:5 259:19
261:15
reading 129:14 257:12
reads 161:10
real 142:24 166:4
211:19
reality 191:20
really 137:13 138:10
159:4 170:22 181:16
206:11 252:24 255:14
255:15
reason 134:11 139:18
150:8,21,24 165:7
166:2 169:3 170:7
172:6 176:15 182:5,6
182:7,10 206:17
248:9 252:20 259:6
reasons 142:24 172:5
246:18,25 259:4
recall 130:25 155:17
158:17 168:3,21
173:12,14 178:2
202:10 206:11 209:10
213:2 215:12,13
216:24 217:3 220:21
222:3
receive 207:22 212:18
213:7 214:6,17 217:9
received 154:13 179:7
179:9,12 207:15,18
212:11,13 213:2,12
214:1 217:17 219:12
219:20,24 254:2
recent 207:11 228:9
recently 160:11 179:15
206:3 232:25
Recess 167:5 205:22
254:11
reciting 254:25
recognize 162:9
recollection 219:5
recommendation 129:8
142:1
recommendations
127:24 161:14
recommended 129:4
136:15 148:5 152:1
160:21 215:8 216:7
237:25 252:13
recommending 142:5
reconfigured 191:19
reconstruction 207:17
record 160:3 202:24
209:22 210:3
records 182:22 189:21
recross 126:5 256:24
rectify 134:19
red 149:6
redirect 126:4 244:3

redline 216:4
reduced 175:9
reenactment 203:24
reference 126:6 156:3
156:16,24 157:18
175:8 182:21 183:14
184:4 185:7 188:10
188:13 200:4
referenced 218:24
references 155:8
157:24
referred 165:17
referring 162:20
refers 164:14
reflected 175:10 237:17
refused 184:7
regard 127:25 188:18
241:9
regarding 214:21
215:15 216:25 223:22
231:13
Registered 260:5
regularly 130:9 148:2
197:9
regulation 187:13,15
regulations 187:9
rehash 211:12
reid 125:20 126:3,4
127:3 155:19 156:21
158:11,14,16,22
160:3,7 162:5 166:25
167:2,6 189:8,10,12
189:13 199:21,25
201:21,22 202:16,21
202:25 203:5,8
205:21,23 206:15
209:11 210:1,10,15
218:10 228:19,21
229:20 244:1,4 254:4
254:9,12 256:23
257:12 261:23
Reid's 226:9
reimburse 243:2
reimbursed 231:9
relate 245:19
related 202:1 257:4
relates 250:1
relative 146:5 216:13
260:12,14
relatively 216:11
reliability 161:11 172:8
reliable 152:8,18 153:6
153:9
relied 162:25 212:8
213:9 215:4
rely 129:11 212:3
214:20
remain 189:22
remands 188:1
remember 130:14,14
130:15 137:15 138:7
142:14,17 150:18
155:21 167:12,13
168:15 171:10 177:8
181:16 183:2 184:15
192:12 204:5,6,9

Page 10

206:18 210:1 212:22
215:5,6 218:6,13
222:7 226:14 247:12
250:7,10,13,15
251:19 255:21
**rentals** 171:1
**repair** 189:20 221:19
244:10
**repairs** 132:3
**repeat** 244:12
**rephrase** 201:20
**replace** 166:2 231:17
239:4,20
**replaced** 164:10 165:9
169:18 240:8
**replacement** 164:4,6,15
164:20 166:10 169:23
189:3,5,7 231:13
232:2 243:10 247:16
**replacements** 132:3
169:13,15
**report** 260:8
**reported** 188:17
**reporter** 213:18 257:17
260:6
**Reporting** 261:2
**represent** 144:2,4
167:25 174:1 204:25
210:19 228:9
**representation** 144:21
145:2,13,15 146:6
148:10,12 149:1
152:6 153:21 157:20
**representations** 145:5
147:20 148:18 154:13
156:13 158:7 212:4,6
213:11,21,24 214:21
215:3,11,14 216:23
216:25
**representative** 141:10
167:10 198:21 199:9
201:9 204:23 205:9
206:6
**representatives** 170:7
201:6 202:8,12
**represented** 144:14
**represents** 158:6
**request** 140:19 248:17
**require** 162:21
**required** 140:17 164:20
198:11,12 243:14
**requirement** 164:9,9
231:16
**requires** 166:9
**requiring** 166:2
**reschedule** 243:13
**research** 153:11,13
**reset** 240:17 241:10
**respond** 127:9
**response** 137:22,23,23
142:6 209:23 226:8
**responsible** 128:13
**responsive** 209:25
**restriction** 196:9
**restrictions** 234:5
235:6

**result** 132:23 171:17
174:18 185:4 205:16
230:2 241:14 242:8
249:7 255:2,25
**resulting** 188:12
**results** 163:17 182:23
**resuscitation** 191:23
**retain** 218:3
**retained** 136:23 167:25
**retaliation** 169:5
171:11
**retract** 148:19,20
**retribution** 172:10
**retrofit** 238:18
**return** 261:17
**reverse** 162:7
**review** 167:7 220:19
223:5 251:12
**revised** 136:9,12
182:11
**revision** 195:19
**re-engineering** 191:10
**re-mand** 185:23 186:22
187:4,5 190:2
**re-manufactured**
173:19 184:8,18
185:10,16,20 187:1
187:17,22
**re-sold** 187:19
**rich** 216:15,18
**right** 128:5 130:14
134:1,3,6 141:4
142:17 148:24 156:4
156:8,11,14 158:3
159:23 163:7 166:19
168:16,19 176:11
177:25 178:5,7
179:11 180:3,8 181:1
188:7 189:12 190:6
190:14 193:9 196:17
196:20 198:4 201:1
204:9 205:6,10
206:21 209:11 210:13
212:15 213:23 217:16
218:22 219:1 221:7
222:2,2 226:11 229:6
229:11,13 233:9,12
235:5,17 236:22
237:18,24 240:8
241:12,13,17,25
242:2,3,24,25 243:24
244:22 245:7 246:19
247:5 248:4,8,25
250:25 251:3 252:1,3
254:4 255:10 256:4
256:10,16
**ring** 241:6
**rings** 241:3
**risk** 199:1,2 208:9
**rod** 163:10,13 164:6,16
165:8 166:2,10 177:5
177:6,11,13 183:8
186:4,11,13,16
231:17 239:4,21,22
**rods** 169:18 240:3,3
**role** 167:10

**room** 257:6
**roughly** 157:22 254:1
**routinely** 152:23
**RPR** 260:20 261:22
**rule** 194:21 210:11
259:1
**ruled** 253:14,15,16
**rules** 187:9,24 198:14
259:1
**run** 146:16 149:5
174:10 191:21 221:25
**running** 150:22 211:2
**ruse** 165:19,23 249:10
254:17 255:15
**ruses** 254:22

**———— S ————**

**S** 124:4,15 126:3 258:4
258:12 259:25 261:13
**safely** 234:2
**safety** 128:7 164:9
166:1,4,5,9 188:12,17
246:24,25
**safety-related** 247:3
**sale** 130:24 133:10
175:10,15 224:14
238:1 239:5
**salesman** 131:8
**same** 152:22 157:24
160:10 162:17 187:23
195:19,24 218:15,19
244:24 256:15
**San** 125:11
**satisfied** 153:13
**saw** 141:18 155:5 159:9
159:24 160:11 164:19
179:14,17,20 180:6
199:11 200:5,7 204:5
204:6,7,10,14 205:24
206:3 209:7 217:3
236:1 251:20
**saying** 144:21 153:8
176:14 190:8 205:1
221:24 235:3 242:5
246:1
**says** 146:7 153:25
156:20 157:14 161:4
165:14 223:10 238:14
250:6,11
**scary** 208:6,7
**school** 199:12,16
**searched** 183:4
**searches** 182:23
**searching** 182:22
**second** 125:18 142:18
143:6 157:14 163:3
165:14 220:25 236:9
**secretary** 134:22
222:20
**section** 164:12
**see** 154:3 157:2,14,18
157:25 158:25 159:7
159:14,22 160:22
161:3,8,17 162:16
167:13 192:15 195:21
202:6,11 204:2,12,13

205:1 209:12 239:10
247:14
**seeing** 150:18
**seek** 173:25
**seem** 160:17
**seemed** 251:13
**seems** 192:25
**seen** 131:12 138:24
139:13 141:24 154:18
159:5 160:12 177:9
177:11,14 179:15,25
180:1 182:22 186:7
187:25,25 203:23
216:1,1 224:23,25
237:23 249:20,22
250:15
**sell** 131:9,10 132:1
172:2,12,13 173:5
188:20,22 226:1
230:1 241:23,24
242:1
**selling** 144:13 188:18
211:20
**seminar** 220:20 222:7,8
223:4
**seminars** 223:1
**send** 130:8 189:24
202:7 257:15
**sending** 165:8 205:3
**Seneca** 153:2 225:20,21
237:11
**senior** 133:16
**sense** 137:9 190:10
194:18
**sent** 142:4 180:16,19,25
181:10,13 182:11,15
202:12 204:2,8,15,24
205:5,13 212:17
217:4 219:2,21 248:9
248:10,17
**sentence** 161:4 163:16
163:25 164:3,8 248:3
**sentences** 161:24 165:5
165:7
**separate** 139:19 249:24
249:25
**September** 141:2
142:16
**series** 224:17,18
**service** 126:11,13,14
127:9,15 128:1
129:14 130:6 132:3
142:13 155:13 158:24
161:4,11 165:14
172:17,18 173:5
178:21,22,23 179:1
179:12,17,19,20
230:5,18,19,19
231:12 239:16
**set** 135:9
**sets** 187:9
**settings** 144:17 195:23
216:14
**settle** 184:8 185:16
**settlement** 201:17,23
202:6 203:11

**settling** 203:19
**seven** 194:13 256:2
**several** 171:10 183:7
186:1,5
**shaft** 165:15 239:20
**shared** 255:13
**sheet** 131:21,22 257:16
261:15,16,17
**sheets** 217:7,20 218:23
**shipping** 171:18
**short** 254:5,8
**shorter** 194:18 244:20
**shortly** 142:12 196:24
**shots** 219:9,9
**show** 147:12 155:20
158:23 160:8 162:6
162:24 197:16 248:2
**showing** 190:6
**shown** 147:21 161:13
**side** 140:8 198:17
203:16 204:3
**sign** 156:1 181:9 201:5
201:11,15 257:13,14
261:16
**signable** 223:6
**signature** 229:7
**significant** 197:22,24
**signing** 155:21 201:8
257:12
**signs** 250:4
**similar** 235:18
**SIMILARLY** 124:5
**simply** 128:6
**since** 139:1 167:16
173:11 181:11 183:19
194:5 212:17 220:13
227:22 238:3
**Sincerely** 261:20
**single** 151:6 183:21,22
195:7
**single-engine** 153:22
**sir** 159:2 228:5,24
229:14 248:1
**Sisk** 180:11,12 193:8
**sit** 131:25 153:14 185:3
250:10
**sitting** 241:18
**SITUATED** 124:5
**situation** 138:20 184:13
184:23 185:2 187:22
208:12 248:19
**six** 133:21 159:8,11
212:12 236:13
**six-cylinder** 152:9,19
153:6
**SKB** 149:20,21 150:1
**skip** 163:16
**Slightly** 248:20
**slip** 229:20
**SMITH** 125:18
**sold** 133:18,21 173:10
173:19 174:19 175:1
175:25 190:9 237:15
**some** 134:10 135:8,8
137:12 138:4,5
140:22 141:15,18

| | | | | |
|---|---|---|---|---|
| 144:21 149:12 151:12 | 143:20 162:24 172:5 | 206:12,14 212:23 | **T** 208:22 260:1,1 | 209:7 212:5 216:6,12 |
| 151:14 154:7 155:8 | 210:7 222:7 249:22 | 259:20 | **table** 137:19 161:14 | 217:20 223:12 232:15 |
| 161:6 163:22 166:18 | **specifically** 145:3 207:6 | **submit** 231:1 | **tabulated** 180:6 | 234:8 237:3 241:8 |
| 166:18,19 168:1 | 251:19 | **submitted** 205:12 | **tail** 146:10 | **telling** 142:19 215:7 |
| 170:6 171:12,22 | **specification** 192:23 | 230:14 | **take** 129:3 138:14 | 222:4 |
| 177:19,20 180:23 | **specifications** 154:20 | **subpoena** 209:24 | 167:2 175:6 186:21 | **tells** 141:24 163:12 |
| 182:25 183:20 185:21 | 217:22 | **subscribe** 224:5,9 | 186:22,23 191:7 | **temperature** 144:19 |
| 186:14 197:25 199:11 | **specs** 187:23 188:1 | **SUBSCRIBED** 258:14 | 194:25 198:23 199:2 | 215:15,19,25 216:4,8 |
| 201:4,5,23,24 207:16 | 190:11 192:10 | **subscription** 178:20,23 | 202:14 205:21 206:3 | 216:17 251:15,17 |
| 208:3 209:16 210:10 | **speculate** 172:4 | **subsequent** 219:21 | 225:5 234:12 254:4 | **temperatures** 149:3 |
| 211:12 212:13 220:17 | **speed** 137:10 144:7,14 | 220:24 | **taken** 124:15 132:2 | 197:7 |
| 222:6,10 223:21 | 144:22 145:15 146:4 | **substance** 168:8 259:3 | 161:6 166:11 167:5 | **term** 131:7 149:9 |
| 229:23 244:7,9 | 146:5,5 195:13,21 | 259:21 | 205:22 254:11 261:13 | **terms** 143:7 230:19 |
| 250:16,23 251:7 | **spell** 192:14 | **substantial** 190:3 | **takeoff** 234:4,17 | 240:3 254:15 |
| 253:2 254:16 255:3,3 | **spend** 240:12 249:11 | **substantively** 184:3 | 251:13 | **Terry** 221:12 |
| 255:19,20 256:6 | 249:12 | **substitutes** 163:1 | **taking** 165:8,13 | **test** 187:23 |
| **somebody** 132:2 | **split** 165:15 239:23 | **successful** 198:15 201:6 | **talk** 145:8 170:11 | **testified** 226:17 |
| 148:11,18 165:6 | **spoke** 128:16 | 201:8 | 189:17,18,19 206:17 | **testimony** 160:10 171:8 |
| 174:19 187:14,16 | **spoken** 132:9 167:15 | **sudden** 165:16 | 209:18 211:24 221:17 | 172:3 173:7 226:15 |
| 199:15 218:14 245:19 | 207:14,15,18 231:7 | **sued** 252:2 | 224:23 229:14,17 | 247:21 260:10 |
| 246:20,23 253:6 | **St** 125:10 | **suffered** 229:24 244:15 | 238:20,23 251:21 | **Texas** 125:3,11,22 |
| **somebody's** 246:6 | **stack** 135:6 | **suggesting** 171:25 | **talked** 127:22 128:17 | 131:8 201:19,24 |
| **someone** 153:21,24 | **standard** 217:22 219:7 | **suggests** 185:8 | 130:23 133:13,15 | 202:1,18,21 203:12 |
| 183:17 199:13 254:20 | **standards** 147:3 | **suit** 138:16 | 137:15 147:16 148:22 | 205:12 208:25 212:14 |
| 254:25 | **staple** 156:7 | **Suite** 125:7,10,14,18,22 | 159:17 167:7,9,18 | 233:16,17 235:1,2 |
| **someone's** 243:2 | **stapled** 156:9 | 261:3 | 168:5,7,7 170:14,16 | 236:15 261:10 |
| **something** 128:24 | **start** 132:22 149:21 | **suits** 135:21 203:13 | 170:20 171:9 173:2 | **textron** 124:8,8 138:19 |
| 129:23 151:3,25 | 154:17 164:4 167:14 | **supplied** 209:24 | 199:17 201:4 203:5,6 | 139:8 152:12,18 |
| 158:19 169:10 187:14 | 167:20 197:13 | **suppliers** 188:11 | 203:12 211:2 212:24 | 153:14 154:14,20 |
| 192:13 199:11 200:5 | **started** 141:16,17,18 | **suppose** 253:10 | 220:25 222:5,6 | 155:12 160:19 161:13 |
| 224:5 226:13 255:15 | 171:18 188:25 197:3 | **supposed** 134:15 | 236:19 238:22 239:2 | 165:18,20,23 172:22 |
| **sometime** 139:17 141:2 | **starting** 145:9 | **sure** 148:7,21 166:14 | 239:8 249:17 251:22 | 173:18 178:21 184:7 |
| 154:24 | **state** 258:1,17 260:2,6 | 174:16 181:14 184:11 | 251:22 254:17 255:10 | 185:25 188:23 209:24 |
| **sometimes** 159:18,21 | **statement** 128:2 133:4 | 185:1 200:18,24 | 255:22 | 213:12 214:18 219:13 |
| 208:21 236:25 237:2 | 152:11,14 153:5 | 211:13 218:4,20 | **talking** 132:15 141:17 | 228:6,10 230:16 |
| **somewhere** 177:14 | 162:1 192:21 245:14 | 224:21 225:22 230:12 | 141:18 143:14,15 | 231:9 246:2,3,5 249:2 |
| 205:25 218:21 250:14 | 246:14 259:4 | 236:20 243:2 244:13 | 152:3 166:15 177:24 | 249:11 254:16 |
| **Soon** 231:4,6 | **STATES** 124:1 | 248:13 249:18 254:9 | 181:5 200:18 202:18 | **Thank** 257:17 261:19 |
| **sophistry** 246:2,3,5 | **statistical** 147:21 | 257:17 | 203:11 213:24 221:25 | **Thanks** 256:23 257:11 |
| **sorry** 134:4 145:21 | **statistics** 147:12,14 | **surface** 163:19 255:16 | 236:21 242:7 247:15 | **their** 128:19 151:25 |
| 155:15,17 159:12 | 177:9,20 193:6 | 256:20 | 249:18 254:18 | 154:18,21,22,23 |
| 160:15 162:14 164:1 | **statute** 139:20 | **surmising** 130:5 | **talks** 203:11,18 | 169:14 171:12,22,25 |
| 178:22 211:13 213:15 | **STC** 152:7 | **survey** 141:18 147:15 | **tantamount** 186:23 | 172:5,23 173:3 |
| 219:17 227:13 229:16 | **stenographically** 260:8 | 180:10,13,19 181:11 | **tapes** 207:18 | 174:20 175:1 193:21 |
| 233:1 234:10 235:15 | **stepped-up** 162:22 | 182:24 193:8,8 | **TAS** 195:21 | 193:21 231:22,22 |
| 242:20 | **Steve** 133:4 134:7 | 199:12,18,23 200:2,5 | **taxable** 198:16 | 235:6,7 246:4 248:17 |
| **sort** 144:20 170:22 | 135:24 165:11 168:5 | 206:1,16,16,19,22 | **TBM** 237:8 | 248:17,23 |
| 207:16 211:3 | 211:18 237:22 256:14 | 207:4,9 | **TBM-700's** 237:5 | **themselves** 206:19 |
| **sorts** 235:6 | **Stickle** 220:10,14,22 | **surveyed** 181:13 | **TBO** 141:25 144:9 | **theories** 137:14 138:3 |
| **sounds** 142:23 153:8 | 222:5 | **surveys** 146:22 147:21 | 145:25 146:20 148:22 | **they'd** 168:17 248:21 |
| 208:21 | **still** 146:8 236:14,14 | 177:21,22 178:1 | 152:23 155:8 156:16 | **thing** 132:19 144:20 |
| **source** 135:7 138:5 | 241:10 242:3 249:9 | 180:4 199:7 200:11 | 157:9,25 160:21 | 185:9 208:7 214:22 |
| 165:6 177:20 256:18 | 249:12 250:23 | 206:7 | 161:7 162:1 178:13 | 215:5 239:21 242:21 |
| **sources** 132:12 159:19 | **stonewalled** 137:24 | **survive** 145:1 146:14 | 190:4 232:7 240:17 | **things** 137:10 140:18 |
| **South** 261:3 | **stop** 170:13 202:14 | 190:12 | 252:13,17 | 144:2,3,5,12 146:2 |
| **SOUTHERN** 124:1 | **stopped** 197:22 | **suspect** 186:17 | **TBO's** 154:21 161:13 | 159:17 170:19 180:24 |
| **so-and-so** 163:11 | **stories** 241:6 | **suspended** 190:15,16 | **technically** 147:11 | 181:6 211:3 245:5 |
| **speak** 127:21 | **stream** 144:1 | **swear** 236:19 | **Teledyne** 152:24 | 254:22 |
| **speaking** 197:7 216:11 | **Street** 125:10,14,18,22 | **swift** 142:7 | 183:25 | **think** 129:5,9 136:25 |
| 220:21 | **stronger** 152:18 | **switch** 169:8 | **telephone** 209:20 | 138:13 139:17 145:6 |
| **spec** 131:21,22 191:16 | **strongest** 152:8 153:5,9 | **SWORN** 258:14 | **tell** 130:3 135:16 136:2 | 146:8 147:7 148:20 |
| 217:7,20 218:23 | **stuck** 233:17,19 | **system** 191:19 | 141:5,6 144:18 146:4 | 151:20 152:16 165:23 |
| **special** 126:16,17 | **stuff** 217:9 | **systemic** 176:19 227:9 | 150:20,23 154:12 | 165:23 166:4 169:9 |
| 162:10 179:21 247:8 | **styled** 261:13 | **S.E** 125:18 | 156:15 168:3,25 | 171:11 172:13 175:11 |
| 247:9 249:6 | **subject** 128:19 140:22 | | 174:5 181:19 192:5 | 176:16,16 180:20 |
| **specific** 138:2 141:6 | 140:25 164:15 190:22 | **T** | 195:14 197:5 208:5 | 181:15,17 183:21,22 |

184:2,20,21,21
186:13,16 188:19
190:21,22,23,25,25
191:9 192:17,20
197:18 199:19 200:3
201:13 202:10,23,24
205:2,2 206:17,18
207:24,25 208:11
214:22 216:2,2,3
217:5,11 218:4 219:4
221:11,20 224:3,8
225:23 226:7,12,21
233:14 235:8,13
236:2,13,14,17
241:20 243:24 254:5
255:14 256:10
**thinking** 141:9 170:19
198:20 214:22 217:18
243:15
**thinks** 238:4
**thinly** 231:16
**third** 238:5
**Thomas** 125:14
**THOMPSON** 125:21
**though** 153:4 168:6
178:4 187:7,13
231:25 248:23
**thought** 129:25 141:12
141:14 145:21 150:20
173:14 176:22 209:2
210:2 226:17 227:12
229:18 234:5 251:8
**threatening** 231:23
**three** 137:14 161:2,19
168:7 179:24 194:13
226:2 239:9
**three-quarters** 234:21
**through** 156:25 172:18
211:25 237:20 240:10
244:6 254:5,7,10
**throughout** 149:16
**thumb** 194:22
**tighten** 191:14
**time** 131:23 135:1
136:24,25 140:22
141:15 145:19 146:3
149:12,19 150:16
154:7 163:8 164:23
167:23,24 170:18,18
176:1,16 185:12
187:6,8,10,18 194:4
195:16 197:11,12,19
209:15 210:14 211:10
211:23 212:21 214:7
214:7,15 220:4,25
221:5,9 222:16,24
224:24 225:7,9
226:19,23 228:13
231:11,14 233:18
235:22,24 238:5
240:2,14,20 243:13
243:17 250:16 256:6
**times** 193:12 217:8
220:21 232:15 235:13
239:9 255:12
**timing** 164:4 229:3

**TIO-340-AE2A** 157:15
**TIT** 215:17,21,25 216:3
216:18
**today** 131:17,25 136:10
143:15 153:14 162:20
173:14 185:4 193:12
203:6,13 237:6,8
241:18,18 249:7,12
249:17 250:10 251:22
254:14,19 255:12
256:3
**together** 127:23 140:17
156:7,9 180:25 258:6
**told** 128:24 132:6,25
134:7 135:13 136:17
137:14 138:17 142:11
143:15 146:4 148:17
149:7 150:15 174:9
176:4 177:22 180:4
188:3,6 189:23
198:11 203:17 207:1
221:5 246:18 247:6
254:21
**tolerances** 191:12,13
191:14
**top** 142:14 149:6 150:7
150:24 151:6,20
157:2 178:6 189:25
240:16,23,24,25
241:2,9,12
**total** 131:23 177:10
197:19,19 225:9
230:11 241:21
**towards** 139:22
**Trade** 143:25
**Trader** 224:1,10
**trading** 212:24
**training** 127:4,5,8
208:7 220:1,7,10,13
220:24
**transcript** 258:5 260:9
261:16
**transcription** 260:10
**transition** 197:13
**transportation** 232:12
**travel** 233:5
**traveling** 185:15
207:12
**tried** 230:25
**trip** 194:12,17,18,22
233:13,15
**trips** 235:11
**true** 152:14,15,16
160:10 174:15 176:8
190:21 195:21 242:2
245:1 258:8 259:20
260:9
**try** 165:19 170:5 227:5
230:13
**trying** 153:7 197:21
201:5 208:14 211:13
**turbocharger** 152:23
**turbochargers** 157:16
**turboprops** 157:17
**turn** 173:4
**Turtle** 125:3 261:9,9

**twice** 232:14 243:16
**two** 127:14,25 128:6,15
128:18 129:14 131:11
135:18 139:19 142:13
147:16,20 157:3
163:20 169:9 174:9
177:22 180:4 186:9
191:18 195:8,15,17
206:7 217:5,17,18
224:11,13,14 225:25
226:3 233:20,21
234:1,22 235:13
237:12 239:8,14,16
250:19 252:2
**two-year** 238:4
**type** 146:8 223:14,16
223:17
**types** 244:6
**typical** 174:8 186:25
194:8,11,12 215:7
219:8
**typically** 131:5,22
194:15 195:4,10,14
195:21

— — — — U — — — —
**Uh-huh** 233:22
**ultimate** 185:22
**ultimately** 143:17
252:8
**under** 143:24 149:19
185:15 190:3 198:14
210:11 246:7 247:11
247:18,24 248:5,17
259:19
**undergo** 231:18
**undergone** 161:12
**understand** 129:10
131:9 141:9,11
143:20,24 148:21
157:3 172:21 182:14
185:17 187:7 188:21
190:14 196:24 198:14
202:25 203:18 206:10
240:9 241:5 243:21
244:13 245:23,25
**understanding** 129:25
130:2 133:9 136:11
139:2,6,12 149:17,25
172:7 174:24 186:19
227:20,24 228:9
237:23
**understood** 202:23
227:8
**undertaking** 200:12
**unique** 141:15 227:1
**UNITED** 124:1
**university** 206:20
**unless** 222:20 249:22
**unpronounce** 192:12
**until** 163:10 179:14
196:14 197:7 241:18
247:16
**unusual** 141:16 227:1
**upgrade** 171:23
**uplanding** 214:10,14

214:16
**use** 135:16,17 151:3
182:16 195:14,23
206:13 211:9 214:9
232:11 235:7,22,24
236:3 253:9
**used** 148:4 184:9 192:1
222:11 224:15,15
254:14,18
**useful** 217:23
**users** 143:16 166:20
**using** 135:14 149:21
150:1 151:22 210:24
211:1,6
**usually** 194:25
**utilizing** 228:3
**U.S** 199:8

— — — — V — — — —
**vague** 159:13 170:22
247:21
**valuable** 238:11
**valuation** 238:21
**value** 175:10,25 176:2
176:6 185:22 189:6
190:5 226:9 230:8
236:23 237:18 238:1
239:10 240:4
**values** 191:24 224:24
**valve** 241:3
**Vann** 137:5 138:22
139:11 140:8 168:7
170:2 196:7,11 215:6
216:6,24
**Vann's** 197:10
**variations** 160:18
161:5
**varied** 195:15
**various** 134:16 135:5
244:6,15 246:4
255:12
**varying** 173:17
**verbally** 212:7
**verbatim** 250:7
**vernacular** 206:13
**Vero** 220:2,24
**version** 204:13,14
213:1
**versus** 142:25 183:25
**very** 142:18 174:11
208:16 231:21 234:10
244:18 245:4 254:13
**VFR** 193:24 194:4
**vibration** 251:8
**Victor** 192:2,4,13,17,18
**video** 209:7,8
**videotape** 205:3 212:21
212:23 213:3,7 217:7
219:3,6
**videotapes** 202:11
203:24 207:16
**view** 127:11 129:22
**visibility** 234:19
**vis-à-vis** 128:15
**VOLUME** 124:14
126:2,8

**volunteered** 172:22
**vs** 124:7 261:11

— — — — W — — — —
**W** 126:10,19
**wait** 196:14
**waive** 257:12
**walk-around** 219:9
**Wally** 215:6
**want** 127:13 128:24
134:8 141:6 142:10
148:18 159:4 162:6
164:22 167:2 168:10
168:22,25 169:9
171:19 179:23 184:22
185:12 189:17 194:22
198:20 199:22 201:15
209:8,17 216:10
228:19 229:14,17
232:19 234:17,20
238:23 239:14 244:12
244:13 251:21 253:22
254:9
**wanted** 131:16 203:2
226:3
**WARD** 125:17
**warned** 188:11
**warrant** 129:7
**warrants** 129:2
**warranty** 172:14,15,17
173:5 230:21,22
247:11,18,18,19,24
248:6,18,24 249:25
250:4,17,18,20,23
**Washington** 125:15
**wasn't** 166:7 203:3
204:20 234:10 235:13
240:22 252:10
**way** 128:16 134:8
135:17,24 137:15
142:9 145:4 151:12
157:20 166:22 170:23
174:25 175:20 182:1
182:4,16 185:5
189:22 191:10 210:5
225:5 230:18,20
235:1 242:14 253:8
253:10
**ways** 151:7
**wear** 241:6
**weather** 232:17,20
**web** 154:22
**website** 152:13 154:18
154:23 155:5 193:22
200:6 205:24
**week** 206:24
**weekly** 224:8
**weeks** 231:5 243:18
**well** 128:2 129:5,19
131:8 133:14 135:3,8
135:18,20 137:14
138:13,18,20 140:16
141:14 142:22 144:16
145:8,11 146:7
147:11,25 149:2,23
151:10 152:20 154:17

155:25 156:1 159:9
160:25 161:8 163:3
165:10 167:13,20
168:10,24 171:18
172:4 175:13,18
176:20,22 177:22
179:17 180:10 185:11
185:14,21 189:18,20
190:19 191:9,14
192:6,24 194:3
195:17 196:20,21
197:1 199:2,17
200:18 204:6 207:6
208:11 210:10 216:13
218:11 223:3 224:12
224:15 231:14 232:6
232:16,25 234:7,16
234:20 237:4 239:8
239:14,23 240:12
241:1 242:7 244:19
245:5,22 246:6
248:21 249:3 250:8
253:5 254:2 255:23
256:14
**went** 137:9 141:12
168:14 182:15 201:24
205:4 214:12 236:13
**were** 129:25 134:10
135:10 137:4,10,10
137:12 142:14,19
143:10,14,14 145:4
145:10 151:11,22
156:9 162:19 163:1
170:5,7 174:14
176:17,17,18 180:25
181:3,10 183:24
184:2,23 185:1,2
186:7,14,16 188:6,18
201:5,6,17,23 202:3,7
202:11,12 204:2,3,8
204:12 205:9 210:24
212:12,12 213:22
214:1 219:20 220:12
220:13,16 223:20
225:11,17 226:2,19
229:18 232:17 233:19
235:16 237:6 244:5
254:21
**weren't** 134:11 136:20
169:6 203:5 235:15
**West** 124:19 125:7,14
233:24 261:4
**we'll** 134:1 138:14
145:8 167:20 189:18
209:12,12 210:11
222:15 230:5,6 253:3
257:13,14
**we're** 129:5,9 133:7
152:3 185:15 205:3
219:11 242:6 247:6
249:3,4 254:5,7,9
**we've** 137:24 142:22
230:3,4 241:18
249:17 254:16 256:3
**while** 128:14 181:22
183:19 188:20 214:1

216:2 250:9 251:25
**Whiskey** 148:1 189:20
210:23 211:9,11
212:25 213:5,13
214:2,7,20 215:4
217:1,10,15 218:12
221:7,19,21 223:14
223:21 225:2,3,15
226:25 236:6,12,21
239:1 250:24 251:5
253:18
**Whiskey's** 214:15
227:8,17
**whole** 134:10 137:6
189:5,14 192:11
**widespread** 176:17
**WILLIAM** 124:4,15
126:3 258:4,12
259:25 261:13
**willing** 131:17 198:23
199:2 239:22 256:2
**wind** 194:21
**winds** 146:9,10
**Winson** 221:12,14,17
222:3
**withdraw** 213:19
**witness** 126:1 166:24
243:25 254:7 259:3,4
260:11 261:15,16
**Wizmith** 171:2,3
**Wolf** 228:10
**word** 186:20 214:9
231:22
**worded** 165:18 180:16
230:20
**wording** 128:5 231:22
246:4
**words** 146:9 184:20
194:18 248:22 254:18
254:20,24
**work** 130:8 164:21
165:20 166:16 167:21
181:11 209:15
**works** 129:19
**world's** 153:22
**worried** 172:11
**worse** 208:12
**worth** 230:12 237:6,8
238:4,14
**wouldn't** 151:24
176:25 198:25 234:12
244:24 246:12 247:3
248:22
**WOWAM** 136:21
137:3 138:14,15,22
139:1,3,7,23 140:5,13
141:14 149:11 151:22
154:25 175:6,9,21
176:5,8 179:6,6 194:9
198:3 202:18 203:13
203:20,25 207:17
210:23
**write** 226:11 228:5
**writing** 131:12
**written** 154:13 155:12
177:14 193:20 213:11

214:24 257:8
**wrong** 132:10 133:25
150:11 151:25 229:3
**wrote** 133:25 229:1,4
**W-I-N-S-O-N** 221:14

————— **Y** —————

**yeah** 133:20,23 134:13
144:13 155:7,16
157:5,10 158:4 159:3
159:4 161:18 166:25
172:25 175:6 177:23
179:22 187:15 188:5
189:8,10 195:3,25
196:5,13 197:3,17
199:3 201:21 213:6
217:19 218:1,11,17
221:2,23 222:9
234:20 237:10
**year** 139:21,22 162:13
180:20 197:1 217:13
218:15 220:20 225:25
230:9 237:11,12,15
253:20
**years** 150:4 174:10
186:1,5,5 219:21
225:25 237:12 250:19
252:16
**year-by-year** 236:24
**yesterday** 135:6
**you-all** 148:4

————— **Z** —————

**Zale** 168:5 169:16
235:8,14,16 255:22
**Zale's** 133:10,11 238:8
238:17
**zero** 187:2,6,8,10,18
240:24
**zeroed** 240:22
**Zulu** 133:12 238:7

————— **$** —————

**$100,000.00** 230:8,10
**$12,000.00** 253:20
**$250.00** 253:23
**$50,000.00** 132:21,23
**$500,000.00** 131:16
**$600,000.00** 237:18
**$623,000.00** 132:18

————— **0** —————

**0** 211:5,15 212:4,8,19
212:20 213:9,13
214:8,16 222:12
226:18 229:9 230:2
232:13 236:7 240:16
241:15 242:9 243:14
250:22
**00-14284** 124:2

————— **1** —————

**1** 124:20 258:6 261:14
**1,000** 147:7,10 150:7
151:9 234:20 240:16

**1,000-foot** 234:17,23
**1,000-hour** 241:11
**1,400-hour** 240:5,6
**1,400-some-odd** 240:2
**1,600** 252:15
**1,310** 259:1
**1/10/97** 126:13
**1:23** 124:20
**10** 126:17 129:17 160:5
162:4,6,8 163:4,5,9
163:10 166:21 186:18
**10,500** 253:22
**10-hour** 166:12
**10/30/00** 126:10
**100** 125:18
**1025** 125:14
**104** 261:3
**11** 126:18 186:1 228:21
228:22,25
**11/5/99** 126:11
**111** 177:10
**127** 126:3
**140** 210:15
**145** 195:22
**15** 197:11
**150** 195:22
**155** 126:9
**158** 126:11,12
**16th** 160:9
**160** 126:14
**162** 126:15,17
**1625** 215:17
**1650** 215:17,21 216:18
**1700** 125:10
**1701** 125:7
**1750** 216:3
**18,000** 148:8 209:17
**18,400-plus** 209:25
**1801** 261:3
**19** 237:5
**19th** 125:3 261:9
**1981** 225:23
**1984** 226:7
**1994** 237:7,8,9
**1996** 186:8,9 227:22
**1997** 160:5
**1997/1998** 219:21
**1998** 133:17 220:3
**1999** 160:5

————— **2** —————

**2** 164:18 197:6 215:9
216:14
**2nd** 142:16
**2,000** 148:22 156:16
162:2 174:1,13
190:13 197:6 246:7
246:11
**2,000-hour** 144:9 157:9
178:13
**2/24/00** 126:19
**2:23** 167:5
**2:30** 166:24
**2:32** 167:5
**20** 197:11,18 215:7
252:16

**2000** 136:18 139:18
141:3 143:6 154:24
155:4 158:15 160:9
162:14,15 164:18
221:3 227:7,11,13,16
227:20,25 228:1,5
229:5,10
**20007** 125:15
**2001** 124:20 258:6,14
260:17 261:6,14
**2004** 260:22
**21** 215:7
**210** 126:4
**215** 215:2
**228** 126:18
**234** 238:7
**24** 133:12
**24th** 229:5
**244** 126:4
**25** 177:12 193:2,5,7
225:3 228:2
**25,000** 146:11 219:10
**25-hour** 225:1
**250** 146:10 148:3
225:13,13
**256** 126:5
**270** 173:10
**29th** 142:16

————— **3** —————

**3** 225:20
**3:25** 205:22
**3:35** 205:22
**30** 158:15
**30-day** 162:17
**30-24** 195:25
**300** 125:14
**31** 210:7
**31st** 162:15
**310** 192:8
**320-hour** 184:21
**324** 184:6
**325** 197:8
**33131** 125:19
**33401** 125:7
**33409** 261:4
**35-inch** 136:8 150:1
**35-25** 196:2
**350** 157:15 197:8
**3811** 125:3 261:9

————— **4** —————

**4** 142:2
**4:48** 254:11
**4:52** 254:11
**4:56** 124:20 257:18
**40** 227:21 228:11
**400** 215:16,20 216:8,17
**4000** 125:18,22
**421** 226:5 251:21
**421A** 225:18
**450** 216:3
**465** 173:20
**475** 216:4

————— **5** —————

**5** 126:9 155:18,20
  160:4
**5/16/00** 126:14
**500** 163:6 173:17 174:7
**500-hour** 133:18
**515** 125:7
**545357** 260:21
**550** 192:7
**56-500** 126:17 162:10
**56500** 239:17
**59-800** 126:16
**59800** 239:17

---

**6**

**6** 126:11 158:21,23
  160:4,25 161:20
  179:24
**60** 183:14,18 239:24
**623** 133:5,5,9,24
**625** 133:22
**635** 133:3,5,7 134:2,6
**65** 177:12,13

---

**7**

**7** 126:12 158:21,23
  160:5 161:20 179:7
  179:24 261:6
**7th** 260:17
**700** 125:10 237:8
**752** 225:10
**75202** 125:22
**75219** 125:3 261:10
**78205** 125:11

---

**8**

**8** 126:14 160:6,8
  161:20 179:7,9,24
**82** 225:23
**85** 189:20 210:23 211:9
  211:11 212:25 213:5
  213:13 214:2,7,15,20
  215:4 217:1,10,15
  218:12 221:7,19,21
  223:14,21 225:2,3,15
  226:25 227:8,17
  236:6,12,21 239:1,24
  250:24 251:5 253:18

---

**9**

**9** 126:15 162:4,6,15
  166:21 179:7,9
  183:13 247:7,25
  260:22
**901** 125:22
**9285** 148:1
**94** 237:5
**95** 173:11
**96** 154:5
**97** 218:17,18
**98** 155:1 217:11,18
  218:11,12

1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF FLORIDA
2       FORT PIERCE DIVISION
     CASE NO. 00-14284 Civ-Roettger
3

4 WILLIAM S. MONTGOMERY, JR.,
  INDIVIDUALLY AND ON BEHALF OF  **CERTIFIED**
5 ALL OTHERS SIMILARLY SITUATED,
              **COPY**
6      Plaintiff,

7 vs.

8 THE NEW PIPER AIRCRAFT, INC. AND
  TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
      Defendants.
10 _____/

11

12

13

14
         VOLUME I
15  DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
    TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
       West Palm Beach, Florida
20       March 1, 2001
        9:02 a.m. - 12:05 p.m.
21

22

23

24

25

Page 4

1          The deposition of WILLIAM S. MONTGOMERY, JR.

2     was taken before me, LISA D. DANFORTH, Registered

3     Professional Reporter, Notary Public, State of Florida

4     at Large, at Burt & Pucillo, LLP, 515 North Flagler

5     Drive, Suite 1701, in the City of West Palm Beach,

6     County of Palm Beach, State of Florida, beginning at

7     the hour of 9:02 a.m., on March 1, 2001, pursuant to

8     Notice filed herein, at the instance of the Defendant

9     in the above-entitled cause pending before the

10    above-named Court.

11                    - - - -

12    THEREUPON,

13               WILLIAM S. MONTGOMERY, JR.,

14    being by me first duly sworn to testify the whole

15    truth, as hereinunder certified, testified as follows:

16          THE WITNESS:   I do.

17               DIRECT EXAMINATION

18    BY MR. REID:

19    Q.    Would you tell me your complete name and your

20    address?

21    A.    William S. Montgomery, Jr., 4210 Lorraine

22    Avenue, Dallas, Texas, 75205.

23    Q.    And how long have you lived at that address?

24    A.    Thirteen years.

25    Q.    And who lives there with you?

Page 5

1        A.    My wife and my two children.

2        Q.    Tell me where you lived before you lived

3    there.

4        A.    42 -- Sorry.

5              4520 Southern Avenue, Dallas, Texas, 75205.

6        Q.    For how long?

7        A.    Ten years.

8        Q.    That's 23 years.  Where did you live before

9    that?

10       A.    I've got to think.

11       Q.    Okay.

12       A.    4650 Meadowood, Dallas, Texas.  I think it's

13   75220.

14       Q.    And for how long?

15       A.    Ten years.

16       Q.    We're getting close, I guess.

17             How old are you, by the way?

18       A.    Fifty.

19       Q.    Okay.  So where did you live the prior seven

20   years of your life, if I've counted correctly?

21       A.    11819 Hampsted, Dallas, Texas, 75230.

22       Q.    I take it you were born in Dallas?

23       A.    No.

24             I'm sorry.  Yes, I was.

25       Q.    And tell me what education you have.

Page 8

1        A.    Yes.

2        Q.    Okay.   Any others?

3        A.    No.

4        Q.    Have you ever lived anywhere because of

5    business where you were assigned to go and be somewhere

6    for an extended period of time, other than the

7    addresses and places you've told me about?

8        A.    No.   I did -- I forgot about Washington, D.C.

9    I lived there for three years.

10       Q.    And when was that?

11       A.    1973 to 1975, two years, two and-a-half

12   years.

13       Q.    What did you do while you were there?

14       A.    I owned a photographic business.

15       Q.    It sounds to me like you'd be a citizen of

16   Texas then?

17       A.    Yes.

18       Q.    And is there anything, any paperwork or

19   documents or registrations, that are of any other state

20   besides Texas that you possess?

21       A.    No.

22       Q.    Have you had your deposition taken before?

23       A.    Yes.

24       Q.    How many times?

25       A.    Three, I think.

Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                         FORT PIERCE DIVISION
                     CASE NO. 00-14284 Civ-Roettger
3

4    WILLIAM S. MONTGOMERY, JR.,
     INDIVIDUALLY AND ON BEHALF OF          **CERTIFIED**
5    ALL OTHERS SIMILARLY SITUATED,
                                              **COPY**
6                    Plaintiff,

7    vs.

8    THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                     Defendants.
10   _____/

11

12

13

14
                              VOLUME I
15        DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
            TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                              West Palm Beach, Florida
20                            March 1, 2001
                              9:02 a.m. - 12:05 p.m.
21

22

23

24

25

```
 1        Q.   Okay.
 2        A.   It may have been a different corporate
 3   entity, but...
 4             And it was the school recognized by the
 5   insurance companies as being the factory school.
 6        Q.   But you don't know whether the instructors
 7   were employees of some Piper entity as opposed to this
 8   Attitudes, Inc., or both, or neither?
 9        A.   I don't know.
10        Q.   Okay.
11        A.   I know that some of them had certainly been
12   Piper employees at one point in time.  Whether they
13   still were...
14        Q.   What was the date, just so I kind of put it
15   in perspective, that you purchased the subject
16   aircraft, or that whoever purchased it purchased it?
17        A.   That's two different questions.
18        Q.   Okay.
19        A.   Which one do you want me to answer?
20        Q.   I realized that as soon as I said it.
21             When did you get an interest in the subject
22   aircraft?
23        A.   April of 2000, April or May.
24        Q.   And when did you get an interest in the WOWAM
25   aircraft?
```

Page 61

1        A.    May of '98.

2        Q.    And when in '98 was the training you did in

3    Vero?

4        A.    June or July.

5        Q.    So that training followed your obtaining an

6    interest in the WOWAM plane?

7        A.    Right.

8        Q.    During the week that you were there, was

9    there anybody who was involved in the training

10   connected with any of the component manufacturers of

11   the aircraft?

12       A.    You mean as a manufacturer's rep?

13       Q.    Anybody who was there who you understood to

14   be representing a manufacturer of any component who

15   participated in the training that you received?

16       A.    I'll go back to the factory school answer,

17   which is, I don't know the contractual arrangements or

18   the business organization, but this was the factory

19   school, so implicit to me, these people worked for the

20   manufacturer of the aircraft.

21             Did anybody represent themselves as being for

22   the avionics or the engine or the landing gear?

23       Q.    Exactly.

24       A.    No.

25       Q.    And specifically then, that would include



Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                  FORT PIERCE DIVISION
               CASE NO. 00-14284 Civ-Roettger
3

4    WILLIAM S. MONTGOMERY, JR.,
     INDIVIDUALLY AND ON BEHALF OF          **CERTIFIED**
5    ALL OTHERS SIMILARLY SITUATED,
                                               **COPY**
6                   Plaintiff,

7    vs.

8    THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                    Defendants.
10   _____/

11

12

13

14
                         VOLUME I
15     DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
       TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                         West Palm Beach, Florida
20                       March 1, 2001
                         9:02 a.m. - 12:05 p.m.
21

22

23

24

25

1    to make the decision.  We've been without an airplane

2    for three and-a-half months.

3         Q.    So when was the WOWAM incident?

4         A.    January 2nd of 2000.

5         Q.    So now we're into March, April?

6         A.    April.

7         Q.    And you've reached the conclusion that you're

8    not going to get any money soon, it appears, from the

9    aircraft insurance?

10        A.    Correct.

11        Q.    And you had also seen lawyers at that point?

12        A.    Yes.

13        Q.    And you had the conversations that we talked

14   about earlier with the lawyers about the possible

15   causes of the WOWAM incident and so forth?

16        A.    Yes.

17        Q.    And at that point, you began looking for or

18   thinking about looking for a new airplane?

19        A.    Right.

20        Q.    So tell me what you did in going about

21   looking for a new airplane.

22        A.    Well, all of my training, recent training,

23   last three years, and experience, has been in a Mirage.

24   At the time I purchased an interest in Mike Alpha, to

25   the extent I had formed an opinion, I was of the

Page 124

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                    FORT PIERCE DIVISION
                  CASE NO. 00-14284 Civ-Roettger
 3

 4   WILLIAM S. MONTGOMERY, JR.,          CERTIFIED
     INDIVIDUALLY AND ON BEHALF OF
 5   ALL OTHERS SIMILARLY SITUATED,          COPY

 6                    Plaintiff,

 7   vs.

 8   THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
 9
                      Defendants.
10   _____/

11

12

13

14
                          VOLUME II
15         DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
           TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                          West Palm Beach, Florida
20                        March 1, 2001
                          1:23 p.m. - 4:56 p.m.
21

22

23

24

25
```

problem -- a unique problem or an unusual problem; that there may be other problems, but I had no idea to the extent of them.

Q. What did you know and when did you know it?

Let me try and break that down.

A. Please.

Q. As of February 2000, is it fair to say that you understood that 85 Whiskey's engine failure was due to systemic improper manufacturing?

A. No.

Q. Is it fair to say that by February of 2000, you thought that --

A. I'm sorry, February of 2000?

Q. Yes.

A. No.

Q. Fair to say that as of February 2000, that you believed that 85 Whiskey's engine failure was due to a fundamental flaw in design?

A. No.

Q. Is it your understanding as of February 2000, that in fact there had been more than 40 failures of this engine since 1996?

A. No.

Q. And is it your understanding that as of February 2000, or is it your belief that as of

1   February 2000, you believe that the failure rate

2   appears to have affected approximately 25 percent of

3   the aircraft utilizing the engine?

4       A.   No.

5       Q.   Did you, sir, in February of 2000 write a

6   letter to John Masten at Textron Lycoming?

7       A.   Yes.

8       Q.   And, in fact, in that letter, didn't you

9   represent that it's your understanding that at a recent

10  Piper distributor meeting Mike Wolf of Textron informed

11  those present that there had been more than 40 failures

12  of the engine?

13      A.   I may be a little off on the time frames.  If

14  I said it in the letter, then I knew about it,

15  obviously.  I mean, there was a lot going on between

16  January and February, March.

17          MR. BATEMAN:  Can we have this marked as the

18          next exhibit?

19          MR. REID:  What do you want to call it?

20          MR. BATEMAN:  Whatever the next one is.

21          MR. REID:  11.

22          (Defendant's Exhibit No. 11 marked.)

23  BY MR. BATEMAN:

24      Q.   Let me hand you, sir, what's been marked as

25  Exhibit 11 and ask you if you can identify that.

```
 1          A.    It's a letter I wrote to John Masten,

 2    ipso facto, the four questions I just answered for you.

 3    I was wrong on the timing.

 4          Q.    And you wrote that letter on or about

 5    February 24th of 2000?

 6          A.    Right.

 7          Q.    And that is your signature on the letter?

 8          A.    Yes, it is.

 9          Q.    And you purchased 0 Mike Alpha in April or

10    May of 2000?

11          A.    Right.

12          Q.    Purchased an interest in it I should say.

13          A.    Right.

14          Q.    I want to talk to you a little bit, sir,

15    about your damages.

16          A.    I'm sorry, what did you say?

17          Q.    I want to talk to you about the damages.

18          A.    I thought you said you were going to attack

19    me about my damages.

20                MR. REID:   That's a Freudian slip if there

21          ever was one.

22    BY MR. BATEMAN:

23          Q.    Your Complaint indicates that some of the

24    damages suffered by Malibu Mirage owners include, first

25    off, excessive maintenance costs.
```

1                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA

2                     FORT PIERCE DIVISION
               CASE NO. 00-14284 Civ-Roettger

3

4   WILLIAM S. MONTGOMERY, JR.,
    INDIVIDUALLY AND ON BEHALF OF   **CERTIFIED**

5   ALL OTHERS SIMILARLY SITUATED,

6                 Plaintiff,      **COPY**

7   vs.

8   THE NEW PIPER AIRCRAFT, INC. AND
    TEXTRON, INC. d/b/a TEXTRON LYCOMING,

9

                  Defendants.

10   _____/

11

12

13

14
                     VOLUME I

15    DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
     TAKEN AT THE INSTANCE OF THE DEFENDANT

16

17

18

19
                   West Palm Beach, Florida

20                  March 1, 2001
                  9:02 a.m. - 12:05 p.m.

21

22

23

24

25

```
 1        Q.    Did you see that before it was filed?

 2        A.    I don't know the answer.  I don't know.

 3        Q.    You've read it now?

 4        A.    Yes.

 5        Q.    And is everything -- Are the factual

 6   allegations contained in here true and correct as far

 7   as you know?

 8        A.    I believe there had been more than 270 Malibu

 9   Mirages built since 1995.

10        Q.    Actually, I gave you my copy.  I was going to

11   ask you about that.

12              Anything else that's --

13        A.    Yes.  As far as I know, this is all factual.

14        Q.    All right.  Let me have that one back.  Let

15   me see what I was doing.  I had you something I wanted

16   to ask you about specifically.  Okay.

17              Okay.  I'll do that later.

18              In the Complaint, you say that you became an

19   owner in a Malibu Mirage in April 2000, and you refer

20   to the MA.

21        A.    Mike Alpha.

22        Q.    Right.

23        A.    Uh-huh.

24        Q.    Now, when you say you became an owner, what

25   does that mean?
```

Page 72

```
 1          A.   Well, I purchased an interest in a -- I'm not
 2     sure if it's a corporation, I think it is -- that owned
 3     -- whose sole asset was that aircraft.
 4          Q.   What was the name for that corporation?
 5          A.   SKB Aviation.
 6          Q.   SKB Aviation?
 7          A.   Uh-huh.
 8          Q.   What does the SKB stand for?
 9          A.   Steven K. Boyd.
10          Q.   And who was that?
11          A.   My partner in SKB Aviation.
12          Q.   Are there any other partners?
13          A.   No.
14          Q.   And as I understand, you own a 25 percent
15     interest in that?
16          A.   Well, it's a little more complex than that.
17     I actually own half of SKB Aviation.  SKB Aviation owns
18     half of a Mirage, 960 Mike Alpha.
19          Q.   Who owns the other half of that airplane?
20          A.   J.M.S. Aviation, I think.
21          Q.   And do you have any interest in J.M.S.
22     Aviation?
23          A.   No.
24          Q.   And who is J.M.S.?
25          A.   Who is J.M.S.?  The correct way to say that
```

```
 1    would be what is J.M.S.

 2         Q.    Okay.

 3         A.    It's another corporation owned by, I think,

 4    and I'm -- It stands for John, Mark, and Steve.

 5               I didn't make this up.  It was already there

 6    when I got there.

 7         Q.    Okay.  Who is John, and who is Mark, and who

 8    is Steve?

 9         A.    These are three individuals that own a 1978

10    King Air and that also own the other half of the

11    Mirage.

12               MR. AMES:  Is that the clean copy of the

13          Complaint that you marked as Number 2?

14               MR. REID:  Yes, it is, the same one that you

15          have.

16               (Defendant's Exhibit No. 3 marked.)

17    BY MR. REID:

18         Q.    I want to show you Exhibit 3.  Would you just

19    look at this and tell me if you've seen any of this

20    before?

21         A.    Well, half of this is illegible.

22         Q.    Sure.  Sure.  I realize that.

23         A.    I mean, without a very thorough, careful

24    review, I'm not going to tell you what in here I have

25    or have not seen.
```

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Agreement") dated as of June 1, 2000, is made by Steven K. Boyd, (the "Lender"), an individual, which has its principal place of residence at 5218 Spicewood, Frisco, Texas 75034, to William Montgomery, (the "Grantor"), with offices at 1470 Reverchon Plaza 3500 Maple Ave. Dallas, TX 75219.

## WITNESSETH:

WHEREAS, Grantor has executed and delivered to the Lender a promissory note of even date herewith made by the Grantor payable to the order of the Lender in the original principal amount of $125,000.00, payable as provided therein (the "Note"); and

WHEREAS, the parties hereto desire to enter into this Agreement to secure the payment and performance of the Note on the terms set forth herein;

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby agrees with the Lender as follows:

Section 1.    Grant of Security.  The Grantor hereby assigns, pledges and grants to the Lender for its benefit a security interest in all of the Grantor's right, title and interest in and to the following (collectively, the "Collateral"):

230 shares in SKB Aviation.

The security interests granted hereby renew and extend all prior security interests heretofore granted by the Grantor to the Lender, such security interests to be governed pursuant to the terms of this Agreement.

Section 2.    Security for Obligations.    This Agreement secures the payment and performance of all debt, liabilities and obligations of the Grantor to the Lender, fixed or contingent, joint or several, now existing or hereafter arising, including but not limited to debt evidenced by the [Note], and all obligations of the Grantor now or hereafter existing under this Agreement and any other agreement or document executed in connection herewith, (all such obligations and liabilities of the Grantor being the "Obligations").

Section 3.    The Grantor Remains Liable.  Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Lender of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) the Lender shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall the

Lender be obligated to perform any of the obligations or duties of the Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4. Representations and Warranties. The Grantor represents and warrants as follows:

(a) The Grantor owns the Collateral free and clear of any lien, security interest, charge or encumbrance except for the security interest created hereby in favor of the Lender. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of the Lender.

(b) This Agreement creates a valid and perfected first priority security interest in the Collateral, securing the payment of the Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been, or will upon request be, duly taken.

(c) No authorization, approval or other action by, and no notice to or other filing with, any governmental authority or regulatory body is required either (i) for the grant by the Grantor of the security interest granted hereby or for the execution, delivery or performance of this Agreement by the Grantor or (ii) for the perfection of or the exercise by the Lender of its rights and remedies hereunder (other than filing of financing statements).

Section 5. Further Assurances.

(a) The Grantor agrees that from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that the Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Grantor will: (i) mark conspicuously each document included in the Collateral and, at the request of the Lender, each of its records pertaining to the Collateral, with a legend, in form and substance satisfactory to the Lender, indicating that such document or Collateral is subject to the security interest granted hereby; (ii) after an Event of Default, transfer, register or otherwise put any of the Collateral in the name of the Lender or its nominee; and (iii) execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Lender may request, in order to perfect and preserve the security interest granted or purported to be granted hereby.

(b) The Grantor hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Grantor where permitted by law (provided that the Lender furnishes to the Grantor a copy of each such statement filed, promptly after the filing thereof). A carbon, photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

2

(c)    The Grantor will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail.

Section 6.    Insurance.

(a)    The Grantor shall, at its own expense, maintain insurance with respect to the Collateral in such amounts, against such risks, in such form and with such insurers, as shall be reasonably satisfactory to the Lender from time to time. Each policy for property damage insurance shall provide for all losses to be paid on behalf of the Lender and the Grantor as their respective interests may appear. Each such policy shall in addition (i) contain the agreement (if available) by the insurer that any loss thereunder shall be payable to the Lender notwithstanding any action, inaction or breach of representation or warranty by the Grantor, (ii) provide that there shall be no recourse against the Lender for payment of premiums or other amounts with respect thereto and (iii) provide that at least 10 days prior written notice of cancellation or of lapse shall be given to the Lender by the insurer. The Grantor shall, if so requested by the Lender, deliver to the Lender original or duplicate policies of such insurance and, as often as the Lender may reasonably request, a report of a reputable insurance broker selected by the Grantor with respect to such insurance. Further, the Grantor shall, at the request of the Lender, duly execute and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 5 hereof and cause the respective insurers to acknowledge notice of such assignment.

(b)    Reimbursement under any liability insurance maintained by the Grantor may be paid directly to the person who shall have incurred liability covered by such insurance.

(c)    All insurance payments in respect of Collateral shall be paid to and applied by the Lender as specified in Section 11(b).

Section 7.    Transfers and Other Liens. The Grantor shall not:

(a)    Sell, assign (by operation of law or otherwise) or otherwise dispose of any of the Collateral, except for the sale of inventory in the ordinary course of business.

(b)    Create or suffer to exist any lien upon or with respect to any of the Collateral to secure debt of any person, except for the security interest created by this Agreement.

Section 8.    Lender Appointed Attorney-in-Fact. The Grantor hereby irrevocably appoints the Lender the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time in the Lender's discretion at any time after the occurrence of an Event of Default under the [NOTE] has occurred and is continuing, to take any action and to execute any instrument which the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

3

(i)    to obtain and adjust insurance required to be paid to the Lender pursuant to Section 6;

(ii)    to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(iii)    to receive, endorse, and collect any drafts or other instruments, documents and chattel paper, in connection with clause (i) or (ii) above; and

(iv)    to file any claims or take any action or institute any proceedings which the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral.

Section 9.    Lender May Perform.  If the Grantor fails to perform any agreement contained herein, the Lender may itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable by the Grantor under Section 12(b).

Section 10.    Lender's Duties.  The powers conferred on the Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

Section 11.    Remedies.  If the Grantor shall fail or refuse to perform or comply in any material respect with any of its obligations under this Agreement and such refusal or failure is not cured within 15 days after the Lender gives notice thereof to the Grantor, or if any representation or warranty made by the Grantor herein proves to have been false in any material respect when made, or any Event of Default under the [NOTE] shall have occurred and be continuing:

(a)    The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the Uniform Commercial Code (the "Code") (whether or not the Code applies to the affected Collateral) and also may (i) require the Grantor to, and the Grantor hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to it and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) business days' notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of

4

sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     All cash proceeds received by the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable pursuant to Section 12) in whole or in part by the Lender against all or any part of the Obligations in such order as the Lender shall elect, subject to any mandatory provisions or applicable law. Any surplus of such cash or cash proceeds held by the Lender and remaining after payment in full of all the Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus.

If, in the opinion of the Lender, there is any question that a public or semipublic sale or distribution of any Collateral will violate any state or federal securities law, the Lender in its discretion (a) may offer and sell securities privately to purchasers who will agree to take them for investment purposes and not with a view to distribution and who will agree to imposition of restrictive legends on the certificates representing the security, or (b) may sell such securities in an intrastate offering under Section 3(a)(ll) of the Securities Act of 1933, as amended, and no sale so made in good faith by the Lender shall be deemed to be not "commercially reasonable" because so made.

The execution and delivery of this Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the payment of the Obligations and no security taken hereafter as security for payment of the Obligations shall impair in any manner or affect this Agreement, all such present and further additional security to be considered as cumulative security. Any of the collateral for, or any obligor on, any of the Obligations may be released without altering, varying or diminishing in any way the force, effect, lien, security interest, or charge of this Agreement as to the Collateral not expressly released, and this Agreement shall continue as a security interest and charge on all of the Collateral not expressly released until all the Obligations secured hereby have been paid in full.

This Agreement shall not be construed as relieving the Grantor from full recourse liability on the Obligations and any and all further and other indebtedness secured hereby and for any deficiency thereon.

Section 12.     Indemnity and Expenses.

(a)     The Grantor agrees to indemnify the Lender from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from the Lender's negligence or willful misconduct.

5

(b)      The Grantor will upon demand pay to the Lender the amount of any and all reasonable expenses, including the reasonable fees and disbursements of its counsel and of any experts and agents, which the Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Lender hereunder or (iv) the failure by the Grantor to perform or observe any of the provisions hereof.

Section 13.      Security Interest Absolute.  All rights of the Lender and security interests hereunder, and all obligations of the Grantor hereunder, shall be absolute and unconditional, irrespective of:

(i)      any lack of validity or enforceability of any Note or any other agreement or instrument relating thereto;

(ii)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of or any consent to any departure from any Note;

(iii)    any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; or

(iv)     any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Grantor, or a third party grantor of a security interest.

Section 14.      Amendments; Etc.  No amendment or waiver of any provision of this Agreement nor consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 15.      Addresses for Notices.  Unless otherwise provided herein, all notices, requests, consents, demands and other communications shall be in writing and shall be mailed, certified mail with return receipt requested, postage prepaid, or telegraphed, cabled, telexed, telecopied or otherwise physically delivered to their respective addresses as set forth herein, or, as to any party, to such other address as may be designated by it in written notice to all other parties.  All notices, requests, consents and demands hereunder will be effective, if addressed to the Lender or the Grantor as aforesaid, when mailed by certified mail, postage prepaid, return receipt requested, or upon delivery if telegraphed, cabled, telexed, telecopied or otherwise physically delivered, addressed as aforesaid.

Section 16.      Continuing Security Interest; Transfer of Note.  This Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon the Grantor, its successors and assigns and (ii) inure, together with the rights and remedies of the Lender hereunder, to the benefit of the Lender, its successors, transferees and assigns.  Upon the payment in full of the

6

Obligations, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Grantor. Upon any such termination, the Lender will, at the Grantor's expense, execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination.

Section 17.    Governing Law; Terms. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, except to the extent that the validity or perfection of the security interest hereunder, or remedies hereunder, in respect of any particular Collateral are governed by the laws of a jurisdiction other than the State of Texas. Terms used in Article 9 of the Uniform Commercial Code in the State of Texas are used herein as therein defined.

IN WITNESS WHEREOF, the Grantor has caused this Agreement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

WILLIAM S. MONTGOMERY JR.

By: _____
Its: _____

ATTEST:

_____
Secretary

7

### PROMISSORY NOTE

Dallas, Texas                                                                                    June 1, 2000

William Montgomery (the "Maker"), for value received, hereby promises to pay to the order of Steven K. Boyd (together with any successors or assigns, the "Payee"), at the time and in the manner hereinafter provided, the principal sum of 125,000 Dollars ($ 125,000.00), together with interest computed thereon at the rate hereinafter provided. This Note shall be payable at the office of the Payee at 5218 Spicewood, Frisco, Texas 75034, or at such other address in Dallas County, Texas as the holder of this Note shall from time to time designate.

The outstanding principal amount of this Note shall bear interest from the date hereof until the due date at the rate of eight percent (8%) per annum. The principal amount of this Note shall be due and payable on June 30, 2002 or on such later date as may be agreed to in writing by Payee. Interest on the outstanding principal amount of this Note shall be payable monthly commencing July 1, 2000.

All sums of principal and interest past due under the terms of this Note shall bear interest at a per annum interest rate equal to the lesser of twelve percent (12%) per annum or the maximum rate allowed by law from the due date thereof until paid.

In the event of default hereunder and this Note is placed in the hands of an attorney for collection (whether or not suit is filed), or if this Note is collected by suit or legal proceedings or through bankruptcy proceedings, the Maker agrees to pay in addition to all sums then due hereon, including principal and interest, all expenses of collection, including, without limitation, reasonable attorneys' fees.

This Note may be prepaid in whole or in part from time to time, without premium or penalty. Each prepayment of principal shall be accompanied by an amount equal to the accrued interest on the principal amount prepaid to the date of such prepayment.

The Payee shall be entitled to accelerate this Note and declare all sums due hereunder immediately due and payable upon default by the Maker in any of its obligations hereunder.

The Maker and any and all sureties, guarantors and endorsers of this Note and all other parties now or hereafter liable hereon, severally waive grace, demand, presentment for payment, notice of dishonor, protest and notice of protest, notice of intention to accelerate, notice of acceleration, any other notice and diligence in collecting and bringing suit against any party hereto and agree (i) to all extensions and partial payments, with or without notice, before or after maturity, (ii) to any substitution, exchange or release of any security now or hereafter given for this Note, (iii) to the release of any party primarily or secondarily liable hereon, and (iv) that it will not be necessary for the holder hereof, in order to enforce payment of this Note, to first institute or exhaust such holder's remedies against the Maker or any other party liable therefor or against any security for this

Note. No delay on the part of the Payee in exercising any power or right under this Note shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power of right preclude further exercise of that power or right.

A security interest in SKB Aviation has been granted by Maker to the Payee to secure the payment of this Note pursuant to the terms and conditions of the Security Agreement, by and among the Maker, and Steven K. Boyd, dated as of June 1, 2000 (the "Security Agreement"), and to secure the payment of any costs and expenses incurred by the Payee in the collection and enforcement hereof.

The Maker understands that this Note may be pledged to secure certain obligations of the Payee and hereby consents to any such pledge.

All agreements between the Maker and the holder hereof, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity hereof, or otherwise, shall the amount paid, or agreed to be paid, to the holder hereof for the use, forbearance or detention of the funds advanced pursuant to this Note, or otherwise, or for the payment or performance of any covenant or obligation contained herein or in any other document or instrument evidencing, securing or pertaining to this Note exceed the maximum amount permissible under applicable law. If from any circumstances whatsoever fulfillment of any provision hereof or any other document or instrument exceeds the maximum amount of interest prescribed by law, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstances the holder hereof shall ever receive anything of value deemed interest by applicable law, which would exceed interest at the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance of this Note or on account of any other principal indebtedness of the Maker to the holder hereof, and not to the payment of interest, or if such excessive interest exceeds the unpaid principal balance of this Note and such other indebtedness, such excess shall be refunded to the Maker. All sums paid, or agreed to be paid, by the Maker for the use, forbearance or detention of the indebtedness of the Maker to the holder of this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between the Maker and the holder hereof.

This Note shall be governed by and construed in accordance with the laws of the State of Texas.

All references to the Maker herein shall, and shall be deemed to, include its successors and assigns, and all covenants, stipulations, promises and agreements contained herein by or on behalf of the Maker shall be binding upon its successors and assigns, whether so expressed or not.

2

MAKER

William J. Montgomery J.

By:

Its:

3

WSM 01341

## ADDENDUM TO NOTE AND SECURITY AGREEMENT

The Note and Security Agreement are not assignable. Montgomery will have the right to use the Malibu N960MA ("aircraft") and, in the event such aircraft is sold for more than $600,000, Montgomery will have the option to cancel the Note and Security Agreement, and further receive in cash from Steven K. Boyd and SKB Aviation the difference between 25% of the sales proceeds of the aircraft and $125,000 in exchange for 230 shares of SKB Aviation. Should the aircraft be sold for less than $600,000, Montgomery will have the option to cancel the Note and Security Agreement and return 230 shares of SKB Aviation, and be obligated to pay Steve Boyd and SKB Aviation the deficit between $125,000 and 25% of the sales proceeds.

WILLIAM S. MONTGOMERY

STEVEN K. BOYD

SKB AVIATION

WSM 01342



Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                         FORT PIERCE DIVISION
                     CASE NO. 00-14284 Civ-Roettger
3

4     WILLIAM S. MONTGOMERY, JR.,
      INDIVIDUALLY AND ON BEHALF OF          **CERTIFIED**
5     ALL OTHERS SIMILARLY SITUATED,

6                         Plaintiff,            **COPY**

7     vs.

8     THE NEW PIPER AIRCRAFT, INC. AND
      TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                          Defendants.
10    _____/

11

12

13

14
                              VOLUME I
15         DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
            TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                              West Palm Beach, Florida
20                            March 1, 2001
                              9:02 a.m. - 12:05 p.m.
21

22

23

24

25

1    Mike Alpha?

2          A.    Steve Boyd, SKB.

3          Q.    Okay.   And what value was he actually placing

4    on the plane at that point?

5          A.    600,000.

6          Q.    And that would be a 1,200-hour --

7          A.    Right.

8          Q.    And was that the right number as far as you

9    were concerned?

10         A.    I thought it was an exceptionally good deal,

11   because it was a year older airplane, and a year prior

12   to that, I just paid 750,000 equivalent for an

13   identical airplane, so...

14         Q.    So did that become the operative number in

15   calculating your interest?

16         A.    Yes.

17         Q.    So you essentially paid 150,000?

18         A.    Yes.

19         Q.    In terms of the maintenance experience that

20   you had on both planes, when you were involved in the

21   WOWAM plane, as well as the later one, did you

22   subscribe to any service materials for the plane, or

23   did you rely on the mechanics to get that kind of

24   information?

25         A.    Well, I subscribe to AOPA Pilot, Flying

ADDENDUM TO NOTE AND SECURITY AGREEMENT

The Note and Security Agreement are not assignable. Montgomery will have the right to use the Malibu N960MA ("aircraft") and, in the event such aircraft is sold for more than $600,000, Montgomery will have the option to cancel the Note and Security Agreement, and further receive in cash from Steven K. Boyd and SKB Aviation the difference between 25% of the sales proceeds of the aircraft and $125,000 in exchange for 230 shares of SKB Aviation. Should the aircraft be sold for less than $600,000, Montgomery will have the option to cancel the Note and Security Agreement and return 230 shares of SKB Aviation, and be obligated to pay Steve Boyd and SKB Aviation the deficit between $125,000 and 25% of the sales proceeds.

WILLIAM S. MONTGOMERY

STEVEN K. BOYD

SKB AVIATION

WSM 01342

Page 1

1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                      FORT PIERCE DIVISION
                   CASE NO. 00-14284 Civ-Roettger
3

4    WILLIAM S. MONTGOMERY, JR.,
     INDIVIDUALLY AND ON BEHALF OF         **CERTIFIED**
5    ALL OTHERS SIMILARLY SITUATED,

6                      Plaintiff,          **COPY**

7    vs.

8    THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                      Defendants.
10   _____/

11

12

13

14
                           VOLUME I
15        DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
           TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                            West Palm Beach, Florida
20                          March 1, 2001
                            9:02 a.m. - 12:05 p.m.
21

22

23

24

25

1    Mike Alpha?

2         A.    Steve Boyd, SKB.

3         Q.    Okay.  And what value was he actually placing

4    on the plane at that point?

5         A.    600,000.

6         Q.    And that would be a 1,200-hour --

7         A.    Right.

8         Q.    And was that the right number as far as you

9    were concerned?

10        A.    I thought it was an exceptionally good deal,

11   because it was a year older airplane, and a year prior

12   to that, I just paid 750,000 equivalent for an

13   identical airplane, so...

14        Q.    So did that become the operative number in

15   calculating your interest?

16        A.    Yes.

17        Q.    So you essentially paid 150,000?

18        A.    Yes.

19        Q.    In terms of the maintenance experience that

20   you had on both planes, when you were involved in the

21   WOWAM plane, as well as the later one, did you

22   subscribe to any service materials for the plane, or

23   did you rely on the mechanics to get that kind of

24   information?

25        A.    Well, I subscribe to AOPA Pilot, Flying



Page 124

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                        FORT PIERCE DIVISION
                     CASE NO. 00-14284 Civ-Roettger
3

4   WILLIAM S. MONTGOMERY, JR.,                  **CERTIFIED**
    INDIVIDUALLY AND ON BEHALF OF
5   ALL OTHERS SIMILARLY SITUATED,               **COPY**

6                       Plaintiff,

7   vs.

8   THE NEW PIPER AIRCRAFT, INC. AND
    TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                        Defendants.
10  _____/

11

12

13

14
                          VOLUME II
15       DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
         TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                          West Palm Beach, Florida
20                        March 1, 2001
                          1:23 p.m. - 4:56 p.m.
21

22

23

24

25

Page 176

1   the plane as of that time; is that fair to say,

2   whatever the full value was?

3        A.   Yes.  Yes.

4        Q.   And you told me this morning that both the

5   WOWAM plane and the Mike Alpha plane, what you paid was

6   the fair value of the plane.

7        A.   No, that's not what I said.  I said that was

8   true for WOWAM.  What I said in Mike Alpha's case --

9        Q.   You got a better deal?

10       A.   I got a much better deal.

11       Q.   Right.

12       A.   What I didn't know was why I got a much

13  better deal.

14       Q.   And now you're saying you believe you got a

15  better deal for what reason?

16       A.   Because I think -- I think by that time,

17  there were enough failures and they were widespread

18  enough that people were beginning to figure out that

19  this airplane had a systemic engine problem.

20       Q.   Well, you knew about the problem before you

21  bought it, didn't you?

22       A.   Well, when I knew about it, I thought that

23  was an isolated instance.  If I had known that the

24  failure rate was as high as we found out it was, I

25  wouldn't have bought it.



Page 1

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF FLORIDA
2             FORT PIERCE DIVISION
          CASE NO. 00-14284 Civ-Roettger
3

4    WILLIAM S. MONTGOMERY, JR.,
     INDIVIDUALLY AND ON BEHALF OF        **CERTIFIED**
5    ALL OTHERS SIMILARLY SITUATED,
                                          **COPY**
6              Plaintiff,

7    vs.

8    THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
               Defendants.
10   _____/

11

12

13

14
                        VOLUME I
15   DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
       TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                    West Palm Beach, Florida
20                  March 1, 2001
                    9:02 a.m. - 12:05 p.m.
21

22

23

24

25

1   failures that you might expect if you didn't do that?

2        A.   Not that I recall.

3        Q.   And I take it you had not been operating the

4   WOWAM aircraft within what we'll call the revised

5   operating parameters?

6        A.   No.

7        Q.   And you had not -- Let's see.  When you began

8   to operate the Mike Alpha, did you operate that within

9   these revised parameters?

10       A.   Well, that's one reason I bought into it,

11  because they had already been operating that way, and

12  they made it to a pretty high time doing so.

13       Q.   Do you expect that Mike Alpha is going to

14  make it to 2,000 hours?

15       A.   No, I know it won't.

16       Q.   Why is that?

17       A.   Because you have to comply with the service

18  bulletin.  No engine out there will make it to

19  2,000-hour TBO.

20       Q.   Explain that to me.

21       A.   Because you have to comply with the service

22  bulletin.  It didn't make it.  And in complying with

23  that service bulletin, if you change the con rod

24  bearings, you have to split the crank case.  If you

25  split the crank case, it didn't make it, by definition.

Page 1

1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2                     FORT PIERCE DIVISION
                  CASE NO. 00-14284 Civ-Roettger
3

4    WILLIAM S. MONTGOMERY, JR.,
     INDIVIDUALLY AND ON BEHALF OF       **CERTIFIED**
5    ALL OTHERS SIMILARLY SITUATED,

6                    Plaintiff,            **COPY**

7    vs.

8    THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                     Defendants.
10   _____/

11

12

13

14
                           VOLUME I
15       DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
          TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                          West Palm Beach, Florida
20                        March 1, 2001
                          9:02 a.m. - 12:05 p.m.
21

22

23

24

25

1      Q.    And when did you first hear this from these

2   people, from anybody?

3      A.    I'm trying to remember.

4      Q.    Sure.  Take your time.

5      A.    I would say in the spring of 2000, and I

6   can't be more precise than that.

7      Q.    And do you remember who the first person was?

8      A.    No.

9      Q.    This may have multiple answers depending on

10  which person you're talking about, but I'm trying to

11  find out why anybody would have made this

12  recommendation to you.  To the extent they had

13  different reasons, I want to know the different reasons

14  of different people.

15     A.    Well, once we had the incident with

16  85 Whiskey, I started asking a lot of questions to a

17  lot of different people about what happened, why did

18  this happen.  And I believe that's when this issue

19  that, well, I fly the airplane to max continuance to

20  five minutes.  The Navaho says five minutes maximum

21  with the same stuff on it, but I remember distinctly

22  asking Steve Boyd if that's the way he flew the

23  airplane, and he said, yeah, we only use max

24  continuance for five minutes.

25     Q.    All right.  Now, you had the WOWAM incident?

Page 124

1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                      FORT PIERCE DIVISION
                    CASE NO. 00-14284 Civ-Roettger
3

4    WILLIAM S. MONTGOMERY, JR.,              **CERTIFIED**
     INDIVIDUALLY AND ON BEHALF OF
5    ALL OTHERS SIMILARLY SITUATED,            **COPY**

6                       Plaintiff,

7    vs.

8    THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                        Defendants.
10   _____/

11

12

13

14
                            VOLUME II
15           DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
             TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                            West Palm Beach, Florida
20                          March 1, 2001
                            1:23 p.m. - 4:56 p.m.
21

22

23

24

25

1    false representation.

2         A.    Well, you can't achieve the operating

3    temperatures that you need to achieve to make the

4    engine live and achieve the fuel burn rates that are in

5    the POH.  And if you run the fuel burn rates, you're

6    going to be top of the green or close to the red.

7         Q.    And you told me that you believe that if you

8    follow the book, that the engine won't live.  That's

9    your term?

10        A.    That's correct.

11        Q.    And you had been flying the WOWAM aircraft

12   for some period of time by the book?

13        A.    As far as I know, it had been operated by the

14   book its entire life.

15        Q.    And likewise, your current airplane has been

16   operated by the book throughout its life?

17        A.    It's my understanding that to the extent the

18   ownership knew about it, that airplane had been

19   operated under the modified parameters for the time it

20   had been in possession of SKB.

21        Q.    When did SKB start using your modified

22   parameters?

23        A.    Well, let's not call them my modified

24   parameters.

25              It's my understanding that the people

```
 1    involved in SKB and J.M.S. had been using the 35-inch

 2    configuration for as long as they owned the airplane.

 3         Q.    And how long would that be?

 4         A.    I believe it was a couple years.

 5         Q.    How many hours would you say?

 6         A.    I don't know.  I do know that that engine had

 7    a top overhaul at about 1,000 hours.

 8         Q.    Do you know anything about the reason for

 9    that?

10         A.    No.

11         Q.    Do you know what they found to be wrong when

12    they did the overhaul?

13         A.    No.  And I -- No.

14         Q.    How do you know about that overhaul?

15         A.    Mr. Boyd told me about it.

16         Q.    Did he own the plane at the time when the

17    overhaul took place?

18         A.    I believe he did.  I remember seeing an entry

19    in a logbook, but the date's not clear to me.

20         Q.    And did he tell you that he thought the

21    reason for that overhaul was because they had been

22    running the plane by the book?

23         A.    He didn't tell me.

24               The normal reason to do a top is to lower

25    compression.
```

Page 124

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF FLORIDA
2            FORT PIERCE DIVISION
         CASE NO. 00-14284 Civ-Roettger

3

4    WILLIAM S. MONTGOMERY, JR.,          **CERTIFIED**
     INDIVIDUALLY AND ON BEHALF OF
5    ALL OTHERS SIMILARLY SITUATED,         **COPY**

6                 Plaintiff,

7    vs.

8    THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                  Defendants.
10   _____/

11

12

13

14
                        VOLUME II
15        DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
          TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                         West Palm Beach, Florida
20                       March 1, 2001
                         1:23 p.m. - 4:56 p.m.
21

22

23

24

25

Page 242

```
 1          Q.   And if you can sell it, that's not going to
 2     be true, right?
 3          A.   Right, but you still have the question of the
 4     engine.
 5          Q.   Okay.  I'm backing up.  I'm saying to date.
 6     Whatever happens in the future, we're going to look at
 7     that as well, but I'm talking to date, have you
 8     quantified damages as a result of ownership in
 9     0 Mike Alpha?
10          A.   I'm going to let my attorney answer that one.
11          Q.   You have not?
12          A.   I haven't made that calculation.
13          Q.   Have you incurred excessive maintenance cost?
14          A.   I don't have any way of knowing that.
15          Q.   Okay.  Have you incurred increased operating
16     costs?
17          A.   I would say so.
18          Q.   In what form?
19          A.   Higher fuel burn, more oil changes.
20          Q.   And you knew about the -- I'm sorry, what was
21     the first thing you said, power fuel changes?
22          A.   Higher fuel burn.
23          Q.   Higher fuel burn.  You knew about that when
24     you purchased the aircraft, right?
25          A.   Right.
```



Page 124

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                      FORT PIERCE DIVISION
                    CASE NO. 00-14284 Civ-Roettger
 3

 4    WILLIAM S. MONTGOMERY, JR.,
      INDIVIDUALLY AND ON BEHALF OF
 5    ALL OTHERS SIMILARLY SITUATED,

 6                     Plaintiff,

 7    vs.

 8    THE NEW PIPER AIRCRAFT, INC. AND
      TEXTRON, INC. d/b/a TEXTRON LYCOMING,
 9
                      Defendants.
10    _____/

11

12

13

14
                          VOLUME II
15      DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
        TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                          West Palm Beach, Florida
20                        March 1, 2001
                          1:23 p.m. - 4:56 p.m.
21

22

23

24

25
```

**CERTIFIED COPY**

Page 178

```
 1        Q.   No other surveys?

 2        A.   Not that I recall.

 3        Q.   On the Mike Alpha plane, you bought that

 4   plane even though it had had an engine overhaul; is

 5   that right?

 6        A.   It had a top overhaul.

 7        Q.   You knew about that, right?

 8        A.   Yes.

 9        Q.   And did you assume it was done with Lycoming

10   parts?

11        A.   Yes.

12        Q.   And you knew that that plane had not made it

13   to the 2,000-hour TBO when you bought it?

14        A.   Yes.

15        Q.   And you knew all that before you bought the

16   plane?

17        A.   Yes.

18        Q.   And you bought it anyway?

19        A.   Yes.

20        Q.   Now, are you familiar with a subscription

21   service that you can get Textron Lycoming advisories

22   and so forth -- I'm sorry, not advisories -- service

23   instructions?  Is there such a subscription service?

24        A.   I don't know if there is or isn't.

25        Q.   If you buy a plane new, do you know whether
```



Page 124

1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF FLORIDA
2      FORT PIERCE DIVISION
     CASE NO. 00-14284 Civ-Roettger
3

4 WILLIAM S. MONTGOMERY, JR.,  **CERTIFIED**
 INDIVIDUALLY AND ON BEHALF OF
5 ALL OTHERS SIMILARLY SITUATED, **COPY**

6     Plaintiff,

7 vs.

8 THE NEW PIPER AIRCRAFT, INC. AND
 TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9

     Defendants.
10 _____/

11

12

13

14
       VOLUME II
15  DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
   TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
      West Palm Beach, Florida
20      March 1, 2001
      1:23 p.m. - 4:56 p.m.
21

22

23

24

25



1    me earlier?

2         A.    That is an implicit assumption on my part

3    that Mr. Johnson has now listed the airplane at 635.

4    I did hear that statement from Steve Boyd.

5         Q.    635 or 623?  You said 623 before lunch.

6         A.    No, I don't believe I did.

7         Q.    Okay.  But just so we're clear, it's 635 that

8    it's been listed as?

9         A.    That's my understanding.  I believe the 623

10   number came from the sale of Mr. Zale's airplane.

11        Q.    Mr. Zale's airplane, which one was that?

12        A.    24 Delta Zulu.

13        Q.    Have we talked about that plane?

14        A.    Well, we haven't named it by pin number, but

15   we have talked about it.

16        Q.    Help me.  I'm having a senior moment.

17        A.    This is the 1998 that was a loaded airplane

18   that was sold, a 500-hour airplane.

19        Q.    You did mention that.

20        A.    Yeah.

21        Q.    And that was sold for six...

22        A.    625.

23        Q.    Yeah, I have that.

24        A.    Okay.  I don't know where 623 came from.

25        Q.    It doesn't matter.  If I wrote it down wrong



1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2              FORT PIERCE DIVISION
           CASE NO. 00-14284 Civ-Roettger
3

4    WILLIAM S. MONTGOMERY, JR.,        **CERTIFIED**
     INDIVIDUALLY AND ON BEHALF OF
5    ALL OTHERS SIMILARLY SITUATED,       **COPY**

6                    Plaintiff,

7    vs.

8    THE NEW PIPER AIRCRAFT, INC. AND
     TEXTRON, INC. d/b/a TEXTRON LYCOMING,
9
                     Defendants.
10   _____/

11

12

13

14
                         VOLUME II
15        DEPOSITION OF WILLIAM S. MONTGOMERY, JR.
          TAKEN AT THE INSTANCE OF THE DEFENDANT
16

17

18

19
                         West Palm Beach, Florida
20                       March 1, 2001
                         1:23 p.m. - 4:56 p.m.
21

22

23

24

25

1    your intention to sell that plane, Mike Alpha, to

2    somebody without having taken any actions concerning

3    repairs or replacements pursuant to the service

4    bulletins?

5         A.   Yes.

6         Q.   And have you told Mr. Johnson that that's

7    your intention, that you're not going to have anything

8    else done to the plane along those lines?

9         A.   I haven't spoken to Mr. Johnson.

10        Q.   Did I say the wrong name?

11        A.   No.

12        Q.   Okay.  You just know from other sources?

13   From who, Mr. Burg?

14        A.   Boyd.

15        Q.   Boyd.  I mean, you know from talking to him

16   that Mr. Johnson's done all this?

17        A.   Mr. Johnson's done all what?

18        Q.   Listed the plane for $623,000.00.

19        A.   The only thing that I know is that Mr. Boyd

20   said to Mr. Johnson when Mr. Johnson asked for his next

21   $50,000.00 deposit was that Mr. Boyd said to

22   Mr. Johnson, when you start marketing my airplane, I

23   will pay you the other $50,000.00.  What the result of

24   that conversation has been, I have no idea.

25        Q.   But you did hear that he listed it, you told

Page 133

1    me earlier?

2          A.    That is an implicit assumption on my part

3    that Mr. Johnson has now listed the airplane at 635.

4    I did hear that statement from Steve Boyd.

5          Q.    635 or 623?  You said 623 before lunch.

6          A.    No, I don't believe I did.

7          Q.    Okay.  But just so we're clear, it's 635 that

8    it's been listed as?

9          A.    That's my understanding.  I believe the 623

10   number came from the sale of Mr. Zale's airplane.

11         Q.    Mr. Zale's airplane, which one was that?

12         A.    24 Delta Zulu.

13         Q.    Have we talked about that plane?

14         A.    Well, we haven't named it by pin number, but

15   we have talked about it.

16         Q.    Help me.  I'm having a senior moment.

17         A.    This is the 1998 that was a loaded airplane

18   that was sold, a 500-hour airplane.

19         Q.    You did mention that.

20         A.    Yeah.

21         Q.    And that was sold for six...

22         A.    625.

23         Q.    Yeah, I have that.

24         A.    Okay.  I don't know where 623 came from.

25         Q.    It doesn't matter.  If I wrote it down wrong

Page 134

```
 1    or if I misheard it, we'll get it right now.  It's

 2    being listed for 635.  There's no dispute about that,

 3    right?

 4         A.   I'm sorry?

 5         Q.   I said, there's no dispute about that; that

 6    is the right number, 635?

 7         A.   That's what I was told by Steve.

 8         Q.   Okay.  Oh, by the way, I did want to ask you,

 9    your log that was produced, did you mean to produce

10    everything, the whole log, or were there some pages

11    that weren't copied for whatever reason?

12         A.   Of my personal logbook?

13         Q.   Yeah.

14         A.   I believe they're all there.

15         Q.   Is it supposed to have the dates and the

16    various check-offs when you got certain certificates or

17    certain -- in the back of it?

18         A.   Yes, it does.  And she did not know to copy

19    that.  We can rectify that.

20         Q.   Okay.  I looked at it at lunch and I noticed

21    that.  It's not there, so...

22         A.   She didn't know to -- My secretary didn't

23    know that.

24         Q.   Okay.

25         A.   That was not an intentional omission.
```