**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

WILLIAM S. MONTGOMERY, JR., )
INDIVIDUALLY AND ON BEHALF OF )
ALL OTHERS SIMILARLY SITUATED; )
)
      Plaintiff, )
)
v. )     Civil Action No: 00-14284
)     Roettger/Lynch
THE NEW PIPER AIRCRAFT, INC., AND )
TEXTRON, INC. d/b/a )
TEXTRON LYCOMING; )
)
      Defendants. )
)

**NEW PIPER'S REPLY BRIEF IN SUPPORT OF ITS**
**SUMMARY JUDGMENT MOTION**

DOMBROFF & GILMORE, P.C.
Elizabeth Lim, Esq.
Florida Bar No.: 129755
1700 Miami Center
201 S. Biscayne Blvd.
Miami, Florida 331313
(305) 341-3145
Fax no. (305) 670-4846
email: elim@dglitigators.com

DOMBROFF & GILMORE, P.C.
Mark A. Dombroff, Esq.
Courtney R. Bateman, Esq.
1025 Thomas Jefferson St.,N.W.
Suite 300-West Lobby
Washington, D.C. 20007
(202) 965-6100
Fax No. (202) 625-3150
email:
cbateman@dglitigators.com

54/
DM

## Table of Contents

I    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    Plaintiff's Contention that FDUTPA Applies
           to a Texas Transaction Undertaken by a
           Texas Corporation and a Texas Citizen, in
           Texas, is Unpersuasive . . . . . . . . . . . . . 1

           1.    Case law precludes FDUTPA's application
                 to Montgomery's Mirage purchase . . . . . . 1
           2.    Plaintiff's attempt to recast this Texas
                 transaction as a Florida transaction is
                 unsuccessful   . . . . . . . . . . . . . . 2

     B.    Plaintiff Fails FDUTPA's Reasonable Consumer
           Test . . . . . . . . . . . . . . . . . . . . . . 5

           1.    Plaintiff's simultaneous embrace and
                 rejection of Millennium is disingenuous . . 5
           2.    Plaintiff's attempt to mischaracterize
                 Millennium's Reasonable Consumer Test
                 as "Subjective Reliance" is Unsuccessful  . 6
           3.    Plaintiff's use of a self-serving,
                 conclusory affidavit to prove that
                 Montgomery acted reasonably under FDUTPA,
                 in the face of contradictory evidence, is
                 rejected by precedent . . . . . . . . . . . 7

     C.    Montgomery Has Not Been Damaged Under FDUTPA . . 9

II   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 10

i

## TABLE OF AUTHORITIES

### Cases

Hall v. Burger King, 812 F. Supp. 1509 (S.D. Fla. 1995) . . 4,8,9

Millennium Communications & Fulfillment, Inc. v. Office
      of the Attorney General, 761 So. 2d 1256
      (Fla. Ct. App., 3rd Dist. 1999)  . . . . . . . . . 1,3,4,5,7

Zerby v. Nueromuscular Medical Centers, No. 98-1082,
      1999 U.S. Dist. LEXIS 212555 (M.D. Fla.
      November 24, 1999) . . . . . . . . . . . . . . . . . . 8

### Exhibits

Exhibit 1, Security Agreement

Exhibit 2, New Piper's Summary Judgment Memorandum

Exhibit 3, February 24, 2000 letter from William S. Montgomery
      to John S. Mastern, Textron Lycoming

Exhibit 4, Montgomery Affidavit

Defendant, The New Piper Aircraft, Inc. ("New Piper"), by and through its attorneys, respectfully submits its Reply Brief in support of its Summary Judgment Motion.

## I.   ARGUMENT

### A.   Plaintiff's Contention that FDUTPA Applies to a Texas Transaction Undertaken by a Texas Corporation and a Texas Citizen, in Texas, is Unpersuasive

Plaintiff, apparently convinced of the futility of his argument that FDUTPA applies to non-Floridians conducting foreign transactions, now attempts to recast his purchase of stock in a (1) Texas corporation, (2) in Texas, (3) to obtain an interest in a Mirage hangared in Texas, as a Florida transaction covered by FDUTPA. See Plaintiff Montgomery's Response to Defendant New Piper's Motion for Summary Judgment And Memorandum of Law in Support Thereof ("Pl. Opp.") at 3-10. This self-serving argument is not supported by case law, nor logic, and therefore fails as a matter of law.

#### 1.   Case law precludes FDUTPA's application to Montgomery's Mirage purchase

As discussed in New Piper's Summary Judgment Memorandum, FDUTPA does not cover (1) non-Florida transactions (2) undertaken by out-of-state consumers. Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General, 761 So. 2d 1256, 1262 (Fla. Ct. App., 3rd Dist. 1999) (holding "[a]s we read FDUTPA, it seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the

<u>territorial boundaries of (Florida)</u> . . . ." (emphasis added).

It is undisputed that Plaintiff is a lifelong Texas citizen and that he purchased 0MA from a Texas Corporation, outside of Florida. <u>See</u> Pl. Opp. at 3.

Therefore, as indicated in New Piper's Summary Judgment Memorandum, Plaintiff cannot recover under FDUTPA.

### 2.   **Plaintiff's attempt to recast this Texas transaction as a Florida transaction is unsuccessful**

Confronted with FDUTPA's inapplicability to Montgomery's Texas transaction, Plaintiff now attempts to recharacterize Montgomery's purchase as a wholly Florida transaction.  <u>See</u> Pl. Opp. at 3-10.  As support, Plaintiff contends that the "facts . . . establish that the unfair and deceptive trade practices complained of here were committed by the Defendants in Florida, where Piper has its principal place of business."   Pl. Opp. at 3.  This attempt to unilaterally enhance FDUTPA's scope is toothless.

<u>First</u>, Plaintiff misapprehends FDUTPA's scope by asserting

---

[1]     Plaintiff has cited <u>Millennium</u> for support no fewer than **seven** times in this litigation.  <u>See</u> Pl. Opp. at 6, 8, 10; Plaintiff's Memorandum of Law In Support of Response to Defendants' Rule 12(b) Motions to Dismiss and Plaintiff's Motion to Strike Documents Outside Pleadings ("Motion to Dismiss Opp.") at 6, 10; Plaintiff's Memorandum In Reply to Defendants' Opposition to Class Certification ("Class Reply") at 25; Plaintiff Montgomery's Response In Opposition to Defendants' Motions for Protective Order and to Stay Discovery and Memorandum In Support Thereof ("Stay Opp.") at 6.

[2]     Interestingly, Plaintiff does not offer a single case that stands for the proposition that FDUTPA applies to non-Florida transactions, undertaken by non-Floridians.  <u>See</u> Pl. Opp. at 3-10.

that FDUTPA applies to transactions that have a "substantial connection" to Florida. Id. at 3. Quite the contrary: FDUTPA only applies to transactions that occur in the territorial boundaries of Florida, as the case Plaintiff has cited **seven** times holds. See Millennium, So. 2d 1256 at 1262 (holding "[a]s we read FDUTPA, it seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of (Florida) . . . .") (emphasis added), cited in Pl. Opp. at 6, 8, 10; Motion to Dismiss Opp. at 6, 10; Class Reply at 25; Stay Opp. at 6. Interestingly, Plaintiff does not offer a single case that supports his newly minted "substantial connection" standard for FDUTPA applicability. Pl. Opp. at 3-8.

Second, Plaintiff's laundry list of New Piper's activities in Florida, ostensibly assembled to prove that a lifelong Texan's purchase of stock, in a Texas corporation, in Texas, in order to obtain an ownership interest in a Texas plane, is a Florida transaction covered by FDUTPA, is similarly flawed. See Pl. Opp. at 3-5. This is because **none** of the fifteen activities that supposedly make FDUTPA applicable to Montgomery's foreign transaction **involve Montgomery**. Id.

---

[1]    For example, Plaintiff offers the fact that "Piper sold Malibu Mirage aircraft directly from its Vero Beach, Florida headquarters," for support that FDUTPA applies to Montgomery, when Montgomery's purchase of 0MA was entirely transacted outside of Florida. See Security Agreement(indicating that the 0MA Security Agreement was executed by two Texas entities who agreed to a Texas choice of law provision), Exhibit 1. See also Pl. Opp. at 3 (Plaintiff concedes that the security agreement for

3

Third, perhaps cognizant that New Piper's general business activities in Florida do not enlarge FDUTPA's scope to include Texas transactions, Plaintiff then suggests that the "fact" that Montgomery (1) went to New Piper's training school in Vero Beach, Florida[3] and (2) according to a self-serving affidavit, was "misled by Defendant's misrepresentations (which emanated from Florida)" somehow transmutes this Texas transaction into a Florida transaction. See Pl. Opp. at 5.

As an initial matter, federal courts routinely hold that conclusory, self-serving affidavits cannot defeat a summary judgment motion. Hall v. Burger King, 812 F. Supp. 1509, 1556 (S.D. Fla. 1995). Therefore, Plaintiff's conclusory, and self-serving, affidavit regarding New Piper's "misrepresentations" does not militate against summary judgment.

Next, even if accepted as true, the "fact" that Montgomery visited Florida once, and was "misled" by New Piper's advertising materials, does not make Montgomery's purchase of a Texas airplane, from a Texas corporation, a Florida transaction covered by FDUTPA. See Millennium, So. 2d 1256 at 1262. Therefore, FDUTPA does not apply to Montgomery, and therefore summary judgment should be granted.

purchase of 0MA was executed in Texas).

[3]     New Piper does not operate the flight school where Montgomery received his training.  While the school is located at the Vero Beach Airport, it is not owned, operated, or supported financially by New Piper.

4

## B.   Plaintiff Fails FDUTPA's Reasonable Consumer Test
### 1.   Plaintiff's simultaneous embrace and rejection of Millennium is disingenuous

Perhaps aware that Montgomery patently fails FDUTPA's reasonable consumer test (as discussed below), Plaintiff attempts to delegitimize Millennium, a Florida case that Plaintiff, himself, has cited for support no fewer than **seven** times in this litigation.  See Pl. Opp. at 11.

Curiously, Plaintiff is now trying to distance himself from Millennium, because as discussed below, it has fatal consequences for his cause of action.  That is, if Millennium is bad law, then Plaintiff's argument that FDUTPA applies to out-of-state residents is eviscerated, and Montgomery's cause of action must be dismissed.  See Pl. Opp. at 10 (Plaintiff asserts that FDUTPA applies to out-of-state residents because the "the *Millennium/Renaissance* line of cases make more sense . . ." and describes Millennium as "authoritative") (italics in original).

If Millennium is good law, then Plaintiff must prove that Montgomery satisfies FDUTPA's Reasonable Consumer Test.  As demonstrated in New Piper's Summary Judgment Motion, recovery under FDUTPA is precluded in this matter because Montgomery cannot prove that New Piper's advertising/marketing materials were likely to mislead him acting reasonably under the

---

[5]   For examples of Plaintiff's dependence on Millennium, see Pl. Opp. 6, 8, 10 (Plaintiff asserts "the *Millennium/ Renaissance* line of cases make more sense . . ." and describes Millennium as "authoritative" ) (italics in original); Motion to Dismiss Opp. at 6,10; Class Reply at 25;Stay Opp. at 6.

5

circumstances.  See Millennium, 761 So. 2d at 1263.  See also

S.J. Memo. at 6-8, attached as Exhibit 2.

That is, Montgomery's vast personal history with the Mirage

precludes his assertion that he acted reasonably, vis-a-vis New

Piper's advertising and marketing materials, when he purchased

his second Mirage- especially considering that the alleged

misrepresentations contradicted his extensive personal experience

with, and wide-ranging personal knowledge of, the Mirage's

alleged engine troubles. Id.

**2.   Plaintiff's attempt to mischaracterize Millennium's Reasonable Consumer Test as "Subjective Reliance" is Unsuccessful**

In order to recover under FDUTPA, a plaintiff must prove

that the alleged misstatements are "likely to mislead the

consumer acting reasonably under the circumstances, to the

consumer's detriment." Millennium, 761 So. 2d at 1263 (emphasis

added).

Simply put: Plaintiff's mischaracterization of FDUTPA's

reasonableness requirement (necessary to prove causation under

the statute) as "subjective reliance," is disingenuous, at best.

New Piper has not suggested that Montgomery must rely upon the

advertising; nor has it argued that the higher standard of

reliance applies in FDUTPA cases. See New Piper's Summary

Judgment Memorandum, Exhibit 2.

However, FDUTPA does require consumers to prove **causation**

under the statute (not the heightened fraud standard of

reliance), which requires a showing that the alleged

misstatements are "likely to mislead the consumer acting

reasonably under the circumstances, to the consumer's detriment."

Millennium, 761 So. 2d at 1263 (emphasis added).

Therefore, Plaintiff's attempt to defeat summary judgment by

misidentifying FDUTPA's causation requirement of reasonableness

as "subjective reliance" is unpersuasive.

### 3. Plaintiff's use of a self-serving, conclusory affidavit to prove that Montgomery acted reasonably under FDUTPA, in the face of contradictory evidence, is rejected by precedent

There is a veritable mountain of evidence demonstrating that

Montgomery was aware of the AE2A engine's troubles, before he

purchased 0MA, which precludes recovery under FDUTPA's Reasonable

Consumer Test.  For example:

- On February 24, 2000, several months before purchasing the aircraft at issue here, Plaintiff wrote a letter to Textron Lycoming asserting that the Mirage fleet suffered endemic engine problems due to "either **systemic** improper manufacturing procedures or a fundamentally flawed design" and that there was an "extraordinary (Mirage engine) failure rate since it appears to have affected approximately 25% of the aircraft utilizing this (Textron Lycoming AE2A) engine." February 24, 2000 Letter from William S. Montgomery to John S. Mastern, Textron Lycoming,(the "Textron letter") Exhibit 3 (emphasis added).

- Plaintiff considered 0MA's price tag an "exceptionally good deal" because, at the time of purchase, "there were enough failures and they were widespread enough that people were beginning to figure out that this airplane had a systemic engine problem."  Montgomery Dep. Tr. 106:10-13; 176:14-19.

In short, Plaintiff believed that the Mirage's engine had

potentially catastrophic shortcomings, but decided to purchase

the plane anyway.  It is simply not credible that Montgomery

acted as a "reasonable consumer under the circumstances" when his

7

personal knowledge, experience, and beliefs flatly contradicted the misstatements allegedly contained in New Piper's advertising/marketing materials.

However, in a tacit admission that Montgomery must meet FDUTPA's rigorous Reasonable Consumer test, Plaintiff now attempts to contradict his **own** letter and testimony by submitting a self-serving affidavit. See Pl. Opp. at 15-18. Through this affidavit, Montgomery is attempting to mitigate the fatal consequences of his deposition testimony, and writings, under FDUTPA's Reasonable Consumer test. This end-run maneuver is precluded by relevant case law.

It is well-settled in Florida that conclusory, self-serving affidavits cannot defeat a summary judgment motion. Hall, 812 F. Supp. at 1556 (holding that "conclusory, self-serving affidavits will not suffice to defeat an otherwise well-supported motion for summary judgment"); Zerby v. Nueromuscular Medical Centers, No. 98-1082, 1999 U.S. Dist. LEXIS 212555, * 5 (M.D. Fla. November 24, 1999)(noting that "conclusory, self-serving or uncorroborated allegations in an affidavit . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment.").

By offering a self-serving affidavit that is patently contradicted by deposition testimony, Plaintiff's attempt to defeat summary judgment is rendered toothless by precedent.

Therefore, Plaintiff's attempt to contradict his own words and writings, by offering a self-serving affidavit, is

8

unsuccessful.

## C.   **Montgomery Has Not Been Damaged Under FDUTPA**

In its Summary Judgment Memorandum, New Piper demonstrated that Montgomery cannot recover under FDUTPA because **(1)** Montgomery has offered no evidence that the market value of 0MA has been negatively impacted and **(2)** Montgomery bought the plane with the full knowledge that the plane was selling for below market value due to engine difficulty.  See S.J. Memo. at 9-10, Exhibit 2, citing Montgomery Dep. Tr. 106:10-13; 176:14-19. Therefore, even if 0MA sells at below market value due to New Piper's advertising, Montgomery cannot be damaged because he purchased the plane at an already discounted cost.

As discussed above, federal courts routinely hold that conclusory, self-serving affidavits cannot defeat a summary judgment motion.  Hall, 812 F. Supp. at 1556(stating that conclusory, self-serving affidavits will not suffice to defeat an otherwise well-supported motion for summary judgment") (citations

---

    Plaintiff's last minute grasp of FDUTPA's unfairness prong is equally unpersuasive.  Plaintiff resorts to hyperbole and ad hominems, by suggesting that New Piper's **advertising** (1) offends public policy and (2) is immoral, unethical, oppressive, unscrupulous or substantially injurious.  See Pl. Opp. at 13.  In this regard, Plaintiff cites a self-serving collection of supposed Mirage design defects that do not relate to this FDUTPA litigation, in any capacity, including arguing that the "Mirage fails to meet even the minimum standards certified (sic) to the FAA."  Pl. Opp. at 13-15.  The Mirage's supposed FAA infirmities have simply **nothing** to do with Plaintiff's FDUTPA claim (which is predicated on "misrepresentations" concerning the longevity and reliability of the Mirage's engine), but instead are a transparent attempt to besmirch New Piper to this Court, in the guise of opposing summary judgment.

9

omitted).

Apparently unable to counter New Piper's demonstration of Montgomery's abject lack of damages, Plaintiff, once again, offers two self-serving damages affidavits to prove that he has been damaged.  See Pl. Opp. at 18-20.

Under applicable case law, Plaintiff's two self-serving affidavits cannot refute the inevitable conclusion that Montgomery cannot recover under FDUTPA, because he has not been damaged under the statute.

## II.   **CONCLUSION**

For the above stated reasons, Defendant's motion for summary judgment should be granted.

---

[7]   In February 2000, Montgomery informed Textron that the Mirage had "systemic problems" and an "extraordinary failure rate." See Lycoming Letter. Nonetheless, in May 2000, Montgomery purchased a 25% interest in a Mirage.  See Security Agreement, Exhibit 1. In October 2000, Montgomery filed this lawsuit alleging that "Mirage owners have consistently experienced premature failures that require engine overhaul or replacement . . . ." Am. Comp. At ¶ 9. Now, interestingly, Montgomery, under oath, swears that he was damaged because, after his deposition on March 1,2001, he purchased the remaining shares of OMA to become its sole owner, at a reduced cost. Mont. Aff. at 13, Exhibit 4.

If OMA is as replete with infirmities as Montgomery suggests, it is patently illogical that a "person acting reasonably under the circumstances" would desire, and ultimately purchase, more of such a "damaged" plane.

Dated: June ___, 2001          Respectfully submitted

DOMBROFF & GILMORE, P.C.
Elizabeth Lim, Fla.Bar No.129755
1700 Miami Center
201 S.Biscayne Blvd.
Miami, Florida 33131
(305) 341-3145
Fax:(305)670-4846
email: elim@dglitigators.com


DOMBROFF & GILMORE, P.C.
Mark A. Dombroff, Esq.
Courtney R. Bateman, Esq.
1025 Thomas Jefferson St., N.W.
Suite 300-West Lobby
Washington, D.C. 20007
(202) 965-6100
Fax No. (202) 625-3150
email: cbateman@dglitigators.com

**COUNSEL FOR DEFENDANT NEW PIPER
AIRCRAFT, INC.**

782493

11

## CERTIFICATE OF SERVICE

I hereby certify that a copy of New Piper's Reply Brief in Support of its Summary Judgment Motion was sent via first class mail on this the 21ˢᵗ day of June, 2001, as indicated on the attached Service List.

By: _____
Elizabeth Lim, Esq.
Florida Bar No.: 129755

## MONTGOMERY SERVICE LIST

Michael J. Pucillo, Esq.
R. Scott Palmer, Esq.
Manuel J. Dominguez, Esq.
**BURT & PUCILLO, LLP**
Northbridge Centre, Suite 1701
515 North Flagler Drive
West Palm Beach, Florida 33401
Telephone: (561) 835-9400
Facsimile: (561) 835-0322
**COUNSEL FOR PLAINTIFF**

Fred Misko, Jr., Esq.
Charles A. Ames, Esq.
**FRED MISKO, JR., P.C.**
3811 Turtle Creek Blvd., 19ᵗʰ Floor
Dallas, Texas 75219
Telephone: (214) 443-8000
Facsimile: (214) 443-8010
**COUNSEL FOR PLAINTIFF**

William Whitehurst, Jr., Esq.
Tom Harkness, Esq.
**WHITEHURST, HARKNESS, OZMUN & ARCHULETA**
24ᵗʰ Floor, Westgate Building
12ᵗʰ and Lavaca Street
Austin, Texas 78701
Telephone:       (512)476-4346
Facsimile:       (512)476-4400
**COUNSEL FOR PLAINTIFF**

R. Michael McCauley, Esq.
**McCAULEY, MacDONALD, DEVIN & HUDDLESTON**
1201 Elm Street, 3800 Renaissance Tower
Dallas, Texas 75270
Telephone:       (214)651-3301
Facsimile:       (214)747-0942
**COUNSEL FOR PLAINTIFF**

James L. Branton, Esq.
**BRANTON & HALL**
1 Riverside Place
700 North St. Mary's Street
San Antonio, Texas 78205
Telephone:       (210)224-4474
Facsimile:       (210)224-1928
**COUNSEL FOR PLAINTIFF**

Benjamine Reid, Esq.
Joseph Ianno, Jr., Esq.
**CARLTON, FIELDS,WARD, EMMANUEL**
**SMITH & CUTLER, P.A.**
4000 International Place
100 S.E. Second Street
Miami, Florida 33131
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
**COUNSEL FOR AVCO CORP.**
**(incorrectly named in the Amended Complaint**
**as Textron, Inc., d/b/a Textron Lycoming)**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Agreement") dated as of June 1, 2000, is made by Steven K. Boyd, (the "Lender"), an individual, which has its principal place of residence at 5218 Spicewood, Frisco, Texas 75034, to William Montgomery, (the "Grantor"), with offices at 1470 Reverchon Plaza 3500 Maple Ave.  Dallas, TX 75219.

### W I T N E S S E T H:

WHEREAS, Grantor has executed and delivered to the Lender a promissory note of even date herewith made by the Grantor payable to the order of the Lender in the original principal amount of $125,000.00, payable as provided therein (the "Note"); and

WHEREAS, the parties hereto desire to enter into this Agreement to secure the payment and performance of the Note on the terms set forth herein;

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby agrees with the Lender as follows:

Section 1.    Grant of Security.    The Grantor hereby assigns, pledges and grants to the Lender for its benefit a security interest in all of the Grantor's right, title and interest in and to the following (collectively, the "Collateral"):

### 230 shares in SKB Aviation.

The security interests granted hereby renew and extend all prior security interests heretofore granted by the Grantor to the Lender, such security interests to be governed pursuant to the terms of this Agreement.

Section 2.    Security for Obligations.    This Agreement secures the payment and performance of all debt, liabilities and obligations of the Grantor to the Lender, fixed or contingent, joint or several, now existing or hereafter arising, including but not limited to debt evidenced by the [Note], and all obligations of the Grantor now or hereafter existing under this Agreement and any other agreement or document executed in connection herewith, (all such obligations and liabilities of the Grantor being the "Obligations").

Section 3.    The Grantor Remains Liable.    Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Lender of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) the Lender shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall the

Lender be obligated to perform any of the obligations or duties of the Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4.     Representations and Warranties.  The Grantor represents and warrants as follows:

(a)     The Grantor owns the Collateral free and clear of any lien, security interest, charge or encumbrance except for the security interest created hereby in favor of the Lender.  No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of the Lender.

(b)     This Agreement creates a valid and perfected first priority security interest in the Collateral, securing the payment of the Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been, or will upon request be, duly taken.

(c)     No authorization, approval or other action by, and no notice to or other filing with, any governmental authority or regulatory body is required either (i) for the grant by the Grantor of the security interest granted hereby or for the execution, delivery or performance of this Agreement by the Grantor or (ii) for the perfection of or the exercise by the Lender of its rights and remedies hereunder (other than filing of financing statements).

Section 5.     Further Assurances.

(a)     The Grantor agrees that from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that the Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Grantor will: (i) mark conspicuously each document included in the Collateral and, at the request of the Lender, each of its records pertaining to the Collateral, with a legend, in form and substance satisfactory to the Lender, indicating that such document or Collateral is subject to the security interest granted hereby; (ii) after an Event of Default, transfer, register or otherwise put any of the Collateral in the name of the Lender or its nominee; and (iii) execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Lender may request, in order to perfect and preserve the security interest granted or purported to be granted hereby.

(b)     The Grantor hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Grantor where permitted by law (provided that the Lender furnishes to the Grantor a copy of each such statement filed, promptly after the filing thereof).  A carbon, photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

2

(c)     The Grantor will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail.

Section 6.     Insurance.

(a)     The Grantor shall, at its own expense, maintain insurance with respect to the Collateral in such amounts, against such risks, in such form and with such insurers, as shall be reasonably satisfactory to the Lender from time to time. Each policy for property damage insurance shall provide for all losses to be paid on behalf of the Lender and the Grantor as their respective interests may appear. Each such policy shall in addition (i) contain the agreement (if available) by the insurer that any loss thereunder shall be payable to the Lender notwithstanding any action, inaction or breach of representation or warranty by the Grantor, (ii) provide that there shall be no recourse against the Lender for payment of premiums or other amounts with respect thereto and (iii) provide that at least 10 days prior written notice of cancellation or of lapse shall be given to the Lender by the insurer. The Grantor shall, if so requested by the Lender, deliver to the Lender original or duplicate policies of such insurance and, as often as the Lender may reasonably request, a report of a reputable insurance broker selected by the Grantor with respect to such insurance. Further, the Grantor shall, at the request of the Lender, duly execute and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 5 hereof and cause the respective insurers to acknowledge notice of such assignment.

(b)     Reimbursement under any liability insurance maintained by the Grantor may be paid directly to the person who shall have incurred liability covered by such insurance.

(c)     All insurance payments in respect of Collateral shall be paid to and applied by the Lender as specified in Section 11(b).

Section 7.     Transfers and Other Liens. The Grantor shall not:

(a)     Sell, assign (by operation of law or otherwise) or otherwise dispose of any of the Collateral, except for the sale of inventory in the ordinary course of business.

(b)     Create or suffer to exist any lien upon or with respect to any of the Collateral to secure debt of any person, except for the security interest created by this Agreement.

Section 8.     Lender Appointed Attorney-in-Fact. The Grantor hereby irrevocably appoints the Lender the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time in the Lender's discretion at any time after the occurrence of an Event of Default under the [NOTE] has occurred and is continuing, to take any action and to execute any instrument which the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(i)    to obtain and adjust insurance required to be paid to the Lender pursuant to Section 6;

(ii)    to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(iii)    to receive, endorse, and collect any drafts or other instruments, documents and chattel paper, in connection with clause (i) or (ii) above; and

(iv)    to file any claims or take any action or institute any proceedings which the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral.

Section 9.    Lender May Perform. If the Grantor fails to perform any agreement contained herein, the Lender may itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable by the Grantor under Section 12(b).

Section 10.    Lender's Duties. The powers conferred on the Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

Section 11.    Remedies. If the Grantor shall fail or refuse to perform or comply in any material respect with any of its obligations under this Agreement and such refusal or failure is not cured within 15 days after the Lender gives notice thereof to the Grantor, or if any representation or warranty made by the Grantor herein proves to have been false in any material respect when made, or any Event of Default under the [NOTE] shall have occurred and be continuing:

(a)    The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the Uniform Commercial Code (the "Code") (whether or not the Code applies to the affected Collateral) and also may (i) require the Grantor to, and the Grantor hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to it and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) business days' notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of

4

sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     All cash proceeds received by the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable pursuant to Section 12) in whole or in part by the Lender against all or any part of the Obligations in such order as the Lender shall elect, subject to any mandatory provisions or applicable law. Any surplus of such cash or cash proceeds held by the Lender and remaining after payment in full of all the Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus.

If, in the opinion of the Lender, there is any question that a public or semipublic sale or distribution of any Collateral will violate any state or federal securities law, the Lender in its discretion (a) may offer and sell securities privately to purchasers who will agree to take them for investment purposes and not with a view to distribution and who will agree to imposition of restrictive legends on the certificates representing the security, or (b) may sell such securities in an intrastate offering under Section 3(a)(ll) of the Securities Act of 1933, as amended, and no sale so made in good faith by the Lender shall be deemed to be not "commercially reasonable" because so made.

The execution and delivery of this Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the payment of the Obligations and no security taken hereafter as security for payment of the Obligations shall impair in any manner or affect this Agreement, all such present and further additional security to be considered as cumulative security. Any of the collateral for, or any obligor on, any of the Obligations may be released without altering, varying or diminishing in any way the force, effect, lien, security interest, or charge of this Agreement as to the Collateral not expressly released, and this Agreement shall continue as a security interest and charge on all of the Collateral not expressly released until all the Obligations secured hereby have been paid in full.

This Agreement shall not be construed as relieving the Grantor from full recourse liability on the Obligations and any and all further and other indebtedness secured hereby and for any deficiency thereon.

Section 12.     Indemnity and Expenses.

(a)     The Grantor agrees to indemnify the Lender from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from the Lender's negligence or willful misconduct.

(b)     The Grantor will upon demand pay to the Lender the amount of any and all reasonable expenses, including the reasonable fees and disbursements of its counsel and of any experts and agents, which the Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Lender hereunder or (iv) the failure by the Grantor to perform or observe any of the provisions hereof.

Section 13.     Security Interest Absolute.  All rights of the Lender and security interests hereunder, and all obligations of the Grantor hereunder, shall be absolute and unconditional, irrespective of:

(i)     any lack of validity or enforceability of any Note or any other agreement or instrument relating thereto;

(ii)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of or any consent to any departure from any Note;

(iii)     any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; or

(iv)     any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Grantor, or a third party grantor of a security interest.

Section 14.     Amendments; Etc.  No amendment or waiver of any provision of this Agreement nor consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 15.     Addresses for Notices.  Unless otherwise provided herein, all notices, requests, consents, demands and other communications shall be in writing and shall be mailed, certified mail with return receipt requested, postage prepaid, or telegraphed, cabled, telexed, telecopied or otherwise physically delivered to their respective addresses as set forth herein, or, as to any party, to such other address as may be designated by it in written notice to all other parties.  All notices, requests, consents and demands hereunder will be effective, if addressed to the Lender or the Grantor as aforesaid, when mailed by certified mail, postage prepaid, return receipt requested, or upon delivery if telegraphed, cabled, telexed, telecopied or otherwise physically delivered, addressed as aforesaid.

Section 16.     Continuing Security Interest; Transfer of Note.  This Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon the Grantor, its successors and assigns and (ii) inure, together with the rights and remedies of the Lender hereunder, to the benefit of the Lender, its successors, transferees and assigns.  Upon the payment in full of the

6

Obligations, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Grantor. Upon any such termination, the Lender will, at the Grantor's expense, execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination.

Section 17.    Governing Law; Terms. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, except to the extent that the validity or perfection of the security interest hereunder, or remedies hereunder, in respect of any particular Collateral are governed by the laws of a jurisdiction other than the State of Texas. Terms used in Article 9 of the Uniform Commercial Code in the State of Texas are used herein as therein defined.

IN WITNESS WHEREOF, the Grantor has caused this Agreement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

WILLIAM S. MONTGOMERY JR.

By: _____
Its: _____

ATTEST:

_____
Secretary

7

## PROMISSORY NOTE

Dallas, Texas                                                                                                      June 1, 2000

William Montgomery (the "Maker"), for value received, hereby promises to pay to the order of Steven K. Boyd (together with any successors or assigns, the "Payee"), at the time and in the manner hereinafter provided, the principal sum of 125,000 Dollars ($ 125,000.00), together with interest computed thereon at the rate hereinafter provided. This Note shall be payable at the office of the Payee at 5218 Spicewood, Frisco, Texas 75034, or at such other address in Dallas County, Texas as the holder of this Note shall from time to time designate.

The outstanding principal amount of this Note shall bear interest from the date hereof until the due date at the rate of eight percent (8%) per annum. The principal amount of this Note shall be due and payable on June 30, 2002 or on such later date as may be agreed to in writing by Payee. Interest on the outstanding principal amount of this Note shall be payable monthly commencing July 1, 2000.

All sums of principal and interest past due under the terms of this Note shall bear interest at a per annum interest rate equal to the lesser of twelve percent (12%) per annum or the maximum rate allowed by law from the due date thereof until paid.

In the event of default hereunder and this Note is placed in the hands of an attorney for collection (whether or not suit is filed), or if this Note is collected by suit or legal proceedings or through bankruptcy proceedings, the Maker agrees to pay in addition to all sums then due hereon, including principal and interest, all expenses of collection, including, without limitation, reasonable attorneys' fees.

This Note may be prepaid in whole or in part from time to time, without premium or penalty. Each prepayment of principal shall be accompanied by an amount equal to the accrued interest on the principal amount prepaid to the date of such prepayment.

The Payee shall be entitled to accelerate this Note and declare all sums due hereunder immediately due and payable upon default by the Maker in any of its obligations hereunder.

The Maker and any and all sureties, guarantors and endorsers of this Note and all other parties now or hereafter liable hereon, severally waive grace, demand, presentment for payment, notice of dishonor, protest and notice of protest, notice of intention to accelerate, notice of acceleration, any other notice and diligence in collecting and bringing suit against any party hereto and agree (i) to all extensions and partial payments, with or without notice, before or after maturity, (ii) to any substitution, exchange or release of any security now or hereafter given for this Note, (iii) to the release of any party primarily or secondarily liable hereon, and (iv) that it will not be necessary for the holder hereof, in order to enforce payment of this Note, to first institute or exhaust such holder's remedies against the Maker or any other party liable therefor or against any security for this

Note. No delay on the part of the Payee in exercising any power or right under this Note shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power of right preclude further exercise of that power or right.

A security interest in SKB Aviation has been granted by Maker to the Payee to secure the payment of this Note pursuant to the terms and conditions of the Security Agreement, by and among the Maker, and Steven K. Boyd, dated as of June 1, 2000 (the "Security Agreement"), and to secure the payment of any costs and expenses incurred by the Payee in the collection and enforcement hereof.

The Maker understands that this Note may be pledged to secure certain obligations of the Payee and hereby consents to any such pledge.

All agreements between the Maker and the holder hereof, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity hereof, or otherwise, shall the amount paid, or agreed to be paid, to the holder hereof for the use, forbearance or detention of the funds advanced pursuant to this Note, or otherwise, or for the payment or performance of any covenant or obligation contained herein or in any other document or instrument evidencing, securing or pertaining to this Note exceed the maximum amount permissible under applicable law. If from any circumstances whatsoever fulfillment of any provision hereof or any other document or instrument exceeds the maximum amount of interest prescribed by law, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstances the holder hereof shall ever receive anything of value deemed interest by applicable law, which would exceed interest at the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance of this Note or on account of any other principal indebtedness of the Maker to the holder hereof, and not to the payment of interest, or if such excessive interest exceeds the unpaid principal balance of this Note and such other indebtedness, such excess shall be refunded to the Maker. All sums paid, or agreed to be paid, by the Maker for the use, forbearance or detention of the indebtedness of the Maker to the holder of this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between the Maker and the holder hereof.

This Note shall be governed by and construed in accordance with the laws of the State of Texas.

All references to the Maker herein shall, and shall be deemed to, include its successors and assigns, and all covenants, stipulations, promises and agreements contained herein by or on behalf of the Maker shall be binding upon its successors and assigns, whether so expressed or not.

2

MAKER

William S. Montgomery d.

By:_____

Its:_____

3

ADDENDUM TO NOTE AND SECURITY AGREEMENT

The Note and Security Agreement are not assignable. Montgomery will have the right to use the Malibu
N960MA ("aircraft") and, in the event such aircraft is sold for more than $600,000, Montgomery will have the
option to cancel the Note and Security Agreement, and further receive in cash from Steven K. Boyd and SKB
Aviation the difference between 25% of the sales proceeds of the aircraft and $125,000 in exchange for 230 shares
of SKB Aviation. Should the aircraft be sold for less than $600,000, Montgomery will have the option to cancel the
Note and Security Agreement and return 230 shares of SKB Aviation, and be obligated to pay Steve Boyd and SKB
Aviation the deficit between $125,000 and 25% of the sales proceeds.

WILLIAM S. MONTGOMERY

STEVEN K. BOYD

SKB AVIATION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

| | | |
|---|---|---|
| WILLIAM S. MONTGOMERY, JR., | ) | |
| INDIVIDUALLY AND ON BEHALF OF | ) | |
| ALL OTHERS SIMILARLY SITUATED; | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 00-14284 |
| | ) | Roettger/Lynch |
| THE NEW PIPER AIRCRAFT, INC., AND | ) | |
| TEXTRON, INC. d/b/a | ) | |
| TEXTRON LYCOMING; | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF NEW PIPER'S MOTION
## FOR SUMMARY JUDGMENT

DOMBROFF & GILMORE, P.C.
Elizabeth Lim, Esq.
Florida Bar No.: 129755
1700 Miami Center
201 S. Biscayne Blvd.
Miami, Florida 331313
(305) 341-3145
Fax no. (305) 670-4846
email: elim@dglitigators.com

DOMBROFF & GILMORE, P.C.
Mark A. Dombroff, Esq.
Courtney R. Bateman, Esq.
1025 Thomas Jefferson St., N.W.
Suite 300-West Lobby
Washington, D.C. 20007
(202) 965-6100
Fax No. (202) 625-3150
email: cbateman@dglitigators.com

## TABLE OF CONTENTS

I       INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II      STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.    New Piper's Malibu Mirage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.    William Montgomery's Extensive Mirage History . . . . . . . . . . . . . . . . . . . . . . 2

III     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    Plaintiff Cannot Recover Because FDUTPA Does Not Apply to
              Non-Florida Consumers Undertaking Out-of-State Transactions . . . . . . . . . 5

        C.    Montgomery Cannot Recover Because He Fails FDUTPA's
              Reasonable Consumer Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        D.    Montgomery Cannot Recover Under FDUTPA Because He Has
              Not Been Damaged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF AUTHORITIES

**Cases**

Coastal Physician Svcs. V. Ortiz, 764 So. 2d 7 (Fla. Ct. App., 4th Dist. 1999) . . . . . . . . . . . . . 5

Davich v. Norman Bros. Nissan, Inc., 739 So. 2d 138 (Fla. Ct. App., 5th Dist. 1999)
    reh'g denied, 760 So. 2d 947 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Delgado v. J.W. Courtesy Pontiac, 693 So. 2d 602 (Fla. Ct. App., 2d Dist. 1997) . . . . . . . . . . 5, 6

Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.,
    No. 96-8532-CIV, 1999 U.S. Dist. LEXIS 22434  (S.D. Fla. January 20, 1999) . . . . . . . . . 4, 5, 9

Himes v. Brown & Company Securities Corporation, 518 So. 2d 937
    (Fla. Ct. App., 3d Dist. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re: Crown Auto Dealerships, Inc., 187 B.R. 1009 (M.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . . 9

Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General,
    761 So. 2d 1256 (Fla. Ct. App., 3rd Dist. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6, 7

Oce Printing Systems USA, Inc. v. Mailer Data Servs., Inc.,
    760 So. 2d 1037, 1042 (Fla. Ct. App., 2d Dist. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Southwest Sunsites, Inc. v. Federal Trade Commission,
    785 F. 2d 1431 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Statutes and Rules**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Exhibits**

Exhibit 1, February 24, 2000 Letter from William S. Montgomery
    to John S. Mastern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 7, 8

Exhibit 2, Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7, 9

Exhibit 3, Undisputed Material Facts in Support of
    Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 4, Molly Martin Pearce Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 5, Deposition of William S. Montgomery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 6, Montgomery Deposition Transcript 4:19 - 5:23; 8:15 - 8:17 . . . . . . . . . . . . . . . . . . 2, 6

Exhibit 7, Montgomery Deposition Transcript 60:24 - 61:1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 8, Montgomery Deposition Transcript 76:3 - 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 7

Exhibit 9, Montgomery Deposition Transcript 227 - 229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 10, Montgomery Deposition Transcript 71:18 - 73:1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 11, Security Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

Exhibit 12, Montgomery Deposition Transcript 106:3 - 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 13, Security Agreement at WSM 01342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 14, Montgomery Deposition Transcript 106:10 - 13; 176:14 - 19 . . . . . . . . . . . . . 4, 8, 9

Exhibit 15, Montgomery Deposition Transcript 122:7 - 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

Exhibit 16, Montgomery Deposition Transcript 120:15 - 24; 149:17 - 25; 150:1 - 4 . . . . . . . . 4, 8

Exhibit 17, Montgomery Deposition Transcript 242:23 - 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

Exhibit 18, Montgomery Deposition Transcript 178:3 - 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

Exhibit 19, Montgomery Deposition Transcript 133:2 - 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhibit 20, Montgomery Deposition Transcript 132:25 - 134:7 . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Defendant, The New Piper Aircraft, Inc. ("New Piper"), by and through its attorneys, under Rule 56 of the Federal Rules of Civil Procedure, respectfully requests that the Court grant its summary judgment motion.

## I. **INTRODUCTION**

In this misguided cause of action, Plaintiff, a Texas citizen, who purchased stock in a Texas corporation, in Texas, in order to obtain an ownership interest in a Malibu Mirage hangared in Texas, is attempting to recover under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") when **(1)** FDUTPA does not apply to non-Floridians undertaking foreign, non-Florida transactions; **(2)** he patently fails to satisfy FDUTPA's "reasonable consumer" standard; and **(3)** he has not suffered any damages.

Underpinning Plaintiff's FDUTPA "claim" is the assertion that New Piper misrepresented the longevity and reliability of the Mirage's Textron Lycoming-designed TIO-540-AE2A engine, including statements that the Mirage offered a 2000 hour "TBO." [1] Am. Complaint at ¶ 8; 19. However, Montgomery's "claims" are belied by his own words. Indeed, before he bought the Mirage, Montgomery believed that: **(1)** the Mirage fleet suffered endemic engine problems due to "either systemic improper manufacturing procedures or a fundamentally flawed design" _and_ **(2)** that there was an "extraordinary (Mirage engine) failure rate since it appears to have affected approximately 25% of the aircraft utilizing this (Textron Lycoming AE2A) engine." February 24, 2000 Letter from William S. Montgomery to John S. Mastern, Textron Lycoming, exhibit 1.

---

[1]     "TBO" stands for "Time Between Engine Overhaul." A plane's TBO is similar to an automobile's suggested mileage before major service, e.g., 100,000 miles before dealer engine service.

1

As discussed below, this "square peg" of a case fails as a matter of law. Therefore, New

Piper's summary judgment motion should be granted.[2]

## II. STATEMENT OF FACTS

### A.    New Piper's Malibu Mirage[3]

New Piper manufactures Malibu Mirage aircraft, with Textron Lycoming TIO-540-AE2A

engines, in Vero Beach Florida. See Molly Martin Pearce Affidavit ( "Pearce Aff.") at ¶ 6,

exhibit 4. New Piper distributes Malibu Mirages to independent, regional distributors on an as-

ordered basis. Pearce Affidavit at ¶ 7, exhibit 4.

### B.    William Montgomery's Extensive Malibu Mirage History

Plaintiff is a lifelong Texas citizen. March 1, 2001 Deposition of William S.

Montgomery ("Montgomery Dep. Tr.") 4:19-5:23; 8:15-8:17, exhibit 6.[4]

In May 1998, Plaintiff purchased an ownership interest in his first Piper Malibu Mirage,

registration number 9285W (referred to as the "WOWAM" aircraft or "85 Whiskey").

Montgomery Dep. Tr. at 60:24-61:1, exhibit 7. In January 2000, WOWAM was involved in a

serious accident, a "gear-up landing," due to engine problems. Montgomery Dep. Tr. at 76:3-4,

---

[2]       Plaintiff is attempting to certify a nationwide class under this cause of action.
Amended Complaint ("Am. Comp.") at ¶ 17, attached as Exhibit 2. As demonstrated in New
Piper's Opposition to Class Certification papers, Plaintiff's class motion, like his FDUTPA
claim, fails as a matter of law.

[3]       Pursuant to Local Rule 7.5, New Piper has included a statement of undisputed
material facts in support of its motion for summary judgment, appended as exhibit 3.

[4]       The entire Montgomery Deposition is appended as Exhibit 5. Cited deposition
excerpts are attached as individual exhibits.

2

exhibit 8. Plaintiff believes that the WOWAM crash was caused by a connecting rod failure, which, in turn, led to a catastrophic engine failure. Montgomery Dep. Tr. at 227-229, exhibit 9.

Several months before purchasing his second Mirage, Plaintiff sent a letter to Textron Lycoming asserting that the Mirage fleet suffered endemic engine problems due to "either systemic improper manufacturing procedures or a fundamentally flawed design." See February 24, 2000 Letter from William S. Montgomery to John S. Mastern, Textron Lycoming, exhibit 11 to the March 1, 2001 Deposition of William S. Montgomery, appended here as exhibit 1 (emphasis added). In Montgomery's letter, Plaintiff contended that the Mirage Fleet suffered an "extraordinary failure rate since it appears to have affected approximately 25% of the aircraft utilizing [the Textron Lycoming AE2A] engine." Id., exhibit 1.

Nonetheless, in April 2000, Montgomery purchased a 25% ownership in a second Mirage, registration number N960MA (hereinafter "N960MA" or "0MA"). Montgomery Dep. Tr. at 71:18- 73:1 (delineating Montgomery's purchase of a half-interest of SKB Aviation, Inc. which owns half of 0MA), exhibit 10. The 0MA purchase transaction occurred entirely in Texas; no portion of this transaction occurred in Florida. See Security Agreement between William Montgomery and SKB (the "Security Agreement") (indicating that both parties are Texas entities agreeing to a Texas choice of law provision), exhibit 11.

At the time of purchase, 0MA was valued at $600,000. Montgomery Dep. Tr. 106:3-5, exhibit 12. See also Security Agreement at WSM 01342 (referencing the $600,000 price baseline), exhibit 13. Plaintiff considered 0MA's price tag an "exceptionally good deal" because, at the time of purchase, "there were enough failures and they were widespread enough that

3

people were beginning to figure out that this airplane had a systemic engine problem."

Montgomery Dep. Tr. 106:10-13; 176:14-19, exhibit 14.

In fact, Plaintiff bought into 0MA because its owners had a history of operating 0MA under revised engine parameters, due to the engine's shortcomings. See Montgomery Dep. Tr. 122:7-12, exhibit 15. Indeed, Plaintiff was cognizant that 0MA's current owners operated the plane using procedures and engine temperatures significantly different from those referenced in the Pilot's Operating Handbook. Montgomery Dep. Tr. 120:15-24; 149:17-25; 150:1-4, exhibit 16. Additionally, at the time of purchase, Montgomery knew that 0MA was experiencing an increase in fuel burn. Montgomery Dep. Tr. 242:23-25, exhibit 17. Moreover, Montgomery knew that the 0MA had not realized the 2,000 TBO. Montgomery Dep. Tr. 178:3-178:19 ("**Q.** And you knew that (0MA) had not made it to the 2,000 TBO when you bought it? **A.** Yes. **Q.** And you knew all that before you bought the plane? **A.** Yes. **Q.** And you bought it anyway? **A.** Yes."), exhibit 18.

Interestingly, 0MA is presently for sale at a price of $635,000, or $35,000 above its value when Montgomery purchased his interest. Montgomery Dep. Tr. 133:2-4, attached as exhibit 19.

## III. ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is proper when there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc., No. 96-8532-CIV, 1999 U.S. Dist. LEXIS 22434, *7 (S.D. Fla. January 20, 1999) (granting summary judgment to a FDUTPA claim) citing Fed.R.Civ.P. 56(c).

4

In order to defeat a summary judgment motion, the non-moving party may not rely on mere allegations, but instead must raise significant probative evidence sufficient for a jury to find in his favor.  Eclipse Medical, Inc., 1999 U.S. Dist. LEXIS 22434, at * 7.

## B.    Plaintiff Cannot Recover Because FDUTPA Does Not Apply to Non-Florida Consumers Undertaking Out-of-State Transactions

As an initial matter, Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") applies solely to in-state consumers.  See Oce Printing Systems USA, Inc. v. Mailer Data Servs., Inc., 760 So. 2d 1037, 1042 (Fla. Ct. App., 2d Dist. 2000) (holding that only Florida consumers can pursue a valid FDUTPA claim because "[o]ther states can protect their own residents") (citations omitted); Coastal Physician Svcs. v. Ortiz, 764 So. 2d 7, 8 (Fla. Ct. App., 4th Dist. 1999) (FDUTPA's application limited to "in-state consumers").  See also Delgado v. J.W. Courtesy Pontiac, 693 So. 2d 602, 606 (Fla. Ct. App., 2d Dist. 1997) (FDUTPA bestows substantive remedies on Florida citizens); Davich v. Norman Bros. Nissan, Inc., 739 So. 2d 138, 141 (Fla. Ct. App., 5th Dist. 1999) (accord), reh'g denied, 760 So. 2d 947 (Fla. 2000).

A few Florida courts, predominantly in the Third District Court of Appeals, have carved-out a limited exception to FDUTPA's scope by extending FDUTPA to non-Floridians undertaking wholly domestic, i.e., in-state, Florida transactions.  See Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General, 761 So. 2d 1256 (Fla. Ct. App., 3rd Dist. 1999).  However, even if the folly of extending FDUTPA to every United States citizen is accepted, these cases flatly do not stand for the proposition that FDUTPA covers (1) non-Florida transactions (2) undertaken by out-of-state consumers.  See Millennium Communication, 761 So. 2d at 1262 (holding "[a]s we read FDUTPA, it seeks to prohibit unfair,

5

deceptive and/or unconscionable practices which have transpired within the territorial boundaries of (Florida) . . . .") (emphasis added).

Further, extending FDUTPA to out-of-state residents, conducting non-Florida transactions, would result in absurd consequences. For example, under Plaintiff's read of FDUTPA, a Maine resident, buying a Malibu Mirage in California, from a Nebraska dealer, after receiving marketing materials in Hawaii, would have a cause of action under Florida's consumer protection laws- simply because the manufacturer of the plane, New Piper, conducts business in Florida. In other words, under the analysis Plaintiff must advocate, and has the burden to prove, FDUTPA applies to all United States residents undertaking non-Florida transactions, as long as the defendant conducts business in Florida- an ill-founded conclusion, and certainly not what the Florida Legislature intended when enacting FDUTPA. See Delgado, 693 So. 2d at 606 (FDUTPA bestows substantive remedies on citizens of the state of Florida).

Plaintiff is a lifelong Texas citizen. Montgomery Dep. Tr. 4:19-5:23; 8:15-8:17, exhibit 6. Plaintiff's purchase of 0MA was entirely transacted outside of Florida. See Security Agreement between William Montgomery and SKB (the "Security Agreement") (indicating that the 0MA Security Agreement was executed by two Texas entities who agreed to a Texas choice of law provision), exhibit 11.

Therefore, Plaintiff cannot recover under FDUTPA.

## C. Montgomery Cannot Recover Because He Fails FDUTPA's Reasonable Consumer Test

Even if FDUTPA applies to foreign residents undertaking foreign transactions, Plaintiff still cannot recover, because he fails FDUTPA's reasonable consumer test.

6

In order to recover under FDUTPA, a plaintiff must prove that the alleged misstatements are "likely to mislead the <u>consumer acting reasonably under the circumstances</u>, to the consumer's detriment." <u>Millennium Communications</u>, 761 So. 2d at 1263 (emphasis added), <u>citing</u> <u>Southwest Sunsites, Inc. v. Federal Trade Commission</u>, 785 F. 2d 1431 (9th Cir. 1986).

The gravamen of Plaintiff's complaint is that New Piper misrepresented the longevity and reliability of the Mirage's TIO-540-AE2A engine, including misrepresenting that the Mirage had a 2000 hour TBO. Am. Complaint at ¶¶ 8; 19. Even assuming the veracity of Plaintiff's allegations, which New Piper vigorously denies, Plaintiff still cannot recover under FDUTPA because he cannot prove that New Piper's advertising/marketing materials were likely to mislead him acting reasonably under the circumstances. <u>See Millennium Communications</u>, 761 So. 2d at 1263. That is, Montgomery's vast personal history with the Mirage precludes his assertion that he acted reasonably, vis-a-vis New Piper's advertising and marketing materials, when he purchased his second Mirage- especially considering that the alleged misrepresentations contradicted his extensive personal experience with, and wide-ranging personal knowledge of, the Mirage's alleged engine troubles. <u>See Millennium Communications</u>, 761 So. 2d at 1263.

In this regard, there is a veritable mountain of evidence demonstrating that Montgomery was aware of the AE2A engine's troubles, before he purchased 0MA. For example:

- Montgomery's first plane was involved in a life-threatening accident, due to engine trouble, fewer than four months before buying 0MA. Montgomery Dep. Tr. at 76:3-4, exhibit 8.

- On February 24, 2000, several months <u>before</u> purchasing his second Mirage, Plaintiff wrote a letter to Textron Lycoming asserting that the Mirage fleet suffered endemic engine problems due to "either **systemic** improper manufacturing procedures or a fundamentally flawed design." February 24, 2000 Letter from William S. Montgomery to John S. Mastern, Textron Lycoming, exhibit 1 (emphasis added).

- In the Textron-Lycoming Letter, Plaintiff suggested that there was an "extraordinary (Mirage engine) failure rate since it appears to have affected approximately 25% of the aircraft utilizing this [Textron Lycoming AE2A] engine." Id.

- Plaintiff considered 0MA's price tag an "exceptionally good deal" because, at the time of purchase, "there were enough failures and they were widespread enough that people were beginning to figure out that this airplane had a systemic engine problem." Montgomery Dep. Tr. 106:10-13; 176:14-19, exhibit 14.

- Plaintiff bought into 0MA because its owners had a history of operating 0MA under revised engine parameters, due to the AE2A engine. See Montgomery Dep. Tr. 122:7-12, exhibit 15.

- Plaintiff was cognizant that 0MA's current owners operated the plane using procedures and engine temperatures significantly different from those referenced in the Pilot's Operating Handbook, due to the engine. See Montgomery Dep. Tr. 120:15-24; 149:17-25; 150:1-4, exhibit 16.

- Before purchase, Plaintiff knew that 0MA was experiencing an increase in fuel burn. Montgomery Dep. Tr. 242:23-25 exhibit 17.

- At the time of purchase, Plaintiff knew that the 0MA had not realized the 2,000 TBO. Montgomery Dep. Tr. 178:3-178:19 exhibit 18 ("**Q.** And you knew that (0MA) had not made it to the 2,000 TBO when you bought it? **A.** Yes. **Q.** And you knew all that before you bought the plane? **A.** Yes. **Q.** And you bought it anyway? **A.** Yes.")

In short, Plaintiff believed that the Mirage's engine had potentially catastrophic

shortcomings, but decided to purchase the plane anyway. It is simply not credible that

Montgomery acted as a "reasonable consumer under the circumstances," when his personal

knowledge, experience, and beliefs flatly contradicted the misstatements allegedly contained in

New Piper's advertising/marketing materials.

Therefore, Plaintiff fails the reasonable consumer test, and therefore cannot recover under

FDUTPA.

**D.     Montgomery Cannot Recover Under FDUTPA Because He Has Not Been Damaged**

Proof of damages is required for recovery under FDUTPA. Eclipse Medical, Inc. v.

American Hydro-Surgical Instruments, Inc., No. 96-8532-CIV, 1999 U.S. Dist. LEXIS 22434,

\* 58 (S.D. Fla. January 20, 1999) (rejecting FDUTPA claim due to a lack of damages); In re:

Crown Auto Dealerships, Inc., 187 B.R. 1009, 1018 (M.D. Fla. 1995) (holding that damages are

necessary to establish a FDUTPA claim); Himes v. Brown & Company Securities Corporation,

518 So. 2d 937, 938 (Fla. Ct. App., 3d Dist. 1987) (no recovery under FDUTPA where plaintiff

sustained no out-of-pocket losses).  Under FDUTPA, recoverable damages are limited to the

market value diminution caused by the deceptive trade practice. Eclipse Medical, 1999 U.S.

Dist. LEXIS at \* 58.

Under FDUTPA, Plaintiff has not been damaged for several reasons. First, Montgomery

has offered no evidence that the market value of 0MA has been negatively impacted. See Am.

Comp. Quite the contrary: less than a year after purchasing 0MA, the plane has been listed to

sell at $635,000; $35,000 dollars more than the value of the plane at the time of purchase- a gain

of almost six percent! Montgomery Dep. Tr. 132: 25- 134:7, exhibit 20. Second, Montgomery

bought the plane with the full knowledge that the plane was selling for below market value due

to engine difficulty. Montgomery Dep. Tr. 106:10-13; 176:14-19, exhibit 14. Therefore, even if

0MA sells at below market value due to New Piper's advertising, Montgomery cannot be

damaged because he purchased the plane at an already discounted cost. In other words, the

"diminished" value of the plane, if any, was absorbed in the 0MA's below-market price at the

time of Montgomery's purchase. By definition, Montgomery cannot "double dip" and recover

9

damages for the plane's diminished sales price, after already capitalizing on 0MA's lowered value at the time of purchase.

Therefore, Montgomery cannot recover under FDUTPA, because he has not been damaged under the statute.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment should be granted.

Dated: May 24, 2001

Respectfully submitted,

DOMBROFF & GILMORE, P.C.
Elizabeth Lim, Esq.
Florida Bar No.: 129755
1700 Miami Center
201 S. Biscayne Blvd.
Miami, Florida 331313
(305) 341-3145
Fax no. (305) 670-4846
email: elim@dglitigators.com

DOMBROFF & GILMORE, P.C.
Mark A. Dombroff, Esq.
Courtney R. Bateman, Esq.
1025 Thomas Jefferson St., N.W.
Suite 300-West Lobby
Washington, D.C. 20007
(202) 965-6100
Fax No. (202) 625-3150
email: cbateman@dglitigators.com

**COUNSEL FOR DEFENDANT NEW PIPER
AIRCRAFT, INC.**

781828

10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

| | | |
|---|---|---|
| WILLIAM S. MONTGOMERY, JR., | ) | |
| INDIVIDUALLY AND ON BEHALF OF | ) | |
| ALL OTHERS SIMILARLY SITUATED; | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 00-14284 |
| | ) | Roettger/Lynch |
| THE NEW PIPER AIRCRAFT, INC., AND | ) | |
| TEXTRON, INC. d/b/a | ) | |
| TEXTRON LYCOMING; | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

## ORDER GRANTING NEW PIPER'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE, having come before the Court upon the Motion filed herein, and after

having duly reviewed the pleadings, it is hereby

ORDERED AND ADJUDGED as follows:

New Piper's Motion is GRANTED. The Court hereby enters summary judgment in favor

of defendant New Piper.

DONE AND ORDERED this ___ day of _____, 2001.


_____
NORMAN C. ROETTGER
District Court Judge


781725

## CERTIFICATE OF SERVICE

I hereby certify that a copy of New Piper's Motion for Summary Judgment, along with

the proposed order and memorandum, was sent via first class mail on this the 24th day of May,

2001, as indicated on the attached Service List.

By: _____
Elizabeth Lim, Esq.
Florida Bar No.: 129755

## MONTGOMERY SERVICE LIST

Michael J. Pucillo, Esq.
R. Scott Palmer, Esq.
Manuel J. Dominguez, Esq.
**BURT & PUCILLO, LLP**
Northbridge Centre, Suite 1701
515 North Flagler Drive
West Palm Beach, Florida 33401
Telephone: (561) 835-9400
Facsimile: (561) 835-0322
**COUNSEL FOR PLAINTIFF**

Fred Misko, Jr., Esq.
Charles A. Ames, Esq.
**FRED MISKO, JR., P.C.**
3811 Turtle Creek Blvd., 19th Floor
Dallas, Texas 75219
Telephone: (214) 443-8000
Facsimile: (214) 443-8010
**COUNSEL FOR PLAINTIFF**

William Whitehurst, Jr., Esq.
Tom Harkness, Esq.
**WHITEHURST, HARKNESS, OZMUN & ARCHULETA**
24th Floor, Westgate Building
12th and Lavaca Street
Austin, Texas 78701
Telephone:    (512)476-4346
Facsimile:     (512)476-4400
**COUNSEL FOR PLAINTIFF**

R. Michael McCauley, Esq.
**McCAULEY, MacDONALD, DEVIN & HUDDLESTON**
1201 Elm Street, 3800 Renaissance Tower
Dallas, Texas 75270
Telephone:    (214)651-3301
Facsimile:     (214)747-0942
**COUNSEL FOR PLAINTIFF**

James L. Branton, Esq.
**BRANTON & HALL**
1 Riverside Place
700 North St. Mary's Street
San Antonio, Texas 78205
Telephone:    (210)224-4474
Facsimile:    (210)224-1928
**COUNSEL FOR PLAINTIFF**

Benjamine Reid, Esq.
Joseph Ianno, Jr., Esq.
**CARLTON, FIELDS,WARD, EMMANUEL
SMITH & CUTLER, P.A.**
4000 International Place
100 S.E. Second Street
Miami, Florida 33131
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
**COUNSEL FOR AVCO CORP.**
**(incorrectly named in the Amended Complaint
as Textron, Inc., d/b/a Textron Lycoming)**

WILLIAM S. MONTGOMERY JR.
3500 MAPLE AVENUE, SUITE 1470
DALLAS, TEXAS 75219

Mr. John S. Masten
Textron-Lycoming
625 Oliver Street
Williamsport, PA  17701

February 24, 2000

RE: 1997 Malibu Mirage N9285W
OWNER: Wowam LLC

Dear Mr. Masten,

    As you are aware this aircraft suffered a catastrophic engine failure on January 2,
2000 at approximately 1:30 AM MDT at an altitude of 14,000' in IFR conditions. The pilot,
Mr. John Vann is a member and 50% owner of Wowam LLC, the owner of the aircraft. He
declared an emergency to ATC and was able to complete an emergency landing just short of
the Bullhead City airport. The FAA and the NTSB were called in sometime during the next
24 hours. The FAA "tagged" the engine. The aircraft was then moved from the side of the
runway to a hanger to await further inspection by Textron-Lycoming, The New Piper
Aircraft (hereinafter "Piper"), AIG, the insurance company for the aircraft and myself

    At the time of the accident the aircraft was 2 ½ years old and had 857 hours total
time on both the airframe and engine. Recommended Factory TBO on this model of the
Lycoming 540 engine is 2000 hours.

    The engine was inspected on February 10th, 2000 at the facilities of Lynn's Aircraft
Engines, Inc., an engine overhauler located in Mohave Valley, Arizona.  Among those
present were representatives from the FAA, NTSB, AIG Insurance, Textron-Lycoming, and
Piper.  The examination revealed that the # 5 connecting rod was in five pieces.  The
crankcase was also cracked in two places.  The metallurgical analysis of these parts is
scheduled to be performed at Seal Labs in El Segundo, California on March 7th, 2000.  Your
representative at the teardown, Mr. Charles Ward, agreed that the connecting rod failed due
to fatigue.  There were no prior indications of metal in the engine oil.  We followed the
factory recommended oil change and analysis by an authorized Piper maintenance facility.

    We believe that the evidence clearly indicates that this was a premature
catastrophic engine failure due to either systemic improper manufacturing procedures or a
fundamentally flawed design.  It is our understanding that at a recent Piper Distributor
meeting Mr. Mike Wolf of Textron-Lycoming informed those present that there have been
more than 40 failures of this engine in the Malibu Mirage since 1996, and that these failures
occurred between 300 and 800 hours of engine time.  He also stated that Textron-Lycoming

214.521.5881                    MM9285W@SWBELL.COM                    FACSIMILE 214.521.5889

· was working on a "fix" for this problem. This is an extraordinary failure rate since it appears to have affected approximately 25% of the aircraft utilizing this engine. We have reason to believe that Piper and Textron-Lycoming were made aware of this problem prior to 1997 in writing and continued to manufacture and sell these aircraft with these engines regardless.

The aircraft was heavily damaged. Initial repair estimates range between $165,730 and $212,385, not including the engine or propeller. Some of the parts necessary to rebuild the aircraft are made to order by Piper and could take many months to obtain. We are very concerned that the integrity of the pressure vessel of this aircraft can be successfully repaired or maintained. Our insurance carrier insists that the insurance coverage does not cover the loss of the engine or the substantial diminution in value of our aircraft. Before purchasing the Mirage, we considered options of pre-owned aircraft, and rejected not only aircraft with Damage History, but also all pre-owned aircraft, because we wanted the added integrity that supposedly comes with a new plane. We wanted the "state of the art" full IFR certified single piston engine aircraft.   We do not want to own a damaged aircraft under any circumstances. For this luxury we paid a premium and you and Piper were beneficiaries of this "Premium". It is our opinion that not only Textron-Lycoming but also Piper have responsibility for the losses that we have incurred.

We therefore are placing you on notice that we expect a speedy resolution of this matter. We will settle our claim in exchange for a new (1999 or 2000 model) Malibu Mirage. We understand that Piper can make a new aircraft available within the next thirty days. We will "trade titles" and you may dispose of the remains of our old aircraft as you see fit.

We have been most patient and cooperative up to this point. You have had almost two months to wait for teardown and inspections. Now that the cause is known, there is no reason not to expedite the conclusion of this matter, and get us in the air again. Should you not resolve this situation quickly, we intend to prosecute this matter to the fullest extent of the law, including loss of use expenses, replacement transportation costs, and any applicable punitive damages.

Sincerely,

W.S.Montgomery
Manager, Wowam LLC



TRANSMISSION VERIFICATION REPORT

```
TIME : 03/01/2000 16:33
NAME : AIR SAFETY & RECORDS
FAX  : 5617700344
TEL  : 5615674361
```



```
DATE, TIME       03/01 16:31
FAX NO./NAME     19733790923
DURATION         00:02:16
PAGE(S)          06
RESULT           OK
MODE             STANDARD
                 ECM
```

## AFFIDAVIT OF WILLIAM S. MONTGOMERY, JR.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned notary, on this day, personally appeared William S. Montgomery, Jr., a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.      "My name is William S. Montgomery, Jr. I am capable of making this affidavit and the facts set forth in this affidavit are true and correct of my personal knowledge.

2.      "I am the proposed representative for the class in the above-captioned lawsuit.

3.      "When this lawsuit was filed, I was a co-owner of two Malibu Mirage aircraft. The first was a 1997 Malibu Mirage, registration number N9285W ("85 Whiskey"), which I purchased an ownership interest in during 1998. I co-own with John Vann the corporation, (WOWAM, L.L.C.) which is the title owner of the aircraft.

4.      "Before I purchased an interest in 85 Whiskey, I knew about the performance characteristics of the aircraft from New Piper's and Textron's marketing materials, from my conversations with other owners and pilots, and from reading various aviation industry publications about the aircraft. From these resources, I knew that the Mirage's engine had a 2000 hour "time between overhaul" or TBO, and I believed it to be a safe and reliable aircraft. I had also researched the market value of the Mirage fleet through Trade-a-Plane, Aircraft Controller, the Malibu Mirage Owners and Pilots Association (MMOPA) newsletters, and other publications.

5.      "85 Whiskey, however, never made it to its 2000 hour TBO. Shortly after midnight on January 2, 2000, while my partner John Vann was piloting 85 Whiskey over the mountains from Las Vegas to Palm Springs, the engine failed catastrophically. The engine failure required an emergency gear-up landing, which John Vann accomplished just short of the runway at the Bullhead City Airport in Bullhead City, Arizona. The aircraft was damaged beyond repair.

6.    "Obviously, I was gravely concerned at the time about our loss of a very expensive aircraft, especially one that had only 857 total hours on its engine when it catastrophically failed. I believed, though, that the engine failure in 85 Whiskey was an isolated incident, not the result of a defect or problem that affected the entire Malibu Mirage fleet. In the context of my protracted negotiations with Textron Lycoming over the engine teardown and inspection of the 85 Whiskey, I did send a letter to John Masten at Textron Lycoming that raised allegations of problems with the Malibu Mirage's engine. But it was my belief at the time that 85 Whiskey's engine failure was an isolated incident. The allegations in my letter, if anything, were meant to force Textron Lycoming to replace the 85 Whiskey with a new Malibu Mirage without resorting to a lawsuit.

7.    "It soon became apparent to me, however, that we were going to be in for a long battle with both the insurers and manufacturers of 85 Whiskey. Therefore, I decided to look into the purchase an interest in another Malibu Mirage because the Malibu Mirage aircraft fit my mission profile; I had significant experience in piloting the Mirage due to my ownership in 85 Whiskey; I had invested a substantial amount of money in training in the Mirage, and I was still convinced that the Mirage aircraft was safe and reliable. In April 2000, I met with Steven Boyd to discuss purchasing a share of his interest in a 1996 Malibu Mirage aircraft, registration number N960MA ("60 Mike Alpha"). This aircraft was identical to 85 Whiskey in terms of panel layout and equipment. I reviewed the logbooks for the aircraft and discussed the aircraft's history with its owners. Finding the aircraft to be in good repair, and still believing that the engine failure of 85 Whiskey was an isolated incident, I decided to purchase an ownership interest in 60 Mike Alpha.

8.    "I negotiated a business deal with Steve Boyd to purchase a one-half interest in his corporation SKB Aviation, L.L.C. which co-owned Mike Alpha with another corporation, J.M.S. Aviation, L.L.C. Because I purchased one-half of SKB Aviation, I became an owner of a 25% interest in 60 Mike Alpha. The price for my 25% interest in 60 Mike Alpha was based on a total purchase price of $600,000. My ownership interest, therefore, cost me $150,000. I believed this to be a bargain in that the purchase price was $150,000 less than what I had paid two years before for a one year newer airplane. I had no reason at the time to suspect that the $600,000 price for the aircraft was due to any engine problem in the Mirage fleet.

9.    "Since I purchased an interest in 60 Mike Alpha, I have become well-acquainted with this particular aircraft, its qualities and characteristics, and its market value. I have personally piloted the aircraft over 100 hours and have kept track of and participated in its maintenance and upkeep over the past year. This is in addition to my knowledge of the Malibu Mirage aircraft from my years of ownership of 85 Whiskey and my knowledge of the Mirage's market value from my own research over the past four years

10.    "In August 2000, Textron Lycoming issued Special Advisory 59-800 requiring Mirage operators to change the oil after every ten hours of flight time and submit a sample for an oil analysis until such time as the connecting rod bearings in the aircraft's engine had been replaced. If any metal was detected the aircraft was to be grounded.

AFFIDAVIT OF WILLIAM S. MONTGOMERY - PAGE 2

11.     "Although my co-owners and I initially determined to comply with the ten hour oil changes and oil analysis but not have the connecting rod bearings replaced because of the high total engine time (1450 hours), we decided to have the connecting rod bearings replaced after Textron Lycoming issued its Mandatory Service Bulletin No. 547 in March 2001. 60 Mike Alpha was sent to an approved facility for the mandatory connecting rod bearing replacement.

12.     "Because of the October 2000 Special Advisory, which amounted to an admission on the part of the company that the Mirage had a defective engine, this class action lawsuit was filed with me as the class representative. My co-owners in 60 Mike Alpha refused to join the lawsuit as additional class representatives for fear of retaliation from New Piper and Textron Lycoming.

13.     "I have now purchased 60 Mike Alpha from J.M.S. Aviation, L.L.C., the aircraft's owner of record. The negotiated purchase price for Mike Alpha was $505,000. When I originally purchased an interest in this plane in April of 2000, it was based upon a value of $600,000. The $95,000 reduction in value partially reflects the diminished value of the plane due to the mandatory bearing service bulletin required of its engine. This diminution in value for the aircraft is consistent with what I have seen in the market for Malibu Mirages since New Piper and Textron issued the bearing recall in October 2000, together with the increasing awareness on the part of the pilot community that there are serious safety issues with regards to this engine. It is my opinion based on my knowledge of this particular aircraft and the Malibu Mirage marketplace that the total diminished value for Mike Alpha is at least $95,000.00.

14.     "As part of the purchase, J.M.S. Aviation, L.L.C. has assigned to me individually all of its rights and claims against The New Piper Aircraft, Inc. and Textron, Inc. arising from the aircraft, including the diminished value for the aircraft resulting from the defendants' conduct that is complained of in this lawsuit. True and correct copies of the documents showing this transaction are included as Exhibit A to this affidavit.

"Further, affiant sayeth not."

AFFIDAVIT OF WILLIAM S. MONTGOMERY - PAGE 3

_____
WILLIAM S. MONTGOMERY, JR.

SWORN TO and SUBSCRIBED before me on this the ____8ᵗʰ____ day of June, 2001.



BREIGH A. RUSSELL
Notary Public, State of Texas
My Commission Expires 5-18-03

_____
Notary Public in and for
the State of Texas

**AFFIDAVIT OF WILLIAM S. MONTGOMERY - PAGE 4**